**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on May 3, 2018**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Criminal No.:** |
| | ) | |
| **v.** | ) | **Violation:  18 U.S.C. § 1001** |
| | ) | **(False Statement)** |
| **JAMES A. WOLFE** | ) | |

**INDICTMENT**

The Grand Jury charges:

**COUNT ONE**

At all times relevant to this Indictment, unless otherwise indicated:

**BACKGROUND**

1.      Between in or around May 1987 and in or around December 2017, the defendant, JAMES A. WOLFE, was employed as the Director of Security for the United States Senate Select Committee on Intelligence (SSCI), located within the Hart Senate Office Building, in the District of Columbia.  As SSCI Director of Security, WOLFE was responsible for receiving, maintaining, and managing all classified information provided to the SSCI by the Executive Branch of the United States.

2.      "Classified information" is information the unauthorized disclosure of which reasonably could be expected to cause identifiable or describable damage to the national security of the United States.  The unauthorized disclosure of SECRET information reasonably could be expected to cause serious damage to the national security.  The unauthorized disclosure of TOP SECRET information reasonably could be expected to cause exceptionally grave damage to the national security.

**FBI INVESTIGATION**

3.      Beginning in or around 2017, the Federal Bureau of Investigation (FBI), an agency of the Executive Branch of the United States government, was conducting a criminal investigation into multiple unauthorized disclosures of classified information to one or more members of the news media ("the FBI Investigation").

4.      It was material to the FBI Investigation whether WOLFE had been in contact with any reporters and, if so, who those reporters were, the nature and extent of those contacts, and the means by which those contacts occurred.

5.      On or about October 30, 2017, FBI agents met with WOLFE and informed him that they were investigating the unauthorized disclosure of classified information that had been provided to the SSCI by the Executive Branch of the United States for official purposes.

6.      On or about December 15, 2017, FBI agents conducted a voluntary, noncustodial interview of WOLFE in the District of Columbia. Prior to questioning, the FBI agents presented WOLFE with a typewritten questionnaire ("the Investigative Questionnaire") which contained blank lines to check indicating "Yes" or "No" answers as well as space to provide any requested explanation. FBI agents read the questions in the Investigative Questionnaire aloud to WOLFE and he answered orally and wrote on the document.

        a.      Question 1 of the Investigative Questionnaire read as follows: "Do you understand that you are being provided this questionnaire as part of a criminal investigation being conducted by the FBI[?]" WOLFE stated and checked "Yes," and initialed this answer.

        b.      Question 3 of the Investigative Questionnaire advised WOLFE, "Do you understand making false statements, orally or in writing to the FBI in connection with a

2

federal criminal investigation is a violation of law, including but not limited to, a violation of Title 18, United States Code, Section 1001?" WOLFE stated and checked "Yes," and initialed this answer.

c.      During the interview, FBI agents showed WOLFE a copy of a news article authored by three reporters, including REPORTER #1, about an individual (referred to herein as "MALE-1"), that contained classified information that had been provided to the SSCI by the Executive Branch for official purposes.

d.      Question 9 of the Investigative Questionnaire asked, "Have you had any contact with" any of those three reporters. As to each reporter, WOLFE stated and checked "No."

e.      Question 10 of the Investigative Questionnaire asked, "Besides [the three named reporters], do you currently have or had any contact with any other reporters (professional, official, personal)?" Before answering this question, WOLFE stated orally to the FBI agents that although he had no official or professional contact with reporters, he saw reporters every day, and so to "feel comfortable" he would check "Yes." He did so, and initialed this answer.

f.      Question 10 of the Investigative Questionnaire further asked, "If yes, who and describe the relationship (professional, official, personal)." In the space provided, WOLFE hand wrote "Official – No" and "Professional – No." WOLFE then orally volunteered that he certainly did not talk to reporters about anything SSCI-related. FBI agents orally asked WOLFE if he had traveled internationally with any reporter, gone to a baseball game or to the movies with a reporter, or had weekly or regular electronic

3

communication with a reporter. To each question WOLFE verbally responded "No." WOLFE then wrote "Personal – No" on the Investigative Questionnaire.

        g.      Question 11 of the Investigative Questionnaire asked, "If yes to question ten, did you discuss or disclose any official U.S. government information or documents whether classified or unclassified which is the property of the U.S. government without express authorization from the owner of the information?" WOLFE stated and checked "No" and initialed this answer.

        h.      WOLFE signed and dated the Investigative Questionnaire next to the following warning: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct."

        8.      On or about December 15, 2017, after WOLFE signed the Investigative Questionnaire, the FBI agents asked WOLFE about an article written by REPORTER #2 that contained information that had been provided to the SSCI by the Executive Branch for official purposes. WOLFE denied knowing about the reporter's sources for the article. After WOLFE stated that he did not know about REPORTER #2's sources, FBI agents confronted WOLFE with pictures showing WOLFE together with REPORTER #2. After being confronted, WOLFE admitted to the FBI agents that he had lied to them, and that he had engaged in a personal relationship with REPORTER #2 since 2014, but maintained that he (WOLFE) had never disclosed to REPORTER #2 classified information or information that he learned as Director of Security for the SSCI that was not otherwise publicly available. WOLFE also stated that he never provided REPORTER #2 with news leads, intelligence, or information about non-public SSCI matters.

4

9.      During the December 15, 2017 interview, WOLFE continued to deny any contact with other reporters and denied providing to any of them classified information or information that he learned as Director of Security for the SSCI that was not otherwise publicly available.

## THE DEFENDANT'S COMMUNICATION WITH REPORTERS

10.     Despite WOLFE's statements, WOLFE had, in truth, engaged in extensive contact with multiple reporters, including conveying to at least two reporters information about MALE-1. WOLFE used his personal cell phone, his SSCI-issued electronic mail account, and anonymizing messaging applications, including Signal and WhatsApp, to exchange electronic communications with reporters.

11.     For example, between in or around December 2015 and in or around June 2017, WOLFE and REPORTER #1 communicated at least five times using his SSCI email account.

12.     WOLFE regularly met clandestinely in person, and communicated, with REPORTER #2, with REPORTER #3, and with other reporters, in places where the substance of their communications was unlikely to be detected by others, including secluded areas of the Hart Senate Office Building, restaurants and bars, and private residences.

## REPORTER #2

13.     During in or around 2013 and in or around 2014, REPORTER #2 was an undergraduate student serving as an intern with a news service in Washington, D.C.

14.     In approximately December 2013, WOLFE and REPORTER #2 began a personal relationship that continued until in or around December 2017.

15.     From in or around mid-2014 through in or around December 2017, REPORTER #2 was employed in Washington, D.C. by several different news organizations covering national security matters, including matters relating to the SSCI.    During this period, REPORTER #2 published dozens of news articles about SSCI and its activities.

16.     From in or around mid-2014 through in or around December 2017, WOLFE and REPORTER #2 exchanged tens of thousands of electronic communications, often including daily texts and phone calls, and they frequently met in person at a variety of locations including Hart Senate Office Building stairwells, restaurants, and REPORTER #2's apartment.  WOLFE and REPORTER #2 also communicated with each other through encrypted cell phone applications.

### REPORTER #2 PUBLISHED INFORMATION ABOUT MALE-1 AFTER COMMUNICATING WITH THE DEFENDANT

17.     In or around March 2017, a particular Executive Branch agency agreed to furnish the SSCI with a specific classified document ("the Classified Document") for official purposes. The Classified Document contained both SECRET and TOP SECRET information, including SECRET-level information regarding the identity and activities of the individual referred to in this Indictment as MALE-1.

18.     On or about March 17, 2017, the Classified Document was transported to the SSCI. As Director of Security, WOLFE received, maintained, and managed the Classified Document on behalf of the SSCI.

19.     On or about March 17, 2017, WOLFE exchanged 82 text messages with REPORTER #2, and that evening engaged in a 28-minute phone call with REPORTER #2.

20.     On or about April 3, 2017, a news organization published an online article, under REPORTER #2's byline, that revealed the identity of MALE-1.

a.     On or about that same date, both before and after the online news article was published, WOLFE and REPORTER #2 exchanged approximately 124 electronic communications.

b.     Approximately 20 minutes after the online news article was published, WOLFE and REPORTER #2 had a cellphone call that lasted 7 minutes.

6

c.     Thereafter, on or about that date, REPORTER #2 appeared on a national cable television show to discuss REPORTER #2's online news article. Approximately 90 minutes later, WOLFE and REPORTER #2 had a phone call lasting 15 minutes.

21.     In or around December 2017, but before being interviewed by the FBI, WOLFE sent a text message to REPORTER #2 that included the following: "I've watched your career take off even before you ever had a career in journalism. . . . I always tried to give you as much information that I could and to do the right thing with it so you could get that scoop before anyone else . . . . I always enjoyed the way that you would pursue a story like nobody else was doing in my hallway. I felt like I was part of your excitement and was always very supportive of your career and the tenacity that you exhibited to chase down a good story."

### REPORTER #3

22.     In or around 2017, REPORTER #3 was employed as a reporter with a news organization in Washington, D.C., and was assigned to cover national security matters, including matters relating to the SSCI.

23.     Between in or around September 2017 and continuing until at least in or around December 2017, REPORTER #3 and WOLFE regularly communicated with each other using the anonymizing messaging application Signal, text messages, and telephone calls.

### REPORTER #3 PUBLISHED INFORMATION ABOUT MALE-1 THAT WAS DISCLOSED TO HER BY THE DEFENDANT

24.     On or about October 16, 2017, WOLFE informed REPORTER #3, using Signal, that he had served MALE-1 with a subpoena to appear before the SSCI.

25.     On or about October 17, 2017, REPORTER #3 asked WOLFE, using Signal, to provide REPORTER #3 with MALE-1's contact information, and WOLFE agreed to do so. Later that day, a news organization published a story, under REPORTER #3's byline, reporting that

MALE-1 had been subpoenaed to testify by the SSCI, and that MALE-1 had been contacted by the news organization for comment. After the story was published, WOLFE congratulated REPORTER #3, using Signal, stating "Good job!" and "I'm glad you got the scoop." REPORTER #3 wrote back, using Signal, "Thank you. [MALE-1] isn't pleased, but wouldn't deny that the subpoena was served."

26.    On or about October 18, 2017, MALE-1 sent an email to the SSCI, complaining that the news organization had published REPORTER #3's news article of the previous day, reporting that he had been subpoenaed.

27.    On or about October 24, 2017, at 7:00 a.m., WOLFE informed REPORTER #3, using Signal, that MALE-1 would testify in closed hearing before the SSCI "this week." At 9:58 a.m., REPORTER #3 sent an email to MALE-1, asking him to confirm that he would be "paying a visit to Senate Intelligence staffers this week." At 9:23 p.m., MALE-1 sent an email to the SSCI, forwarding the email he had received from REPORTER #3, and complaining that the details of his appearance had been leaked to the press.

**REPORTER #4**

28.    In or around 2017, REPORTER #4 was employed as a reporter with a news organization in Washington, D.C., and was assigned to cover national security matters, including matters relating to the SSCI.

29.    Between in or around October 2017 and continuing until at least in or around December 2017, REPORTER #4 and WOLFE regularly communicated with each other using the anonymizing messaging application Signal, text messages, and telephone calls.

30.     In or around October 2017, WOLFE contacted REPORTER #4 using Signal, offering to act as an anonymous source. WOLFE specifically cautioned REPORTER #4 to "never use [WOLFE's] name to any of [REPORTER #4's] colleagues or other news related colleagues."

## FALSE STATEMENT

31.     On or about December 15, 2017, in the District of Columbia, defendant JAMES A. WOLFE did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Executive Branch of the Government of the United States, in that the defendant executed a written questionnaire in which he falsely stated and represented to agents of the Federal Bureau of Investigation that he did not have contact with any reporter, when in truth and in fact, and as he then well knew and believed, WOLFE did have contact with REPORTER #1, REPORTER #3, and REPORTER #4, variously, on multiple occasions from at least in or around December 2015 until at least on or about December 15, 2017.

**(18 U.S.C. § 1001(a)(2) – False Statement to a Government Agency)**

## COUNT TWO

32.     The factual allegations contained in paragraphs 1 through 30 are incorporated herein as if set forth in full.

33.     On or about December 15, 2017, in the District of Columbia, defendant JAMES A. WOLFE did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation, in a matter within the jurisdiction of the Executive Branch of the Government of the United States, to wit, the defendant falsely stated and represented to agents of the Federal Bureau of Investigation that he did not disclose to REPORTER #2 information that he learned as Director of Security for the Senate Select Committee on Intelligence that was not otherwise publicly available, when in truth and in fact, and as he then well knew and believed, WOLFE did disclose such information to REPORTER #2, between on or about March 17, 2017, and on or about April 3, 2017.

**(18 U.S.C. § 1001(a)(2) – False Statement to a Government Agency)**

10

## COUNT THREE

34.    The factual allegations contained in paragraphs 1 through 30 are incorporated

herein as if set forth in full.

35.    On or about December 15, 2017, in the District of Columbia, defendant JAMES A.

WOLFE did willfully and knowingly make a materially false, fictitious, and fraudulent statement

and representation in a matter within the jurisdiction of the Executive Branch of the Government

of the United States, in that the defendant falsely stated and represented to agents of the Federal

Bureau of Investigation that he did not disclose to REPORTER #3 information that he learned as

Director of Security for the Senate Select Committee on Intelligence and that was not otherwise

publicly available, when in truth and in fact, and as he then well knew and believed, WOLFE did

disclose such information to REPORTER #3, during in or around October 2017.

**(18 U.S.C. § 1001(a)(2) – False Statement to a Government Agency)**


A TRUE BILL


FOREPERSON

_SESSIE K. LIU_
Attorney of the United States in
and for the District of Columbia

11