**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Criminal No.:** | **18-cr-170 (KBJ)** |
| | ) | | |
| **v.** | ) | | |
| | ) | **Status Date:** | **July 26, 2018** |
| **JAMES A. WOLFE** | ) | | |

**THE UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION
FOR ORDER GOVERNING EXTRAJUDICIAL STATEMENTS
UNDER LOCAL CRIMINAL RULE 57.7(c)**

The defendant has asked the Court to issue an order under Local Criminal Rule 57.7(c) to restrict the government's extrajudicial commentary in this case, alleging that "highly prejudicial public comments" made by the President and senior Department of Justice officials "have threatened Mr. Wolfe's right to a fair trial under the Sixth Amendment, and must be prevented in the future." Motion for Order Governing Extrajudicial Statements under Local Criminal Rule 57.7(c) by Defendant James A. Wolfe at 1 (Defendant's Memorandum). The United States opposes the entry of such a special order – which is permitted under this Local Criminal Rule for some "widely publicized or sensational cases" – as unwarranted and unnecessary, for the reasons, and based on the authorities set forth herein.

## BACKGROUND

On June 7, 2018, the defendant was indicted on three counts of making false statements to the Federal Bureau of Investigation (FBI). One count alleges he lied to FBI agents about his repeated contacts with three particular reporters. Two counts allege he lied about providing two reporters with non-public information relating to matters occurring before the U.S. Senate Select Committee on Intelligence (SSCI), where the defendant was employed as Director of Security. The defendant was arrested that evening, at which time the indictment was unsealed. Shortly

thereafter, the government issued a press release briefly identifying the defendant and the charges against him.[1]  The press release attached the indictment, while noting that "[t]he charges in the indictment are merely allegations, and every defendant is presumed innocent unless and until proven guilty beyond a reasonable doubt."  The press release also contained brief statements from the Assistant Attorney General for the Justice Department's National Security Division (AAG/NSD),[2] the U.S. Attorney for the District of Columbia,[3] and a Special Agent in Charge of the FBI's Washington Field Office (SAC/FBI-WFO).[4]  Apart from this one press release, the defendant has identified no evidence that any attorney, law enforcement officer, or other person associated with the prosecution of this case has made an extrajudicial statement regarding this case.

---

[1]     A press release announcing an indictment and arrest is a routine action consistent with the government's obligations to administer justice, promote public safety, inform the public, and protect the defendant's right to a fair trial and privacy interests.  See generally 28 C.F.R. § 50.2 (b) (1975) (Guidelines to criminal actions); U.S. Attorney's Manual § 1-7.500 (2017) (information that can be provided to the news media includes the "public policy significance of a case," which "may be discussed by the appropriate United States Attorney or Assistant Attorney General when doing so would further law enforcement goals").

[2]     AAG/NSD John C. Demers:  "The Attorney General has stated that investigations and prosecutions of unauthorized disclosure of controlled information are a priority of the Department of Justice.  The allegations in this indictment are doubly troubling as the false statements concern the unauthorized disclosure of sensitive and confidential information.  Those entrusted with sensitive information must discharge their duties with honesty and integrity, and that includes telling the truth to law enforcement."

[3]     U.S. Attorney Jessie K. Liu:  "Mr. Wolfe's alleged conduct is a betrayal of the extraordinary public trust that had been placed in him.  It is hoped that these charges will be a warning to those who might lie to law enforcement to the detriment of the United States."

[4]     SAC/FBI-WFO Timothy M. Dunham:  "All individuals in positions of trust must be held to the highest of standards, as the American public deserves no less.  As alleged in this indictment, Mr. Wolfe failed to meet those standards in his repeated lies to federal agents concerning the unauthorized disclosure of information.  His arrest demonstrates that this conduct will not be tolerated, and those that engage in it will be held accountable."

Media reporting on the indictment and arrest has focused on the defendant's association with the SSCI and his interactions with one particular reporter.  Publicity about the prosecution itself and the charges against the defendant has not, however, been so exceptional as to render the case "widely publicized or sensational" under the standard set forth in Local Criminal Rule 57.7(c).  See Gentile v. State Bar of Nebraska, 501 U.S. 1030, 1054 (1992) (Kennedy, J., delivering opinion of the Court and dissenting in part) ("Only the occasional case presents a danger from pretrial publicity").

In his motion, the defendant points to comments made by the President during an impromptu encounter with members of the press corps on the morning of June 8, 2018.[5]   Asked by a reporter, "Are you glad they caught a leaker?" the President replied:

> It's very interesting that they caught a leaker in a very important – it's a very important leaker.  So it's very interesting.  I'm getting information on it now.  Happened last night.  It could be a terrific thing.  I know – I believe strongly in freedom of the press.  I'm a big, big believer in freedom of the press, but I'm also a believer in classified information.  Has to remain classified.  And that includes Comey and his band of thieves who leak classified information all over the place.  So I'm a very big believer in freedom of the press, but I'm also a believer that you cannot leak classified information.

Neither the President nor the reporter named Wolfe or otherwise commented on facts of this prosecution, although press reporting on the President's comments did associate them with Wolfe.  The defendant has not identified any extrajudicial comment by any other member of the Executive Branch, and, to date, government counsel is unaware of any further comment by the President about this case.

---

[5]    See Exhibit A (Transcript of Remarks by President Trump Before Marine One Departure, located at https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-8/).

During an initial hearing in this case on June 13, 2018, the defendant's counsel announced that the defense was considering seeking a court order barring extrajudicial statements pursuant to Local Criminal Rule 57.7(c).  Following that court appearance, defense counsel issued a press release and made statements to reporters.  At a status hearing before this Court on June 19, 2018, defense counsel indicated that the defense would file the instant motion.  At the hearing's conclusion, defense counsel filed the instant motion and made additional statements to the press at the courthouse entrance.  During each of these statements, defense counsel reportedly criticized the prosecution and vouched for the defendant's innocence and his character for truthfulness.[6]

---

[6]     See, e.g., New York Times, Scott Shane, "Senate Aide's Lawyers Ask Judge to Order Trump to Stop Discussing Case," June 19, 2018 ("Calling Mr. Wolfe 'a dedicated public servant and a decorated Army veteran,' Mr. Klubes said after a court hearing on Tuesday that the Senate staff member's Sixth Amendment right to an impartial jury and his presumption of innocence 'have been jeopardized by President Trump's comments about the merits of this case.'"); Washington Post, Spencer Hsu, "Senate Intelligence Aid Charged in U.S. Leak Probe Pleads Not Guilty in District Federal Court," June 13, 2018 ("Klubes cited the president in a statement outside the courthouse after the hearing. 'We intend to file a motion seeking an order from the court prohibiting the government, including at all levels – that means including President Trump – from making improper and prejudicial statements regarding this case,' he said.   Klubes said Wolfe 'never breached that trust' given to him over his career with the Senate and as an Army intelligence officer. 'We are going to vigorously defend Mr. Wolfe against this unfair, unjustified prosecution,' he said, adding that the case also 'raises serious questions about the First Amendment and freedom of the press.'" (emphasis added)); Politico, Josh Gerstein, "Ex-Senate Intelligence Aide Pleads Not Guilty to Lying in Leak Probe," June 13, 2018 ("Outside the courthouse, Wolfe stayed silent as another of his attorneys, Ben Klubes, refuted the charges and emphasized that Wolfe never improperly disclosed confidential information. 'He was trusted with the government's most precious secrets while he was working as the director of security for the Senate Intelligence Committee for . . . almost 30 years. He never breached that trust,' Klubes told reporters. 'We're going to vigorously defend Mr. Wolfe against this unfair, unjustified prosecution.' . . . Klubes signaled Wednesday that the defense expects free-expression concerns to play a role in the case. 'This prosecution, I think it's evident to all, raises serious questions about the First Amendment and freedom of the press that will be addressed in the court,' the defense attorney said." (emphasis added)).

**ARGUMENT**

**A.  Pretrial Publicity Has Not Created a Substantial Likelihood of Material Prejudice to the Defendant.**

Local Criminal Rule 57.7(c) permits the Court "[i]n a widely publicized or sensational criminal case"[7] to "issue a special order governing such matters as extrajudicial statements by parties, witnesses and attorneys likely to interfere with the rights of the accused to a fair trial by an impartial jury."  The Supreme Court has made clear that as a prior restraint of speech, such orders against trial participants, including trial attorneys, require a showing of a likelihood of material prejudice to a defendant's fair trial, not mere publicity or sensationalism.  See Gentile, 501 U.S. at 1051 (Rehnquist, C.J., delivering opinion of the Court).   But this Circuit has not settled on the precise standard the Court must apply in determining whether extrajudicial statements are "likely to interfere with the rights of the accused to a fair trial by an impartial jury," so as to warrant a Rule 57.7(c) order.  See In re Halkin, 598 F.2d 176, 193, n. 42 (D.C. Cir. 1979), abrogated in part by Seattle Times v. Rhinehart, 467 U.S. 20 (1984) (recognizing competing standards but opting not to decide); United States v. Morrow, 2005 LEXIS 8330, at *20-21 (D.D.C. Mar. 21, 2005) (Kollar-Kotelly, J.) (recognizing Circuit split in interpreting similar rules relating to issuance of orders restricting extrajudicial statements).  The case law suggests three possible standards, which are, from most- to least-strict:  (1) a clear and present danger (or serious and imminent

---

[7]      The government contends that this matter does not meet the threshold for application of Rule 57.7(c) because the merits of this case, the false statements charges against the defendant, have neither been "widely publicized" nor are "sensational."

threat),[8] (2) a substantial likelihood of material prejudice,[9] or (3) a reasonable likelihood of material prejudice.[10]   The defendant's proposed order would apply the "substantial likelihood" standard, and this standard is consistent with the guidance provided by the Department to its employees.  United States Attorneys' Manual (USAM) § 1-7.600 ("DOJ personnel shall not make any statement or disclose any information that reasonably could have a substantial likelihood of materially prejudicing an adjudicative proceeding.")   However, the extrajudicial statements about which the defendant complains in this case have not risen to any of these standards.

Assuming, arguendo, that the Court finds this matter meets the threshold for application of Rule 57.7(c), the defendant has identified only four examples of pretrial publicity reporting extrajudicial statements that he claims are prejudicial to him:  three news stories (by The New York Times, CNN and The Los Angeles Times) reporting the President's remarks, and the government's press release.[11]   It is notable that he "do[es] not ascribe any inappropriate

---

[8]      See, e.g., United States v. Ford, 830 F.2d 596 (6th Cir. 1987) (clear and present danger); Chicago Council of Lawyers v. Bauer, 522 F.2d 242 (7th Cir. 1975) ("serious and imminent threat"); Levine v. U.S. District Court, 764 F.2d 590 (9th Cir. 1985) ("either a clear and present danger or a serious and imminent threat"); see also Pedini v. Bowles, 940 F. Supp. 1020 (N.D. Tex. 1996) ("clear and serious threat").

[9]      See, e.g., United States v. Scarfo, 263 F.3d 80 (3d Cir. 2001) ("substantial likelihood of material prejudice"); United States v. Brown, 218 F.3d 415 (5th Cir. 2000) (same); United States v. Stanford, Case No. H-09-CR-342, Dkt. 307 (S.D. Tex. Sept. 30, 2010) (same).

[10]      See In re Morrissey, 168 F.3d 134 (4th Cir. 1999) ("reasonable likelihood" of prejudice); In re Russell, 726 F.2d 1007 (4th Cir. 1984) ("reasonable likelihood" of prejudice); United States v. Tijerina, 412 F.2d 661 (10th Cir. 1969) (same).

[11]      The AAG/NSD's statement in the press release, referring to "sensitive and confidential information," used words only slightly different from those in the indictment's charges that the defendant lied to FBI agents about having disclosed to reporters information he learned as SSCI Director of Security "that was not otherwise publicly available."   Characterizing the information as "sensitive and confidential" is simply another way to describe the "not otherwise publicly available" information, and is not unduly "inflammatory" as the defendant claims.  Importantly, the context of the quote must be considered.  The defendant takes this quote wholly out of context

6

commentary addressed in this motion to the Assistant U.S. Attorneys handling this matter." Defendant's Memorandum at n.4.

First, it is significant that the President's passing comments about the unnamed "leaker" made no reference to the actual case against the defendant; did not suggest the President had any non-public information, or even prior knowledge, about the case ("I'm getting information on it now"); and segued immediately into unrelated general remarks about freedom of the press and leaks of classified information – conduct with which the defendant was not charged.  The President has authority to speak on matters of public policy and public interest, and as a non-lawyer and non-party to this case, his general comments, isolated and far removed from any trial in this matter, did not present any likelihood of material prejudice to the defendant's right to a fair trial by an impartial jury.

With respect to the government's press release, there is not even a remote – let alone substantial – likelihood that this release or the statements therein could interfere with the defendant's right to a fair trial by an impartial jury.  The statements in the press release by senior Department officials, noting that the defendant's alleged conduct was a betrayal of the public trust he held, were well within their responsibilities to discuss the public policy significance of the case in order to further law enforcement goals.  USAM § 1-7.500.  It is well-established that prosecutors can, ethically, speak publicly about a case on a matter of public concern.  <u>See, e.g.</u>, ABA Standard Rule of Professional Responsibility 3-1.10(c) ("the prosecutor may make statements that inform the public of the nature and extent of the prosecutor's or law enforcement actions and serve a

---

and ignores that when considered in the context of the release and the appended indictment, the characterization of the information in the quotation is not meaningfully different from the language used in the indictment.  Moreover, at trial the jury will be carefully instructed as to the precise nature of the charges and the non-public information at issue.

legitimate law enforcement purpose"); <u>see also</u> <u>In re Conduct of Lasswell</u>, 673 P.2d 855, 858-59

(Or. 1983) (<u>en banc</u>) (under state ethical rule, prosecutor's extrajudicial statement improper only

where the "lawyer's intent or knowledge and indifference when making public statements" were

highly likely to impair the fairness of an actual trial). [12]

In sum, neither the authorized, law enforcement-related statements of the senior

Department officials regarding the defendant's indictment and arrest, nor the President's offhand

remarks during a press scrum, created circumstances prejudicial to the defendant in any articulable

way. "Prejudice from trial publicity is not to be presumed from a record barren of evidence that

jurors were actually influenced unless publicity about the case has so pervaded the community as

to 'utterly corrupt' the trial atmosphere." <u>United States v. Shorter</u>, 620 F. Supp. 73, 76 (D.D.C.

1985) (denying motion for mistrial based on violations of local rules "because defendant has not

presented any evidence of actual prejudice to his fair trial rights and has not established that

publicity has so pervaded the proceedings as to cause actual prejudice").

## B. Existing Constraints on Extrajudicial Statements in this Case are More Than Adequate

In this case, as in every case brought by this Office, the government seeks to protect and

preserve a fair trial, and ample measures are already in place to assure that outcome. Government

---

[12]     Courts have found that the issuance of government press releases announcing charges is not inconsistent with a defendant's right to a fair trial. <u>See, e.g.,</u> <u>United States v. Babich</u>, 301 F. Supp. 3d 213, 217-218 (D. Mass. 2017) (ordering DOJ to issue press release in pending case to notify potential victims); <u>United States v. Corbin</u>, 620 F. Supp. 2d 400, 411-14 (E.D.N.Y. 2009) (finding no basis to conclude press release violated local rule and declining to address possible violation of bar rules limiting parties' extrajudicial statements); <u>United States v. Smith</u>, 2014 WL 1744253 at *2-5 (E.D. Wash. Apr. 30, 2014). (rebutting defendant's claim that DOJ press release including the term "snake-oil salesman" did not establish "the rare and extreme case where prejudice should be presumed from pretrial publicity").

counsel in this matter are already bound by an array of ethical strictures and Department policies that clearly limit public comment on pending cases, as follows:

– USAM § 1-7.000, Confidentiality and Media Contacts Policy. ("The Policy governs the protection and release of information that DOJ personnel obtain in the course of their work, and it balances four primary interests: (1) an individual's right to a fair trial or adjudicative proceeding; (2) an individual's interest in privacy; (3) the government's ability to administer justice and promote public safety; and (4) the right of the public to have access to information about the Department of Justice.")

– D.C. Bar Rule of Professional Conduct 3.6, Trial Publicity ("A lawyer engaged in a case being tried by a judge or jury should not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of mass public communication and will create a serious and imminent threat of material prejudice to the proceeding.")

– D.C. Bar Rule of Professional Conduct 3.8(f), Special Responsibilities of a Prosecutor (prosecutor shall not, "[e]xcept for statements which are necessary to inform the public of the nature and extent of the prosecutor's action and which serve a legitimate law enforcement purpose, make extrajudicial comments which serve to heighten condemnation of the accused.")

– 28 C.F.R. § 50.2, Release of information by personnel of the Department of Justice relating to criminal and civil proceedings.

– Local Criminal Rule 57(b)(1) ("It is the duty of the lawyer or law firm not to release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or

imminent criminal litigation with which the lawyer or the law firm is associated, if there is

a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise

prejudice the due administration of justice.")

– Memorandum from Deputy Attorney General Rod J. Rosenstein dated November 6,

2017, regarding Confidentiality and Media Contacts Policy, reminding all DOJ personnel

that they are subject to the Department's confidentiality and media contact policy set forth

in USAM § 1-7.000.

Defense counsel are likewise subject to ethical rules limiting public comments, including D.C. Bar

Rule of Professional Conduct 3.6 and Local Criminal Rules 57.7(b)(1) and (3).[13]

Moreover, the Court may employ myriad measures to safeguard the defendant's right to a

fair trial if it should become necessary to do so in the future, including intensive voir dire of

prospective jurors, change in venue, and placing other restrictions on "prosecutors, counsel for

defense, the accused, witnesses, court staff [and] enforcement officers coming under the

jurisdiction of court." Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 569-70 (1976) (finding a

judicial order restricting media from reporting accused's confessions to be an unacceptable prior

restraint of speech); see also United States v. Gray, 189 F. Supp. 2d 279, 280-81 (D. Md. 2002)

(rejecting order against non-trial participant but agreeing to additional conditions to protect

impartial jury). Here, this Court has already taken one such important step in issuing, at the parties'

---

[13]     In this case, it is notable that defense counsel have not hesitated to avail themselves of
opportunities to make their own extrajudicial statements to the press, which renders them ill-suited
to obtain protection from the Court in their efforts to bar others. See, e.g., United States v.
Caldwell, 543 F.2d 1333, 1344 (D.C. Cir. 1974) (where defense counsel had "made a series of
extrajudicial statements to the press . . . he is no position to complain of publicity for which he is
in part responsible"); United States v. Palfrey, 515 F. Supp. 2d 120, 123 (D.D.C. 2007) (denying
request to bar government attorneys from participating in the matter for violation of Local Criminal
Rule 57.7 where "the Defendant and her counsel have made extensive use of the media to inform
the public about what they believe to be the merits of the case").

joint request, a Protective Order relating to discovery, which will limit the amount of non-public information that can be shared to third parties including the press.  See Protective Order at Docket Entry 24.

### C.  The Proposed Order Constraining the Entire Executive Branch is Overbroad

Even if the Court were to find that pretrial publicity has created a substantial likelihood of material prejudice to the defendant in this case, and that existing constraints on extrajudicial statements were not adequate, the special order requested by the defendant – which would encompass an extraordinarily broad universe of "all interested participants in this matter, including the parties, any potential witnesses, counsel for the parties and witnesses and all persons affiliated therewith (including all supervisors of this prosecution in the U.S. Attorney's Office, the United States Department of Justice, and the Executive Branch, up to and including the President of the United States), and law enforcement agents involved in this prosecution" – is unprecedentedly overbroad and unenforceable.

For one thing, neither Local Criminal Rule 57.7(c) nor its predecessors allows the contemplated special order to bar the extrajudicial statements of non-trial participants.[14]  While the rule contains a clause allowing a special order to include "any other matters which the Court may deem appropriate for inclusion in such an order," this is not an unlimited power.[15]  Indeed,

---

[14]     In Rule 57.7(c) and its predecessors, Local Rule 308 ("Release of Information by Attorneys and Court Personnel), Local Rule 1-27 ("Free Press – Fair Trial"), and Local Rule 100 – going back several decades – the relevant clause has been expressly limited to trial participants who might likely to interfere with a fair trial by an impartial jury.  This also appears consistent with the historic practice in this district.

[15]     This also appears consistent with the historic practice in this district.  See In re Anderson, 306 F. Supp. 712, 713-14 (D.D.C. 1969) (refusing to find a violation of Local Rule 100 where there was no evidence that the attorney was aware of the client's intentional and prejudicial release of information during jury selection).

the sample court order proffered by the defendant – entered in a Texas federal criminal case infected by substantial prejudicial pretrial publicity – limited its scope to prosecution and defense counsel and their staffs, alleged victims and designated or potential witnesses, and the defendants and their representatives and agents, including publicity agents.  See Exhibit 6 to Defendant's Memorandum.  Additionally, Rule 57.7(c) special orders are not to be issued without sound reason. See generally In re Halkin, 598 F.2d at 193 (for protective order under both the federal Criminal Rule and the local rule – 1-27 at the time – Court must rely on "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements" and "[t]his requirement is constitutionally mandated when the order restricts expression"); United States v. Caldwell, 543 F.2d 1333, 1342 (D.C. Cir. 1974) (no error where Court did not sua sponte take additional steps to restrict extrajudicial statements under then-Local Rule 1-27); Morrow, 2005 LEXIS 8330 at *21-22 (rejecting protective order requested by defense under Local Criminal Rule 57.7(c)).

Further, any order issued by this Court must be narrowly tailored to comport with constitutional requirements.  See, e.g., Nebraska Press Ass'n, 427 U.S. at 565-569 (finding risk of adverse pretrial news accounts was insufficient to support prior restraint of speech by non-trial participants, where "the restraining order actually entered would [not] serve its intended purpose"). The defendant's motion gives no consideration to the numerous less restrictive means of protecting a fair trial.

The defendant also appears to be asking this Court to engage in an unprecedented exercise of judicial power – to restrict the speech of non-trial participants – with a minimal showing of need.  It is not surprising that courts have routinely treated such proposed orders with skepticism as unconstitutional prior restraints of speech.  See, e.g., Gray, 189 F. Supp. 2d at 281 (reviewing

request to restrict extrajudicial statements by non-trial participant and finding no "authority for such a sweeping order"); see also United States v. Scarfo, 263 F.3d 80, 93 (3d Cir. 2001) (acknowledging significant limits on the court's power to enjoin speech of non-trial participants). Moreover, the defendant's effort to broadly enjoin Executive Branch officials raises significant separation of powers issues.  See United States v. Koubriti, 305 F. Supp. 2d 723, 755-56 (E.D. Mich. 2003) (recognizing separation of powers concerns in finding the Attorney General in contempt of court).

With respect to the President, the defendant's sweeping assertion that the Court can enjoin the President simply because "the President is ultimately responsible for all powers wielded by that Branch, including prosecutorial powers," Defendant's Memorandum at 8, fails to establish a basis for treating the President as a member of the prosecution team who is before this Court.[16]  So doing would also ignore more than a century of separation of powers precedent.  See, e.g., Mississippi v. Johnson, 71 U.S. (4 Wall) 475, 499-501 (1866) (holding Court had "no jurisdiction of a bill to enjoin the President in the performance of his official duties" and that when presidential action requires "the exercise of judgment," "general principles . . . forbid judicial interference with the exercise of Executive discretion"); see also Franklin v. Massachusetts, 505 U.S. 788, 802-03 (1992) (plurality opinion) ("the District Court's grant of injunctive relief against the President

---

[16]     It has been recognized since the founding of our country that the Office of the Attorney General of the United States was created to shoulder the unique and specific role of prosecuting cases.  See, e.g., Judiciary Act of 1789, 1 Stat. 73, 92-93 ("there shall also be appointed a meet person, learned in the law, to act as attorney general for the United States . . . whose duty it shall be to prosecute and conduct all suits in the Supreme Court in which the United States shall be concerned"); 28 U.S.C. § 516 (1966) ("the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested . . . is reserved to the officers of the Department of Justice, under the direction of the Attorney General").  Indeed, as noted above, it does not appear that the President had any special knowledge or information about the case ("I'm getting information on it now").

himself [was] extraordinary, and should have raised judicial eyebrows"; holding "in general, '[the] court has no jurisdiction of a bill to enjoin the President in the performance of his official duties'"); id. at 827-29 (Scalia, J., concurring) (recognizing injunctive relief against the President in his official capacity was unavailable and that such principle is "a functionally mandated incident of the President's unique office"); Massachusetts v. Mellon, 262 U.S. 447, 488 (1923) ("The general rule is that neither department may invade the province of the other and neither may control, direct, or restrain the action of the other."); Kendall v. United States ex rel. Stokes, 37 U.S. (12 Pet.) 524, 610 (1838) ("The executive power is vested in a President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power"); Newdow v. Bush, 391 F. Supp. 2d 95, 105-07 (D.D.C. 2005) (finding injunctions against the President and the Inaugural Committee to bar prayer was directed at the President's "exclusive decision-making authority as to whether there will be religious prayer at an inauguration" and was therefore inappropriate under the Mississippi line of cases).[17]   Given that the defendant has failed to establish a specific and compelling basis for his unprecedented request, his motion must fail.

---

[17]     Any relief directed at the President's core protected speech would "distract [the President] from his constitutional responsibility to 'take Care that the Laws be faithfully executed,'" Franklin, 505 U.S. at 828 (Scalia, J., concurring), even though "the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." Loving v. United States, 517 U.S. 748, 757 (1996) (recognizing that "[e]ven before the birth of this country, separation of powers was known to be a defense against tyranny"). The constitutional concern is that parties would "deputize federal courts as 'virtually continuing monitors of the wisdom and soundness of Executive action'" by wielding injunctions to police the President's personal decisions, which, "most emphatically, 'is not the role of the judiciary.'" Hein v. Freedom from Religion Found., Inc., 551 U.S. 587, 612 (2007) (quoting Allen v. Wright, 468 U.S. 737, 760 (1984)); see also Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 222 (1974) (counseling that "distort[ing] the role of the Judiciary in its relationship to the Executive . . . [could] open the Judiciary to an arguable charge of providing 'government by injunction'").

## CONCLUSION

The defendant has not established that pretrial publicity has created, or reasonably could be expected to create, a substantial likelihood of material prejudice in this case, so as to justify the Court's entry of a special order under Local Criminal Rule 57.7(c).  Both the prosecution team and the defense team are subject to already-existing extensive constraints limiting their extrajudicial statements in the matter, and absent clear evidence of need for a special order, these measures are adequate.  Even if the Court were to consider entering a special order in this case, the order sought by the defendant should be rejected as unenforceably overbroad and wholly unwarranted.  Accordingly, the government respectfully requests that the defendant's Motion for Order Governing Extrajudicial Statements Under Local Rule 57.7(c) be DENIED.  A proposed order is submitted herewith.[18]

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar Number 472845

By:      _____/s/_____ _
TEJPAL S. CHAWLA
DC Bar: 464012
JOCELYN BALLANTINE
CA Bar: 208267
Assistant United States Attorneys
LAURA A. INGERSOLL
CT Bar: 306759
Special Assistant U.S. Attorney
National Security Section
555 4th Street, N.W., 11th Floor
Washington, DC  20530

---

[18]     To the extent that the defense continues to make extrajudicial statements and in the event that those statements create a substantial likelihood of material prejudice in this case, the government reserves its right at a future date to seek the Court's entry of an appropriate order under Local Criminal Rule 57.7(c).

202-252-7280 (Chawla)
202-252-7252 (Ballantine)
202-305-4881 (Ingersoll)
Tejpal.Chawla@usdoj.gov
Jocelyn.Ballantine2@usdoj.gov
Laura.Ingersoll@usdoj.gov

**Certificate of Service**

I hereby certify that a copy of the foregoing memorandum was served on the following counsel by electronic mail on July 12, 2018:

Preston Burton, Esq.
Benjamin Klubes, Esq.
Buckley Sandler LLP
1250 24th Street, N.W., Suite 700
Washington, D.C. 20037

_____/s/_____
Tejpal Chawla
Assistant United States Attorney



Skip to content

REMARKS

# Remarks by President Trump Before Marine One Departure

Issued on: June 8, 2018

—       ⬚⬚⬚       —

[?]  ALL NEWS                          South Lawn

                                       8:02 A.M. EDT

Q    Is the Comey report going to be your birthday present?

THE PRESIDENT:  Well, it seems that it's coming out on my birthday.  Maybe that's appropriate.  Let's see if it is.  Look, he's a very dishonest man; I've been saying it for a long time.  I think I did our country a great fire — a really great favor when I fired him.  And we'll see what happens.  We'll see what the report says.  But I guess it just got announced that it's coming out on June 14th, so that'll be maybe a nice birthday present.  Who knows.

Q    (Inaudible) Trudeau?

THE PRESIDENT:  We're going to deal with the unfair trade practices.  If you look at what Canada, Mexico, the European Union, all of them have been doing to us for many, many decades, we have to change it.  And they understand it's going to happen.

Q    What are you going to do if they form an agreement without you?

THE PRESIDENT:  We are going to do very well.  Now, if we're unable to make a deal, we'll terminate NAFTA; we'll have a better deal.  If we are unable to make a deal, we will be

better off.  Right now, we are not going to live with the deals the way they are.  European Union treats us very unfairly.  Canada, very unfairly.  Mexico, very unfairly.

With that being said, I think we'll probably very easily make a deal.

Q    Were you serious about really not needing to prepare for the Kim summit?  Or were you —

THE PRESIDENT:  No, I didn't say that.  I said I've been preparing all my life.  I always believe in preparation, but I've been preparing all my life.  You know, these one-week preparations, they don't work.  Just ask Hillary what happened to her in the debates.

So I've been preparing for this all my life.  And frankly, it's really just the fake news.  Because if you run, Peter, just a little but longer, the clip, you would see: I've really been preparing all my life.  I said that, but, you know, the news doesn't pick that up because it's fake news.

Q    Are you glad they caught a leaker?

THE PRESIDENT:  It's very interesting that they caught a leaker in a very important — it's a very important leaker.  So it's very interesting.  I'm getting information on it now.  Happened last night.  It could be a terrific thing.

I know — I believe strongly in freedom of the press.  I'm a big, big believer in freedom of the press, but I'm also a believer in classified information.  Has to remain classified.  And that includes Comey and his band of thieves who leak classified information all over the place.

So I'm a very big believer in freedom of the press, but I'm also a believer that you cannot leak classified information.

Q    Do you have a reaction to Anthony Bourdain's death this morning?

THE PRESIDENT:  Yeah, I think it's very sad.  In fact, I want to extend to his family my heartfelt condolences.  That was very shocking.  When I woke up this morning: Anthony Bourdain is dead.  And I enjoyed his show.  He was quite a character, I will say.  But I just want to extend my condolences.  And also to the family of Kate Spade.

Q    (Inaudible) G6-plus-one?

THE PRESIDENT:  It may be.  You can call it anything you want.  It doesn't matter.  It doesn't matter what you call it.  It used to be the G8 because Russia was in it.  And now Russia's not in it.

Now, I love our country.  I have been Russia's worst nightmare.  If Hillary got in, I'd think Putin is probably going, "Man, I wish Hillary won."  Because you see what I do.  But, with that being said, Russia should be in this meeting.  Why are we having a meeting without Russia being in the meeting?  And I would recommend, and it's up to them, but Russia should be in the meeting.  They should be a part of it.

You know, whether you like it or not — and it may not be politically correct — but we have a world to run.  And in the G7, which used to be the G8, they threw Russia out.  They should let Russia come back in.  Because we should have Russia at the negotiating table.

Q    Mr. President, why did you decide to cut (inaudible) short?

THE PRESIDENT:  Say it?  What?

Q    You're leaving a little early from the summit.  Why did you decide (inaudible)?

THE PRESIDENT:  I may leave a little bit early.  It depends on the timing.  But I may leave a little bit early.  And it depends what happens here.

Look, all of these countries have been taking advantage of the United States on trade.  You saw where Canada charges our dairy farmers 270 percent tariffs.  We don't charge them, or if we do, it's like a tiny percentage.  So we have to straighten it out.

We have massive trade deficits with almost every country.  We will straighten that out.  And I'll tell you what, it's what I do.  It won't even be hard.  And in the end, we'll all get along.

But they understand.  And you know, they're trying to act like, "Well, we fought with you in the war."  They don't mention the fact that they have trade barriers against our farmers.  They don't mention the fact that they're charging almost 300 percent tariffs.  When it all straightens out, we'll all be in love again.

Q    Will there be more pardons?

THE PRESIDENT:  There will be more pardons.  I thought Alice, yesterday, was beautiful.  I thought Jack Johnson, which was recommended by Sylvester Stallone and some great boxers — I thought Jack Johnson was a great one.

I'm thinking about somebody that you all know very well.  And he went through a lot.  And he wasn't very popular then —

Q    Is it O.J.?

THE PRESIDENT:  And he wasn't very popular then.  No, I'm not thinking about O.J.  But he's not — only you could say O.J.  But he was — look, he was not very popular then.  He's — certainly, his memory is very popular now.  I'm thinking about Muhammad Ali.

I'm thinking about that very seriously.  And some others.  And some folks that have sentences that aren't fair.  But I am thinking about Muhammad Ali.

In fact, we're doing right now, recommendations on — frankly, we're doing recommendations on Muhammad Ali.

Q    (Inaudible.)

THE PRESIDENT:  Say it, Peter.  What?

Q   (Inaudible) that you are above the law?

THE PRESIDENT:  No.  No.  No, I'm not above the law.  I'd never want anybody to be above the law.  But the pardons are a very positive thing for a President.  I think you see the way I'm using them.  And yes, I do have an absolute right to pardon myself.  But I'll never have to do it because I didn't do anything wrong.  And everybody knows it.  There's been no collusion.  There's been no obstruction.  It's all a made-up fantasy.  It's a witch hunt.  No collusion, no obstruction, no nothing.

Now, the Democrats have had massive collusion, massive obstruction, and they should be investigated.  We'll see what's happening.  Yeah.

Q   (Inaudible.)

THE PRESIDENT:  I haven't even thought about it.  I haven't even thought — I haven't thought about any of it.  It certainly is far too early to be thinking about that.

Q   (Inaudible.)

THE PRESIDENT:  They haven't been convicted of anything.  There's nothing to pardon.  It's far too early to be — it is far too early to be thinking about it.

Q   Mr. President, what will it take for you to actually get tired of Scott Pruitt and say, "Enough"?

THE PRESIDENT:  Well, Scott Pruitt is doing a great job within the walls of the EPA.  I mean, we're setting records.  Outside, he's being attacked very viciously by the press.  And I'm not saying that he's blameless, but we'll see what happens.

Q   But he's an embarrassment.  Are you not tired of him?

Q   (Inaudible) pardons?

THE PRESIDENT:  That's what I want to do.  We have 3,000 names.  We're looking at them. Of the 3,000 names, many of those names really have been treated unfairly.  You know, this is a group of 3,000 that we've assembled.  And I would get more thrill out of pardoning people that nobody knows — like Alice, yesterday.

I thought Kim Kardashian was great because she brought Alice to my attention.  Alice was so great.  And the way she left that jail, and the tears and the love that she has with her family — I mean, to me, that was better than any celebrity that I can pardon.

So we're looking at it.  But we are looking at literally thousands of names of people that have come to our attention that have been treated unfairly, or where their sentence is far too long.

Q    Mr. President, in the NBA, both Lebron James and Steph Curry say, if they win, they're not coming to the White House.

THE PRESIDENT:  I didn't invite them.  No, I didn't invite Lebron James, and I didn't invite Steph Curry.  We're not going to invite either team.  But we have other teams that are coming.

You know, if you look, we had Alabama, national champion; we had Clemson, national champion; we had the New England Patriots; we had the Pittsburgh Penguins last year.

Q    What about the Caps?

THE PRESIDENT:  I think we'll have the Caps.  I mean, we'll see.  You know my attitude: If they want to be here — it's the greatest place on Earth — I'm here.  If they don't want to be here, I don't want them.

Q    What's your response to Paul Ryan saying the FBI did the right thing (inaudible)?

THE PRESIDENT:  I think if you look at what Paul Ryan is saying, it didn't come out that

way. The fact is, they had people in our campaign — they had people doing things that have never been done in the history of this country, and it really is a disgrace. And frankly, that stuff is just starting to come out.

Q    (Inaudible.)

THE PRESIDENT:  Fire who?

Q    (Inaudible.)

THE PRESIDENT:  We'll see what happens.  We'll see what happens.

Q    What do you think about Mitt Romney now saying you're a shoe-in to win again?

THE PRESIDENT:  Mitt Romney said what?

Q    Mitt Romney said you're going to find it easy to win again.

THE PRESIDENT:  Well, we're doing well.  Look, Mitt's a straight shooter.  Whether people love him or don't love him —

Q    Well, he called you a "con man" last time.

THE PRESIDENT:  Mitt Romney is a straight shooter.  And yeah, he — that's a very nice thing to say.  I appreciate that.  That's good.

Q    Mr. President, what do you have to say to Canada?  (Inaudible.)

THE PRESIDENT:  I love Canada, but they treat us very unfairly on trade.  Very, very unfairly.  You see the numbers.  Almost 300 percent on dairy.  So they treat us very unfairly.

Are you guys all going?  You better get going, Peter.  We'll leave without you.

Q    (Inaudible.)

THE PRESIDENT:  I would only do a deal if I get it through Congress.  I wouldn't do like Obama did.  And fortunately, he wasn't able to get it through.  You know, he tried to get it through — the Iran deal.  He tried to get it through Congress, failed.  So he just did it without, which is why I was able to break it up so easy.

And Iran is now a different country.  They're not looking to the Mediterranean anymore; Iran is now a much different company — country since I did — since I signed that out, Iran is a much different country.

Q    Do you support Senator Gardner's marijuana federalism bill?

THE PRESIDENT:  I really do.  I support Senator Gardner.  I know exactly what he's doing; we're looking at it.  But I probably will end up supporting that, yes.

Q    (Inaudible.)

THE PRESIDENT:  The First Lady is great.  Right there.  She has to — and she wanted to go — can't fly for one month.

Q    Why not?

THE PRESIDENT:  The doctors say.  She had a big operation.  That was a — close to a four-hour operation.  And she's doing great.  Right there.  And you know what?  She is a great First Lady.

Q    (Inaudible) sonic devices?

THE PRESIDENT:  Terrible.

Q    (Inaudible.)

THE PRESIDENT:  We'll be talking to them, but that's terrible.  Okay, any other questions?

Q    How do you feel about the fact that (inaudible)?

THE PRESIDENT:  Was one of my lawyers.  Incredible that you can break into a lawyer's office.  That's one thing I can say.  And I think that was unfortunate that they broke into a lawyer's office.  Not a good practice.

Q    (Inaudible.)

THE PRESIDENT:  Well, the Democrats — this is a Democrat bill.  The Democrats can end that very quickly.  All they have to do is sit down with us and negotiate a real bill allows us to keep criminals out of this country.  It's very easy.

You know, Schumer is a guy — he complains, but he doesn't do anything.  Schumer is a guy who is an obstructer.  He can't do anything.  All he can do is obstruct.  All they have to do is call us and we'll draw a bill that gives us great border safety and security and is fair.  Because I don't like the children being separated from the parents.  I don't like it.  I hate it.

But that's a Democrat bill that we're enforcing.  We can change it in one day.  All they have to do is come and see us.

Q    (Inaudible.)

THE PRESIDENT:  I can't hear your question, darling.  Too much competition.  Go ahead.

Q    (Inaudible.)

THE PRESIDENT:  No, you're not prepared.  I can't believe she's not prepared.  See they're shocked, right?

Q    Are you going to bring up (inaudible)?

THE PRESIDENT:  We'll bring it up.  Yeah.  We'll bring it up.

Q    What are you going to do for five hours on the plane?

THE PRESIDENT:  I have work.  I have about 15 boxes of work.  I will be able to work without being bothered by phone calls, where you people are writing fake stories about me and we have to respond.

No, seriously, I mean, I have a lot of work that's on the plane so that will be good.

Q    Are you worried at all about the things that Rudy is saying in Israel?  Is he giving you any headaches?

THE PRESIDENT:  Look, Rudy is great.  But Rudy is Rudy.  But Rudy is doing a very good job, actually.  Doing a very good job.

Q    Is being a porn star respectable work?  He said it's not.

THE PRESIDENT:  He said what?

Q    He said that being a porn star is not respectable work.

THE PRESIDENT:  I'm not going to disagree with him on that.

Q    (Inaudible.)

THE PRESIDENT:  I can't hear a word he's saying.

Q    Was Dennis Rodman invited to North Korea?

THE PRESIDENT:  No, he wasn't, but I like Dennis.  A great rebounder.  You know when you think — Dennis was a great rebounder and he wasn't, relatively speaking, that tall.  So that tells you.  You know, there's a rebounding — there's a genius for that.  Dennis

Rodman was a great rebounder.

One thing we are thinking about, speaking of sports stars — the power to pardon is a beautiful thing.  You got to get it right.  You got to get the right people.  I am looking at Muhammad Ali.  But those are the famous people.  And in one way, it's easier, and people find it fascinating, but I want to do people that are unfairly treated like an Alice, where she comes out and there's something beautiful.

What I am thinking to do — you have a lot of people in the NFL, in particular, but in sports leagues.  They're not proud enough to stand for our National Anthem.  I don't like that.  What I'm going to do is I'm going to say to them — instead of talk.  It's all talk, talk, talk.  We have a great country, you should stand for our National Anthem.  You shouldn't go in a locker room when our National Anthem is played.

I am going to ask all of those people to recommend to me — because that's what they're protesting — people that they think were unfairly treated by the justice system.  And I understand that.  And I'm going to ask them to recommend to me people that were unfairly treated — friends of theirs or people that they know about — and I'm going to take a look at those applications.  And if I find, and my committee finds that they are unfairly treated, then we will pardon them or at least let them out.

Q    Will you invite them to the White House for a roundtable about social —

THE PRESIDENT:  You know, I don't have to do that.  I'm not looking to grandstand.  We've got enough grandstanders in this town.

I'm just saying, for the leagues, if they have people — if the players, if the athletes have friends of theirs or people that they know about that have been unfairly treated by the system, let me know.

Q    So do you need a celebrity advocate to get a pardon?

THE PRESIDENT:  Well, you know, if you think about it, that's really — that becomes

celebrity advocates.  But they know a lot of things that we're not going to know.  They've seen a lot of abuse and they've seen a lot of unfairness.  So if they have — how do you like that idea, David?

Q    I'll leave it to you.

Q    (Inaudible)?

THE PRESIDENT:  Oh, no.  I have the absolute right.  I don't have to do it.  Never did anything wrong.  And you know that better than anybody.

Q    Are you concerned about reporters leaking to their sources?

THE PRESIDENT:  I think you have a double edge.  Reporters can't leak.  You cannot leak classified information.  At the same time, we need freedom of the press.  But you cannot leak like Hillary Clinton did, like Comey did; you cannot leak classified information.  If you look at the young sailor — Saucier — I mean he went to jail over not classified, a much lower level.  And it's very unfair that he goes to jail, and that Comey's allowed to do it all over.  It's very unfair.

Thank you much.  I'll see you in Canada.

END

8:19 A.M. EDT



The White House

LIVE          JOBS          GET INVOLVED          COPYRIGHT POLICY          PRIVACY POLICY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Criminal No.:** | **18-cr-170 (KBJ)** |
| | ) | | |
| **v.** | ) | | |
| | ) | | |
| **JAMES A. WOLFE** | ) | | |

## PROPOSED ORDER

     The Court, having considered Defendant James A. Wolfe's Motion for an Order

Governing Extrajudicial Statements under Local Criminal Rule 57.7(c), it is hereby ORDERED

that the Defendant's motion is DENIED.


     SO ORDERED this _____ day of _____, 2018.



_____
JUDGE KETANJI BROWN JACKSON
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA