EXHIBIT 1

Google    James Wolfe leak

All    **News**    Images    Videos    Shopping    More          Settings    Tools

About 11,300 results (0.27 seconds)



**Border Agent Who Questioned Reporter Is Investigated for Computer ...**
New York Times - Jul 12, 2018
James A. Wolfe, the Senate Intelligence Committee's former security ... whether Mr. Wolfe leaked sensitive material to journalists are now under ...

Border Agent Who Grilled Reporter About Leaks Investigated For ...
TPM - Jul 12, 2018
Border Patrol agent under investigation after obtaining journalist's ...
Washington Examiner - Jul 12, 2018
Trump admin investigating border agent for computer misuse after ...
The Hill - Jul 12, 2018
Report: Border Agent Probed for Misuse of Govt Info Systems
Newsmax - Jul 12, 2018

    
TPM    Washington E...    The Hill    Newsmax    Breaking Israe...

**View all**



**How an Affair Between a Reporter and a Security Aide Has Rattled ...**
New York Times - Jun 24, 2018
She had met James Wolfe, a 50-something senior aide to the Senate ... preoccupations: leaks, which he has railed about since taking office; ...



**New York Times reassigns reporter who dated Senate intelligence ...**
Washington Post - Jul 3, 2018
... with James Wolfe, the former head of security for the Senate Intelligence ... Watkins, during their investigation of leaks from the committee.

New York Times Reassigns Reporter in Leak Case
Highly Cited - New York Times - Jul 3, 2018

**View all**



**Trump Finds a New Weapon for His War on Journalism — Leak ...**
The Intercept - Jul 16, 2018
Last month, James Wolfe was indicted for lying to the FBI about his contacts with four reporters while he worked for the Senate Select ...



**US opposes gag order for Trump sought by Senate intelligence aide in ...**
Washington Post - Jul 12, 2018
Wolfe's attorneys also said that Assistant Attorney General John Demers ... [Senate intelligence aide pleads not guilty in leak probe, seeks gag ...



**How a young reporter's affair with a top government staffer became the ...**
Business Insider - Jun 25, 2018
The staffer, James Wolfe, has been charged with lying to federal investigators about ... as part of an investigation of classified information leaks.

REVEALED: Intelligence staffer, 58, who 'leaked to lover, 26, and lied ...
In-Depth - Daily Mail - Jun 25, 2018

**View all**



**NSA contractor Reality Winner admits leak**
BBC News - Jun 26, 2018
Winner's plea is the latest leak-related case this month. Former Senate Intelligence Committee staffer James Wolfe was arrested earlier in ...

Reality Winner, NSA Contractor Accused in Leak, Pleads Guilty
Highly Cited - New York Times - Jun 26, 2018

**View all**



**Is the Ali Watkins case the first shot in Trump's war on the press?**
San Francisco Chronicle - Jun 28, 2018
The first person charged by the Trump administration with **leaking** ... Last month, a
veteran congressional aide, **James** A. **Wolfe**, who was head ...
**Von Drehle: Conflict of interest undermines media**
Spartanburg Herald Journal - Jun 28, 2018
**View all**



**NY Times uncovers troubling questions about its reporter's affair with ...**
Fox News - Jun 27, 2018
The indictment of a Senate intelligence committee official in a **leak** ... covered the
very committee where **James Wolfe** was the security director.
**How a reporter's sex life put journalism ethics at stake**
Opinion - Washington Post - Jun 26, 2018
**View all**



**Decision on Trump gag order for James Wolfe case could come this ...**
Washington Times - Jul 9, 2018
Decision on Trump gag order for **James Wolfe** case could come this month ...
relationships with reporters to FBI agents investigating the **leak** of ...

Stay up to date on results for **James Wolfe leak**.                    [Create alert]



1   2   3   4   5   6   7   8   9   10   Next

The selection and placement of stories on this page were determined automatically by a computer program. The time or date displayed
reflects when an article was added to or updated in Google News.

Help       Send feedback       Privacy       Terms

# EXHIBIT 2

# The New York Times

# *Border Agent Who Questioned Reporter Is Investigated for Computer Misuse*

**By Scott Shane and Ron Nixon**

July 12, 2018

A Border Patrol agent who obtained the confidential travel records of a Washington journalist and used them to press her about her sources last year is under investigation for misuse of government computer systems, according to an official briefed on the inquiry.

The agent, Jeffrey A. Rambo, who usually worked in the San Diego area, was temporarily assigned at the time to the National Targeting Center, a facility in Sterling, Va., operated by Customs and Border Protection that stores data on the travel of millions of Americans and foreigners. Such information is supposed to be used only under strict rules by immigration and law enforcement officials.

Now the Department of Homeland Security's inspector general and investigators from the border agency are examining whether Mr. Rambo used the travel data improperly or illegally and whether anyone else was involved. Press advocates have expressed alarm that a government official would use sensitive private information in what they say amounted to a blackmail attempt against a journalist.

On June 1, 2017, Mr. Rambo, 33, contacted Ali Watkins, a reporter for Politico at the time who now works at The New York Times, saying that he needed to meet her in Washington immediately. He told Ms. Watkins that he worked for the government but declined to give his name or agency.

In a lengthy conversation at a bar near Dupont Circle, Mr. Rambo claimed to be helping the F.B.I. with investigations into leaks of sensitive material to journalists. He eventually revealed that he knew the details of a trip to Spain that Ms. Watkins had taken with James A. Wolfe, security director of the Senate Intelligence Committee, who was then her boyfriend.

According to accounts Ms. Watkins provided to friends and editors, Mr. Rambo hinted that he might disclose their relationship to The Washington Post and pressed her to become his informant and report to him on other journalists and their sources.

Ms. Watkins rejected the request and returned the next day to the bar where they had talked and learned his identity from a credit card receipt. The episode was widely reported last month after Mr. Wolfe was arrested and accused of lying to F.B.I. leak investigators about his contacts with Ms. Watkins and other reporters. He has pleaded not guilty.

7/23/2018
Case 1:18-cr-00170-KBJ Document 29-1 Filed 07/23/18 Page 6 of 23
Border Patrol Questioned Reporter's Investigated Her Leaks to House — The New York Times

News of Mr. Wolfe's arrest also revealed that Ms. Watkins's email and phone records had been secretly seized by the Trump administration as part of the leak inquiry. The Times subsequently conducted an internal review of Ms. Watkins's actions, and she was recently reassigned to its New York newsroom.

Mr. Rambo's actions raised several questions: What was a California border patrol agent doing in the Washington area? Was he really helping the F.B.I. with leak investigations, as he claimed? Was his anonymous approach to Ms. Watkins, which violated law enforcement standards, part of an authorized operation or the work of a rogue agent?

Law enforcement officials have said they can find no evidence that Mr. Rambo was officially assigned to work on leak investigations. Officials at Customs and Border Protection and its parent agency, Homeland Security, have declined to answer questions about Mr. Rambo's role, citing the internal investigation.

Mr. Rambo has not replied to repeated requests for comment. But several government officials, speaking on condition of anonymity, have supplied some basic facts.

The officials confirmed that Mr. Rambo had been assigned to the National Targeting Center, which is why he was in the Washington area and might have had access to Ms. Watkins' private travel information.

It remains unclear whether Mr. Rambo handled or heard about an official F.B.I. request to the center for Mr. Wolfe's travel records, and, if so, whether that led to the discovery that Ms. Watkins was his traveling companion. According to Ms. Watkins's accounts, Mr. Rambo spoke with enthusiasm to her about Mr. Trump's crackdown on leaks, telling her that "we're finally going to be able to drain the swamp," raising the possibility that he had searched the database for her records on his own initiative.

Either way, for Mr. Rambo, the venture into combating leaks appears to be the latest expression of an entrepreneurial personality. Public records and internet archives show that starting in his teenage years, he has embarked on ambitious enterprises, although they have produced only modest results.

When he was 16, records show, he helped start what he called an "online consulting company," called Rambo Harrington & Hopkins, to advise small businesses how to use the web. In 2003, he announced in a news release that his business had "evolved into Brandergy, Inc., a new firm with a new sense of direction and purpose."

"The new firm, where Rambo finds himself as Managing Director and CEO, will focus all of its attention to the Branding world," said the release, written when Mr. Rambo was 17.

But Brandergy went nowhere, according to Kwan Skinner, an experienced programmer whom Mr. Rambo announced as "Operations Director and Chief Technology Officer." Mr. Skinner said in an interview that he had supplied software to Mr. Rambo but had never received the payments he was promised, and that he had eventually dropped out of the effort.

"I don't think he was doing anything deliberately dishonest or manipulative," Mr. Skinner said of Brandergy. "It just never took off."

Mr. Rambo joined the border patrol in 2007, serving in and around San Diego. While there, he created a website, jefframbo.com, where he periodically posted blog items recounting his thoughts on law enforcement, current events and developments in San Diego, sometimes posting photographs.

One 2011 post hinted at a difficult upbringing.

"We were deprived of cousins to call over for playtime because they were in graves for traveling the wrong path in life," he wrote. "We were deprived of fathers that were serving prison sentences. We were deprived of going outside after certain hours due to fears of drive-by's. We were deprived of a mother due to an addiction. We were deprived of our happiness in result of too many beatings. We were deprived of our brothers who liked the wrong colors and paid a price for it."

In 2014, again showing a flair for promotional entrepreneurship, Mr. Rambo announced that he and a partner would soon open a microbrewery, Social Jack's Brewing Company, in San Diego's Little Italy neighborhood. He had lined up a location and an experienced manager, and the plans were written up in San Diego Eater, a website, and described in a captivating video.

Once again, the business appears to have failed quickly, leaving multiple claims against Mr. Rambo for start-up loans he had not repaid, court records show.

Mr. Rambo's blog went silent for a long stretch, but in 2016 he used it to promote a new idea: to turn business failure into a kind of success.

"Have you ever set out to achieve greatness only to find yourself alone in a corner, with nothing to show but the resulting fear of embarrassment, regret, and worst of all … shame?" he wrote. "If there were ever fifty words to surmise what has become of my life, you just read them. But the most important words are those to come, which detail my rebound and will inspire you toward greatness of your own."

Nothing appears to have followed. But early this year, months after his encounter with Ms. Watkins, he added a nicely designed, blue-and-red logo to the blog.

"Dear Failure with Jeff Rambo," it said. The website is no longer online and can be viewed only in archived versions.

A version of this article appears in print on July 13, 2018, on Page B4 of the New York edition with the headline: Border Agent Who Pressed Reporter Faces Inquiry Into Computer Misuse

# EXHIBIT 3



# White House says Trump is not above the law

BY **JORDAN FABIAN** - 06/04/18 03:00 PM EDT

**1,033** SHARES

 

## Just In...

**Pollster: Plurality of Americans do not believe Trump colluded with Russia**
WHAT AMERICA'S THINKING
— 3M 23S AGO

**Ex-CIA chief on possible removal of security clearance: 'Won't have any effect on what I say'**
ADMINISTRATION — 3M 33S AGO

**Clapper: Trump considering revoking security clearance 'very petty'**
NATIONAL SECURITY
— 7M 26S AGO

**Rock band Papa Roach mocks Trump with all-caps reference to their hit song "Last Resort"**
IN THE KNOW — 9M 57S AGO

**Federal prosecutors received 12 audio tapes seized from Cohen**
ADMINISTRATION — 12M 22S AGO

**GOP pollster: 'A lot of Democrats' will back Trump on trade**
WHAT AMERICA'S THINKING
— 13M 34S AGO

**Georgia lawmaker who yelled racial slurs on Sacha Baron Cohen show says he won't resign**
NEWS — 18M 43S AGO



The White House on Monday said President Trump is not above the law, despite his assertion he has the power to pardon himself to avoid punishment in the Russia probe.

"Certainly, no one is above the law," White House press secretary Sarah Huckabee Sanders told reporters at her daily press briefing.

Sanders was asked three separate times if Trump believes he is above the law, and she reiterated the president's belief that he would not need to use a pardon on himself because "he hasn't done anything wrong."

"Thankfully, the president hasn't done anything wrong and wouldn't have any need for a pardon," she said.

Trump raised fears of a constitutional crisis on Monday morning when he claimed in a tweet that he has the "absolute right" to pardon himself.

The comment came after The New York Times published a months-old letter from his lawyers to special counsel Robert Mueller that opened the door to extraordinary actions by Trump to curtail the Russia investigation, including pardons for himself or associates who have been charged with crimes.

Trump's personal attorney Rudy Giuliani responded over the weekend by saying the president "probably" has the ability to pardon himself, but likely would not because it would cause political problems.

**On the front lines of a trade war, U.S. chemical manufacturers home in on solutions**

OPINION — 18M 46S AGO

VIEW ALL

Despite Sanders's claim Monday that the Constitution "very clearly lays out the law," legal experts say the idea of a self-pardon is untested and are divided over whether it would be legal.

The mere suggestion of a self-pardon, however, prompted criticism from Democrats and some Republicans that the president would be abusing his power if he decided to exonerate himself in the Russia probe.

"Donald in Wonderland: through a legal looking glass, no President can be prosecuted because whatever he says is the law," Sen. Richard Blumenthal (D-Conn.) tweeted on Sunday. "Too absurd even for fiction. In fact, no one is above the law."

*--Updated at 3:33 p.m.*

TAGS   ROBERT MUELLER   DONALD TRUMP   PARDON   WHITE HOUSE PRESS BRIEFING   TRUMP TWEETS

 SHARE    TWEET    PLUS ONE   

Related News by



Sponsored

How Hawaii Is Building the Future Now



The Memo: Summit fallout hits White House



Leader in Iran's Revolutionary Guard...



Trump warns Iran's Rouhani: Threaten us...



THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX
THE CONTENTS OF THIS SITE ARE ©2018 CAPITOL HILL PUBLISHING CORP., A SUBSIDIARY OF NEWS COMMUNICATIONS, INC.

# EXHIBIT 4

59 Misc.3d 790, 74 N.Y.S.3d
442, 2018 N.Y. Slip Op. 28082

**\*\*1**  Summer Zervos, Plaintiff,

v

Donald J. Trump, Defendant.

Supreme Court, New York County

150522/17

March 20, 2018

CITE TITLE AS: Zervos v Trump

### HEADNOTES

Constitutional Law
Supremacy Clause
State Defamation Action against Current President of
United States

([1]) Defendant, the current President of the United
States, was not entitled to have plaintiff's defamation
action against him, based on statements made during
his presidential campaign, dismissed or stayed during the
term of his presidency. The President of the United States
has no immunity and is subject to the laws for purely
private acts, since immunities are grounded in the nature
of the function performed, not the identity of the actor
who performed it. When unofficial conduct is at issue,
there is no risk that a state will improperly encroach on
powers given to the federal government by interfering
with the manner in which the President performs federal
functions. There is no possibility that a state court will
compel the President to take any official action or that
it will compel the President to refrain from taking any
official action. State courts can manage lawsuits against
the President based on private unofficial conduct just as
well as federal courts and can be just as mindful of the
unique position in the constitutional scheme that the office
occupies.

Pleading
Sufficiency of Pleading
Libel and Slander—Defamation Action against President
of United States—Comments Made during Presidential
Campaign

([2]) Plaintiff's defamation pleading against defendant
President of the United States, alleging that defendant,
during campaign speeches and on social media, called
her a liar and suggested that she was seeking fame or
hired by his opponent when she publicly stated that
defendant forcibly kissed and touched her inappropriately
on several occasions, met the minimum standards to
proceed. A false statement tending to expose a person
to public contempt, hatred, ridicule, aversion or disgrace
constitutes defamation. Statements calling an individual
who claims to have been a victim of sexual abuse a liar
and suggesting that they were motivated by other interests
are susceptible to a defamatory connotation where the
defendant appears well placed to have information about
the charges and the context of the statements suggested
that he spoke with authority, and that his statements were
based on facts. Here, defendant, the only person other
than plaintiff who knows what happened between the
two of them, repeatedly accused plaintiff of dishonesty
not just in his opinion but as a matter of fact. He
averred that plaintiff told "phony stories" and issued
statements that were "totally false" and "fiction," and he
insisted that the events "never happened" and that the
allegations were "100% false [and] made up." Defendant
used specific, easily understood language to communicate
that plaintiff lied to further her interests and his statements
could be proved true or false. Moreover, the statements,
which were not made through op-ed pieces or letters to
the editor, but were delivered in speeches, debates and
through Twitter, a preferred means of communication
often used by defendant, could not be characterized
simply as opinion.

#### \*791  RESEARCH REFERENCES

Am Jur 2d Libel and Slander §§ 109, 196, 269, 414–416.

NY Jur 2d Defamation and Privacy §§ 7, 16, 128–130, 257,
258, 410.

New York Law of Torts §§ 1:41, 1:48.

#### ANNOTATION REFERENCE

See ALR Index under Libel and Slander; President of
United States.

FIND SIMILAR CASES ON
THOMSON REUTERS WESTLAW

Path: Home > Cases > New York State & Federal Cases
> New York Official Reports

Query: president /s "unofficial conduct" & immun!
dismiss!

## APPEARANCES OF COUNSEL

*Kasowitz Benson Torres LLP* (*Mark E. Kasowitz*, *Christine A. Montenegro* and *Paul J. Burgo* of counsel) for defendant.

*Cuti Hecker Wang LLP* (*Mariann Meier Wang*, *John Cuti*, *Eric Hecker*, *Daniel Mullkoff* and *Heather Gregorio* of counsel) and *Allred, Maroko & Goldberg* (*Gloria Allred*, *Nathan Goldberg* and *Marcus Spiegel* of counsel) for plaintiff.

## OPINION OF THE COURT

Jennifer G. Schecter, J.

In *Clinton v Jones* (520 US 681 [1997]), the United States Supreme Court held that a sitting president is not immune from being sued in federal court for unofficial acts. It left open the question of whether concerns of federalism and comity compel a different conclusion for suits brought in state court. Because they do not, defendant's motion to dismiss this case or hold it in abeyance is denied.

### Background

On this motion to dismiss the complaint, the court must accept the facts alleged by plaintiff to be true (*Davis v Boeheim*, 24 NY3d 262, 268 [2014]).

In 2005, plaintiff Summer Zervos, a California resident, was a contestant on *The Apprentice*, a reality show starring and produced by defendant Donald J. Trump (affirmation in support, exhibit 19 [complaint] ¶ 19). After defendant "fired" her **\*792** on the program, plaintiff continued to seek him out for advice and to pursue job opportunities (*id.* ¶ 21).

In 2007, plaintiff met with defendant at his New York office. He allegedly kissed her twice on the lips, making her "uncomfortable, nervous and embarrassed" (*id.* ¶ 26). The next time she saw defendant was after he called her and asked her to meet him at the Beverly Hills Hotel for

dinner at a restaurant (*id.* ¶ 27). When plaintiff arrived, she was escorted to defendant's bungalow and waited for him in the living room area (*id.* ¶ 28). After 15 minutes, **\*\*2** defendant emerged from his bedroom, kissed Ms. Zervos "open mouthed" and pulled her toward him (*id.* ¶ 29). He asked her to sit next to him, "grabbed her shoulder, again kissing her very aggressively, and placed his hand on her breast" (*id.* ¶ 29). After plaintiff pulled back and walked away, defendant took her hand and led her into the bedroom (*id.* ¶ 30). When plaintiff walked out, he turned her around and suggested that they "lay down and watch some telly telly" (*id.*). He embraced her and plaintiff pushed him away, telling him to "get real" (*id.* ¶ 30). He then repeated plaintiff's words back to her lasciviously and "began to press his genitals against her, trying to kiss her again" (*id.* ¶ 30).

After plaintiff told defendant that she had come to see him for dinner, defendant "paced around the room and seemed angry" (*id.* ¶ 31). The two had dinner, which abruptly ended when defendant stated that he needed to go to bed and told plaintiff to meet him the next day at his golf course (*id.* ¶ 34). Plaintiff immediately went to discuss what had happened with her father and to get his advice (*id.* ¶ 35). She decided to go ahead with the meeting (*id.*).

The following day, plaintiff had limited interaction with defendant who introduced her to the general manager of the golf course (*id.* ¶ 36). Later that week, the manager offered plaintiff a job at half the salary that she had been seeking (*id.* ¶ 38). Plaintiff called defendant and told him that she "was upset, because it felt like she was being penalized for not sleeping with him" (*id.* ¶ 39).

In 2009 and 2010, plaintiff continued seeking employment within the Trump Organization to no avail (*id.* ¶ 40). She believed that defendant's "sexually inappropriate misconduct . . . at the Beverly Hills Hotel was either a test or an isolated incident" (*id.* ¶ 42). In 2016, plaintiff emailed defendant "that their past encounter had been hurtful and embarrassing" (*id.* ¶ 43). She never received a response (*id.*).

**\*793** In July 2016, defendant was selected as the presidential nominee for the Republican party (*id.* ¶ 44).

On October 7, 2016, footage from the television show *Access Hollywood* was made public that depicted defendant telling the program's host: " 'I just start kissing

[women] . . . Just kiss. . . . I don't even wait. And when you're a star, they let you do it. You can do anything. . . . Grab them by the pussy. You can do anything' " (*id.* ¶¶ 1, 4). During a presidential debate two days later, defendant denied engaging in the behavior that he had discussed on tape and characterized his words as "locker-room talk" (*id.* ¶ 48).

Plaintiff subsequently "chose to come forward and to speak publicly . . . . She felt that telling the world of her specific experiences . . . was ethically the right thing to do, so that the public could evaluate Mr. Trump fully as a candidate for president" (*id.* ¶ 50). On the afternoon of October 14, 2016, plaintiff along with her counsel held a press conference at which she "publicly described her interactions with Mr. Trump in detail, including his unwanted sexual misconduct" (*id.* ¶ 53).

That very day, defendant responded in a statement that was widely reported and appeared on his campaign website: " 'To be clear, I never met her at a hotel or greeted her inappropriately a decade ago. That is not who I am as a person and it is not how I've conducted my life' " (*id.* ¶ 55). Later on, at a North Carolina campaign rally, defendant stated,

> "these allegations are 100% false . . . They are made up, they never happened . . . It's not hard to find a small handful of people willing to make false smears for personal fame, who knows maybe for financial reasons, **\*3** political purposes, or for the simple reason they want to stop our movement. They want to stop our campaign. Very simple. These claims defy reason, truth, logic, common sense. They're made without supporting witnesses. No witnesses. Hey you know, 28 years ago, 10 years ago, 14 years ago, 12 years ago. Not me. Believe me. Not me. Not me" (*id.* ¶ 59; affirmation in support, exhibit 3 at 2-3).

At a rally in New Hampshire on October 15, 2016, defendant reported that plaintiff's cousin "wrote a letter that what she said is a lie" (affirmation in support, exhibit 8 at 2). He stated that many of the allegations against him had already been "proven so false," referred to another story in the media about **\*794** him and insisted: "we can't let them get away with this . . . . Total lies. . . . [You've] been seeing total lies" (*id.*). He said "you have phony people coming up with phony allegations, with no witnesses whatsoever" (*id.* at 3).

He tweeted about "100% fabricated and made up charges" and that nothing "ever happened with any of these women. Totally made up nonsense to steal the election" (complaint ¶¶ 60, 63). He lamented over Twitter about losing large numbers of women voters "based on made-up events that never happened" (*id.* ¶ 66).

On October 17, 2016, defendant tweeted: "Can't believe these totally phony stories, 100% made up by women (many already proven false) and pushed big time by press, have impact!" (Affirmation in support, exhibit 12.) He also re-tweeted a statement by someone else about plaintiff, which included a picture of her and set forth "this is all yet another hoax," adding his own comment: "Terrible" (complaint ¶ 69; affirmation in support, exhibit 13). At 4:31 that afternoon, defendant tweeted: "New polls are good because the media has deceived the public by putting women front and center with made-up stories and lies, and got caught" (affirmation in support, exhibit 14).

At the next presidential debate, on October 19, 2016, defendant answered a question about reports by nine women of nonconsensual kissing or groping (complaint ¶ 73; affirmation in support, exhibit 17 at 19/37). He stated:

> "those stories are all totally false. . . . I didn't know any of these women. I didn't see these women. These women, the woman on the plane, the woman on the—I think they want either fame or [the Clinton] campaign did it. . . . I believe . . . [Hillary Clinton] got these people to step forward. If it wasn't, they get their ten minutes of fame, but they were all totally—it was all fiction. It was lies and it was fiction" (complaint ¶ 73; affirmation in support, exhibit 17 at 20/37).

Finally, on October 22, 2016, at a Pennsylvania rally, defendant declared: "Every woman lied when they came forward to hurt my campaign, total fabrication. The events never happened. Never. All of these liars will be sued after the election is over" (complaint ¶ 74).

On January 17, 2017, plaintiff commenced this action, alleging that defendant made defamatory statements about her "knowing they were false and/or with reckless disregard for **\*795** their truth or falsity" (*id.* ¶ 78). She asserts that as a direct result of the false statements and being "branded a liar who came forward only for fame or at the manipulation of the Clinton campaign," she

suffered emotionally and financially (*id.* ¶¶ 80-82). She pleads that defendant's statements included numerous false representations about her, "including that [her] description of being subjected to unwanted sexual touching by defendant was a lie, phony, a hoax and 'made up,' and that [she] was motivated by fame and/or directed by Clinton or the Democrats" (*id.* ¶ 85). She contends that she "suffered at least $2,914" in financial losses because her restaurant lost business (*id.* ¶ 81). **4

Three days after this action was filed, defendant became the 45th President of the United States. He now moves for dismissal or for a continuance of this case until he leaves office. Because there is no authority for delaying adjudication and because plaintiff has stated a cause of action, defendant's motion is denied.

### Analysis

No one is above the law. It is settled that the President of the United States has no immunity and is "subject to the laws" for purely private acts (*Clinton*, 520 US at 696). In *Clinton v Jones*, the United States Supreme Court made clear that "immunities are grounded in 'the nature of the function performed, not the identity of the actor who performed it' " (*id.* at 695 [citation omitted]). There, the Court required then-President William Jefferson Clinton to defend against a civil rights action that included a state-law defamation claim in federal court. The Court concluded that the President was subject to suit because regardless of the outcome there was no "possibility that the decision [would] curtail the scope of the official powers of the Executive Branch" (*id.* at 701). It explained that the "litigation of questions that relate entirely to the unofficial conduct of the individual who happens to be the President poses no perceptible risk of misallocation of either judicial power or executive power" (*id.*). In holding that the doctrine of separation of powers did not mandate a stay of all private actions against the President, the Court flatly rejected that "interactions between the Judicial Branch and the Executive, even quite burdensome interactions, necessarily rise to the level of constitutionally forbidden impairment of the Executive's abil- **796 ity to perform its constitutionally mandated functions" (*id.* at 702).

The rule is no different for suits commenced in state court related to the President's unofficial conduct. Nothing in the Supremacy Clause of the United States Constitution even suggests that the President cannot be called to account before a state court for wrongful conduct

that bears no relationship to any federal executive responsibility. Significantly, when unofficial conduct is at issue, there is no risk that a state will improperly encroach on powers given to the federal government by interfering with the manner in which the President performs federal functions. There is no possibility that a state court will compel the President to take any official action or that it will compel the President to refrain from taking any official action.

To be sure, in pointing out that proceedings in state court may warrant a different analysis from those in federal court, each and every one of the concerns that the United States Supreme Court raised implicates unlawful state intrusion into federal government operations (*id.* at 691 n 13, citing *Hancock v Train*, 426 US 167 [1976] [federal agencies' operations could not be conditioned on obtaining state permits]; *Mayo v United States*, 319 US 441, 445, 447 [1943] [a state cannot lay fees or exact money on a United States instrumentality as "the federal function must be left free"]; *see also Matter of Schmoll, Inc. v Federal Reserve Bank of N. Y.*, 286 NY 503, 509 [1941] [a state court may not "control the manner in which a federal agency performs or attempts to perform its functions and duties . . . . Assumption of such power would hamper orderly government and ignore the division of the fields of government of state and nation **5 created by the Constitution"], *cert denied* 315 US 818 [1942]). [1] Those concerns are nonexistent when only unofficial conduct is in question.

Nor is there any legitimate fear of local prejudice in state court when the actions under review bear no relationship to **797 federal duties (*Clinton*, 520 US at 691, citing 28 USC § 1442 [a] [1] [authorizing removal from state to federal court of ac- tions against officials "for or relating to any act under color of such office"]; *Mesa v California*, 489 US 121, 139 [1989] [explaining that in cases where "true state hostility may have existed, it was specifically directed against federal officers' efforts to carry out their federally mandated duties"]; *see also Watson v Philip Morris Cos.*, 551 US 142, 150 [2007] [purpose of removal statute is to "protect the Federal Government from the interference with its 'operations' "]).

There is no reason, moreover, that state courts like their federal counterparts will be "either unable to accommodate the President's needs or unfaithful to the tradition . . . of giving 'the utmost deference to Presidential

responsibilities' " (*Clinton*, 520 US at 709). State courts can manage lawsuits against the President based on private unofficial conduct just as well as federal courts and can be just as mindful of the " 'unique position in the constitutional scheme' that th[e] office occupies" (*id.* at 698).

Additionally, and for the very same reasons articulated in *Clinton v Jones*, a stay for the duration of the Trump presidency must be denied. A lengthy and categorical stay is not justified based on the possibility that, at a moment's notice, the President may have to attend to a governmental or international crisis. If and when he does, of course, important federal responsibilities will take precedence.

([1]) In the end, there is absolutely no authority for dismissing or staying a civil action related purely to unofficial conduct because defendant is the President of the United States. Resolution of an action unrelated to the President's official conduct is the responsibility of a state court and is not impermissible "direct control . . . over the President" (*Clinton*, 520 US at 691 n 13). Congress, moreover, has enacted legislation deferring civil litigation under circumstances it felt appropriate (*see* 11 USC § 362 [bankruptcy stay]; 50 USC § 3901 *et seq.* [staying proceedings against servicemembers during military service]). Even after *Clinton v Jones*, decided more than 20 years ago, Congress has not suspended proceedings against the President of the United States and there are no compelling reasons for delaying plaintiff's day in court here. **6

*798 ([2]) Dismissal of the complaint for failure to state a cause of action is also denied as the "pleading meets [the] minimal standard necessary" to proceed (*see Davis*, 24 NY3d at 268).[2] Plaintiff's complaint is based on assertions made by defendant, that if proved false, form the predicate for a maintainable defamation action (*Gross v New York Times Co.*, 82 NY2d 146, 154 [1993]).

A false statement tending "to expose a person to public contempt, hatred, ridicule, aversion or disgrace constitutes defamation" (*Davis*, 24 NY3d at 268). In *Davis v Boeheim*, the Court of Appeals determined that a defamation action could be maintained against a defendant who called individuals claiming to have been victims of sexual abuse liars and stated that he believed that they were motivated by money to go public (*Davis*, 24 NY3d 262 [reinstating defamation action against someone

who *may* have known undisclosed facts about alleged sexual abuse]). The Court concluded that the statements were susceptible to a defamatory connotation because they communicated that defendant had information unknown to others that justified his statements that the individuals were neither credible or victims of abuse (*id.* at 272). Defendant in *Davis* "appeared well placed to have information about the charges" and the context of the statements suggested that he "spoke with authority, and that his statements were based on facts" (*id.* at 273).

The statements here weigh even more heavily against dismissal of the complaint. Defendant—the only person other than plaintiff who knows what happened between the two of them—repeatedly accused plaintiff of dishonesty not just in his opinion but as a matter of fact. He not only averred that plaintiff told "phony stories" and issued statements that were *799 "totally false" and "fiction," he insisted that the events "never happened" and that the allegations were **7 "100% false [and] made up.[3] A reader or listener, cognizant that defendant knows exactly what transpired, could reasonably believe what defendant's statements convey: that plaintiff is contemptible because she "fabricated" events for personal gain (*see Divet v Reinisch*, 169 AD2d 416, 417 [1st Dept 1991] [libelous character of statement "derives from the fact that it charges (individuals) in writing with being liars and is thus actionable on its face"]).

Defendant used "specific, easily understood language to communicate" that plaintiff lied to further her interests (*Davis*, 24 NY3d at 271). His statements can be proved true or false, as they pertain to whether plaintiff made up allegations to pursue her own agenda (*id.*). Most importantly, in their context, defendant's repeated statements—which were not made through op-ed pieces or letters to the editor but rather were delivered in speeches, debates and through Twitter, a preferred means of communication often used by defendant—cannot be characterized simply as opinion, heated rhetoric or hyperbole.[4] That defendant's statements about plaintiff's veracity were made while he was campaigning to become President of the United States, does not make them any less actionable (*see Silsdorf v Levine*, 59 NY2d 8, 16 [1983] [explaining that "concern over undue limitations upon expression in the course of political campaigns" by allowing a defamation action to proceed was "misplaced"], *cert denied* 464 US 831 [1983]).[5]

Zervos v Trump, 74 N.Y.S.3d 442 (2018)
74 N.Y.S.3d 442, 2018 N.Y. Slip Op. 28082

Because there is a reasonable view of the claim upon which plaintiff would be entitled to recover for defamation, the **\*800** complaint sufficiently states a cause of action ( **\*\*8** *Davis*, 24 NY3d at 274).

Accordingly, it is ordered that defendant's motion is denied.

### FOOTNOTES

Copr. (C) 2018, Secretary of State, State of New York

Footnotes

1    The cases defendant relies on are no different (*see Tennessee v Davis*, 100 US 257, 267 [1879] [statute authorizing removal of actions against federal officers engaged in official duties is "no invasion of State domain"]; *Tarble's Case*, 80 US 397 [1871] [state judge could not intrude with operations of federal government by discharging a prisoner held under the authority of the United States]; *McClung v Silliman*, 19 US 598, 605 [1821] [state court cannot issue writ of mandamus compelling federal officer to take governmental action]).

2    New York law applies. Defendant has not established that there is a conflict between substantive New York and California defamation law (*K.T. v Dash*, 37 AD3d 107, 111 [1st Dept 2006]). The only difference defendant points out is California's anti-SLAPP provision, which is a procedural statute enacted as part of California's Code of Civil Procedure and has no applicability here (*see* Cal Civ Proc Code § 425.16 [j] [1] [requiring transmission of papers to California's Judicial Council]; *see also Liberty Synergistics Inc. v Microflo Ltd.*, 718 F3d 138, 154 [2d Cir 2013] [explaining that "California courts have repeatedly held . . . that California's anti-SLAPP rule is 'procedural' in nature" and applies in California courts regardless of which source of law governs a plaintiff's substantive claim; *Kibler v Northern Inyo County Local Hosp. Dist.*, 39 Cal 4th 192, 202, 138 P3d 193, 198 [2006] [anti-SLAPP statute is a "procedural device"]).

3    Accepting the allegations in the complaint as true, the challenged statements were "of and concerning" plaintiff. Some of the statements referred to "every woman" who came forward—"a particular, specifically-defined group of individuals" that a jury could find included plaintiff (*see Three Amigos SJL Rest., Inc. v CBS News Inc.*, 28 NY3d 82, 86-87 [2016]; *see also Gross v Cantor*, 270 NY 93, 96 [1936]). The context of other statements—some of which were made days after plaintiff's press conference, related to allegations raised at her press conference or mentioned plaintiff and her family— similarly raise jury questions as to whether they pertained to her.

4    *Contrast Jacobus v Trump*, 156 AD3d 452, 453 (1st Dept 2017) (holding that the statement that plaintiff, a political strategist, "begged" for a job, was "too vague, subjective and lacking in precise meaning . . . to be actionable [and that its] immediate context . . . would signal to the reasonable reader or listener" that it was an opinion and not fact).

5    Plaintiff's complaint, like the one in *Silsdorf*, sufficiently alleges actual malice (*Silsdorf*, 59 NY2d at 17).

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                              6

# EXHIBIT 5

  

Home › ABA Groups › Criminal Justice › Criminal Justice Standards › Criminal Justice Standards for the Prosecution Function

**AMERICAN BAR ASSOCIATION**

Fourth Edition of the

**CRIMINAL JUSTICE STANDARDS**

**for the**

**PROSECUTION FUNCTION**

**PART I.**

**GENERAL STANDARDS**

**Standard 3-1.1        The Scope and Function of These Standards**

(a)  As used in these standards, "prosecutor" means any attorney, regardless of agency, title, or full or part-time assignment, who acts as an attorney to investigate or prosecute criminal cases or who provides legal advice regarding a criminal matter to government lawyers, agents, or offices participating in the investigation or prosecution of criminal cases.  These Standards are intended to apply in any context in which a lawyer would reasonably understand that a criminal prosecution could result.

(b)  These Standards are intended to provide guidance for the professional conduct and performance of prosecutors.  They are written and intended to be entirely consistent with the ABA's Model Rules of Professional Conduct, and are not intended to modify a prosecutor's obligations under applicable rules, statutes, or the constitution.  They are aspirational or describe "best practices," and are not intended to serve as the basis for the imposition of professional discipline, to create substantive or procedural rights for accused or convicted persons, to create a standard of care for civil liability, or to serve as a predicate for a motion to suppress evidence or dismiss a charge.  For purposes of consistency, these

# Pages Intentionally Omitted

(a)  The prosecutor should act with diligence and promptness to investigate, litigate, and dispose of criminal charges, consistent with the interests of justice and with due regard for fairness, accuracy, and rights of the defendant, victims, and witnesses.  The prosecutor's office should be organized and supported with adequate staff and facilities to enable it to process and resolve criminal charges with fairness and efficiency.

(b)  When providing reasons for seeking delay, the prosecutor should not knowingly misrepresent facts or otherwise mislead.  The prosecutor should use procedures that will cause delay only when there is a legitimate basis for such use, and not to secure an unfair tactical advantage.

(c)  The prosecutor should not unreasonably oppose requests for continuances from defense counsel.

(d)  The prosecutor should know and comply with timing requirements applicable to a criminal investigation and prosecution, so as to not prejudice a criminal matter.

(e)  The prosecutor should be punctual in attendance in court, in the submission of motions, briefs, and other papers, and in dealings with opposing counsel, witnesses and others.  The prosecutor should emphasize to assistants and prosecution witnesses the importance of punctuality in court attendance.

**Standard 3-1.10**                **Relationship with the Media**

(a)  For purposes of this Standard, a "public statement" is any extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication or media, including social media.  An extrajudicial statement is any oral, written, or visual presentation not made either in a courtroom during criminal proceedings or in court filings or correspondence with the court or counsel regarding criminal proceedings.

(b)  The prosecutor's public statements about the judiciary, jurors, other lawyers, or the criminal justice system should be respectful even if expressing disagreement.

(c)  The prosecutor should not make, cause to be made, or authorize or condone the making of, a public statement that the prosecutor knows or reasonably should know will have a substantial likelihood of materially prejudicing a criminal proceeding or heightening public condemnation of the accused, but the prosecutor may make statements that inform the public of the nature and extent of the prosecutor's or law enforcement actions and serve a legitimate law enforcement purpose.  The prosecutor may make a public statement explaining why criminal charges have been declined or dismissed, but must take care not to imply guilt or otherwise prejudice the interests of victims, witnesses or subjects of an investigation.  A prosecutor's public statements

should otherwise be consistent with the ABA Standards on Fair Trial and Public Discourse.

(d)  A prosecutor should not place statements or evidence into the court record to circumvent this Standard.

(e)  The prosecutor should exercise reasonable care to prevent investigators, law enforcement personnel, employees, or other persons assisting or associated with the prosecutor from making an extrajudicial statement or providing non-public information that the prosecutor would be prohibited from making or providing under this Standard or other applicable rules or law.

(f)  The prosecutor may respond to public statements from any source in order to protect the prosecution's legitimate official interests, unless there is a substantial likelihood of materially prejudicing a criminal proceeding, in which case the prosecutor should approach defense counsel or a court for relief.  A statement made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity.

(g)  The prosecutor has duties of confidentiality and loyalty, and should not secretly or anonymously provide non-public information to the media, on or off the record, without appropriate authorization.

(h)  The prosecutor should not allow prosecutorial judgment to be influenced by a personal interest in potential media contacts or attention.

(i)  A prosecutor uninvolved in a matter who is commenting as a media source may offer generalized commentary concerning a specific criminal matter that serves to educate the public about the criminal justice system and does not risk prejudicing a specific criminal proceeding.  A prosecutor acting as such a media commentator should make reasonable efforts to be well-informed about the facts of the matter and the governing law.  The prosecutor should not offer commentary regarding the specific merits of an ongoing criminal prosecution or investigation, except in a rare case to address a manifest injustice and the prosecutor is reasonably well-informed about the relevant facts and law.

(j)  During the pendency of a criminal matter, the prosecutor should not re-enact, or assist law enforcement in re-enacting, law enforcement events for the media.  Absent a legitimate law enforcement purpose, the prosecutor should not display the accused for the media, nor should the prosecutor invite media presence during investigative actions without careful consideration of the interests of all involved, including suspects, defendants, and the public.  However, a prosecutor may reasonably accommodate media requests for access to public information and events.