FILED
OCT 15 2018
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No.: 18-Cr-170 (KBJ) |
| | ) | |
| v. | ) | |
| | ) | Status Date: October 11, 2018 |
| JAMES A. WOLFE | ) | |

### STATEMENT OF OFFENSE IN SUPPORT
### OF DEFENDANT'S PLEA OF GUILTY

The Government respectfully submits the following Statement of Offense in support of a plea of guilty by defendant James A. Wolfe to Count Three of the Indictment in the above-captioned matter.

**I.  ELEMENTS OF THE OFFENSE**

To sustain a conviction for a violation of 18 U.S.C. § 1001(a)(2) at trial, the government must prove the defendant (1) knowingly and willfully, (2) made any materially false, fictitious, or fraudulent statement or representation, (3) in a matter within the jurisdiction of the executive branch of the Government of the United States. A statement is "material" if it has a natural tendency to influence, or is capable of influencing, either a discrete decision or any other function of the agency to which it was addressed. The statement need not actually influence an agency in order to be material. The "knowing and willful" element does not require that an agency or individual actually be deceived, but only that the defendant knew that his statement was false.

**II.  SUMMARY OF FACTS**

If this case were to go to trial, the government would prove the following facts beyond a reasonable doubt:

1.  James A. Wolfe ("Wolfe") was employed as the Director of Security for the United States Senate Select Committee on Intelligence (SSCI) from May 1987 until at least December

2017. As SSCI Director of Security, Wolfe was responsible for receiving, maintaining, and managing all classified information provided to the SSCI by the Executive Branch of the United States.

2. Wolfe was specifically prohibited by the terms of his employment from communicating with the media without specific authorization from the SSCI Chairman or Vice Chairman. Wolfe was never given authorization to have contact with the media other than occasional contact regarding logistical matters.

3. Wolfe was advised in writing that SSCI rules prohibited him from having contact with the media. On October 23, 2012, and again on November 15, 2017, Wolfe acknowledged, by handwritten signature, having received, reviewed, and understood the SSCI Office Policy Manual ("the Manual"). Both versions of the Manual explicitly limited communications with the media to the Chairman, the Vice Chairman, and their designees.

4. Wolfe himself trained SSCI staff on the media contact policy. Wolfe regularly provided security briefings to all SSCI staff, and would routinely advise them about the SSCI media contact policy.

5. On April 11, 2017, classified national security information concerning the existence and predication of FBI surveillance of an individual ("MALE-1") pursuant to the Foreign Intelligence Surveillance Act (FISA) was published in an article authored by three reporters, including REPORTER #1.

6. In April 2017, the Federal Bureau of Investigation (FBI) opened an investigation into the unauthorized disclosure of this classified information to the news media. It was material to the FBI investigation whether Wolfe had been in contact with reporters and, if so, who those

reporters were, the nature and extent of those contacts, and the means by which those contacts occurred.

### The FBI Interview

7. On December 15, 2017, FBI agents conducted an interview of Wolfe in the District of Columbia. Prior to questioning, the FBI agents presented Wolfe with a typewritten questionnaire ("the Investigative Questionnaire") which contained blank lines to check indicating "Yes" or "No" answers as well as space to provide any requested explanation. FBI agents read the questions in the Investigative Questionnaire aloud to Wolfe and he answered orally and wrote on the document.

    a. Question 1 of the Investigative Questionnaire read as follows: "Do you understand that you are being provided this questionnaire as part of a criminal investigation being conducted by the FBI[?]" Wolfe stated and checked "Yes," and initialed this answer.

    b. Question 3 of the Investigative Questionnaire advised Wolfe, "Do you understand making false statements, orally or in writing to the FBI in connection with a federal criminal investigation is a violation of law, including but not limited to, a violation of Title 18, United States Code, Section 1001?" Wolfe stated and checked "Yes," and initialed this answer.

    c. During the interview, FBI agents showed Wolfe a copy of the news article authored by three reporters, including REPORTER #1, that contained classified information that had been provided to the SSCI by the Executive Branch for official purposes.

  d. Question 9 of the Investigative Questionnaire asked, "Have you had any contact with" any of those three reporters. As to each reporter, Wolfe stated and checked "No."

  e. Question 10 of the Investigative Questionnaire asked, "Besides [the three named reporters], do you currently have or had any contact with any other reporters (professional, official, personal)?" Before answering this question, Wolfe stated orally to the FBI agents that although he had no official or professional contact with reporters, he saw reporters every day, and so to "feel comfortable" he would check "Yes." He did so, and initialed this answer.

  f. Question 10 of the Investigative Questionnaire further asked, "If yes, who and describe the relationship (professional, official, personal)." In the space provided, Wolfe hand wrote "Official – No" and "Professional – No." Wolfe then orally volunteered that he certainly did not talk to reporters about anything SSCI-related. FBI agents orally asked Wolfe if he had traveled internationally with any reporter, gone to a ball game or to the movies with a reporter, or had weekly or regular electronic communication with a reporter. To each question Wolfe verbally responded "No." Wolfe then wrote "Personal – No" on the Investigative Questionnaire.

  g. Question 11 of the Investigative Questionnaire asked, "If yes to question ten, did you discuss or disclose any official U.S. government information or documents whether classified or unclassified which is the property of the U.S. government without express authorization from the owner of the information?" Wolfe stated and checked "No" and initialed this answer.

4

8.  On December 15, 2017, Wolfe signed and dated the Investigative Questionnaire adjacent to the following warning: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct."

9.  On or about December 15, 2017, after Wolfe had signed the Investigative Questionnaire, the FBI agents asked Wolfe about an article authored by REPORTER #2 that contained information that had been provided to the SSCI by the Executive Branch for official purposes. Wolfe denied knowing about the reporter's sources for the article.

10. After Wolfe stated that he did not know about REPORTER #2's sources, FBI agents confronted Wolfe with photographs showing Wolfe together with REPORTER #2. Wolfe then admitted to the FBI agents that he had lied to them, and that he had engaged in a personal relationship with REPORTER #2 since 2014, but maintained that he (Wolfe) had never disclosed to REPORTER #2 classified national security information or information that he learned as Director of Security for the SSCI that was not otherwise publicly available. Wolfe also stated that he never provided REPORTER #2 with news leads, intelligence, or information about non-public SSCI matters.

11. During the December 15, 2017 interview, Wolfe continued to deny any personal or professional contact with other reporters regarding SSCI matters.

### Wolfe's Contacts With Reporters

12. As of December 15, 2017, Wolfe had, in truth, engaged in contact with multiple reporters, including conveying to at least one reporter unclassified information concerning MALE-1, and on multiple occasions using his personal cell phone, his SSCI-issued electronic mail account, and anonymizing messaging applications, including Signal and WhatsApp.

*REPORTER #1*

13. At all times relevant to this indictment, REPORTER #1 was employed in Washington, D.C., by a news organization that covered national security matters, including matters relating to the SSCI. Between December 2015 and June 2017, Wolfe had repeated contact with REPORTER #1 using his official Senate email account, as follows:

   a. On December 9, 2015, at 10:18 p.m., Wolfe sent an email to REPORTER #1, stating, "Nice meeting you." At 10:56 p.m., REPORTER #1 replied, "Very nice meeting you! Enjoyed the chat." At 11:38 p.m., Wolfe responded, "Did you make it home safely?"

   b. On November 7, 2016, using the same email thread from December 2015, REPORTER #1 wrote, "Hey Jim. How are you? Been awhile."

   c. On May 8, 2017, MALE-1 emailed REPORTER #1 complaining about REPORTER #1's reporting of him (MALE-1). According to metadata recovered during the search of Wolfe's email, Wolfe was blind-copied on that email by MALE-1.

   d. On May 11, 2017, at 11:13 a.m., REPORTER #1 emailed Wolfe, "What's your cell?" The signature block of REPORTER #1's email contained the reporter's name, affiliation with a national news outlet, and telephone numbers.

   e. On May 11, 2017, at 5:16 p.m., REPORTER #1 sent a second email to Wolfe, writing "Hi! When can we get coffee?" This time, the signature block of the second email included a 44-character-long code made up of letters and numbers that appears to be a "PGP" fingerprint. If used, this fingerprint would have permitted Wolfe to send REPORTER #1 an email using an application that would encrypt the contents of the message, but not the subject line or the name of the sender.

24. On or about October 18, 2017, Wolfe contacted REPORTER #4 using Signal, offering to act as an anonymous source for REPORTER #4. Wolfe specifically cautioned REPORTER #4 to "never use [Wolfe's] name to any of [REPORTER #4's] colleagues or other news related colleagues."

Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar No. 472845

By: _____
Jocelyn Ballantine
Tejpal Chawla
  Assistant U.S. Attorneys

Laura Ingersoll
  Special Assistant U.S. Attorney
  National Security Section

Dated: October 15, 2018

## DEFENDANT'S ACCEPTANCE

I have read each of the pages which constitute the Statement of Offense and have discussed it with my attorneys, Preston Burton, Benjamin B. Klubes, and Lauren Randell. I fully understand this proffer and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this agreement fully.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in my plea agreement. I am satisfied with the legal services provided by my attorneys in connection with this proffer and my plea agreement and matters related to it.

Date: 10/15/2018

_____
James A. Wolfe
Defendant

## ATTORNEYS' ACKNOWLEDGMENT

I have read each of the pages which constitute the Statement of Offense, reviewed them with my client, and discussed the provisions of the proffer with him, fully. These pages accurately and completely set forth the government's proof as I understand it.

Date: 10/15/2018

_____
Preston Burton
Benjamin B. Klubes
Lauren Randell
Attorneys for Defendant

11