**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    :
**UNITED STATES OF AMERICA**          :
                                                    :
                                                    :
       **v.**                                    :        **Criminal No. 18-170 (KBJ)**
                                                    :        **Sentencing Date: December 20, 2018**
                                                    :
**JAMES A. WOLFE**                        :
                                                    :
                                                    :
_____ :


## DEFENDANT'S SENTENCING MEMORANDUM

In accordance with 18 U.S.C. § 3553(a) and Fed. R. Crim. P. 32(i), James A. Wolfe, through counsel, respectfully submits this memorandum to aid the Court in determining an appropriate sentence. "A just sentence is one that is sufficient but not greater than necessary." _United States v. Williamson_, 83 F. Supp. 3d 394, 404 (D.D.C. 2015) (Collyer, J.). For the reasons stated herein, we respectfully request that the Court impose a non-incarcerative sentence of probation with a community service obligation.

Mr. Wolfe lied to FBI agents in a December 2017 interview in connection with the FBI's probe of leaks of information regarding the activities of the Senate Select Committee on Intelligence ("SSCI") to various reporters. It is a decision, along with his breaking his marital vows and violating his former employer's rules regarding contacts with the media, that he deeply regrets—and the consequences of those failings will follow him for the rest of his life. The FBI's investigation was initially focused on the unauthorized release of Classified Information related to media reports concerning a FISA warrant and its subject, described as MALE-1 in the Indictment

1

and Statement of Offense.  At the time of his December 2017 interview, Mr. Wolfe had already

met with the FBI once but was not aware that the government, through a surreptitious search of

his mobile phone and other investigative steps, already knew that he had undisclosed and

unauthorized contacts with certain reporters and about his personal relationship with Reporter # 2.

As we will address more fully herein, Mr. Wolfe falsely denied his contacts with several

reporters, largely because he had been involved in an inappropriate personal relationship with

Reporter # 2 for several years which he was afraid to reveal.  The agents confronted Mr. Wolfe

during that interview with proof that they were already aware of that inappropriate relationship,

and Mr. Wolfe thereafter, in the very same interview, acknowledged that relationship.  He later

acknowledged other unauthorized contacts with reporters, despite having falsely denied them

during the December interview.  Consistent with what Mr. Wolfe also said during all of his

interviews, though, at no time did he provide Classified Information to reporters or improperly

share such information with any other individuals.  He has not been charged with doing so, despite

numerous false media and social media articles and commentary suggesting the contrary.

Mr. Wolfe, with undersigned counsel, has carefully reviewed the draft Presentence

Investigation Report ("PSR") prepared by United States Probation Officer Kelli Willett.  We have

no material objections to the facts set forth in the draft PSR or its Guidelines calculations.[1]  The

---

[1] We provided to Ms. Willett some minor factual corrections and also our objections to the inclusion and/or characterization of a 2004 traffic infraction and certain legal proceedings from 2004-08 related to Mr. Wolfe's contentious divorce from his first wife.  *See* PSR ¶¶ 67-69.  We are advised that inclusion of such information is standard practice by the Probation Office.  We do not know, given the briefing schedule, whether or how those points will be resolved in the final PSR so we address them here briefly.  None of these matters, including a *nolle prossed* misdemeanor allegation from 2004, affect the calculation of his Criminal History of zero points, form the basis for any departure, nor, we respectfully submit, bear on any other appropriate sentencing consideration.  *See* U.S.S.G. § 4A1.2 (c)(2) (minor traffic offenses are never counted in Criminal History).  As such, we respectfully submit that the Probation Office's apparent standard practice of automatically including traffic infractions or civil protective orders in PSRs is

PSR calculates the applicable Sentencing Guidelines level under the 2018 edition of the United States Sentencing Guidelines (the "Guidelines"), yielding a final adjusted offense level of 4 (0-6 months), with a corresponding Criminal History of zero points, in Zone A, which is consistent with the parties' shared position regarding the appropriate Guidelines analysis as set forth in the Plea Agreement.  PSR ¶¶ 55-66; Plea Agreement (Dkt. 36) at 3.  Probation is expressly permitted for Zone A defendants.  *See* U.S.S.G. § 5B1.1(a)(1).  As we will address more fully herein, a non-incarcerative sentence is also fully consistent with the legislative directives undergirding the enactment of the Guidelines, recent guidance from the Sentencing Commission, and the factors outlined in 18 U.S.C. § 3553(a).[2]

Until his formal retirement earlier this year, Mr. Wolfe ably served this country for his entire adult life, first in the U.S. Army and then, for the past three decades, as the Director of Security for the United States Senate Select Committee on Intelligence.  He tarnished that unblemished service by engaging in undisclosed interactions with members of the media, in violation of the very Committee regulations he helped establish and was tasked with enforcing. His initial denials of those contacts reflected an understandably human, but nonetheless improper,

---

inconsistent with the Guidelines, inappropriate, and prejudicial.

[2]  In its objections to the draft PSR, the government advised the Probation Office that it would be seeking an upward departure under U.S.S.G. § 5K2.0(a)(4) (Departures Based on Circumstances Identified as Not Ordinarily Relevant) and an upward variance based on § 3553(a).  The government changed its position several days later, and informed the Probation Office of its intent to rely instead on U.S.S.G. § 5K2.7 (Disruption of Governmental Function) and U.S.S.G. § 5K2.14 (Public Welfare) for an upward departure.  The government did not articulate any basis for these departures or variance.  We will respond to the government's arguments once we become aware of them, including potentially seeking a corresponding downward departure pursuant to U.S.S.G. § 5K2.20 (Aberrant Behavior).  Our sentencing memorandum assumes that the draft PSR's calculations and recommendations will not change but we will address any changes in the final PSR in our reply memorandum.

attempt to conceal his extramarital personal relationship with a reporter and to preserve his job. But his personal indiscretions and his contacts with certain reporters in which he shared limited, unclassified information about matters occurring before the Committee violated no federal law.[3] Instead, when confronted by the FBI about these relationships, Mr. Wolfe initially lied, before ultimately acknowledging minutes later in the same interview that he had indeed had such a personal relationship with "Reporter # 2"—something the agents clearly knew already with proof they had obtained from Mr. Wolfe's own communications, along with the fact that he had had undisclosed contacts with other reporters.  It was those lies that have brought him before this Court—not the underlying conduct about which he was answering questions.

Mr. Wolfe has paid and will continue to pay a very heavy price for his conduct.  He lost his job and career, he betrayed his commitment to his wife and family and country, and he has been the subject of numerous articles falsely damning him for purportedly betraying his responsibilities regarding Classified Information.  His rights and opportunities have also been altered for the rest of his life due to his status as a felon.  Those consequences, while very real and very humbling, are separate from the punishment the Court must now consider.

Mr. Wolfe has much to do in attempting to repair his marriage and he will almost certainly never regain his reputation given the very public shaming he has endured nor have any meaningful employment opportunities in the field where he has worked for the past 30 years.  But his foolish decision to lie about his affair was corrected almost immediately in the same fateful interview last December and he later acknowledged other unauthorized contacts with the media that he first

---

[3] The underlying conduct behind the false statement in Count 3 of the Indictment, the particular charge to which Mr. Wolfe pleaded guilty, relates to his having told "Reporter # 3" the identity of a person who had been subpoenaed by the SSCI, and then the timing of that same person meeting with SSCI staff.

falsely denied.  We do not condone lying to federal agents.  And his offense conduct is contradicted sharply by his longstanding and highly-regarded service to his country, his community, and his family as documented in the many attached letters.

Indeed, the attached letter, Exhibit 1, from the bipartisan present and past U.S. Senators who lead SSCI, whose internal policies and procedures Mr. Wolfe violated with his unreported and unapproved contacts with reporters, expresses the Senators' belief that there is "[no] public utility in depriving [Mr. Wolfe] of his freedom."  Exhibit 1.  Their letter urges the Court to impose a sentence that achieves justice through the "imposition of probation or community service."  *Id*. We respectfully submit that these factors distinguish him from other recent false statement cases before this Court and in this District and warrant—consistent with the Guidelines, recent amendments to their commentary, and Section 3553—imposition of a non-incarcerative, probationary sentence that requires Mr. Wolfe to continue his life of public service with a meaningful community service obligation.

## BACKGROUND

James A. Wolfe will appear before the Court for sentencing on December 20, 2018.  He entered his guilty plea on October 15, 2018, to Count 3 of the Indictment, which charged him under 18 U.S.C. § 1001 with making certain false statements to the FBI, namely falsely denying having had unauthorized contacts with Reporter # 3.[4]  The underlying facts are set forth in the

---

[4]  Though the allegations from the Indictment are set forth in full in the PSR, as we emphasized to the Court at the Plea Hearing, Mr. Wolfe did not plead guilty to, and does not admit, having shared any information from a Classified Document—even unclassified information—in March or April 2017, as had been alleged originally in Count 2 of the Indictment, and we believe that the government would not be able to prove any such sharing of information by even a preponderance of the evidence.  To that point, it is our understanding that Mr. Wolfe was never given access to the contents of the Classified Document in question during any relevant time period—though that document has subsequently been declassified.

Statement of the Offense accompanying Mr. Wolfe's plea and in the PSR.  In his December 15, 2017, FBI interview, he falsely denied having had unauthorized contact with several reporters in contravention of SSCI rules.  As set out in the Statement of the Offense, those contacts ranged from unremarkable undisclosed contact with Reporter # 1 (about items like public wifi passwords) to tipping off Reporter # 3 as to an individual whom SSCI had subpoenaed or met with.  While these undisclosed contacts were not appropriate under Committee rules, at no time did Mr. Wolfe share Classified Information or substantive information with any of the Reporters.  Mr. Wolfe acknowledged that he had lied with respect to Reporter # 2 during that same interview after the agents confronted him with photographs and other documentation demonstrating that he had not been truthful.  He later acknowledged in January 2018 that he had contacts with the other reporters referenced in the Indictment.

During the December interview, Mr. Wolfe's access to his SSCI documents and emails was terminated by his employer and, although he technically remained on the SSCI staff until his retirement the following May, he did not return to work substantively after his FBI interview.  Six months later, he was indicted and arrested in his home on June 7, 2018, and jailed overnight pending his initial appearance in U.S. District Court in Baltimore, MD, where he was released from custody.  Following his presentment in this Court, Mr. Wolfe, through counsel, promptly negotiated a resolution of this matter, which is detailed in the Plea Agreement.

In addition to having agreed to the facts set forth in the Statement of Offense (Dkt. 37) and his acknowledgement of his conduct and acceptance of responsibility in his discussions with the Probation Officer, Mr. Wolfe will address the Court directly at sentencing and attempt to further explain in his own words and to the best of his ability how he erred from a life dedicated to serving his country and engaged in the foolish and illegal actions that bring him before the Court.  The

impact of Mr. Wolfe's conduct and his conviction on him and his family have already been profound, and he will continue to suffer the collateral consequences of his transgressions personally and professionally for years to come.

This sentencing memorandum is divided into several sections. Part I addresses the application of the Sentencing Guidelines. Part II addresses Mr. Wolfe's history and characteristics. And Part III explains why we believe that a non-incarcerative sentence is appropriate.

## APPLICATION OF STATUTORY SENTENCING FACTORS

18 U.S.C. § 3553(a) requires federal courts to impose sentences that are "sufficient, but not greater than necessary." *Accord Williamson*, 83 F. Supp. 3d at 404.[5] The primary directive of § 3553(a) is the imposition of a sentence that is sufficient, but not greater than necessary, to comply with the purposes articulated in § 3553(a)(2), namely:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining a minimally sufficient sentence, § 3553(a) further directs sentencing courts to consider the following factors:

1)     the nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1));

2)     the kinds of sentences available (§ 3553(a)(3));

3)     the advisory sentencing guidelines range (§ 3553(a)(4));

4)     any pertinent policy statement issued by the Sentencing Commission (§ 3553(a)(5));

5)     the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct (§ 3553(a)(6)); and

6)     the need to provide restitution to any victims of the offense. (§ 3553(a)(7)).

---

[5] The Court is well familiar with the post-*Booker* sentencing standards and they will not be repeated here unnecessarily. See generally *United States v. Booker*, 543 U.S. 220 (2005).

*Accord Williamson*, 83 F. Supp. 3d at 401.  Pursuant to the applicable sentencing Guidelines and the § 3553(a) considerations in this matter, we respectfully submit that those factors all support the imposition of a sentence on Mr. Wolfe that does not involve incarceration but, instead, obligates him to provide a meaningful amount of community service as part of a term of probation.

I.      **The Sentencing Guidelines Calculations (18 U.S.C. § 3553(a)(4)).**

As set forth in the Plea Agreement, and confirmed in the PSR, the following Guidelines calculation is applicable under the 2018 United States Sentencing Guidelines:

| | |
|---|---|
| Base Level | 6 |
| Acceptance of Responsibility | (2) |
| Total Offense Level and Range | 4 (0-6 months) |

*See* PSR ¶¶ 55-63.  With this calculation and the lack of any Criminal History points, *see id.* ¶¶ 66, 115-16, Mr. Wolfe falls squarely into Zone A of the Guidelines, permitting a probationary sentence.

The government has advised the Probation Office of its intention to seek an upward departure or variance.  Beyond its barebones citation to U.S.S.G. § 5K2.7 (Disruption of Governmental Function) and U.S.S.G. § 5K2.14 (Public Welfare) in its objections to the PSR, the government has not provided any further information regarding its position.  Mr. Wolfe will respond once the government files its sentencing memorandum and presumably articulates its position. That response may, if warranted, seek a downward departure for Aberrant Behavior.  *See* U.S.S.G. § 5K2.20.

Mr. Wolfe is also a nonviolent first offender within Zone A, which brings him within the ambit of the most recent Guidelines amendments and recent commentary from the Commission, which emphasize that sentencing courts are encouraged to consider imposing sentences other than

imprisonment for such defendants. *See* U.S.S.G. §5C1.1 (comment n. 4) (effective Nov. 1, 2018).

In explaining this amendment, the Commission stated:

> **This new application note is consistent with the statutory language in 28 U.S.C. § 994(j) regarding the 'general appropriateness of imposing a sentence other than imprisonment' for 'a first offender who has not been convicted of a crime of violence or an otherwise serious offense' and cites the statutory provision in support.**

U.S. Sentencing Commission, Amendments to the Sentencing Guidelines, at 73 (Apr. 30, 2018) (emphasis added).[6]  As set forth more fully herein, notwithstanding the availability of a purely probationary sentence, we believe Mr. Wolfe should fulfill a meaningful amount of community service as part of any punishment.  He has likely forever lost his ability to serve his country, a role he cherished, and such a sentence will not only serve as a reminder of the kind of service he once provided but also harness what Mr. Wolfe has to offer his community in a more productive manner than simply serving a jail term.[7]

## II.    Mr. Wolfe's History and Characteristics (18 U.S.C. § 3553(a)(1)).

After *Booker*, a defendant's history and characteristics are once again important factors for the sentencing court's consideration.[8]  Mr. Wolfe does not take lightly the gravity of his offense

---

[6] This perspective echoes other recent guidance from the Commission on the issue of appropriate sentences for first-time, nonviolent offenders.  "Sentences [for Zone A offenders] that involve any amount of incarceration are in excess of the least restrictive sentence available, and so cannot be said to be an 'alternative' to the sentence that would otherwise be imposed." Alternative Sentencing in the Federal Criminal Justice System, U.S. Sentencing Commission, p.6 (May 2015).  In providing this guidance, the Commission noted that their 2015 definition modified the 2009 definition of alternative sentences.  *See id*. n.32.

[7] Mr. Wolfe has, in fact, served a night in jail in this matter as a result of being arrested in his home and detained pending his initial appearance in federal court in Baltimore, MD.

[8] *See Rita v. United States,* 551 U.S. 338, 364-65 (2007) (Stevens, J., concurring) ("Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civil, charitable, or public service are not ordinarily considered under the Guidelines.  These are, however, matters that § 3553(a) authorizes the sentencing judge to consider.") (citations omitted);

conduct nor his personal conduct underlying his offense.  His illegal activity is  well-documented in the Statement of the Offense.  But Mr. Wolfe's offense conduct tells only part of his story, as the numerous accompanying letters in support of Mr. Wolfe and the additional information set forth in the PSR demonstrate.[9]

A.   <u>Background and Career</u>

Mr. Wolfe grew up in a stable, working class family in northern Kentucky, just outside Cincinnati, Ohio.  He will turn 58 on the day the Court is scheduled to impose his sentence.  His father was a construction equipment operator and his mother held various jobs, including working for a florist, in a machine shop, and as a medical assistant.  He and his elder brother, now deceased, grew up in a trailer park in the Florence, Kentucky area.  His parents divorced when Mr. Wolfe was a teenager.  His mother eventually remarried and was able to move into a single family home. Following his graduation from high school, Mr. Wolfe enlisted in the U.S. Army, serving approximately four years before his honorable discharge with the rank of Sergeant in 1987.  He continued to serve in the Army Reserve for another six years, earning a final promotion to Staff Sergeant.  *See* PSR ¶ 94.  Mr. Wolfe was awarded several medals and commendations during his military service, summarized in the PSR.  *See id.* ¶ 95.

_____

*see United States* v. *Preacely*, 628 F.3d 72, 84 (2d Cir. 2010) (Lynch, J., concurring) ("[Section 3553(a)(1)] requires sentencing courts to treat the Guidelines only as a starting point, and then to craft an appropriate sentence taking full account of 'the history and characteristics of the defendant.'").

[9] The accompanying letters from Mr. Wolfe's family, former colleagues, supporters, and friends are collected as Exhibits 1-4.  Specifically, the letter from the SSCI leadership is attached as Exhibit 1; the letter from Jane Rhodes Wolfe, his wife, is attached as Exhibit 2; the letters from his sons are attached as Exhibit 3; and letters from other supporters, family members and former colleagues are attached as Exhibit 4.  These letters have been redacted in accordance with Fed. R. Crim. P. 49.1.  Undersigned counsel has retained the originals and will provide them to the Court or government counsel upon request.  Some documents were sent to counsel electronically so a PDF or fax version is the only "original" in our possession.

During his military service and continuing while he was working for the Senate, Mr. Wolfe pursued a college education at night and ultimately earned a degree in Management Studies from the University of Maryland in 1991.  In 1987, Mr. Wolfe began working for the U.S. Senate Select Committee on Intelligence (SSCI) and was soon named its Director for Security.   He held that non-partisan position for some 30 years, ably serving both Democrat and Republican leadership. Mr. Wolfe served his country his entire adult employment life, both in the military and as a civilian.

Notwithstanding the contentious dissolution of his first marriage, which had lasted 20 years, Mr. Wolfe helped raise two fine sons, one of whom is currently stationed in South Korea with the U.S. Army, and the other who is training in South America to become a mountain climbing guide.  Their heartfelt letters to the Court reflect Mr. Wolfe's dedication to his sons and to his example of service and hard work.  Their passion, support and respect for their father is vividly captured in those letters, attached as Exhibit 3.  His devotion to his family is also captured in letters from his aunt and his mother's first cousin.  *See* Exhibit 4 (Bishop and Hensley letters).

During his time working for the Senate, Mr. Wolfe earned a well-founded reputation for taking seriously his job and the sensitive issues that were discussed before the SSCI.  Letters from James Clapper, the former Director of the Office of National Intelligence, Robert S. Litt, the former General Counsel for the Office of the Director of National Intelligence and a former federal prosecutor, and Denis McDonough, former White House Chief of Staff and a former member of the National Security Council, attest to Mr. Wolfe's dedication to the mission of the Committee and respect for the sensitivity of classified matters occurring before it.  *See id*. (Clapper, Litt, and McDonough letters).  Numerous letters from former colleagues on the Committee staff, including its former General Counsel and a former Staff Director, confirm Mr. Wolfe's dedication to ensuring that sensitive matters before Committee were protected and that its credibility was

maintained. *See, e.g., id.* (L. Britt Snider and Andrew W. Johnson letters).  He is described by another former colleague as the best security officer he has worked with in 35 years.  *Id.* (Bryan Smith letter).

Exhibit 1, the letter from SSCI itself, signed by Chairman Burr, Vice Chairman Warner, and former Chairman Feinstein, is a powerful, bipartisan testament to Mr. Wolfe's service and the high esteem in which he was held by Committee leadership.  As reflected in the letter, SSCI leadership respectfully urges the Court to impose a non-incarcerative sentence notwithstanding Mr. Wolfe's violation of the Committee's rules and his failing during his FBI interview.

The letters also share Mr. Wolfe's dedication to enriching the lives of others, particularly in ways that celebrated the work of the United States Senate, including through the Senate tours he regularly gave to friends and others he has known throughout his life, and even to those he did not know but who were referred to him.  *See* Exhibit 4 (Peeler and Byrnes letters).  He reveled in giving these tours, totally separate from his job requirements, offering anecdotes and stories that have made lasting positive impressions as detailed in the attached letters.

Mr. Wolfe has also supported neighbors and former colleagues and their families.  *Id.* Veteran Marine and CIA Officer David Byrnes relates how Mr. Wolfe reached out to help Mr. Byrnes's family during his overseas deployments.  *Id.* (Byrnes letter).  Mr. Wolfe and his sons raised $5,000 to support wounded soldiers, sponsoring a climb of Mt. Whitney.  *See id.* (Smith letter).  As documented by Reverend Erik J. Arnold and Dawn Weglein in their letters, in addition to his responsibilities at work and in helping to raise his sons, Mr. Wolfe also volunteered in the Ellicott City community for many years, helping to feed the homeless through an organization called Our Daily Bread.  *See id.* (Arnold and Weglein letters).  Ms. Weglein describes a particular example from six years ago when Mr. Wolfe stepped in to deliver food for Our Daily Bread at the

last minute when Ms. Weglein's father passed away.  Mr. Wolfe has recently been able to intensify his pre-existing commitment to Our Daily Bread as a result of being unemployed and unable to work as a result of the charges against him.  These documented examples all point to a man who has given time and effort to his community selflessly over the past several decades.

In 2008, Mr. Wolfe remarried.  Ultimately and directly pertinent to the criminal conduct before the Court, Mr. Wolfe strayed from his vows to his wife and his behavior has severely tested their marriage.  But as noted in her letter to the Court, Ms. Rhodes Wolfe, a former FBI agent herself, has continued to stand behind Mr. Wolfe and they have begun the hard work together to try to salvage their marriage.  We note the force and passion of her perspective on how Mr. Wolfe was treated during the investigation and his arrest, the views not only of a supportive spouse but of a former FBI agent.

## III.     A Non-Incarcerative Sentence is Consistent with the Section 3553(a) Factors.

Following *Booker*, the D.C. Circuit has stated that the Guidelines are no longer binding sentencing edicts, "but rather are one factor that a district court must consider when imposing a sentence." *United States v. Gardellini*, 545 F.3d 1089, 1092 (D.C. Cir. 2008).  Pursuant to 18 U.S.C. § 3553(a)(2), the sentencing court must impose a sentence that is minimally sufficient to achieve the goals of sentencing based on all of the § 3553(a) factors present in a case.  This so-called parsimony provision serves as the "overarching instruction" of the statute.  *See Kimbrough v. United States,* 552 U.S. 85, 111 (2007).  A sentencing court has unique competence to make the "defendant-specific determinations" relevant to the § 3553(a) analysis.  *Gardellini,* 545 F.3d at 1095.  We respectfully submit that the § 3553(a) factors present in Mr. Wolfe's case demonstrate that a sentence which does not result in incarceration will reasonably and appropriately result in a

sentence that provides just punishment, offer adequate deterrence, and recognize the unlikelihood of Mr. Wolfe's recidivism.

A.      Mr. Wolfe's history and characteristics justify a lenient sentence

As discussed above, Mr. Wolfe served his country honorably and supported and cared for his family and his community for almost his entire adult life.  His fateful decision to conceal an affair and generally deny improper contacts with other reporters, the most significant of which were tips about the status of a witness before the SSCI, *see, e.g.,* Statement of Offense (Dkt. 37) at ¶ 13, stands in stark contrast to a man who, as attested by his peers and other members of the Intelligence Community, had an unblemished devotion to preserving and protecting Classified Information through three decades of non-partisan service to the Senate regardless of the majority party.  We respectfully submit that these personal characteristics provide ample support for a sentence that does not involve incarceration.

B.      The objectives of § 3553(a)(2) can be satisfied by a non-incarcerative sentence

A non-incarcerative sentence is not inconsistent with the sentencing objectives set forth in 18 U.S.C. § 3553(a)(2).  We certainly agree that lying to FBI agents cannot be countenanced.  The nature of those lies is, however, a factor the Court should consider and we address that in greater detail in our discussion of arguably comparable cases.  Though his affair with Reporter # 2 was not a criminal offense, he tried to conceal it from the agents in his December 2017 interview.  The FBI agents, of course, were already well aware of the affair and his unauthorized contact with other reporters, as evidenced in their preparation of a Questionnaire prior to the interview which they walked him through prior to confronting him with certain evidence after he lied.  Regardless of the actual impact of Mr. Wolfe's false denials, though, Mr. Wolfe, to his credit, admitted to the FBI during the very same interview that he had, in fact, lied with respect to Reporter # 2 and he

later acknowledged, albeit in discussions that were not detailed, other improper contact and communications with other reporters.

Through his conduct and felony conviction, Mr. Wolfe has caused himself significant devastation, both personally and professionally. He has faced a barrage of highly negative (and largely false) media attention, forever damning his reputation well beyond what an ordinary defendant faces. He was publicly branded a leaker by the President of the United States in a context that falsely suggested he had compromised Classified Information.[10] He has been subjected to a blistering set of articles regarding his affair.[11] Those were and are very real punishments but, aside from the high octane media attention, they are, of course, natural consequences of the poor choices that he made when he decided to lie to the agents that day.

There was not, however, a significant impairment to the government's investigation as a result of the false denials—including because the FBI already knew the answers to many of the questions they were asking (and indeed had photographic proof regarding certain issues)—and certainly there has been no financial loss or tangible harm to any victim. To the extent one may consider either his wife (a former FBI agent) or the SSCI (including the current Ranking Member of the Judiciary Committee) as victims here, it is notable that they both urge the Court to impose a lenient, non-penal sentence. A prison sentence in this context would achieve only purely punitive goals and substantially discount the other important sentencing goals set forth in the statute. The Court has at its disposal sentencing options completely consistent with the Guidelines, and in line with recent amendments to the commentary, that would better serve Mr. Wolfe and the ultimate

---

[10] See Eileen Sullivan & Katie Brenner, Trump praises arrest of former Senate Committee Aide in Leaks Inquiry, N.Y. Times (June 8, 2018).

[11] *See generally* Def.'s Reply in Supp. of Mot. for Order Governing Extrajudicial Statements at 3-4 (Dkt. 20).

community interests, including probation with a term of community service (or, if some restraint on his liberty appears required to the Court, time-served). To put it simply, even without a sentence that includes actual incarceration, the twin goals of incarceration—punishment and rehabilitation—have in some measure already been and can continue to be met fully outside of the bars and fences of a penal institution.

1. *Seriousness of the Offense; Promoting Respect for the Law; and Just Punishment for the Offense*

Pursuant to § 3553(a)(2)(A), a sentencing court must impose the most parsimonious sentence consistent with the seriousness of the offense, the need to promote respect for the law, and the need to provide just punishment. To be sure, the offense conduct here is serious, and we obviously respect the law enforcement goal of prosecuting and punishing those who lie to agents conducting important investigations. Until the time he engaged in the offense conduct, Mr. Wolfe had no convictions for criminal conduct.[12] We respectfully submit that given Mr. Wolfe's personal characteristics, a "just punishment" in this case may reasonably include a non-incarcerative sentence—a point reinforced by the Guidelines and commentary applicable to this case.

2. *Affording Adequate Deterrence to Criminal Conduct*

Under § 3553(a)(2)(B), a sentencing court must also consider the goals of specific deterrence and general deterrence. A term of incarceration for Mr. Wolfe is not necessary to

---

[12] As described in the draft PSR, in the midst of a very bitter divorce, his ex-wife made certain allegations against Mr. Wolfe that he strongly denies. Mr. Wolfe was never arrested, and the case she initiated was *nolle prossed* by the government. *See* PSR ¶ 67. Tellingly, there was no impairment of his security clearance as a result of these allegations. Given the circumstances, we do not believe it appropriate to include this bare record in the PSR, much less for the Court to consider it in any way in assessing Mr. Wolfe's sentence or Criminal History, which was properly determined to have no points, or his background. Further, the draft PSR also improperly included a Virginia HOV traffic infraction from over 14 years ago as "other criminal conduct"—it is not criminal conduct and should not be considered as part of Mr. Wolfe's Criminal History. *See* PSR ¶ 68; *but see* Va. Code § 33.2-501(B) (HOV violations are defined as traffic infractions) and Va. Code § 18.2-8 ("Traffic infractions are . . . not deemed to be criminal in nature.").

advance either goal.  Through the powerful process of recognizing and admitting publicly his improper personal, professional, and criminal conduct and accepting a felony conviction, Mr. Wolfe has faced immense guilt and shame.  He will almost certainly be unable to work again in his field of experience or to hold a security clearance.  Indeed, his felony conviction will substantially impair any other employment opportunity, which plays a substantial role in punishing him.  As a government employee his entire adult life, Mr. Wolfe has a limited retirement benefit to support himself from now through the remainder of his life.  He has undertaken the hard work to begin to repair the damage he caused to his marriage, a marriage he cares about deeply, and he has much more work to do in that respect.  He has also expanded his longstanding support of a community charity in light of his recently increased opportunities to do so.  And he has even attempted to repay to the identifiable contributors to his legal defense fund nearly $10,000 in contributions.  This is not the profile of a man who is likely to re-offend; rather, this is a man who is working hard to regain the trust of his family and his community and who hopes to lead a quiet, honorable life.  Incarceration is unnecessary to promote specific deterrence here.

Further, the goal of general deterrence for others who might be inclined to commit similar crimes does not require Mr. Wolfe's incarceration.  This case has garnered a significant amount of media attention and plainly sends a loud message to the public that lying to federal agents—even when those lies were denials animated by a desire to conceal a personal failing—has profound consequences.  While that media attention has been unfair at times, in this sense alone, the goal of general deterrence has been attained.  To the extent that this case is also about improperly sharing information with the media, even if that action is not itself a crime, this case also provides general deterrence in making it clear that the conduct will be investigated and that there are consequences, both from an employment standpoint and possibly from a prosecution standpoint.

### 3. *Incapacitation of Mr. Wolfe is Not Necessary to Protect the Public*

Under § 3553(a)(2)(C), a sentencing court must evaluate the need to "protect the public from further crimes of the defendant[.]"   Section 3553(a)(2)(C) implements the penological concept of "incapacitation (physically preventing the defendant from committing crimes on 'the outside,' by imprisoning him) . . . ."  *United States* v. *Kubeczko*, 660 F.3d 260, 262 (7th Cir. 2011); *see also Rita*, 551 U.S. at 347-48.  There is no information whatsoever suggesting that Mr. Wolfe will commit crimes in the future or that his incapacitation is necessary to protect the public.  He stands before the Court humbled by his actions and their consequences.

Mr. Wolfe has had ample opportunity to review and reflect upon his actions.  As demonstrated by the letters of support attached hereto (Exhibits 1-4), Mr. Wolfe is well-loved, respected, and supported by members of his community.  To the extent that the Court perceives some value in even a relatively modest term, we also note that Mr. Wolfe did serve a night in jail following his arrest.  His formal arrest in his own home and having to spend a night in jail were powerful and sobering experiences.

In sum, Mr. Wolfe is exceedingly unlikely to engage in any criminal conduct, regardless of the sentence imposed.  We respectfully submit that incarceration does not relate to any meaningful concept of protecting the public from Mr. Wolfe.

### 4. *Need for Education or Vocational Training, Medical Care, or Other Correctional Treatment*

Pursuant to § 3553(a)(2)(D), a sentencing court must also assess the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."   These factors do not apply meaningfully to Mr. Wolfe; he very much wants to work but will almost certainly never work again in the area where he has the most relevant experience.  He does not face any significant

medical care issues at this stage of his life.

   5.   *Other 3553(a) Factors*

A non-incarcerative sentence is also consistent with similar prosecutions and does not promote unwarranted disparity. *See* 18 U.S.C. § 3553 (a)(6).   Mr. Wolfe's Guidelines, the November 1, 2018, amendments to the Guidelines commentary regarding nonviolent first offenders, and the factual circumstances of his false statements all distinguish his case from other recent false statement prosecutions in this District.

In *United States v. Jeffrey Kahn*, the Court imposed a one month term of incarceration with five months of home confinement where the Guidelines were determined to be at a Level 10 (Zone B) and there was a financial loss to the Office of Personnel Management of nearly $80,000.00. Mr. Kahn's offense conduct consisted of claiming falsely that he had performed thorough background checks for the government, which caused the government to have to re-examine many dozens of personnel files for other deficiencies that presented significant risk that otherwise ineligible individuals might obtain government employment or security clearances. *See* Judgment as to Jeffrey Kahn at 2-3, *United States v. Jeffrey Kahn*, No. 18-CR-00056 (D.D.C. Aug. 28, 2018), ECF No. 39; *see also* Government's Mem. in Aid of Sentencing at 3-4, *United States v. Jeffrey Kahn*, No. 18-CR-00056 (D.D.C. July 23, 2018), ECF No. 28.   Indeed, 55 false statements over many months were identified in that process.   Here, of course, Mr. Wolfe is in a substantially lower Guidelines level and Zone, and his false denials caused no actual harm as the government already knew about his relationship with the primary reporter at issue (and Mr. Wolfe admitted during the same interview that he had that relationship).   The nature of his other past media contacts did not affect SSCI nor the investigation in any material way we are aware of, and Mr. Wolfe was effectively suspended from his work that day and for the remaining pendency of the investigation.

The Special Counsel investigation has also yielded two other recent false statement prosecutions in this courthouse, of Alex van der Zwaan and George Papadopoulos. van der Zwaan was sentenced by Judge Amy B. Jackson to a term of 30 days in prison, and Papadopoulos was sentenced by Judge Randolph D. Moss to 14 days of incarceration. Both cases have exactly the same Guidelines calculation as Mr. Wolfe (0-6 months), though both were sentenced prior to the recent amended Guidelines commentary emphasizing the applicability of non-prison sentences for nonviolent first offenders. Those cases share key characteristics that distinguish them from Mr. Wolfe's situation, including that their false statements had a much more significant actual impact on the course of the government's respective investigations.

For example, van der Zwaan was represented by counsel during his interview (and, therefore, was presumably prepared for and anticipated his interview, unlike Mr. Wolfe). His false statements during that interview included affirmatively false narratives and concealing his prior destruction of evidence, acts that impaired significantly the Special Counsel's investigation. *See* Statement of the Offense at ¶¶ 5-7, *United States v. van der Zwaan*, No. 18-CR-00031 (D.D.C. Feb. 20, 2018), ECF No. 9. He did not acknowledge any of his lies until two weeks later. Judge Jackson also noted, in imposing the prison term, that given van der Zwaan's family's substantial wealth, the punitive impact of a simply imposing fine was diluted.

Papadopoulos also did not acknowledge his lies until much later, despite having the benefit of counsel at a second interview in which he still "did not correct the record." *See* Government's Sentencing Mem. at 6, *United States v. Papadopoulos*, No. 17-CR-00182 (D.D.C. Aug. 17, 2018), ECF No. 44. Like van der Zwaan, Papadopoulos's false statements were not simply denials but included confecting elaborate false narratives, *see* Statement of the Offense at ¶¶ 2, 22-31, *United States v. Papadopoulos*, No. 17-CR-00182 (D.D.C. Oct. 5, 2017), ECF No. 19, that materially

impacted the Special Counsel's investigation, including by impairing the government's ability to contact or detain a key foreign witness during that witness's brief travel through the United States. *See* Government's Sentencing Mem. at 6, *Papadopoulos*.  We note that Papadopoulos has also persisted, both before his sentencing and after, in suggesting that he intends to withdraw his plea, calling into question whether he has ever truly accepted responsibility.  No such investigatory damage flowed from Mr. Wolfe's actions and he has fully embraced his guilt.[13]  What is more, Mr. Wolfe, who did ***not*** have counsel at any time during any of his FBI interviews, admitted his relationship with Reporter # 2 during the same December interview and acknowledged other unauthorized contacts with other reporters during a follow up interview a few weeks later while his home was being searched.

C.        Financial Punishment Considerations

As discussed in the PSR at ¶¶ 96-99, 102, Mr. Wolfe is a retired career government servant living on his pension and savings who, at the age of 58, has no meaningful employment prospects in his area of experience and expertise.  Despite his limited financial resources, he has mailed checks attempting to refund the generous contributions made to his legal defense fund.  A fine may well be an appropriate component of the punishment here but given Mr. Wolfe's financial circumstances, we respectfully submit that any such fine should be consistent with, and at the

---

[13] Another case for comparison is the prosecution of former CIA Director General David Petraeus. General Petraeus improperly shared Classified Information with his mistress while she was writing a book.  He lied to agents when confronted about his illegal disclosures, but he was permitted by the government to resolve his case with a misdemeanor charge and he received a probationary sentence.  General Petraeus, of course, was a highly decorated and widely admired war hero but Mr. Wolfe has also served the country with distinction for over 30 years, was not afforded the same charging leniency and, as we have emphasized, there is no charge nor evidence of his having compromised Classified Information, unlike General Petraeus.

lower end of, the Guidelines range determined for this case, between $500 and $9,500.[14]

## CONCLUSION

For the foregoing reasons, we respectfully ask the Court to impose a non-incarcerative sentence and, instead, impose a sentence of probation with a community service obligation in addition to the one day in jail that Mr. Wolfe has already served.  Mr. Wolfe, despite the conduct that brings him before the Court, has long been and can again be a good and productive member of society.  He has much to do in attempting to repair his marriage and he will almost certainly never regain his reputation or have any meaningful employment in the area where he has worked for the past 30 years.  But his foolish decision to pursue an affair and then lie about it was corrected almost immediately during the very same fateful interview last year.  We do not condone lying to federal agents.  But Mr. Wolfe's conduct is contradicted sharply by the character of the man that his family and community and country relied upon and loved and respected, as documented in the attached letters, including a remarkable bipartisan letter from the Senators leading SSCI.  Mr. Wolfe has committed serious mistakes for which he has paid dearly, and we respectfully urge the Court to consider the Guidelines, the totality of Mr. Wolfe's life, the very public shaming he has endured, and his dedication to rehabilitating himself in determining an appropriate sentence.

---

[14] Mr. Wolfe has submitted his required financial disclosures and paid his $100 Special Assessment.

Respectfully submitted,


___/s/_____

Preston Burton (D.C. Bar No. 426378)
Benjamin B. Klubes (D.C. Bar No. 428852
Lauren R. Randell (D.C. Bar No. 503129)
Buckley Sandler LLP
1250 24th Street, N.W.
Washington, D.C. 20037
Telephone: (202) 349-8000
Email: pburton@buckleysandler.com

Counsel for James A. Wolfe

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 11th day of December 2018, I caused a true and correct copy of

the foregoing Sentencing Memorandum of Defendant James A. Wolfe, to be filed with the Clerk

of Court using the CM/ECF filing system.


_____/s/_____

Lauren R. Randell, (D.C. Bar No. 503129)
Buckley Sandler LLP
1250 24th Street N.W., Suite 700
Washington, D.C. 20037
Telephone: (202) 349-8000
Email: lrandell@buckleysandler.com

# Exhibit 1

RICHARD BURR, NORTH CAROLINA, CHAIRMAN
MARK R. WARNER, VIRGINIA, VICE CHAIRMAN

JAMES E. RISCH, IDAHO                    DIANNE FEINSTEIN, CALIFORNIA
MARCO RUBIO, FLORIDA                     RON WYDEN, OREGON
SUSAN M. COLLINS, MAINE                  MARTIN HEINRICH, NEW MEXICO
ROY BLUNT, MISSOURI                      ANGUS S. KING, JR., MAINE
JAMES LANKFORD, OKLAHOMA                 JOE MANCHIN, WEST VIRGINIA
TOM COTTON, ARKANSAS                     KAMALA HARRIS, CALIFORNIA
JOHN CORNYN, TEXAS

MITCH McCONNELL, KENTUCKY, EX OFFICIO
CHARLES SCHUMER, NEW YORK, EX OFFICIO
JAMES M. INHOFE, OKLAHOMA, EX OFFICIO
JACK REED, RHODE ISLAND, EX OFFICIO

CHRISTOPHER A. JOYNER, STAFF DIRECTOR
MICHAEL CASEY, MINORITY STAFF DIRECTOR
KELSEY S. BAILEY, CHIEF CLERK

# United States Senate

SELECT COMMITTEE ON INTELLIGENCE

WASHINGTON, DC 20510-6475

November 30, 2018

The Honorable Judge Ketanji Brown Jackson
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Jackson:

We are writing to seek leniency in the sentencing of Mr. James Wolfe, former Director of Security for the United States Senate Select Committee on Intelligence. We do not seek to diminish the seriousness of the allegations against Jim, nor diminish the significance of misleading federal agents – something he has freely admitted to the Court – but we ask that the totality of his service and career be taken into consideration.

We have all known Jim for many years, both as rank and file members of the Committee as well during our tenures as Committee leadership. We respectfully ask that you consider as part of sentencing his long service both in uniform as a U.S. Army Intelligence Analyst and as a civilian employee of the Senate and this Committee. Like many others, we were surprised and disappointed when we learned of the allegations against Jim as they were totally out of character for someone who we considered a friend and had provided thoughtful support to the Committee's membership and staff for so long. Jim has no prior criminal record and he received multiple positively adjudicated background investigations over the course of his 35-years of government employment. While Jim pled guilty to one count of making a false statement to special agents of the FBI, there are no indications that he disclosed classification information, he was not charged with disclosing classified information, and his plea includes no reference to classified information. To the extent there was a disclosure of "non-public information", it was of information considered Committee Sensitive, and the most severe punishment for such action has already, effectively, been imposed.

Jim has already lost much through these events, to include his career and reputation, and we do not believe there is any public utility in depriving him of his freedom. As the Court considers an appropriate sentence if necessary, we encourage you to examine other options available and respectfully suggest that if additional punishment is required, justice may still be served through the imposition of probation or community service.

We appreciate your consideration of our request and thank you for your service.

Sincerely,

Richard Burr
Chairman (2015-present)

Mark R. Warner
Vice Chairman (2017-present)

Dianne Feinstein
Chairman (2009-2015)
Vice Chairman (2015-2016)

# Exhibit 2

Jane Rhodes Wolfe
██████████████

Ellicott City, ████████

The Honorable Ketanji Brown Jackson
United States District Judge
United States District Court of the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Jackson,

I am writing to you today in support of my husband, James Anthony Wolfe. As background, Jim and I have been married for ten years and I am the proud stepmother of two fine young men. My professional background includes a career in federal service from which I retired in 2016 as an executive in the FBI's Counterterrorism Division and am now employed in Stamford, CT where I run the corporate security program of a Fortune 100 company. Throughout our marriage both Jim and I were dedicated to our professional responsibilities and the sensitivities of the work we performed. We are a family of service to our country.

The charge Jim is facing and the impact on our lives has been devastating. Jim's personal behavior was selfish and thoughtless, which lead to the charge he is facing. Upon learning of his arrest in the middle of the night, I was shocked and sickened as my life was destroyed along with his. Despite all this, I support him as he has demonstrated remorse and accepted responsibility for his personal actions. Over the past several months he has sought help to understand his actions, returned to his faith, trusted God to forgive, and is working to repair our relationship and rebuild trust. Our lives will never be the same again, and don't know what the future will bring, but together we are working to find a new way to love, have a strong family, serve others and build a future.

Jim has already faced professional and personal humiliation in the most public manner. As I walked through the airport at 6:00am following Jim's arrest to return home, the headlines screamed of a man who betrayed our country, leaked sensitive information along with scandalous details of his personal misconduct. As a former agent, I do not condone lying to law enforcement or Jim's behavior but I cannot help but believe that the publicity and timing of his arrest and initial court proceedings were designed to create a spectacle and create pain and anguish—which they did. Given my FBI career I know there was no genuine need to arrest him at our home on a Thursday night. I believe the FBI was well aware that Jim spent the earlier part of that day in the emergency room, where he was seeking treatment for a kidney stone. And their decision to send some 20-30 law enforcement officers to our home for the arrest was a show of force normally reserved for high-risk subjects. Our quiet street became the scene of major federal law enforcement action, unnecessarily embarrassing us and more particularly Jim. His late-night arrest required he spend the night in jail and he was released to face a media

circus and false allegations that have deeply affected him to this day. Indeed, given the nature of the charges, it is ironic that the news media was apparently made aware of his impending arrest just before it occurred as there was coverage contemporaneous to his arrest.

Despite the fact he had cooperated with the FBI throughout the investigation, he was arrested and treated like a subject who was a physical threat when a simple phone call to Jim would have resulted in his surrender. Jim had been a trusted partner with the FBI for decades handling sensitive matters with integrity. He was denied him the opportunity to call me while being transported to jail, further adding to the pain I have suffered. During my career, I treated subjects I arrested with respect and allowed them to contact family members when there was no potential physical threat. Instead, his treatment was orchestrated to exact the most emotional wounds on both of us.

Following his arrest the FBI continued to behave in a manner designed to further humiliate both of us. As a retired FBI Agent, I had legal weapons in our home. I understood the Court would impose pre-trial conditions that would preclude Jim from being near weapons and was attempting to make arrangements for a friend to remove from the home. Instead, I agreed the case agent could retrieve the weapons from our home to satisfy the conditions. As this could have been handled in a quiet, confidential manner. Instead, the FBI returned to our home positioning Agents around our home, while the media was camped outside to further highlight and embarrass Jim and our family.

Jim and I have already lost so much—reputation, friends, family, joy, holiday celebrations and professional opportunities for Jim to name just a few. Our home went from the central social gathering place in our neighborhood where we enjoyed the friendship and respect of many, to a target of gossip. Many friends, or people we thought were friends, have turned their backs; a large Catholic charity we supported with our time, prayers and money shunned Jim; my family is saddened at Jim's behavior and struggling to understand; professionally Jim's opportunities for a career in security have essentially evaporated. However, there have been many bright moments of love and support. Our real friends have rallied to support us; families are healing; my company has supported me despite the headline news; and Jim is finding God's grace and forgiveness in his service to a charity we have supported for many years. Enclosed you will find a photo of our family from happier times. Simply put, Jim is much more than the person charged by the Government for lying to the FBI.

Despite everything, I remain proud of Jim for accepting responsibility both with me and the Court. He is working hard at his community work and our marriage. No one prepares a person for the nightmare our family is in, but he is doing his best to move forward and make this situation an opportunity to grow as a person. I also recognize this is a chapter we must face, and other families are dealing with situations more challenging than ours, I pray for them.

I fully respect your duties as a Judge and recognize you must follow guidelines in determining Jim's punishment. With that in mind, I request your consideration in not imposing a jail sentence for Jim as I understand is consistent with those guidelines. I am confident he has learned powerful lessons from this situation, which he caused and for which he is responsible. He is focused on rebuilding his life. A period of incarceration would only delay his ability to be

a fully productive member of society.  Further, additional emotional strain on Jim, and me, if he were incarcerated would only add to the pain.   Regardless of the outcome, I appreciate your consideration and time in reading this letter.


Respectfully,

Jane Rhodes Wolfe

# Exhibit 3

Dear Honorable Judge Jackson,

My name is Private First Class Elliott Adair Wolfe. I am the second son of James Anthony Wolfe. I am writing today with a heavy heart and the hope of giving you perspective of who my father, James Wolfe is to me and a small piece of the world, outside of this court and this case. Over the last seven months my father has been labeled a liar, a disgrace, and a leaker, monikers that may capture his misdeeds, but do not represent all that he is. My intent is to show you a different side of my dad, the loving, protective, and supportive father he was, is, and will always be.

When I hear the name James Anthony Wolfe, I do not think of anything other than dad. Since my brother Bennett and I were born he has always put us before himself because he wanted the best for the both of us. When my father was growing up he did not have the luxuries of a nice home or stable family. He grew up in a trailer park in Florence, Kentucky, not knowing where his life would take him. From the stories my grandmother and my father would tell me, ever since a young age he worked so that he could save money to travel the world and to support his family. He then volunteered for the United States Army in 1983 as a signal analyst. He put his country first by deciding to serve. During his service he was stationed in Germany for two years and multiple stateside posts for the remainder of his contracts. During his time in Germany he met a female linguist for the United States Army named Leslie Adair Wilson. From stories he and his mother Marie told me, Leslie was a gorgeous, smart, and athletic woman who changed his life. They married years later.

My dad became a father in 1991 to my brother Bennett Nelson Wolfe. Bennett received numerous attributes from my father. He is intelligent, athletic, adventurous, hardworking,

compassionate, and loving.  Dad has told Bennett and me that this was a turning point in his life

where he would put us in front of his own life. He would tell us that he did not want my brother

or me to grow up the same way he did. During this time my father began to work in the United

States Senate. He has had the pleasure of working with multiple senators and even meeting past

United States Presidents. I have never met a person so passionate for what he does on a daily

basis. When I was little, I had multiple opportunities to visit my father's workplace and I thought

it was incredible. He would show me most of his daily duties and when he had time he would

take not just me but groups of people through the United States Capital on a very thorough tour.

He worked for the United States Senate for over thirty years and I know for a fact that even in

light of his current situation, he would not change it for the world.

   As I grew up I began to learn and realize more about my father. He didn't grow up in

Kentucky and make it all the way to the United States Senate by pure luck, he did it with hard

work and belief in the American Dream. The American Dream is something of a tall-tale today,

but I believe it still exists and anyone with heart and dedication can achieve it. I believe that the

United States of America was founded with the "American Dream" preeminent in the minds of

every citizen. Citizens of the United States or people trying to become citizens for the United

States can change their entire life through hard work and dedication. Just like many parents say

to their children, my father would tell me, "you can do anything you want to do when you grow

up," a message he lived and reinforced every day. He believed if you were happy or thought he

could make a positive impact on people, he would give his full support. He never used the words

"The American Dream" but you could tell he believed in it.

   I am currently on my own path to achieve, my American Dream.  My first step was to

join the United States Army as an Intelligence Analyst. I am currently in South Korea and

learning how incredible this country is. I have just finished my first year in Korea and the NCOs and Officers I have worked with have helped me forge a path towards my American Dream. One lesson that will stay with me for a lifetime is when my old Officer in Charge taught me about predictability, reliability and transparency. He told me that these qualities are how trust is established between people. I did not think of much of this advice initially, but as I continued my service I realized that this is a truism. If you ask anyone who has worked with or who knows my father whether he has established trust with predictability, reliability and transparency they would say "absolutely."

My father is the man who I will always look up to, no matter what is happening to me or this world. He is the person who helps me get through each and every day by setting the standard. I wish I will be able to teach at least a fraction of the lessons he has taught me growing up to my future children. He was the one who gave me passion to travel the world to experience other countries and cultures. I hope that I will be able to follow his footsteps by working in the United States Government years down the line to continue the American Dream.

Your Honor, I want to thank you for the opportunity to write to you and support my father.

Elliott Adair Wolfe

The Honorable Ketanji Brown Jackson

United States District Judge

United States District Court for the District of Columbia

E. Barrett Prettyman United States Courthouse

333 Constitution Avenue N.W.

Washington, D.C. 20001

11/23/18


Your Honor Jackson,


As I pen you this letter in my humble cabin tucked deep in the Patagonian mountain´s I have a strange sensation of being other worlds away from where you sit reading these words. I am quite close to the end of South America and the polar winds are screaming over the icefield with little resistance until they hit the massif. The towering spires of granite that claw at the sky clothed in wonderfully neon blue sashes of glaciers around their shoulders. With their violent winds that carry voices of years long past dawned with the thundering drums of collapsing seracs deep in its bowels. They are the sirens of the mountains calling you in to shipwreck on her rocky shores, we are but moths to flames. As my cabin shakes violently with the winds I only want to share these experiences with one other person; my father, Jim Wolfe.

 When I was small and obsessed with everything that crawled and slithered my father spent all his free time with me fishing in the lake, climbing trees and skipping rocks. When he wasn´t riding his bike with me he was in Washington working long hours to make sure that my little brother and I had everything we needed to be happy children. I have not one memory of being hungry or not having what I needed when I would come back from snowy days, blue faced but like a dog with two tails. His character is like that, he puts himself before others, even if that means putting himself in dire straits. A quality that I have made a staple in my own life. A trait that can get us into trouble at times. One must keep some love for themselves and not give it all away to others. What some view as flaws, I view as the beautiful tapestry that weaves our lives together. It seems quite obvious to put ones hand out instead of keeping it closed, to help out our fellow man. It is in our own interest to live as a family.

When you get down to the brass tacks, none of us chose to be here. Every time he returns to Kentucky to see his family he always brings a mountain of cookies to the nursing home where my angel of a grandmother spent her last happy days. It´s quite a sight to see him between a group of old ladies in wheelchairs. Even some with dementia remember his smile. He has a particularly

interesting relationship with a homeless man in town who he always brings food and items of importance to make his life comfortable. I think he remembers his humble childhood with not very much. He sees himself in them, and can´t but help. I see too much, the turning of heads as people pass by the ones who have been forgotten. Kindness can change the world. One person can pass on selflessness to another and in turn feed the fire until the cornice can no longer hold and avalanches into every society to supply dignity, so we can live out our extremely short lives with smiles.

Your honor, I am completely aware of my fathers offences, and the serious implications that it holds, his face has been plastered on every respected newspaper, to the trashiest tabloid press. His reputation is in sunders, one he has worked his whole adult life to cultivate. This event has made him commit political suicide at the gallows. The humiliation he has suffered is punishment enough. When we deconstruct this situation down to the bare bones it´s quite easy to understand, love. People come and go throughout our lives, some stay. We may love them fiercely to the point where without them it is too much to bear. We do insane, absurd things in the name of it. We cannot rightfully explain it in its entirety, but we exist in a cloud of ecstasy, but then we wake up in the gutter, eyes filled with sulfuric acid and a heart so in pain that you´d rather have it ripped out and die, than bare another second of it inside your chest. We have all been there. We are heartbroken children of the world wandering to find the meaning of the joke that stares right back at us. One who can suffer great tragedy can love as deeply to heal themselves.

This will follow my father, but this will not define him. He is stronger than that. My father has been dedicated to our country, served it with rifle and pen. He has held her keys, protected her secrets and he has not faltered in my eyes. What turned into harmless pillow talk, to later not being honest, to protect his marriage. He had a moment of weakness. But he is a powerful asset to his country, and ally. An error of judgement in the thralls of love has mushroomed into bedlam. Your honor Jackson, the mountains have shaped my life and taught me lessons and gave me freedom from fear and taught me how to love myself. My father shares this passion of climbing snowy peaks as well. Will you bestow this act of kindness for me, and pardon my dear father from the political gallows. I need this man in my life. Allow his freedom so he can come to Patagonia with me, to experience the raw power of the winds upon his face and climb these peaks with his devoted son.

Yours Sincerely,

Bennett Wolfe

# Exhibit 4



**OUR LADY OF PERPETUAL HELP CATHOLIC CHURCH**

*4795 Ilchester Road, Ellicott City, MD 21043*

*410.747.4334 ~ www.olphparish.org*

*Rev. Erik J. Arnold, Pastor*

November 23, 2018

The Honorable Ketanji Brown Jackson
United States District Judge
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue N.W.
Washington, D.C. 20001

Dear Judge Jackson:

I am writing on behalf of James Wolfe, who is scheduled for sentencing on December 20, 2018.

I have known Jim and his family since 2007 when I began serving as pastor at their parish here in Ellicott City. I am aware of the offense to which Jim has pleaded guilty, and I am writing to share with you some of what I know about Jim's character and integrity, in the hope that you may take some of this into consideration as you determine his sentencing.

Jim and his wife have had a quiet but consistent presence here in our parish over the years. I believe that Jim's faith is sincere and authentic, best evidenced in his desire to serve. From 2010 until now in 2018, Jim has taken part in our Catholic Charities *Our Daily Bread Casserole Program* which serves the hungry and homeless in Baltimore City. Part of Jim's service has included attending the meal service days over these years. In his current situation, in the time since these recent events have unfolded, Jim has given even more time to serving at Catholic Charities in Baltimore City. I do believe this reflects his heart's sincere desire to serve and to be of service to others.

In the time since his arrest and guilty plea, I have grown closer to Jim and his family and have witnessed his sincere desire for repentance and reconciliation. From my point of view, as a Catholic priest, any desire to make amends must begin at that most profound level of our relationship with God and then flow out from there into our relationships with others and with society. If it does not begin in the heart in this way, then such desire to make amends will probably prove to be short-lived. I share this with you because I believe Jim's desire to make amends is heartfelt. I have seen this not only in my work with him over the past several months but also in his participation in our parish's Christian twelve-step program *Celebrate Recovery*. This weekly program joins the traditional twelve-steps with Biblical principles that are meant to bring individuals to a place of healing, wholeness, and accountability.

As I mentioned earlier, I share all of this with you in the hope that you may take some of this into consideration as you determine his sentencing. I know that the criminal charges and ensuing events have severely affected Jim's life and I have witnessed the personal toll it has taken on Jim

and his family. In light of this, I am writing with the hope that you may give consideration to a punishment that would minimize his incarceration or confinement.

As I make this request, let me also share a little of my background in order to give some context. I was ordained a Roman Catholic priest in 1999 and have been serving as pastor at Our Lady of Perpetual Help in Ellicott City since 2007. Before my years in seminary, I obtained a B.S. in Computer Science as well as a B.A. in History from the University of Maryland, Baltimore County. My years in seminary were spent in Rome where I earned both a Baccalaureate Degree in Sacred Theology and a Licentiate Degree in Sacred Theology. My real joy, over these nearly twenty years as a priest, has been my service to our parishes and our parishioners. It is out of this context, as a priest and pastor, that I write on behalf of Jim.

Thank you for your time and consideration, I am grateful for it.

Sincerely,

Rev. Erik J. Arnold
Pastor

November 19, 2018

The Honorable Ketanji Brown Jackson
United States District Judge
United States District Court for the
District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue N.W.
Washington, D.C. 20001

Thomas E. Auld
█████████████████

Falls Church, Virginia ███████

Dear Judge Jackson:

I am writing to you on behalf of Jim Wolfe, a friend and professional colleague I understand will be sentenced on December 20, 2018. I am aware of the offense for which Jim has both confessed and taken full responsibility.

I am deeply disappointed by Jim's decisions. The integrity of our national security system depends on the public's confidence in each person entrusted with guarding confidential information. I believe Jim will spend the rest of his life regretting what he did and working to regain the trust of friends and colleagues. That is heavy punishment in itself.

I met Jim in August 2003 when I began working on the U.S. Senate Select Committee on Intelligence (SSCI) as a Professional Staff Member. Jim was the head of security for the committee and managed everything from staff and committee member security clearances, to overseeing who had access to committee spaces and ensuring all classified materials from any U.S. Government organization were properly handled and stored. To keep his job for so many years, Jim had to win and hold the confidence of senior staff leaders and senators on the committee and show that he was a non-partisan expert with the highest level of discretion. Given competing agenda among senators and staff, Jim heard and saw many sensitive issues that required the highest degree of care. In my more than two years on the committee, I never knew of an instance where Jim violated the trust of members or staff.

After I left the committee, I moved to a position at the Office of the Director of National Intelligence. My duties took me to the SSCI occasionally, and I usually saw Jim briefly during those visits. I also think we saw each other a few times socially over the years at holiday gatherings around Capitol Hill. We have been connected on social media since about 2016. Finally, I have kept up with Jim indirectly over the years through friends from the SSCI.

As for my background, I retired from the Air Force Reserve in August 2018, after 40 years of service on active duty, in the Air National Guard and in the Air Force Reserve. I also retired as a senior executive from federal civil service after 30 years of service in the Intelligence Community and in the national security policy world. I now work in the private sector for a

multinational defense firm.  I am a graduate of the University of Pittsburgh where I earned a Master in Public and International Affairs and the University of South Carolina where I earned separate Bachelor of Arts degrees in German Language and in Journalism.

In the course of my professional life in the military and federal civil service, I have seen many cases of personal failure, including some very serious ethical lapses that have derailed careers and personal lives.  I have seen people refuse to acknowledge the harm they have done.

Conversely, I have seen people acknowledge their failures, make restitution, learn, grow and move on to useful lives in the professional world and in their communities.  I think that is where Jim is today.  He wisely and humbly realized that his actions mean his life is going to be different and that he has years of rebuilding ahead of him.  He did the right thing in fully confessing his offense.

Jim is now at the mercy and grace of your court for a decision that will shape the course of his life.  It is a tragedy and a heartbreaking reality to me that a few moments of indiscretion have eclipsed Jim's long career of honorable service.  However, I believe Jim is a good man who has a conscience.  He understands the difference between right and wrong, honoring an oath and violating an oath.  He has the capacity for humility, to learn, and to contribute to his community again in new ways.  Finding that place to contribute may be the biggest challenge of his life going forward.

I respectfully ask that when you consider the options for Jim, you will take account of decades of faithful past service to our country, as well as the potential he still has for new service.  I hope your sentence will allow Jim the opportunity begin that work immediately.

Respectfully,

Thomas E. Auld

Thomas E. Auld

2



**Bonita Bishop**

**Pflugerville, Texas**

The Honorable Ketanji Brown Jackson
United States District Judge
United States District Court for the
District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue N.W.
Washington, D.C. 20001

Re: James Wolfe

Dear Judge Jackson:

This letter is concerning the case of James Wolfe (Jimmy as we know him), and to give you insight of who he has been and still is now.

A little background on me, I am 72 years old and married to his Uncle Mike. I met James Wolfe when I dated his Uncle Mike when we were in high school. I have some college education but have worked in the corporate world for many years and then worked with doctors and psychologist. I have raised two children who I am very proud of. Jimmy's mother is deceased, and I am proud to stand beside this man as I know his heart.

As his family he has shared the case with us and that he pleaded guilty taking responsibility for his actions. I have known Jimmy since he was approximately 3-4 years old. He was raised in a middle-class family and taught to be loving, caring to others, giving and to always do his best. He grew up with values, love for family and country and respect for others.

His Uncle Mike speaks about as a young man active in sports well liked by all his peers and how proud when Jimmy was also Soldier of the Week, Soldier of the Month, Soldier of the Quarter and Soldier of the Year, in Astterdoch, Germany in 1984-85. This attest to the man who has always done his best in everything he has embarked on. Jimmy has always shown integrity in all he did whether it be sports as a young man, as a soldier and his job as a member of U.S. Senate staff. This is who he was then and who he is now.

His goal in life, as we know, was to serve his country and the people in it to the best of his ability and he has served in the military and approximately 35 years in the government in the U.S. Senate His impeccable career up to this point speaks for itself. I believe he has tried to do this with integrity. He is a valuable, responsible, an asset to his community and by all who know him. It would be unjust to wipe away or mire all the good years he has given to the administration due to one bad judgement or mistake.

Many will verify to you he is an educated, dedicated, dependable, conscientious, human being who cares about his family and country. This has taken such a toll on his family life, his self-esteem and self -worth. He has asked all his family for forgiveness for making a wrong decision and failing to be beyond reproach. We feel he did not fail. His wife, children and whole family stand behind him. We know that not one of us can say we have not made a mistake or that we are perfect.

As of all human beings he made a bad judgement and mistake. We all also know that this does not excuse it but hope through an act of some compassion will not let it run his life after so many years of dedication to his country and job. We ask that you as another human being with the authority to take all of this in your consideration while making your decision in a fair manner and consider a minimal judgement.

Regards,

Mrs. Bonita Bishop

**November 1, 2018**

THE HONORABLE KETANJI BROWN JACKSON
UNITED STATES DISTRICT JUDGE
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA
E. BARRETT PRETTYMAN UNITED STATES COURTHOUSE
333 CONSTITUTION AVENUE N.W.
WASHINGTON, D.C. 20001

Your Honor,

I am writing to express my support for Mr. James A. Wolfe and to provide my perspective on Jim's character and his ability to continue to make a significant contribution to his community.

I have known Jim since 1999, when I started on the Senate Select Committee on Intelligence as a Professional Staff Member and Jim was the Committee's Security Officer. We immediately hit it off due to our prior service in the U.S. Army and Jim's willingness to walk me through the ropes on how things were done on the Committee. Jim was on active duty from 1983 to 1987 and mobilized in 1990 and 1991 during Operations Desert Shield and Desert Storm. He joined the Senate Intelligence Committee in 1987.

A little on my background. I graduated from the United States Military Academy (West Point) in 1972 and then served in the Army for 27 ½ years as an Infantry Officer before retiring as a Colonel and joining the Senate Intelligence Committee in October 1999. I worked as a Professional Staff Member on the Committee for 17 years with primary duties as the budget monitor for the Central Intelligence Agency. I retired from the Committee in June, 2017.

During those 17 years I came to know Jim extremely well, both professionally and personally. As the Committee's Security Officer, Jim was responsible for maintaining control of thousands of highly classified documents received from agencies within the Intelligence Community as well as those created by the Committee, ensuring only those with the proper security clearances had

Southport N.C.

access.  Jim also served as liaison to Intelligence Community representatives for all our briefings and hearings and for conducing background investigations of staff members.  As well, Jim served as the Committee Archivist responsible for records dating back to the Church Committee and coordinating the declassification process for classified material.  During hearings and meetings on highly classified issues, Jim was responsible for getting witnesses into and out of Committee spaces securely and discreetly.  Needless to say, this was a tremendously important and serious job dealing with our Nation's most sensitive secrets.  One of critical importance to our national security.  Jim performed his duties in an exceptionally competent and efficient manner.  He was known throughout the Senate and House of Representatives as well as within the Intelligence Community as someone who knew his trade well and could be counted on to "get it right" the first time.  His reputation was impeccable.  I believe this is the reason when Jim was charged with lying to the FBI the Committee Chairman, Senator Richard Burr, and Vice Chairman, Senator Mark Warner, said in a joint statement that while they were troubled to hear of the charges against Jim, the charges did not appear to include anything related to the mishandling of classified information and also acknowledged Jim's honorable past service, stating, "This news is disappointing, as the former staffer in question served on the Committee for more than three decades, and in the Armed Forces with distinction."  An acknowledgement of Jim's character, integrity and good behavior prior to this event.

Personally, Jim and I have grown to be good friends over the years.  I could always count on him for support and encouragement both at work and outside work as we socialized with our wives and friends.  When I participated in the "JFK 50 Mile" race in Maryland, Jim was there as my support person providing food, water, clothing and morale support to help me make it to the finish line.  We also both ran in numerous Cherry Blossom 10-mile races in Washington DC, supporting each other and building comradery with other staff on the Committee and I often stayed at Jim and Jane's home in Maryland when I participated in nearby triathlon races.  When Jim and Jane married, my wife and I invited them to spend time in our condominium in Emerald Isle, North Carolina as a mini-honeymoon, which they did.  Both my wife and I are proud to consider Jim and Jane as good friends.

I understand the seriousness of lying to the FBI, the charge to which Jim has plead guilty.  I am also aware of the severe emotional, physical and mental anguish he has suffered as a result of

his actions.  His reputation can probably never be restored.  I know Jim's wife and sons, one who is in the Army in Korea, have also been embarrassed and disappointed by Jim's conduct. In fact, his whole life turned upside down, and although this was due to his own actions, it should not diminish the fact that prior to this incident Jim's life was exemplified by the highest standards of duty and service to his community and our country.

James A. Wolfe is a good man who made a terrible choice and has paid a significant price already.  I hope and pray that you will consider his conduct and contributions prior to this incident and consider his potential for continued service to his community and the nation after this sentencing.  Thank you for considering this letter.

SINCERELY,

RANDALL D. BOOKOUT

SOUTHPORT, NC

David Byrnes

███████████

Alexandria, VA ████████

5 November 2018

The Honorable Ketanji Brown Jackson
United States District Judge
United States District Court for the
District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue N.W.
Washington, D.C. 20001

Dear Judge Jackson;

My name is David Byrnes and I write to you on behalf of James Wolfe as you prepare to sentence Jim for the offense to which he has pleaded guilty. By way of background, I've served a combined 40 years of service as a Marine Corps Officer and as a CIA Officer and have known Jim for over 15 years.

My relationship with Jim has been both professional and personal and as much as I'm fully aware of Jim's actions and sadden by this situation, I remain a committed friend. I have known Jim through the best and worst of times and he is a humble and good man whose love for his sons, Bennett and Elliott is without question. Sadly, I know from our conversations just how overwhelmed and disheartened he has been by the pain he has caused his family.

Regrettably, "the Jim" that has appeared in your Court is not the full measure of the man I have known. In the end, his guilty plea was the right move for him, his sons and his wife Jane and as he rebuilds his life, I continue to stand by him. Since his retirement, it was of no surprise to me to hear of his commitment in supporting a local Homeless Shelter, much like he did in supporting my family when I was deployed to both Iraq and Afghanistan. On a number of occasions while I was gone for a year at a time he reached out to my family, while providing my children with tours of the US Capitol and being someone for them to talk to as needed. By the very nature of my work, there were very few individuals such as Jim who were capable or even willing to make themselves available.

Many years ago, as a former graduate of the Naval Justice School and as a Marine Officer who presided over a number of Court-martials and Administrative Separations, I always tried (during the sentencing phase) to measure the individuals intent related to the event with their prior good deeds, character, remorsefulness and how the very nature and seriousness of the offense affected the community and their family. For

those of us who have known Jim, I can truly say he's a good person focused on family, friends and community who is sincerely remorseful and apologetic. By his own wrong doings and through these difficult times he has found a path to goodness in helping those less fortunate as he continues to take those important steps in rebuilding his relationship and creditability with his wife and sons.

In closing, I sincerely ask for your consideration as it relates to the greater good as you impose your compassionate justice.

Respectfully,

D. BYRNES

**JAMES R. CLAPPER, JR.**

LT. GENERAL, USAF RETIRED

FAIRFAX, VA ███████

November 1, 2018

The Honorable KetAnji Brown Jackson
United States District Judge
United States District Court for the
  District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington D.C. 20001

Your Honor:

I write this letter on behalf of Mr. James
A. Wolfe, whom I understand will be
sentenced on December 20th; I am aware
of the offense to which he pleaded guilty.

By way of background, I served in the
Intelligence Community for over 50 years,
culminating as the Director of National
Intelligence from 2010 to 2017. Earlier,
I served as the Undersecretary of Defense
for Intelligence, and prior to that as
Director of the Defense Intelligence Agency,
and later as Director of the National
Geospatial-Intelligence Agency. I have

been a political appointee in both Republican and Democratic administrations. I served in the military for 34 years, first in the Marine Corps Reserve, and then in the Air Force, retiring in 1995 as a Lieutenant General. I served two combat tours in Southeast Asia, and I hold a bachelor's and master's degree in political science.

I have known Jim since about 2001, in his capacity as the Director of Security for the Senate Select Committee for Intelligence. I interacted with him during the many hearings when I testified before the Committee. In every instance, Jim conducted himself professionally and courteously. He was well known as an expert in security matters and was very conscientious about protecting classified information and the physical security of the hearing rooms and environs. I found him to be honest, forthright, ethical, and helpful. Jim served

the Committee long and well — 31 years,
22 of which were as the Director of
Security.

Knowing Jim as I do, I know this whole
experience — and its exposure in the media
— has been very traumatic for him
already. I would hope the Court
would consider Jim's long and faithful
service, as well as what he has
endured thus far — in sentencing him,
and would recommend minimal con-
finement.

Respectfully,

James R Clapper

██████████████████████
Washington, DC ████████
November 14, 2018

The Honorable Ketanji Brown Jackson
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C.  20001

Dear Judge Jackson:

I am writing in the hope that the information in this letter will assist the Court in understanding the important contributions of James A. Wolfe to the work of the Senate Select Committee on Intelligence.

I should say at the outset that I am aware, from public reporting and documents, of the charges against Jim and his plea.  I believe in the need for candor in statements to law enforcement officers, as well as to the Congress, and appreciate that Jim has accepted responsibility for the conduct he has acknowledged, conduct that was inconsistent with everything I have known about him.  It is my understanding that no part of the charges concern use or disclosure of classified information.

From 1979 to 1995, I served as Senate Legal Counsel, a position created by Title VII of the Ethics in Government Act of 1978.  In addition to representing the Senate, its committees, members, and employees in litigation relating to official matters, my office worked with committees on a range of matters including investigations.  Jim began to work at the Senate Intelligence Committee in 1987 and I had occasion to interact with him from then until I concluded my service as Senate Legal Counsel in 1995.  I returned to the Congress in 2002, first as General Counsel to the Joint 9/11 Inquiry of the Senate and House Intelligence Committees in 2002, and then as the Minority Counsel (2003-2006) and the General Counsel (2007-2011) of the Senate Intelligence Committee.  During my time at the Senate Intelligence Committee, from 2003-2011, I had the opportunity to work with and observe Jim on practically a daily basis.

The contemporary system of oversight of the Intelligence Community -- which began with the Church Committee in 1975–76 and the creation of the Senate Select Committee on Intelligence in 1976 -- has from the outset been grounded in a bargain.  The Committee (and its House counterpart) would have broad and deep access to the classified information of the Intelligence Community, across the spectrum of human and technical means of collection and the analysis of the fruits of that collection.  In turn, the Committee would establish and implement multiple controls to safeguard that information.

As Security Director, Jim was at the center of the Committee's successful effort to keep its part of that bargain.  He helped to institute and diligently maintain multiple controls.  He was quietly dedicated in doing his job, willing to work long hours to assist Members and staff whenever any one of them needed him to do so, and cared about the success of the missions of both the Committee and the Intelligence Community.

There is a further dimension to Jim's contribution to the work of the Committee.  The secrets entrusted to the Committee could be made safe by simply locking them securely away.  But to accomplish oversight the information needs to be used by Members and staff in study and analysis, whether at their desks, in meetings, or in the field.  That involves physical and electronic access within the Committee, movement of information from agencies to the Senate, not only in the Washington, D.C. area, but also around the nation and internationally, all of which calls for the Security Director's care and attention to detail.

And within the Committee, on account of executive branch requests to limit access for especially sensitive information to subsets of the staff, the Security Director administers a system to adhere to those limitations, a complex system which requires the Security Director to ensure adherence to the different access opportunities of individual staff members.

In short, Jim played a major role in enabling us to do our job.  For that, I believe he deserves a share of the credit for the work done by the Committee, on behalf of the Senate.  That work enables the Committee to ensure that the Intelligence Community has the resources and

authorities essential to the nation's security while also enabling the Committee, through inquiries that are well-known and many more that will never be publicly known, to ensure that U.S. intelligence agencies act lawfully.

Many thanks for the opportunity to present these thoughts.

Sincerely,

Michael Davidson

November 2, 2018

The Honorable Kentanji Brown Jackson

United States District Judge

United States District Court for the District of Columbia

E Prettyman United States Courthouse

333 Constitution Avenue N.W.

Washington, D.C. 20001

Dear Judge Jackson:

My name is Therese Hensley, I am 74 years old and retired. I am writing on behalf of James Wolfe. I have known Jimmie since birth. His mother Marie and I were cousins, my mother and her father being siblings. Marie and I were "buddies" growing up, spending time at each others homes until we got to high school age. Marie married young and had her first child, George, at 16 or 17, followed by Jimmie a couple of years later. Jimmie and his family in early years lived next to my grandparents and I would often see Jimmie and his brother George there. As they grew and eventually pursued their own lives. I would most often see them at family gatherings. George went off to college and Jimmie entered the military. Eventually Jimmie was stationed in D.C and throughout the years pursued his college education . After his military service I know he stayed in Washington and eventually was in security in the senate building.

Jimmie has always been a kind, thoughtful, caring person. He took great care to see to his brother, George's needs as George had some physical and other afflictions. Jimmie was there for his dad when he was dying, taking time to be by his side till his death. When George died, Jimmie was there to lend support to his mother and other family members, helping in any way he could. He was always the rock everyone leaned on, despite his own sorrow. He always made it a point to visit his mom and other family as often as possible. Many times when he came, his boys would come with him along with his wife.

Jimmie's mom died several years ago and he was by her side during this time, lending his support to the rest of her family, despite his own need for comfort. His mom relied on Jimmie for support during many difficult times.

I have never known Jimmie to be anything but kind and thoughtful, always looking to help someone else. I am aware of the charges facing him, and frankly was very surprised. Jimmie has been supportive of family so many times without asking much for himself. Always supportive, he was a quiet, strong, reserved man. He never discussed any type of politics anywhere in family gatherings even though someone might bring something up. He always steered clear of the subject, something for which I admired him.

There are just three (3) members of his mom's immediate family remaining and I know how much they love Jimmie, as we all do and fully support him, as I do. Jimmie is a good person and I believe in that.

Sincerely,

*Therese Hensley*

Therese Hensley

11-2-18

13 November 2018

The Honorable Ketanji Brown Jackson
United States District Judge
United States District Court for the
 District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue N.W.
Washington, D.C. 20001

Dear Judge Jackson,

I writing on behalf of James "Jim" A. Wolfe, who I have known professionally and personally for over twenty years.

I respectfully request the Court give the totality of Jim's stellar military and civil service career appropriate weight against the serious transgression, for which he has taken responsibility, prior to his sentencing on December 20th.

Allow me to provide some details of how I know Jim and why I believe he is deserving of leniency.

I worked with Jim on the U.S. Senate Select Committee on Intelligence (SSCI) for twelve years, during which he was employed as Security Director. I observed him handling our nation's most sensitive classified materials on a daily basis, including the full extent of covert action and human, signals, and imagery intelligence collection and analysis programs of the U.S. Intelligence Community. During my tenure on the SSCI, my professional relationship with Jim changed when I became his direct supervisor.

My employment with the SSCI as a Professional Staff Member began in early 1997. In 2004, I was promoted to Minority Staff Director. In January 2007, I took over as Staff Director for the full committee and was responsible for managing and tasking the 44-person, bipartisan staff to carry out legal, budgetary, and programmatic oversight of the U.S. Intelligence Community. I continued in this capacity until I departed the SSCI in early 2009.

At no time during these twelve years did I observe or was I otherwise aware of Jim mishandling, leaking or compromising classified or committee sensitive materials and information.

To the contrary, Jim demonstrated a solemn and unwavering fidelity to the laws and policies for the retention and safeguarding of information that, if disclosed, could harm national security and cost persons their lives. Jim was a bulwark in this regard during a difficult, high-pressured period of congressional oversight when many SSCI investigations, such as those into the 9/11 attacks and

pre-war intelligence on Iraq, were carried out in public and behind closed doors, and resulted in the production of both unclassified and highly-classified reports.

Some matters before the SSCI were so sensitive that they were limited to the Chairman, Vice Chairman and the two staff directors. During the consideration of this information, I had one-on-one dealings with Jim often, and he unfailing demonstrated to me—by his words and by his actions—that the safeguarding of the information was paramount. I observed that Senators on the committee and fellow committee staffers shared the same confidence in how Jim carried out his duties and came to rely on him in this regard.

As I mentioned earlier, my professional relationship with Jim ended in 2009. However, the friendship we forged at work continued on after I left the committee. I know him to be a proud and loving father of his two boys, and he showed kindness towards my wife and children over the years we have known each other. Recently, we have kept in touch through Christmas cards and the occasional email exchanges.

At some point in our lives, we all fall short of what is required of us. Most failures are ethical or moral failings; some are violations of law. Through my own professional experience, I understand the significance of the matter before the Court, and I do not seek to minimize it.

Knowing Jim as well as I do—as someone who dedicated himself to safeguarding classified and sensitive information, as someone who understood the importance of being truthful—I view his actions in the matter before the Court as an aberration, an anomaly when viewed against an otherwise accomplished and spotless career.

Moreover, I believe Jim is profoundly embarrassed by and contrite over what he did. I believe he feels he let down his family and his friends. I further believe he feels disgraced for violating the trust committee Senators and staff placed in him. I have no doubt the public reporting and judicial proceedings concerning his lapses in judgment have shamed him to the core. In sum, the punishment Jim is already shouldering is considerable and will be everlasting. As such, I do not believe incarceration is warranted.

Thank you for affording me the opportunity to have my voice heard on this important matter before the Court.

Sincerely,

Andrew W. Johnson

Andrew W. Johnson

Poolesville, MD



**ROBERT S. LITT**

**Chevy Chase, MD**

Hon. Ketanji Brown Jackson
United States District Court
District of Columbia
333 Constitution Ave., N.W.
Washington, D.C. 20001

Re:  United States v. James A. Wolfe, Crim. No. 18-CR-170 (KBJ)

Your Honor:

I understand that Jim Wolfe is to be sentenced on December 20, after pleading guilty to making a false statement to the FBI concerning his personal relationship with a reporter. I know nothing of the facts of the case beyond what is contained in the statement of offense, and as a former federal prosecutor I do not condone lying to law enforcement officers. However, I have known Jim professionally for close to ten years, and I am confident that his behavior in this instance was an aberration that does not reflect his overall integrity and decency.

As General Counsel for the Office of the Director of National Intelligence from 2009 to 2017, I was a frequent visitor to the classified spaces of the Senate Select Committee on Intelligence in the Hart Building, for hearings, briefings, or meetings with committee staff. On many of those occasions I dealt with Mr. Wolfe, who had overall responsibility for ensuring security at the closed hearing room and the committee's offices. He was unfailingly courteous, friendly, cooperative and non-partisan. More importantly, he clearly understood and enforced the importance of protecting the sensitive classified information that the committee dealt with; he would work with visitors to ensure that they had appropriate access with a minimum of hassle, but he would not bend or break the rules no matter how friendly he was with you. In other words, he behaved as a public servant should:  attentive to his responsibilities without being in any way officious.

I was therefore saddened to read of Jim's arrest and guilty plea, but not in any way surprised that he has taken responsibility for his actions. I hope that the Court will take account of Jim's long and meritorious service to the nation, and his otherwise unblemished record and character, in sentencing him.

Respectfully submitted,

Robert S. Litt

November 13, 2018

The Honorable Ketanji Brown Jackson
United States District Judge
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Jackson,

I am writing in relation to the December sentencing of James (Jim) A. Wolfe. I submit this letter in the hopes that this additional information about Jim is helpful to you.

I met Jim in the Summer of 2000, when I first began working as Foreign Policy Advisor for the Senate Democratic Leader, Senator Tom Daschle. In that position, I interacted with Jim since he was the security officer for the Senate Intelligence Committee. I worked in the Senate until the end of 2005 and occasionally worked with Jim to arrange for meetings in the Intelligence Committee's secure facilities or to arrange to review classified documents.  Starting in January 2009 I began to work for the White House National Security Council and continued to work there until January 2013.  In that period I also interacted with Jim, though less frequently than I had when I worked with him in the Senate, in order to arrange for briefings of and meetings with senators about important national security matters. I also interacted with Jim in 2014 when, as White House Chief of Staff, I led a negotiation with Senator Feinstein, then Chairwoman of the Senate Intelligence Committee, on the declassification of a Senate Intelligence Committee report. Finally, my last interaction with Jim was in July 2017 when I was interviewed by Intelligence Committee Staff members conducting an investigation of Russian meddling in our 2016 elections. On that occasion, Jim helped schedule my appearance before the committee staff and assisted me when I arrived the morning of the appearance.

In all my interactions with Jim he was careful, professional and courteous. Over his many years on the committee staff, he developed not just important experience and expertise but also earned the trust of his superiors and his colleagues, irrespective of party affiliation, a fact that is made clear by Jim's continuation in his important position even as control of the committee rotated between Republicans and Democrats in that same period. In all my dealings with him I have not had any concern about his honesty or his integrity, nor have I personally heard anyone else question these attributes. I have no knowledge of the facts or circumstances of the matter in your court, but my interaction with him has been free of any concern about these personal qualities.

As you consider next steps in his case, I hope you will consider his many years of service to the Senate – service which I personally witnessed – and the country.

2

I thank you in advance for your consideration of this additional information.

Sincerely,

Denis McDonough



Lisa Peeler

Ellicott City, MD

November 4, 2018

The Honorable Ketanji Brown Jackson
United States District Judge
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue N.W.
Washington, D.C. 20001

Re:  Sentencing of James Wolfe

Dear Judge Jackson:

My name is Lisa Peeler.  I am 37 years old and an accountant for the Controller's office at The Johns Hopkins Hospital.  I have been in this position for over 10 years and earned my Bachelor's degree in Accounting and a Master's degree in Business Administration.  I have known Mr. Wolfe as a good friend and neighbor for over three years.

Mr. Wolfe has informed me of the events surrounding his felony conviction of making a false statement to the FBI. In light of these circumstances, I am happy to offer an endorsement of Mr. Wolfe's good character.

In addition to our friendship, Mr. Wolfe is a respectable and caring individual in the community.  We have attended numerous community and social gatherings together and interact frequently while walking our dogs.  Mr. Wolfe has always had the respect of our neighborhood and he will routinely go out of his way to help someone in need.  For example, one of our neighbors needed help unloading a moving truck and Mr. Wolfe willingly assisted to help unload the entire truck.  This instance, among many others, is indicative of Mr. Wolfe's reputation for helpfulness and generosity in our neighborhood.

Additionally, Mr. Wolfe also gave my family and parents a wonderful private tour of the Capitol on August 19, 2016.  We all loved the tour, especially my parents.  Mr. Wolfe's personal tour was very informative and educational.  His incredible knowledge gave such great insight into the building and the workings of Congress.  Mr. Wolfe taught us a lot of the history of the building and the tour was very insightful.  He gave us many exceptional details and showed such respect for the building, system, and all the people.  Mr. Wolfe has a great sense of humor and made the tour so much fun by including fascinating facts and humorous anecdotes about the building.  We were all grateful to have such a memorable personal tour and opportunity to see the beauty and history first hand.

While it is regrettable that Mr. Wolfe has made some unfortunate decisions that resulted in this case, I have witnessed his remorsefulness for his actions.  Although I was shocked to hear of Mr. Wolfe's misconduct, it comes as no surprise that he accepted responsibility for his actions and I believe he will emerge as a better person as a result.  I am aware that he has also been volunteering at Our Daily Bread regularly as well.  Mr. Wolfe has expressed deep regret for making such a serious mistake and it is my sincere hope the Court takes this letter into consideration at the time of sentencing.

Thank you for taking the time to read my letter.

Sincerely,

Lisa Peeler

24 November 2018

The Honorable Ketanji Brown Jackson
United States District Judge
United States District Court for the
District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue N.W.
Washington, D.C. 20001

Your Honor:

I write to attest to the character and conduct of a defendant in your court, Mr. James A. (Jim) Wolfe, who is scheduled to be sentenced on December 20, 2018, for the serious crime of presenting false testimony to the Federal Bureau of Investigation.

By way of introduction, I am retired from the federal government after 35 years of service in national security, including as a commissioned Air Force intelligence officer, member of the CIA Senior Intelligence Service, member of the Senior Executive Service in the Executive Office of the President, and professional staff member of both houses of Congress. After leaving government, I have worked as a Vice President with the national security consulting firm, Beacon Global Strategies. Outside of work, I am an ordained Elder in the Presbyterian Church, where I am actively involved in efforts to alleviate urban poverty and homelessness.

I have known Jim Wolfe well professionally for over ten years, and during that time, I also became a friend of his. I first met Jim in 2007 when I was assigned as a Professional Staff Member to the Senate Select Committee for Intelligence (SSCI), where I worked for four years under Vice Chairman, Senator Kit Bond. During my involvement with Jim, I believed him to be the best Security Officer I had worked with in my 35 years in national security service, and I have shared this assessment with many co-workers.

At the SSCI, I was in close and daily contact with Jim. He was completely devoted to the mission of the Committee, and he was absolutely on top of every security-related issue and action. Unlike many Security Officers with whom I had worked, Jim did not make his critical security job "about him". Also, while ensuring that Members, staff, and he, himself, strictly followed all the many rules regarding classified information, he was focused on the job's key outcome -- protecting classified information -- not "administrivia".

I continued to work with Jim when I moved to the House Permanent Select Committee for Intelligence in 2011, where I served four years as Budget Director. In this position, I was responsible, under Chairman Mike Roger's direction, for

preparing the classified budget for the Intelligence agencies and negotiating it with the SSCI. This involved the frequent exchange and control of some of the government's most highly-classified materials -- a process Jim led. He ensured the security and promptness of these exchanges, including the proper dissemination of materials to appropriately-cleared officers in Congress and the Executive Branch.

During my many years working with Jim, he showed no political biases and treated all co-workers and Members of Congress with courtesy and respect. He took great pride in leading special tours of the Capitol for friends and family of staff. This was a completely voluntary function that he cheerfully performed, even when extremely busy with his security responsibilities. I never had any reason to question his integrity, and I also came to know Jim socially as a deeply devoted family man.

I also am aware of, and indeed contributed to, his fund-raising efforts on behalf of our wounded warriors. Jim and his sons personally raised $5,000 for the Heroes Project by sponsoring their own climb to the summit of Mount Whitney (the highest peak in the lower 48 states). Jim also has been volunteering with Catholic Charities to help feed the homeless of Baltimore.

Given everything I know about Jim, I was shocked and saddened by the serious lapse that led him to your bench.

I firmly believe that the circumstances of Jim's criminal case are completely at odds with the main course of his conduct over his 30 plus years of public service in the U.S. Army and U.S. Senate. Moreover, I believe that Jim's legal difficulties have left him deeply chastened. Therefore, I believe he is positioned to return to his community and serve it with the commitment and talent I know him to possess.

Accordingly, I respectfully request that you consider the views I have presented in this letter, along with those of other associates and family members, in reaching a just, wise, and merciful sentence.

Sincerely,

Bryan R. Smith
Alexandria, VA

November 2, 2018

The Honorable Ketanji Brown Jackson
United States District Judge
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue N.W.
Washington, D.C. 20001

Your Honor:

I write in support of James A. "Jim" Wolfe, who is scheduled to be sentenced in
your court on December 20, 2018.

By way of introduction, I am 73 years old, a lawyer by training, who retired from
the federal government in 2001, having spent 31 years in various jobs including
nine years as General Counsel of the Senate Select Committee on Intelligence
(SSCI). When I retired, I was the Inspector General of the Central Intelligence
Agency.

I joined the staff of the SSCI in January, 1987, having been hired by the
committee's vice chairman, Senator Bill Cohen of Maine, to serve as Minority
Counsel of the committee. My recollection is that Jim had joined the staff shortly
before I arrived, after serving in the security office at the National Security
Agency. At the time, he was deputy to then Director of Security, Paul Joyal.
When Joyal left the committee not long afterwards, Jim assumed his position. For
my part, I was made General Counsel of the committee about a year after I arrived,
pursuant to an agreement between the Chairman at the time, David Boren, and
Senator Cohen. A Minority Counsel was never subsequently hired in the ensuing
nine years I was with the committee.

I worked quite closely with Jim during that entire nine-year period. As Director of
Security, he was responsible for every aspect of the committee's security: storing
and handling of classified documents; overseeing the security clearances of
committee staff; physical security for the committee's spaces; dealing with
suspected leaks of classified information by Members and staff; enforcement of the
committee's non-disclosure agreements; and dealing with other committees or
individual Members who, from time to time, required access to classified materials
held by the committee.

While, as Director of Security, he was not involved in the substantive work of the committee, his job was an important one.  The ability of the SSCI to establish and maintain its credibility as a capable overseer of the Intelligence Community is dependent upon its ability (real and perceived) to protect the classified information that is shared with it.  Jim, I think, was key to that credibility.  He was respected by his counterparts in the Intelligence Community whom he made sure understood what he was doing, and how security on his watch was being administered at the SSCI.

Over the nine years I worked with Jim, I recall no slip-ups on his part:  no misconduct, no aberrant behavior of any kind, nothing that he should have done but didn't do.  He was quiet and self-effacing, and played everything by the book.  Politics never entered his frame of reference.  If you were violating the committee's security procedures, he was going to come down on you, regardless of whether you were a Democrat or Republican.

You will understand how shocked I was when I read the accounts in the newspapers last fall of what he was alleged to have done.  It seemed so out-of-character for the man I had known.  Even more dismaying was his subsequent guilty plea, admitting to having lied to the FBI on several occasions.

I have had trouble coming to grips with all of this.  I know nothing of what happened here other than what I've read in the newspapers.  I have not talked with him about it.  Indeed, I have very little contact with Jim over the last sixteen years.

But he remains my friend, and I would, in closing, point out several things to you:

He served the SSCI as its Security Director for 32 years.  That in itself is a remarkable accomplishment.   Typically, committee staff changes when a new Chairman comes in.  Jim was there, as I count, for nine different chairmen, five Democrats and four Republicans.

He would never have been kept on if his job performance had in some manner been derelict.  Indeed, I know of nothing he did or was suspected of doing over the last 32 years, personally or professionally, that in any way reflected poorly on him, until this.

I would simply urge you to consider all of this in deciding what his sentence should be.  He had an exemplary career in the federal government until now.  He

poses no danger to society.  Without a doubt, he made serious mistakes of judgment, but his career and reputation have been ruined as a result.

Thank you.

Sincerely,

L. Britt Snider

Hanover, MD ██████████
November 17, 2018

The Honorable Ketanji Brown Jackson
United States District Judge
United States District Court for the
District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue N.W.
Washington, D.C. 20001

Dear Judge Jackson,

I am writing to you regarding James Wolfe.  I have been the St. Augustine Casserole Coordinate for Our Daily Bread since 2009.  Our Daily Bread is the largest "soup kitchen" in the Maryland and serves 500-800 meals every day.  The casserole program is the cornerstone to their meal program, and without community donations, hundreds of people would go hungry each and every day.

Our church community prepares and donates about 65 casseroles each month, and James has been a regular casserole donor since we began this Ministry almost ten years ago, and James has volunteered at Our Daily Bread since this ministry began.  Six years ago my Dad died a few days before our monthly November collection date, and I sent an e-mail out to our regular donor asking for help - my dad's funeral was scheduled the same day as the collection.  James was the first one to respond, and he collected and delivered the casseroles for me.  This was a genuinely horrible day for my family, but I will never forget James' kindness in stepping in and taking over.

I believe in helping our community, and I also believe in forgiveness.  I am hoping that you will consider James' past contributions to our community and the potential contributions he will be able to make.

Please feel free to call me at ██████████ if you have any questions.

Sincerely,

Dawn M. Weglein