**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA** | ) | | |
| | ) | **Criminal No.:** | **18-cr-170 (KBJ)** |
| **v.** | ) | | |
| | ) | **Sentencing Date:** | **December 20, 2018** |
| **JAMES A. WOLFE** | ) | | |

**GOVERNMENT'S SENTENCING MEMORANDUM
AND MOTION FOR UPWARD DEPARTURE AND/OR VARIANCE**

The United States of America, by and through its representative, the U.S. Attorney for the District of Columbia, in accordance with the United States Sentencing Commission Guidelines Manual ("U.S.S.G." or the "Guidelines"), files this Memorandum in support of its position on sentencing. An upward departure is warranted here because although the defendant is not alleged to have disclosed classified information, his conduct nonetheless disrupted an important governmental function and endangered national security. An above Guidelines sentence is also appropriate as a variance, in light of the factors set forth in 18 U.S.C. § 3553(a). Taking all aggravating circumstances and factors into account, a sentence of 24 months of incarceration is appropriate and justified in this case.

## I.    INTRODUCTION

In April 2017, the Federal Bureau of Investigation ("FBI") opened a criminal investigation into several unauthorized disclosures of classified national security information, including an April 2017 article in a national media publication that revealed certain Top Secret[1] information

---

[1]     According to Executive Order 13526, information shall be classified at the Top Secret level if its unauthorized disclosure reasonably could be expected to cause exceptionally grave damage to the national security.

concerning the existence and predication of a particular FBI surveillance operation pursuant to the Foreign Intelligence Surveillance Act ("FISA"). As part of its investigation, the FBI reviewed records of individuals who had been granted pre-publication access to this classified national security information. Among others, the FBI learned that the U.S. Senate Select Committee on Intelligence ("Senate Intelligence Committee" or "SSCI") had requested to review this classified information in connection with its official government function of conducting oversight of the nation's intelligence activities.  Given the sensitive nature of the information, the Department of Justice hand-carried the FISA application to the SSCI on several occasions and did not leave the materials with the SSCI to be housed in its secure space. It was at all times material to the FBI's investigation to know which individuals who may have had access to that classified information had been in contact with members of the media.

At the time the classified national security information about the FISA surveillance was published in the national media, defendant James A. Wolfe was the Director of Security for the SSCI. He was charged with safeguarding information furnished to the SSCI from throughout the United States Intelligence Community ("USIC") to facilitate the SSCI's critical oversight function. During the course of the investigation, the FBI learned that Wolfe had been involved in the logistical process for transporting the FISA materials from the Department of Justice for review at the SSCI. The FBI also discovered that Wolfe had been involved in a relationship with a reporter (referred to as REPORTER #2 in the Indictment and herein) that began as early as 2013, when REPORTER #2, then a college intern, published a series of articles containing highly sensitive U.S. government information. Between 2014 and 2017, Wolfe and REPORTER #2 exchanged tens of thousands of telephone calls and electronic messages. Also during this period, REPORTER

#2 published dozens of news articles on national security matters that contained sensitive information related to the SSCI.

Upon realizing that Wolfe was engaged in conduct that appeared to the FBI to compromise his ability to fulfill his duties with respect to the handling of Executive Branch classified national security information as SSCI's Director of Security, the FBI faced a dilemma. The FBI needed to conduct further investigation to determine whether Wolfe had disseminated classified information that had been entrusted to him over the past three decades in his role as SSCI Director of Security. To do that, the FBI would need more time to continue their investigation covertly. Typically, upon learning that an Executive Branch employee and Top Secret clearance holder had potentially been compromised in place – such as by engaging in a clandestine affair with a national security reporter – the FBI would routinely provide a "duty-to-warn" notification to the relevant USIC equity holder in order to allow the intelligence agencies to take mitigation measures to protect their national security equities. Here, given the sensitive separation of powers issue and the fact that the FISA was an FBI classified equity, the FBI determined that it would first conduct substantial additional investigation and monitoring of Wolfe's activities. The FBI's executive leadership also took the extraordinary mitigating step of limiting its initial notification of investigative findings to the ranking U.S. Senators who occupy the Chair and Vice Chair of the SSCI.[2]

The FBI obtained court authority to conduct a delayed-notice search warrant pursuant to 18 U.S.C. § 3103a(b), which allowed the FBI to image Wolfe's smartphone in October 2017. This was conducted while Wolfe was in a meeting with the FBI in his role as SSCI Director of Security, ostensibly to discuss the FBI's leak investigation of the classified FISA material that had been

---

[2]     At the FBI's request, the SSCI did not take any action that might reveal the existence of the investigation to the defendant at that time.

shared with the SSCI. That search uncovered additional evidence of Wolfe's communications with REPORTER #2, but it did not yet reveal his encrypted communications with other reporters.

On December 15, 2017, FBI agents conducted an interview of Wolfe. During the interview, the agents informed Wolfe of the nature and purpose of their investigation, and he acknowledged the agents' warnings that lying to them would constitute a federal criminal offense. During the interview, Wolfe falsely stated, in writing and orally, that he had not had contact with any of the reporters who had reported on the FISA, and no personal, professional, or official contact with any other reporters (other than seeing them in the hallway of the Senate office building). After being confronted with evidence of his extensive personal contacts with REPORTER #2, Wolfe admitted having lied about his relationship with her, but he continued to falsely deny any personal or professional contact with other reporters, including whether he disclosed information about non-public SSCI matters.

Following the December 15, 2017 interview, the FBI informed the SSCI of Wolfe's initial denial of his relationship with REPORTER #2 and then his admission that he had lied about it. Thereafter, the SSCI terminated Wolfe's access to their facilities and the classified information housed therein.

Notwithstanding Wolfe's denials in his December 2017 interview with the FBI, Wolfe had, in fact, very recently used encrypted applications to communicate with multiple reporters in which he provided at least one reporter with non-public unclassified SSCI information and offered to be a confidential source for another, instructing her to protect his identity as a source. Wolfe was again interviewed by the FBI on January 11, 2018, and he continued to deny having disclosed any SSCI information to any reporters. Despite his adamant denials to the FBI during the course of the two interviews, the FBI later discovered the extent of Wolfe's false statements after conducting a

second search of his telephone and finding evidence of his encrypted communications with these reporters.

On October 15, 2018, Wolfe pleaded guilty to the felony offense of willfully and knowingly making a material false statement, in violation of 18 U.S.C. § 1001(a)(2), when he lied to FBI agents by denying that he had disclosed to one of those reporters non-public unclassified information that he had learned as SSCI Director of Security. In the Statement of Offense in Support of the Defendant's Plea of Guilty (Statement of Offense) (Docket at 37), Wolfe further admitted having lied to the FBI when he denied having contacts with several other reporters, often through encrypted electronic communications and at times regarding SSCI matters.

Wolfe was entrusted by two branches of government – the Legislative Branch (i.e., the SSCI) and the Executive Branch (i.e., the USIC) – to safeguard information. He abused that trust by using his position to cultivate relationships with reporters, employing encrypted communications, and offering to serve as a confidential source. Wolfe then lied, and lied persistently, about his actions and his relationships to the FBI agents who were investigating an unauthorized disclosure of classified information. According to Wolfe, he lied in order to conceal that he had maintained relationships with several reporters in violation of unambiguous SSCI rules restricting such media contacts – rules that he, as Director of Security, was actually responsible for helping to enforce. By his own admission, Wolfe lied because he feared the truth would cost him his job.

Having served as SSCI Director of Security for nearly three decades and having been responsible for safeguarding classified national security information provided to the SSCI from throughout the USIC, Wolfe fully appreciated the grave national security consequences of misleading federal agents in their efforts to investigate the compromise of Top Secret information.

When his lies were discovered, the FBI and other stakeholders were forced to devote significant time and resources to investigate and assess whether damage to the national security had been done. Importantly, in order to avoid the possible disruption of information flow in the oversight process, the FBI felt compelled to quickly pursue its covert investigation of Wolfe prior to notifying the USIC of the security risk that he might pose. The FBI's concerns also led to its extraordinary decision to limit its initial notifications to SSCI leadership.

Given all of these circumstances, and notwithstanding the fact that the FBI did not uncover evidence that the defendant himself disclosed classified national security information, Wolfe nonetheless caused significant disruption to a governmental function and significantly endangered the national security. Neither of these aggravating circumstances is taken into consideration by the applicable Guideline for this offense, meaning this case clearly falls outside the heartland of prosecutions for which the applicable advisory Guideline, U.S.S.G. § 2B1.1, prescribes a range of 0 to 6 months of incarceration.[3]  As a result, the government hereby moves for an upward departure under U.S.S.G. §§ 5K2.7 (Disruption of Government Function) and 5K2.14 (Public Welfare – National Security) and recommends that the Court sentence Wolfe to serve a term of incarceration of 24 months. As explained below, a 24-month custodial sentence is appropriate to punish the defendant for his criminal conduct and is consistent with the purposes of sentencing set forth in 18 U.S.C. § 3553(a). The government, therefore, further requests that the Court find that an upward variance from the applicable Guideline is likewise warranted based upon the statutory sentencing factors set forth in Section 3553(a).

---

[3]     In its plea agreement with Wolfe, the government agreed to the applicability of this Guideline and the resulting range, but did not agree that a sentence within that range would constitute a reasonable sentence in light of all of the factors set forth in 18 U.S.C. § 3553(a), and did not agree to limit its allocution regarding what an appropriate sentence for Wolfe would be.

## II.    FACTUAL SUMMARY

Facts relevant to this sentencing are set forth in the Statement of Offense, to which Wolfe agreed orally and in writing on October 15, 2018. The government will establish any supplemental facts, or seek judicial notice thereof, prior to or at the hearing on sentencing. We highlight the following to aid the Court in making its sentencing determination.

The SSCI has a legislative oversight function vis-à-vis the USIC – the components of the Executive Branch of the federal government of the United States that collect, analyze, and deliver foreign intelligence and counterintelligence information – in order to prevent and/or detect abuses in activities conducted by the USIC. The SSCI's oversight, or "checks and balances," function necessarily involves the acquisition of classified national security information from the USIC, including information the unauthorized disclosure of which could cause exceptionally grave damage to the national security of the United States.

Wolfe served for approximately four years on active duty with the U.S. Army, assigned to the U.S. Army Intelligence Command at Ft. Meade, Maryland. After his honorable discharge in or about 1987, he served for some years on Army Reserve duty, rising to the rank of Staff Sergeant. Meanwhile, in or about 1987, Wolfe was hired by the SSCI as Director of Security. In furtherance of his duties with the SSCI, Wolfe was granted a Top Secret clearance with access to Sensitive Compartmented Information (SCI) on August 23, 1988, following a security background investigation conducted by the FBI. Wolfe subsequently underwent periodic background investigations that were successfully completed in or about 1997, 2002, 2008, and 2014.

Wolfe served as the SSCI's Director of Security through at least December 15, 2017. In this capacity, Wolfe was trusted with receiving, maintaining, and managing the classified national security information provided to the SSCI by the USIC, including the Central Intelligence Agency,

the National Security Agency, and the FBI, in furtherance of the SSCI's critical intelligence oversight functions. Statement of Offense ¶ 1. Wolfe was further responsible for managing the storage and handling of such national security information, and for controlling its authorized dissemination to SSCI members and staff. He was also in charge of managing the SSCI facilities used in connection with such information, including the SSCI's Sensitive Compartmented Information Facility (SCIF) – a suite of rooms specially constructed to prevent electronic surveillance and suppress data leakage of sensitive national security information, access to which was limited to persons having proper security clearances and otherwise authorized to enter. Wolfe's own office was located within this SCIF, so that his daily work life was immersed in an environment of care for the protection of classified national security information.

In addition, Wolfe was specifically prohibited by the terms of his employment from communicating with the media about any matter relating to the SSCI without specific authorization from the SSCI Chairman or Vice Chairman. Wolfe was advised in writing that SSCI rules prohibited him from having contact with the media. On October 23, 2012, Wolfe signed an acknowledgement that he had received, reviewed, and understood the SSCI Office Policy Manual that explicitly limited communications with the media to the Chairman, the Vice Chairman, and their designees. Exhibit 1A;[4] Statement of Offense ¶ 3. By his own admission, Wolfe was never given authorization to have contact with the media other than "occasional" contact regarding logistical matters. Statement of Offense ¶ 2. Wolfe was responsible for training SSCI staff on the media contact policy, and as part of his regular security briefings to all SSCI staff, Wolfe routinely

---

[4]     All exhibits were provided to the defense in discovery. Copies filed on the public docket with this Memorandum are redacted to omit personal identification information; unredacted versions are being filed under seal.

advised them about the policy's restrictions on communicating with reporters. Exhibit 2; Statement of Offense ¶ 4.

In fact, Wolfe was one of the officials to whom SSCI staffers were required to report media efforts to contact and communicate with them. In 2014, Wolfe was forwarded an email from the Staff Director to REPORTER #1[5] – a well-known reporter with a news organization in Washington, D.C., who covered national security matters including matters relating to the SSCI. In the email, the Staff Director informed REPORTER #1 of the SSCI policy prohibiting SSCI staff from having contact with the reporter. Exhibit 3A. In 2015, a different SSCI staffer reported directly to Wolfe that REPORTER #1 had made two attempts to contact the staffer. Exhibit 3B. And, in April 2017, Wolfe – displaying astonishing hypocrisy – applauded another SSCI staffer's report of having slammed the door on a reporter, who was identified as a colleague of REPORTER #2. The reporter had shown up at the staffer's house. Exhibit 3C ("Excellent work!").

In December 2013, Wolfe began a close personal relationship with REPORTER #2, who was then an undergraduate student serving as an intern with a news service in Washington, D.C. The relationship became intimate, and it continued until December 2017. During her relationship with Wolfe, REPORTER #2 was employed by several different news organizations in Washington, D.C., covering national security matters including matters relating to the SSCI, about which she published dozens of news articles, and in the course of her work REPORTER #2 (like other reporters) regularly frequented the hallways outside the SSCI SCIF. Statement of Offense ¶¶ 14-16. Over the years of their relationship, Wolfe and REPORTER #2 exchanged tens of thousands of text messages and other electronic communications, often dozens of times a day. To the

---

[5]     The reporters are referred to in this Memorandum as they are in the Indictment and Statement of Offense.

government's knowledge, Wolfe never disclosed to the SSCI his contacts with REPORTER #2.

On April 11, 2017, classified national security information concerning the existence and predication of the FBI's FISA surveillance of an individual referred to herein as MALE-1 was published in a news article. Exhibit 4. The FBI promptly opened an investigation into the unauthorized disclosure of this classified information to the news media.[6] During the course of its investigation, the FBI learned that the FISA application, a document classified as Top Secret, had been shared with the SSCI in March 2017 on a read-and-return basis, and that Wolfe had been involved in coordinating logistics for the FISA materials to be transported to the SSCI.

On May 8, 2017, MALE-1 sent an email to REPORTER #1 and several other known national security reporters. Exhibit 5A. MALE-1 blind-copied Wolfe on that email. Exhibit 5B (showing metadata establishing that the same email was sent to Wolfe's Senate email account).[7] In the following days, REPORTER #1 emailed Wolfe twice, first asking for his cellular telephone number, and then asking when she could "get coffee" with Wolfe and providing him with her 40-character PGP ("Pretty Good Privacy") code, which would have enabled Wolfe to send information to REPORTER #1 through an encrypted channel. Exhibits 6B & 6C.[8]

By mid-September 2017, the FBI investigation had gathered sufficient information to determine that Wolfe and REPORTER #2 had been engaged in a relationship that began as early as 2013, when REPORTER #2, then a college intern, published a series of articles containing

---

[6]     This information remained classified at all times relevant to this case, and until it was declassified by order of the President in February 2018.

[7]     On May 10, 2017, Wolfe forwarded the email from his Senate email account to another individual, proving that he received and read it. Exhibit 5C.

[8]     The government has been unable to confirm whether the defendant and REPORTER #1 successfully exchanged further communication using PGP encryption.

highly sensitive information. Between 2014 and 2017, Wolfe and REPORTER #2 exchanged tens of thousands of telephone calls and electronic messages. Also during this period, REPORTER #2 published dozens of news articles on national security matters that contained sensitive information related to the SSCI.

The evidence that Wolfe was engaged in conduct that appeared to the FBI to potentially compromise his ability to fulfill his duties as SSCI's Director of Security led to a dramatic expansion of the FBI's existing investigation. No longer was the FBI investigating a discrete leak of classified information, i.e., the FISA surveillance. Now the FBI needed to conduct further investigation to determine whether Wolfe had disseminated classified information that had been entrusted to him over the past three decades in his role as SSCI Director of Security, and certainly since he began his relationship as early as 2013 with REPORTER #2.

Normally, upon learning that a TS/SCI clearance holder such as Wolfe had potentially been compromised – such as by engaging in a clandestine affair with a national security reporter – the FBI would provide "duty-to-warn" notification to the USIC, so that the intelligence agencies could take immediate mitigation measures to protect their national security equities. In consideration of the separation of powers issue, the decision concerning how to proceed went to the highest levels of the FBI, where ultimately it was determined that the FBI would endeavor to protect national security by promptly conducting its extensive investigation of Wolfe, prior to notifying the USIC of the risk. To compensate, the FBI's executive leadership took the extraordinary step of limiting its notification to two individuals – the Chair and Vice Chair of the SSCI. Had this delicate balance not been achieved, this situation could easily have resulted in the possible disruption of information flow to the SSCI from the USIC – an untenable degradation of national security oversight.

In furtherance of the investigation, the FBI obtained court authority to conduct a delayed-notice search warrant pursuant to 18 U.S.C. § 3103a(b), which allowed the FBI to image Wolfe's cell phone in October 2017. That search uncovered additional evidence of Wolfe's communications with REPORTER #2, but did not reveal communications with other reporters. The FBI met with Wolfe while his cell phone was, unbeknownst to him, being imaged. During the meeting, Wolfe was asked whether he was familiar with the April 11, 2017, article, authored by REPORTER #1. Wolfe acknowledged that he was aware of what he called "the FISA," and stated that he had facilitated the SSCI review of a document that disclosed the existence and predication of the FISA surveillance, which was provided to the SSCI by the Executive Branch on a "read and return" basis beginning in March 2017.

Meanwhile, unwitting to the fact investigators were delving into his communications to determine whether he was making unauthorized disclosures of classified information, Wolfe began communicating with two new national security reporters. Beginning in September 2017, Wolfe communicated regularly with REPORTER #3 using the encrypted application Signal.[9] REPORTER #3 was employed with a news organization in Washington, D.C., and covered national security matters including matters relating to the SSCI. On October 16, 2017, Wolfe provided REPORTER #3 the unclassified but otherwise not publicly available fact that Wolfe had served MALE-1 with a subpoena to appear before the SSCI. Exhibit 7A. The next day, Wolfe

---

[9]      The government was able to recover and view a limited number of these encrypted conversations only by executing a Rule 41 search warrant on the defendant's personal smartphone after his January 11, 2018 interview with the FBI. It is noteworthy that Signal advertises on its website that its private messaging application allows users to send messages that "are always end-to-end encrypted and painstakingly engineered to keep your communication safe. We [Signal] can't read your messages or see your calls, and no one else can either." *See* Signal Website*,* located at https://signal.org. The government did not recover or otherwise obtain from any reporters' communications devices or related records the content of any of these communications.

provided REPORTER #3 with MALE-1's contact information. Exhibit 7B. Later that day, REPORTER #3's news organization published a story under her byline, reporting that the SSCI had subpoenaed MALE-1 to testify and that MALE-1 had been contacted by the news organization for comment. Exhibit 8. After the story was published, Wolfe sent REPORTER #3 a congratulatory message through Signal, stating "Good job!" and "I'm glad you got the scoop."  REPORTER #3 replied to Wolfe, using Signal:  "Thank you. [MALE-1] isn't pleased, but wouldn't deny that the subpoena was served."  Exhibit 7C.

The next day, October 18, 2017, Wolfe contacted REPORTER #4, who was also employed with a news organization in Washington, D.C., and who covered national security matters including matters relating to the SSCI. In a text message, Wolfe asked REPORTER #4 whether she was "on Signal?"  Exhibit 9A. When REPORTER #4 responded that she was, Wolfe used the encrypted application to send messages in which he offered to act as an anonymous source for REPORTER #4. Exhibit 9B. Specifically in his communication with REPORTER #4, he had the following exchange once they moved to Signal:

| Wolfe: | Do you understand complete discretion? |
|---|---|
| R#4: | I understand how to work with anonymous sources, if that's what you're asking. |
| Wolfe: | Good. |
| R#4: | What kind of help/info are you usually able to provide?  In other words, what's the best way to work with you? |
| Wolfe: | By never using my name to any of your colleagues or other news related colleagues, got it? |
| R#4: | Understood. |

| Wolfe: | I know a lot of people in your firm and other organizations but I never want you to use my name with them. |
|---|---|
| R#4: | Understood. |

Exhibit 9B.

One week later, on October 24, 2017, at 9:52 a.m., Wolfe sent a Signal message to REPORTER #3, disclosing to her the unclassified but not otherwise publicly available fact that MALE-1 would testify in a closed hearing before the SSCI "this week." Exhibit 7D. At 9:58 a.m., REPORTER #3 sent an email to MALE-1, asking him to confirm that he would be "paying a visit to Senate Intelligence staffers this week." *See* Exhibit 10 (email from MALE-1 to the SSCI, forwarding the email he received from REPORTER #3, and complaining that the details of his appearance had been leaked to the press; the SSCI staffer who received the email responded to MALE-1, with a copy to Wolfe, advising that Wolfe could "assist you in entering the building discreetly").[10]

Thereafter, on November 15, 2017, in the course of his SSCI duties, Wolfe acknowledged by handwritten signature having received, reviewed, and understood the revised SSCI Office Policy Manual, which reiterated the SSCI policy that explicitly limited to the SSCI Chairman and Vice Chairman, and their designees, any communications with the media about SSCI matters. The 2017 Manual directed that any SSCI employee "who receives requests or contacts from the media regarding any issue related to the Office must report them to their respective Staff Director or the Security Director [Wolfe] immediately." Exhibit 1B.

---

[10]    Given the nature of Signal communications, which can be set to delete automatically, and which are difficult to recover once deleted, it is impossible to tell the extent of Wolfe's communications with these two reporters. The FBI recovered 626 Signal communications between Wolfe and REPORTER #3, and 106 Signal communications between Wolfe and REPORTER #4.

On December 6, 2017, Wolfe sent a text message to REPORTER #2 in which he reminisced:

> I've watched your career take off even before you ever had a career in journalism. . . . I always tried to give you as much information that I could and to do the right thing with it so you could get that scoop before anyone else . . . . I always enjoyed the way that you would pursue a story like nobody else was doing in my hallway. I felt like I was part of your excitement and was always very supportive of your career and the tenacity that you exhibited to chase down a good story.

Exhibit 11.

On December 15, 2017, Wolfe was voluntarily interviewed by the FBI a second time. During the interview, the FBI agents showed Wolfe a copy of the April 11, 2017 news article authored by REPORTER #1, and asked Wolfe whether he had had any contact with REPORTER #1. Wolfe falsely denied having any contacts with her. The FBI later discovered that Wolfe, in fact, had had several direct contacts with REPORTER #1 using his official Senate email account, beginning as early as December 2015, with an exchange of late-night emails. These contacts continued until at least until June 2017, when they discussed her use of the Senate press Wi-Fi password. Exhibits 6C & 6D.

During the December 15, 2017, interview, the FBI, using a written Investigative Questionnaire, asked Wolfe whether "you currently have or had any contact with any other reporters (professional, official, personal)?" Before answering this question in writing, Wolfe told the FBI agents that although he had no official or professional contact with reporters, he saw reporters every day, and so to "feel comfortable" he would check "Yes." He did so, and initialed this answer. In responding to the Investigative Questionnaire item asking "If yes, who and describe the relationship (professional, official, personal)," Wolfe wrote "Official – No," "Professional – No," and "Personal – No." Wolfe then orally volunteered that he never provided statements to

reporters regarding SSCI information and he "certainly" would not talk to reporters he saw in the hallway outside the SSCI SCIF about anything SSCI-related. Wolfe signed and dated the Investigative Questionnaire adjacent to the following warning: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct." Exhibit 12.

During this December 15, 2017 interview, Wolfe was specifically asked about, and denied having, contact with REPORTER #2. After being confronted with photographs of himself together with REPORTER #2,[11] some of them during foreign travel, Wolfe admitted to the FBI agents that he had lied to them, and that he had been engaged in a personal relationship with REPORTER #2 since December 2013. When asked why he did not tell the truth to the agents about his contacts with REPORTER #2 from the beginning, Wolfe stated, "Why would I?," adding that if he had made such an admission, he believed that he would have lost his job as Director of Security of the SSCI.

During the December 15, 2017 interview, even after acknowledging having initially lied about having a relationship with REPORTER #2, Wolfe persisted in denying having had any personal or professional contact with other reporters regarding SSCI matters, and he did not disclose to the agents that he was using Signal or other encrypted applications to communicate with those reporters. These lies were particularly egregious because, as the evidence shows and as Wolfe has acknowledged, he had for many months leading up to his December 15, 2017 interview been engaged in regular contact with other reporters, including REPORTER #3, to whom Wolfe disclosed SSCI information that was not otherwise publicly available, and with REPORTER #4, for whom Wolfe volunteered to act as an anonymous source.

---

[11]     At this point in the investigation, the FBI was unaware of the additional reporters with whom Wolfe had been in contact.

It is noteworthy that Wolfe continued to lie to the FBI about his contacts with reporters, even after he was stripped of his security clearances and removed from his SSCI job – when he no longer had the motive he claimed for having lied about those contacts on December 15. During a follow-up voluntary interview at his home on January 11, 2018, Wolfe signed a written statement falsely answering "no" to the question whether he provided REPORTER #2 "or any unauthorized person, in whole or in part, by way of summary, or verbal [or] non-verbal confirmation, the contents of any information controlled or possessed by SSCI." On that same day, the FBI executed a second search warrant pursuant to which it physically seized Wolfe's personal telephone. It was during this search, and after Wolfe had spoken with the FBI on three separate occasions about the investigation into the leak of classified information concerning the FISA application, that the FBI recovered fragments of his encrypted Signal communications with REPORTERS #3 and #4.

## III.   DETERMINING THE SENTENCE

In fashioning an appropriate sentence in the aftermath of *United States v. Booker*, 543 U.S. 220 (2005), the Court must undertake a multi-step process beginning with a correct calculation of the applicable Guidelines range, based on findings of fact.

> As a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the [court] should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable . . . [but] must make an individualized assessment based on the facts presented. If [the court] decides that an outside-Guidelines sentence is warranted, [the court] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. . . . After settling on the appropriate sentence, [the court] must adequately explain the chosen sentence to allow for meaningful appellate review [under an abuse-of-discretion standard] and to promote the perception of fair sentencing.

*Gall v. United States*, 552 U.S. 38, 49-50 (2007) (citations omitted).

### A.    United States Sentencing Guidelines Calculation

The government has reviewed the Presentence Investigation Report (PSR), which properly calculates a Guidelines base offense level of 6 for the count to which Wolfe pleaded guilty, pursuant to U.S.S.G. § 2B1.1, and properly applies a two-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, resulting in a total offense level of 4 and a recommended Guideline sentence of 0 to 6 months of incarceration.[12]   The government has no additions, corrections, or objections to the report, except to object to its conclusions that in this case (1) there are no aggravating circumstances, including offender characteristics, that would warrant a departure from the applicable Guidelines range, and (2) there are no factors that would warrant a variance from the applicable Guidelines range based on § 3553(a) factors.

To the contrary, the government submits that the applicable Guideline is inadequate to address this defendant's conduct, and that an individualized assessment of the facts in this case compels a significant upward departure or, in the alternative, a variance under applicable § 3553(a) factors.

In *Koon v. United States,* the Supreme Court set forth a four-part test for appropriateness of upward departures:

> 1)    What features of this case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case?
> 2)    Has the Commission forbidden departures based on those features?

---

[12]    The government agrees that a 2-level increase for Abuse of Position of Trust does not apply because, although indisputably Wolfe held a position of public trust, he did not abuse that position "in a manner that significantly facilitated the commission or concealment of" his crime of lying to the FBI. U.S.S.G. § 3B1.3. Notwithstanding his official position, Wolfe's obligation to be truthful in an FBI interview was no greater, nor less, than that of any other individual:  all persons have an equal and absolute responsibility to be truthful in an FBI interview. It is precisely the inapplicability of this provision under these unique and aggravating circumstances that counsels in favor of an upward departure under Guidelines or, alternatively, a variance from the prescribed range and would not constitute impermissible double counting.

3)      If not, has the Commission encouraged departures based on those features?
4)      If not, has the Commission discouraged departures based on those features?

518 U.S. 81, 95 (1996). The features of this case, notably its potential impact on national security and constitutional checks and balances, take it outside of the heartland of U.S.S.G. § 2B1.1. Nowhere in the applicable Guideline is there any provision for, or consideration of, these factors. In such cases, special factors are encouraged. Two such factors supporting an upward departure are present here.

1.    **Wolfe's Conduct Resulted in the Significant Disruption of an Important Governmental Function**

Pursuant to U.S.S.G. § 5K.2.7 "[i]f the defendant's conduct resulted in a 'significant disruption of a governmental function,' the court may increase the sentence above the authorized guideline range 'to reflect the nature and extent of the disruption and the importance of the governmental function affected." *See generally United States v. Root*, 12 F.3d 1116 (D.C. Cir. 1994) (departure warranted where defendant's fraudulent conduct as an attorney before the Federal Communications Commission created significant disruption of governmental function). As Director of Security, Wolfe oversaw and policed the procedures by which the SSCI gained access to Executive Branch secrets, and he was specifically tasked to make sure that the SSCI – including its SCIF – was not compromised by anyone, whether that be foreign agents or media who wished to report on sensitive and classified information possessed by the SSCI. Wolfe's conduct had the potential to significantly disrupt the governmental function he performed. When the FBI learned that Wolfe had been engaged in conduct – an extramarital affair with a national security reporter who routinely reported on the SSCI and who had an unusual level of access given her level of

experience – the FBI correctly poured its resources into determining whether Wolfe had compromised classified national security information.

The SSCI plays a critical role in our government. It is one of the legislative bodies that oversees the Executive Branch's intelligence agencies. In order to accomplish its mission, the SSCI requires, requests, and obtains from the Executive Branch highly sensitive and classified intelligence secrets on the condition that those secrets remain safe and uncompromised. Wolfe's role in protecting this process is beyond dispute. When Wolfe violated that duty, first by engaging in furtive exchanges with multiple reporters, and second, by lying multiple times to the FBI, he foreseeably placed in some jeopardy this constitutional checks and balances system. It is, therefore, not surprising that the SSCI, immediately after the December 15, 2017 interview, barred him from further unaccompanied access to the SSCI SCIF.

Wolfe caused a disruption to a key governmental oversight function, and undermined public confidence in the trustworthiness of the individual charged with safeguarding intelligence in furtherance of that function. Several Circuits have held that the undermining of public confidence is an appropriate ground for an upward departure under 5K.2.7. *See, e.g.*, *United States v. Paulus*, 419 F.3d 693, 696 (7th Cir. 2005) (six level departure under 5K.2.7 appropriate based on judicial notice of the fact that public confidence in Wisconsin's justice system had been undermined by District Attorney taking bribes); *United States v. Gunby*, 112 F.3d 1493, 1499 (11th Cir. 1997) (four level departure under 5K2.7 appropriate in case of fraud of court filing fees where district court found that underlying guideline insufficient to account for the defendant's conduct which put a "black eye" on the judicial system); *United States v. Shenberg*, 89 F.3d 1461, 1477 (11th Cir.1996) (five level departure under 5K2.7 appropriate based on systematic corruption and massive loss of public confidence furthers the objectives of the guidelines). Similarly, courts have

recognized the applicability of this departure where the underlying Guideline "does not encompass an interference with the administration of a governmental program."  *See, e.g.*, *United States v. Regueiro*, 240 F.3d 1321, 1323 (11ᵗʰ Cir. 2001) (permitting departure and agreeing with the district court that Regueiro's conduct took the case out of the heartland of typical money laundering case). An upward departure of five levels is warranted here based upon the defendant's disruption of a core governmental function.

### 2.    Wolfe's Conduct Significantly Impacted the National Security

U.S.S.G. § 5K2.14 permits the court to depart upward to reflect the "nature and circumstances of the offense" if "national security . . . was significantly endangered."  In most criminal cases involving classified information or affecting the national security apparatus, the Guidelines expressly recognize and consider national security factors. *See, e.g.*, 18 U.S.C. § 793 *et seq.*, the Espionage Act applying U.S.S.G. §§ 2M3.2 - 2M3.4; and 50 U.S.C. § 1705, the International Emergency Economic Powers Act applying U.S.S.G. §§ 2M5.1 - 2M5.3. The applicable Guideline for 18 U.S.C. §1001, U.S.S.G §2B1.1, does not expressly recognize this interest, but the departure principle embodied in U.S.S.G. § 5K.2.14 does.

The defendant was in a unique position in that he was entrusted by both the Executive Branch (through the granting of his TS/SCI security clearances, among other things) and the Legislative Branch (through his employment with the SSCI) with keeping and protecting highly classified information for the purpose of facilitating a national security function.  After nearly three decades in the position, in 2013, he began a clandestine and inappropriate relationship with one reporter who was regularly reporting on the SSCI (REPORTER #2). That betrayal only worsened when he expanded his clandestine relationships and unauthorized communications with other

reporters over the next several years. It culminated in Wolfe's multiple lies to the FBI in December 2017 and January 2018.

When the FBI investigation first learned of the extent of Wolfe's improper contact with REPORTER #2 in the fall of 2017 – while Wolfe was still employed by the SSCI – the FBI faced a dilemma. The FBI needed to conduct further investigation to determine whether Wolfe had disseminated classified information that had been entrusted to him over the past three decades in his role as SSCI Director of Security. As set forth above, the FBI needed more time to continue their investigation covertly and elected to notify the SSCI Chair and Vice Chair about the investigation, prior to determining whether it was necessary to notify the broader intelligence community about a potential compromise. Any delay was necessary to preserve the FBI's ability to determine whether Wolfe had disclosed classified national security information to reporters.

While the investigation has not uncovered evidence that Wolfe disclosed classified information, he nevertheless repeatedly disclosed non-public, SSCI-sensitive information relating to national security investigations.[13]   Notwithstanding, the impact of the defendant's conduct on national security is concrete. By repeatedly lying to the FBI, the defendant directly interfered with an FBI national security investigation into the disclosure of classified information related to a Top Secret FISA application. This actual impact of his conduct on the national security should be considered in addition to potential risk the defendant caused to the intelligence oversight function of the SSCI, as set forth above.

In *United States v. Roth*, 934 F.2d 248 (10th Cir 1991), the court recognized that merely the potential endangerment of national security warranted a substantial upward departure in a case

---

[13]    Indeed, MALE-1 complained explicitly to the SSCI that information about his testimony was being leaked to the media, and threatened at one point not to comply with SSCI requests.

involving theft of military equipment by a member of an Air Force security police squadron where that theft had an adverse effect on the morale and pride of the military. On remand following resentencing, the Court of Appeals in *Roth* affirmed an upward departure from an initial range of 30-37 months to 108 months (reflecting a ten-level increase). *See United States v. Ross*, 972 F.2d 357 (table), 1992 WL 186283 at *2 (10th Cir. 1992); *see also United States v. Vargas*, 73 Fed. Appx. 746 (5th Cir. 2003) (affirming departure in part based on risk to national security caused by person who sold false social security cards to individuals who hail from nations who are known to support terrorism, even where no evidence that these cards were actually used by terrorists, because "the guidelines encourage departures for offense conduct which specifically endangers national security").

The *Roth* case demonstrates that a significant departure of ten levels is appropriate where the court has a "grave concern with the national security implications" of the conduct, and the underlying sentencing guideline does not take into account the national security concerns. *Roth*, 1992 WL 186283 at *2. The instant case poses a much more potent argument in favor of an upward departure. Here, the government seeks an upward departure of six levels based upon both the actual and potential risks to national security caused by the defendant.

**B.      Application of the Section 3553(a) Factors**

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range[,]" which is "the starting point and the initial benchmark" for the sentence to be imposed. *Gall*, 552 U.S. at 49. "Then, 'after giving both parties an opportunity to argue for whatever sentence they deem appropriate,' the court considers all of the section 3553(a) sentencing factors and undertakes 'an individual assessment based on the facts presented.'" *United States v. Akhigbe,* 642 F.3d 1078, 1084 (D.C. Cir. 2011) (quoting *Gall*, 552 U.S. at 49-50). The

government submits that the above-calculated Guidelines range, including the upward departures, is consonant with the applicable factors set forth in 18 U.S.C. § 3553(a).  In any event, a sentence of 24 months is supported by the § 3553(a) factors as a variance.

Under § 3553(a), "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). The purposes of sentencing are as follows:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

The Section 3553(a) factors include the following:  (1) "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1); (2) "the history and characteristics of the defendant," *id.*; (3) the promotion of "respect for the law," 18 U.S.C. § 3553(a)(2)(A); (4) "deterrence," 18 U.S.C. § 3553 (a)(2)(B); (5) the Guidelines and Guideline range, § 3553(a)(4); and (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6).

Of course, a "sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," *Rita v. United States*, 551 U.S. 338, 351 (2007), and it "may not presume that the Guidelines range is reasonable," *Gall*, 552 U.S. at 50; *Nelson v. United States*, 555 U.S. 350, 350 (2009). Examination of the Section 3553(a) factors, however, shows that a Guidelines sentence, including the requested upward departure discussed above, is appropriate in this case.

### 1.      Nature and Circumstances of the Offense

Section 3553(a)(2)(A) requires the court, in determining the particular sentence to be imposed on Wolfe, to consider the need for the sentence to "reflect the seriousness of the offense."

As set forth above, Wolfe was held to a high standard of compliance with regulations for safeguarding classified national security information and for adhering to the SSCI rules. Yet Wolfe violated both with impunity, running a grave risk of compromising the integrity of the SSCI's work and his own duties. Then, when questioned by FBI agents trying to ascertain what media contacts may have occurred with SSCI personnel and whether classified national security information may have been thereby compromised, Wolfe lied to avoid having his own conduct come to light. In this case, Wolfe lied to the FBI agents not to further or conceal another crime, but to avoid revealing that he had, or desired to cultivate personal relationships with reporters that involved the exchange of sensitive SSCI information and otherwise conducted himself in a manner that he believed would have caused him to lose his job as security director. It is furthermore not unreasonable to conclude that he may also have been motivated by a wish to shield from FBI scrutiny the female reporters whom he had favored.[14]   Whatever his motive, Wolfe's mendacity in the face of a clear obligation to cooperate with the FBI's leak investigation was a serious crime.

### 2.      History and Characteristics of the Defendant

Next, Section 3553(a)(1) requires the court, in determining the particular sentence to be imposed on Wolfe, to consider "the history and characteristics of the defendant."  The government

---

[14]     For example, while Wolfe denied that he ever disclosed classified information to REPORTER #2, and the government has no evidence that he did, the government proffers that Wolfe admitted to the FBI on December 15, 2017, that he believed REPORTER #2 had been obtaining classified national security information from other SSCI sources yet, despite his responsibilities as Director of Security, he did not initiate or cause an investigation into such a breach because it would have revealed REPORTER #2's sources.

does not dispute that Wolfe served honorably in the U.S. military and for much of his long career as the SSCI's Director of Security. Rather than mitigating his criminal acts, however, this only highlights the egregiousness of his disregard for the need to truthfully cooperate with the FBI's important national security investigation.

Nor can Wolfe's offense conduct be considered a mere aberration. His multiple lies to the FBI agents were aimed at covering up at least three years' worth of clandestine behavior that unquestionably bears on his trustworthiness as SSCI Director of Security. He was put on notice during his initial FBI interview on October 30, 2017 – fully six weeks before the December 15, 2017 interview in which he lied to the FBI agents – that the FBI was investigating a serious leak of classified national security information. Yet, when asked logical investigative questions about his own activity, Wolfe repeatedly made false statements about facts material to that investigation. While Wolfe entered his guilty plea relatively early in these proceedings, the government submits that, in view of the overwhelming evidence of Wolfe's guilt, he should not receive further sentencing consideration for this reason.

Additionally, two aspects of Wolfe's employment as SSCI Director of Security so color his criminal conduct that the Court should take them into account in imposing the sentence recommended by the government.

### a.   Wolfe's Duties and Responsibilities as SSCI Director of Security

As the SSCI's Director of Security, Wolfe unquestionably occupied a position of public trust. In that capacity, Wolfe held national security clearances at the Top Secret level with authorized access to Sensitive Compartmented Information. These clearances, granted by the Executive Branch, required Wolfe to undergo, and he did undergo, periodic background investigations and training in how to properly handle, store, and protect classified national security

information. He received security briefings and was required periodically to execute written acknowledgements and agreements attesting to his understanding of the rules governing access to such information, including the criminal penalties for its unauthorized retention or disclosure. Moreover, as Director of Security, Wolfe himself administered the required annual security briefings to all SSCI members and staffers. As a result, he can be held to have fully understood that the unauthorized disclosure of classified national security information could cause damage, grave damage, or exceptionally grave damage to the United States – and to fully appreciate the importance of an FBI investigation into leaks of such information.

Wolfe's official duties were not merely clerical or ministerial, but required him on a day-to-day basis to exercise substantial judgment and discretion in managing, on the SSCI's behalf, the handling, storage, and access to classified national security information. He further had responsibility for ensuring that Senators and SSCI staff were properly informed about how to handle and safeguard classified national security information. Having served in this trusted capacity for nearly three decades – virtually his entire professional career – Wolfe was relied upon to ensure that classified national security information furnished to the SSCI by the Executive Branch was adequately protected.

During his FBI interview, Wolfe told agents that on some occasions when it appeared such information had been improperly disclosed, he would be part of an internal SSCI investigation to address how the information had been handled and to remediate any failings. In short, Wolfe was the SSCI's trusted senior professional staff member charged with actively managing the SSCI's classified national security information holdings, and with instructing and directing Senators and staff in properly handling those holdings, a position of authority in which his actions and judgment regarding such matters could be expected to be presumptively accepted.

Consequently, Wolfe acutely appreciated the adverse consequences to the national security of the United States of unauthorized leaks to the media of classified information, and when approached by the FBI for a voluntary interview in a leak investigation he knew, far better than most individuals, the importance of such an investigation and the need for total candor in assisting the investigation. While Wolfe did not use his positon of trust "in a manner that significantly facilitated the commission or concealment of" his crime of lying to the FBI, so as to warrant application of the U.S.S.G. § 3B1.3 enhancement, the government submits that it is an exceptional offender characteristic that goes to the seriousness of his crime and provides an appropriate basis for an upward variance. It is precisely the inapplicability of this enhancement that makes an upward departure/variance all the more appropriate.

The Guidelines recognize the special relevance of a public official's status as an aggravating sentencing factor with respect to several statutory crimes. *See, e.g.*, U.S.S.G. § 2C1.1 (higher base offense level for public official sentenced for crimes involving bribery, extortion under color of official right, deprivation of honest services fraud, and conspiracy to defraud by interference with governmental functions) and § 2C1.2 (same, for crimes involving a gratuity). The Guidelines do not, however, address the circumstance presented here, in which a senior security official's lies to FBI agents frustrated their investigation into leaks of classified national security information, the grave consequences of which he was distinctively capable of appreciating. This Court should recognize that § 3553(a)(1) provides appropriate and sufficient authority for the Court to consider Wolfe's duties and responsibilities as the SSCI's Director of Security as a basis for the custodial sentence the government recommends.

### b. Wolfe's Obligations to Enforce the SSCI Media Contact Rules

The recommended custodial sentence is supported by a second offender characteristic: Wolfe's official responsibility for training SSCI staff on, and helping enforce their compliance with, the rules restricting contacts with the media, as described in detail in the Factual Summary above.

Despite these obligations, as Wolfe has admitted, throughout a period of nearly four years, that he was in extensive and sustained unauthorized contact – including through tens of thousands of electronic communications – with REPORTER #2, a national security reporter whose "beat" included the SSCI. Wolfe's own communications show that he was providing unclassified information to REPORTER #2 for his own interests (and those of REPORTER #2), placing his wants and desires over SSCI rules and, eventually, over his obligation to tell the truth to the FBI in an investigation into the unauthorized disclosure of highly classified information. And his conduct did not begin and end with REPORTER #2, for he had other unauthorized contacts with several other national security reporters, including about matters before the SSCI, without ever reporting those contacts as required by the very SSCI policy he was responsible for enforcing. Wolfe also used encrypted and anonymizing applications to conduct his communications in secret, and lied about the extent and nature of his contacts in at least two different FBI interviews. Wolfe's lack of candor further made it impossible to obtain a full accounting of Wolfe's use of Signal and other encrypted applications to communicate with unauthorized persons outside the SSCI. Moreover, Wolfe specifically warned a reporter to "never use [Wolfe's] name to any of [the reporter's] colleagues or other news related colleagues." Statement ¶¶ 12, 17-18, 21, 23, 24. These actions were not mistakes, but rather a conscious and deliberate course of conduct aimed at accomplishing unauthorized communications with reporters with whom Wolfe sought to curry

favor, through means intended to conceal that he was doing so.

In sum, Wolfe was in persistent, flagrant violation of the very rules he was charged with helping to enforce. His lies to the FBI were not merely misstatements or errors in judgment. His long tenure as Director of Security and his special responsibilities to enforce the media contact rules are offender characteristics highly relevant to an assessment of the gravity of his failure to be candid with the FBI, and constitute circumstances that a sentencing court should consider in fashioning a sentence appropriate to the conduct a case such as this – specifically, the custodial sentence recommended by the government.

### 3.   Respect for the Law and Deterrence.

Section 3553(a)(2)(A) & (B) requires the Court, in determining the sentence to be imposed on Wolfe, to consider the need for the sentence to promote "respect for the law" and to "afford adequate deterrence to criminal conduct."   The requested custodial sentence will serve as an important deterrent to others who might consider lying to federal law enforcement officers, especially in connection with a national security investigation. As noted above, *all* persons have an equal and absolute obligation to be truthful when making a statement in an FBI interview, and the integrity of the criminal investigative process justifiably relies on this obligation. Such persons – and particularly public officials such as Wolfe, who have a sworn duty to uphold the Constitution and laws of the United States – must know that there are severe consequences for violating that duty. The fact that Wolfe, by virtue of his national security training and responsibilities, lied in a national security investigation, the significance of which he was particularly situated to appreciate, is further reason to send a strong message that such conduct will be severely punished.

### 4.      The Guidelines Range

The advisory Guidelines range should be given considerable weight. First, the Guidelines range is itself a § 3553(a) factor. "The fact that § 3553(a)[(4)] explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50, n.6. Indeed, "the sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the [Guidelines range] with reference to the latter." *Nelson*, 555 U.S. at 350.

Second, one of the Sentencing Commission's purposes in promulgating the Guidelines was to "assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2)." 28 U.S.C. §§ 991(b)(1)(A), 994(f). The Commission wrote the Guidelines to "carry out these same § 3553(a) objectives," resulting in "a set of Guidelines that seek to embody the § 3553(a) considerations, both in principle and in practice." *Rita*, 551 U.S. 338, 350.

Third, Congress is the ultimate maker of sentencing policy, *Mistretta v. United States*, 488 U.S. 361, 363 (1989); *Dorszynski v. United States*, 418 U.S. 424 (1974); *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 94 (1820), and the Guidelines reflect the views of Congress through its instructions to the Commission, the Commission's effort to "establish a sentencing range that is consistent with all pertinent provisions of Title 18," Congress's review of all Guidelines before they take effect, and Congress's direct input into certain Guidelines. *See, e.g.*, 28 U.S.C. §§ 991(b), 994(b)(1), (h)-(l), (p). The Judiciary also had input into the Guidelines directly as Commission members and commentators and indirectly through the Commission's

ongoing and "careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46; 28 U.S.C. § 994(o)-(p).

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349. As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. § 1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007). "[W]here judge and Commission both determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347. As discussed above, the government believes that an eleven-level upward departure from the applicable Guideline Range, for the reasons set forth in 5K2.7 and 5K2.14 to level 15, is appropriate, resulting in a Guideline range of 18 to 24 months (Zone D).

### 5.      Avoiding Unwarranted Sentencing Disparities

Section 3553(a)(6) requires the Court, in determining the particular sentence to be imposed on Wolfe, to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Cases involving false statements to law enforcement on national security matters, without underlying criminal conduct involving a proven disclosure of classified material, are uncommon. In one recent case in this district, *United States v. van der Zwaan*, Cr. No. 18-31 (ABJ), a foreign national attorney, while himself represented by counsel, lied repeatedly to the Special Counsel's Office about matters important to the Office's ongoing criminal investigation, and ultimately pleaded guilty to a § 1001 charge. That defendant held no position of trust vis-à-vis the United States, had no special understanding of the impact of providing materially false information to investigators, and enjoyed no access to classified information. The court sentenced van der Zwaan to incarceration for 30 days and a fine of $20,000, followed by two months of supervised release, and he was deported.

In another case brought by the Special Counsel, *United States v. Papadopoulos*, Cr. No. 17-182 (RDM), the defendant pleaded guilty to a § 1001 count after lying repeatedly to investigators in order to conceal his contacts with Russians and Russian intermediaries during the 2016 presidential campaign, with the intent and effect of harming a criminal investigation. Similarly, Papadopoulos held no position of trust vis-à-vis the United States, had no special understanding of the impact of providing misleading information to investigators, and enjoyed no

access to classified information. The government nonetheless sought an unspecified sentence of incarceration within the applicable Guidelines range of 0 to 6 months, and noted that the defendant consented to imposition of a fine. Papadopoulos was sentenced to serve 14 days' incarceration followed by 12 months on supervised release, to perform 200 hours of community service, and to pay a $9,500 fine.

Unlike the *van der Zwaan* and *Papadopoulos* cases, Wolfe's case involves significant distinguishing factors that transcend the applicable Guidelines range, as set forth in detail in this Memorandum. Wolfe can and should be held accountable for knowing full well, by virtue of his training, experience, and job responsibilities, the criticality of the SSCI Director of Security being truthful to federal law enforcement agents during a national security investigation, and, conversely the potential devastating impact of his lies. Under these circumstances, the recommended custodial sentence would not create an unwarranted sentencing disparity.

**CONCLUSION**

For the reasons set forth above, the government respectfully submits that a custodial term

of 24 months is an appropriate sentence given that Wolfe's conduct significantly disrupted a

government function and significantly endangered national security.


Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar No. 472845


Dated:  December 11, 2018                    by:    _____/s/_____

Jocelyn Ballantine
Tejpal S. Chawla
Assistant U.S. Attorneys


**Certificate of Service**

I hereby certify that a copy of the foregoing Government's Sentencing Memorandum and Motion
for Upward Departure and/or Variance was served on the following counsel by electronic mail on
December 11, 2018:

Preston Burton, Esq.
Benjamin Klubes, Esq.
Lauren R. Randell, Esq.
Buckley Sandler LLP
1250 24th Street, N.W., Suite 700
Washington, D.C. 20017


_____/s/_____

Jocelyn Ballantine
Assistant U.S. Attorney

**ADDENDUM**

**Government Exhibits 1 through 12**

**Redacted for the Public Record**

# OFFICE POLICY MANUAL
## FOR THE
## SELECT COMMITTEE
## ON INTELLIGENCE



*July 1, 2012*



**Government Exhibit 1A**

**REDACTED**

## 2.22   Media Relations

Only the Chairman may authorize the Staff Director and the Staff Director's designee, and only the Vice Chairman may authorize the Minority Staff Director and the Minority Staff Director's designee, to communicate with the media in a manner that does not divulge classified or committee sensitive information.  Communication with the media about any matter relating to the Committee without such authorization is prohibited.

**REDACTED**

**Government Exhibit 1A**

## REDACTED

- Failure to follow the Office's computer, e-mail and voicemail, and Internet policies;

## REDACTED

- Unauthorized communications with members of the press, written statements, personal appearances, testimony, articles or comments on any aspect of the employee's official responsibility as an employee of the Office or relating to matters of the Senate;

## REDACTED

**Government Exhibit 1A**

Jim Wolfe

## ACKNOWLEDGEMENT OF RECEIPT OF
## OFFICE POLICY MANUAL FOR THE
## SELECT COMMITTEE ON INTELLIGENCE

I acknowledge that I have received a copy of the Office Policy Manual for the Select Committee on Intelligence and that I have read and understand its contents. I understand the Manual is intended to provide me with general information about policies and procedures that govern my employment.

I further understand that all policies, procedures and benefits described in this Manual are subject to change at any time and at the discretion of the Staff Director.

I acknowledge and understand that employment with the Office is at-will and that all employees serve at the pleasure of the Office. This is so even if I have been hired for a specific or limited period of time. I acknowledge that no one in the Office is authorized to make exception to this understanding. Accordingly, I have the right to resign from my position at any time, and the Office can terminate my employment, with or without cause, at any time, except the Office cannot terminate my employment in violation of the Congressional Accountability Act of 1995, as amended, or any other applicable law. I understand that by signing this Acknowledgement I do not waive my rights under such laws.

_____
(Signature of Employee)

10/23/2012
(Date)

**Government Exhibit 1A**

# OFFICE POLICY MANUAL

## THE SENATE SELECT COMMITTEE ON INTELLIGENCE



*September 2017*

**Government Exhibit 1B**

**REDACTED**

## 2.21 Media Relations

As prescribed by Committee Rule 10.5, only the Chairman and Vice Chairman are authorized to communicate about any matter related to the Office with members of the press without express permission from the Staff Directors. The Chairman may authorize the Staff Director and the Staff Director's designee, and the Vice Chairman may authorize the Minority Staff Director and the Minority Staff Director's designee to communicate with

the media in a manner that does not divulge classified or committee sensitive information. An employee who receives requests or contacts from the media regarding any issue related to the Office must report them to their respective Staff Director or the Security Director immediately.

**REDACTED**

## REDACTED

- Failure to follow the Committee's computer, e-mail and voicemail, social media, instant messaging, and Internet policies;

## REDACTED

- Engaging in communications with members of the press, including providing written statements, personal appearances, testimony, articles, or comments on any aspect of the employee's official responsibility as an employee of the Committee or relating to matters of the Senate, that have not been authorized pursuant to the Committee's media relations policy;

## REDACTED

**Government Exhibit 1B**

ACKNOWLEDGEMENT OF RECEIPT OF
OFFICE POLICY MANUAL FOR THE
SELECT COMMITTEE ON INTELLIGENCE

With my signature below, I acknowledge that I have received a copy of the Office Policy Manual ("the Manual") for the Senate Select Committee on Intelligence; that I have read and understand its contents; and that I agree to comply with the policies and procedure set forth in this Manual. The Manual outlines the policies and procedures that govern my employment with the Committee. I further understand that all policies, procedures, and benefits described in this Manual are subject to change at any time and at the discretion of the Staff Directors.

As noted in the Manual, I also acknowledge and understand that employment with the Committee is at-will and that all employees serve at the pleasure of the Committee. This at-will status also applies to individuals who have been hired for a specific or limited period of time. I acknowledge that no one on the Committee is authorized to make exception to this at-will understanding.

As an at-will employee, I understand that I have the right to resign from my position at any time, and the Committee can terminate my employment, with or without cause, at any time, except the Committee cannot terminate my employment in violation of the Congressional Accountability Act of 1995, as amended, or any other applicable law. I understand that by signing this Acknowledgement I do not waive my rights under such laws.

JAMES A. WOLFE
(Name of Employee)

_(signature)_
(Signature of Employee)

11/15/2017
(Date)

**Government Exhibit 1B**

# SSCI Security Procedures

Security Director

Presentation to SSCI Staff



**Government Exhibit 2**

# SSCI Security Procedures, cont.

- Media Contacts – Only the Staff Directors are authorized to speak to the media. All media inquiries must be forwarded to the Staff Directors – no exceptions.

- Media Disclosures are NOT Authorized Disclosures

- Publication does NOT Constitute Declassification

- Do Not Confirm or Deny Media Disclosures

25

**Government Exhibit 2**

# SSCI Security Procedures, cont.

## #1 Example: SH-219 Stakeouts and probing Qs

## #2 Real example of a media pitch via e-mail and the Staff Member's response:

**From:** Staff Member
**Sent:** Thursday, March 31, 2011 08:01 PM
**To:** Recipient
**Subject:** Re: hello

Hi Sender,
I have nothing against that, but with Committee restrictions, I'm not able to have informal conversations with a reporter. If you'd like information on the Committee, the best person to talk to is our staff director.

Best of luck –
Staff Member

**From:** Sender
**Sent:** Thursday, March 31, 2011 02:59 PM
**To:** Staff Member
**Subject:** hello

Hi Staff Member,

Just writing to say hi. I cover intel for the LA Times and Chicago Tribune, two cities that must have a place in your heart. And I see you went to [University] ! I went to [University]. Ah, shouldn't have told you that, will you meet me for coffee?

Sender
National Security Correspondent
*Los Angeles Times/Chicago Tribune Washington Bureau*
1090 Vermont Avenue NW, Washington, DC 20005

26

**Government Exhibit 2**

| | |
|---|---|
| **From:** | ███ (Intelligence) |
| **Sent:** | Tuesday, October 7, 2014 1:46 PM |
| **To:** | ███ (Intelligence); Wolfe, J (Intelligence) |
| **Cc:** | ███ (Intelligence) |
| **Subject:** | FW: ██ |

FYI.

**From:** ███ (Intelligence)
**Sent:** Tuesday, October 07, 2014 1:46 PM
**To: Reporter #1**
**Subject:** ██

**Reporter #1**

As you know, because we have discussed it before, ██████ and other members of the SSCI are not authorized to talk with you pursuant to committee Rule 10.5, which is available at
http://www.intelligence.senate.gov/pdfs/11214.pdf.  If you reach out to him again, not only will you not hear back from him, you will also not get any additional comments from me.

██

██
Staff Director
Senate Select Committee on Intelligence
█████

1

██████

**Government Exhibit 3A**

| | |
|---|---|
| **From:** | ███████ (Intelligence) |
| **Sent:** | Wednesday, February 4, 2015 2:48 PM |
| **To:** | Wolfe, J (Intelligence); ███████ (Intelligence) |
| **Subject:** | RE: Reporter |

She just tried again (2:07pm), without leaving a message.

**From:** Wolfe, J (Intelligence)
**Sent:** Wednesday, February 04, 2015 10:30 AM
**To:** ███████ (Intelligence); ███████ (Intelligence)
**Subject:** RE: Reporter

Roger.

James A. Wolfe
Director of Security
U.S. Senate
Select Committee on Intelligence

Hart Senate Office Building
Washington, DC 20510

███████

**From:** ███████ Intelligence)
**Sent:** Wednesday, February 04, 2015 10:26 AM
**To:** ███████ (Intelligence); Wolfe, J (Intelligence)
**Subject:** Reporter

**Reporter #1** ███████, who writes on NSA surveillance issues, just called my direct line.
She didn't leave a message (I Googled the incoming number), which may suggest she misdialed or is cold-calling
staff. I've never spoken with her, or ever been directly contacted by a reporter. Regardless, I figured I'd flag this
for both of you.

1

**Government Exhibit 3B**

| | |
|---|---|
| **From:** | ▮ (Intelligence) |
| **Sent:** | Saturday, April 22, 2017 6:25 PM |
| **To:** | ▮ (Intelligence) |
| **Cc:** | Wolfe, J (Intelligence) |
| **Subject:** | Re: ▮ reporter |

He sat outside of mine for a good half hour after I slammed the door. It was all a bit stalkerish.

> On Apr 22, 2017, at 6:23 PM, ▮ (Intelligence) ▮ wrote:
>
> I heard - I also wonder if they didn't get called off while they were sitting in front of my house.
>
>> On Apr 22, 2017, at 6:21 PM, ▮ (Intelligence) ▮ wrote:
>>
**Reporter #2** says that the reporter will not be showing up at anyone else's house again. She was very apologetic.
>>
>>> On Apr 22, 2017, at 2:51 PM, Wolfe, J (Intelligence) ▮ wrote:
>>>
>>> Excellent work!
>>>
>>> James A. Wolfe
>>> Director of Security
>>> U.S. Senate
>>> Select Committee on Intelligence
>>> Hart Senate Office Building, ▮ Washington, DC 20510
>>> ▮
>>>
>>>
>>> -----Original Message-----
>>> From: ▮ (Intelligence)
>>> Sent: Saturday, April 22, 2017 2:50 PM
>>> To: Wolfe, J (Intelligence) ▮
>>> Cc: ▮ (Intelligence) ▮
>>> Subject: Re: ▮ reporter
>>>
>>> ▮ something. I think he said ▮. But I was slamming the door.
>>>
>>>> On Apr 22, 2017, at 2:24 PM, Wolfe, J (Intelligence) ▮ wrote:
>>>>
>>>> ▮ -- Was it ▮ ?
>>>>
>>>> James A. Wolfe
>>>> Director of Security
>>>> U.S. Senate
>>>> Select Committee on Intelligence
>>>> Hart Senate Office Building, ▮ Washington, DC 20510
>>>> ▮

1

**Government Exhibit 3C**

>>>> █████████
>>>>
>>>>
>>>> -----Original Message-----
>>>> From: ███████ (Intelligence)
>>>> Sent: Saturday, April 22, 2017 1:39 PM
>>>> To: Wolfe, J (Intelligence) █████████ ; ████,
>>>> ██
>>>> (Intelligence) █████████
>>>> Subject: ████ reporter
>>>>
>>>> Showed up at my house. Happy weekend.

2

**Government Exhibit 3C**

**Government Exhibit 4**

**Entire Exhibit Redacted**

| | |
|---|---|
| **From:** | **Male-1** |
| **Sent:** | Monday, May 8, 2017 11:12 PM |
| **To:** | **Reporter #1** ▮ ; ▮▮▮▮▮▮▮▮ |
| | ▮▮▮ |
| **Cc:** | **Male-1** |
| **Subject:** | Fwd: Important information regarding your Yahoo account - target of state-sponsored actors |

Related to the redundant note below, I was immensely appreciative to have already been previously forewarned by the excellent reporting from you guys about the devious targeting of state-sponsored actors last year! Aside from the felonies involved, few people are so fortunate as me to have such strong watchdogs covering their back by keeping an eye out for these deceitful political schemers. Keep up the good work.... - **Male-1**

Sent from my iPhone

Begin forwarded message:

> **From:** Yahoo <Yahoo@communications.yahoo.com>
> **Date:** May 8, 2017 at 12:15:06 PM EDT
> **To:** **Male-1**
> **Subject: Important information regarding your Yahoo account**
> **Reply-To:** <replies@communications.yahoo.com>



Dear Yahoo User,

Yahoo is committed to protecting the security and safety of our users, and we strive to detect and prevent unauthorized access to user accounts by third parties. We are writing to inform you that we strongly suspect your Yahoo Mail account has been the target of state-sponsored actors. This does not necessarily mean that your account has been accessed.

To learn more about how you can protect yourself and your Yahoo account, please visit Yahoo Help Central at help.yahoo.com and search for "Protect Yourself from Advanced

1

▮▮▮▮▮▮

**Government Exhibit 5A**

Attackers" or "SLN26995."

Sincerely,

Yahoo Security Team

Copyright © 2016 Yahoo. All rights reserved.

**Government Exhibit 5A**



Received: from ████████ senate.ussenate.us ████████

████████ via Mailbox Transport; Mon, 8 May 2017 23:12:46 -0400

for <j_wolfe@████████

**Government Exhibit 5B**



From: **Male-1**

Date: Mon, 8 May 2017 23:12:23 -0400

Cc: **Male-1**

**Government Exhibit 5B**

To:**Reporter #1**

█████████████████████████████

**Return-Path:  Male-1**

**From:** Wolfe, J (Intelligence)
**Sent:** Wednesday, May 10, 2017 1:33 PM
**To:**

## REDACTED

**Subject:** FW: Important information regarding your Yahoo account - target of state-sponsored actors

## REDACTED

James A. Wolfe
Director of Security
U.S. Senate
Select Committee on Intelligence
Hart Senate Office Building,
Washington, DC 20510
REDACTED

**From: Male-1**
**Sent:** Monday, May 8, 2017 11:12 PM
**To: Reporter #1**                 ;

**Cc: Male-1**

**Subject:** Fwd: Important information regarding your Yahoo account - target of state-sponsored actors

Related to the redundant note below, I was immensely appreciative to have already been previously forewarned by the excellent reporting from you guys about the devious targeting of state-sponsored actors last year! Aside from the felonies involved, few people are so fortunate as me to have such strong watchdogs covering their back by keeping an eye out for these deceitful political schemers. Keep up the good work.... - **Male-**

Sent from my iPhone

Begin forwarded message:

> **From:** Yahoo <Yahoo@communications.yahoo.com>
> **Date:** May 8, 2017 at 12:15:06 PM EDT
> **To: Male-1**
> **Subject: Important information regarding your Yahoo account**
> **Reply-To:** <replies@communications.yahoo.com>

1

**Government Exhibit 5C**

# YAHOO!

Dear Yahoo User,

Yahoo is committed to protecting the security and safety of our users, and we strive to detect and prevent unauthorized access to user accounts by third parties. We are writing to inform you that we strongly suspect your Yahoo Mail account has been the target of state-sponsored actors. This does not necessarily mean that your account has been accessed.

To learn more about how you can protect yourself and your Yahoo account, please visit Yahoo Help Central at help.yahoo.com and search for "Protect Yourself from Advanced Attackers" or "SLN26995."

Sincerely,

Yahoo Security Team

Copyright © 2016 Yahoo. All rights reserved.

2

**Government Exhibit 5C**

| | |
|---|---|
| **From:** | **Reporter #1** |
| **Sent:** | Monday, November 7, 2016 1:52 PM |
| **To:** | Wolfe, J (Intelligence) |
| **Subject:** | RE: Hey |

Hey Jim,
How are you?
Been awhile.
**Reporter #1**

-----Original Message-----
From: Wolfe, J (Intelligence) [mailto:J_Wolfe@█████████████]
Sent: Wednesday, December 09, 2015 11:38 PM
To: **Reporter #1**
Subject: Re: Hey

Did you make it home safely?

Sent from my iPhone

> On Dec 9, 2015, at 10:56 PM, **Reporter #1**                                    wrote:
>
> Very nice meeting you! Enjoyed the chat. **Reporter #1**
>
**Reporter #1**
> Reporter, ████████████
> ████
> Sent from my iPhone
>
>
>> On Dec 9, 2015, at 10:18 PM, Wolfe, J (Intelligence) <████████████████> wrote:
>>
>> Nice meeting you.
>>
>> ~Jim
>>
>> Sent from my iPhone

| | |
|---|---|
| **From:** | **Reporter #1** |
| **Sent:** | Thursday, May 11, 2017 11:13 AM |
| **To:** | Wolfe, J (Intelligence) |
| **Subject:** | Hi |

What's your cell?

**Reporter #1**

Reporter, ▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇

Sent from my iPhone

**Government Exhibit 6B**

| | |
|---|---|
| **From:** | **Reporter #1** |
| **Sent:** | Thursday, May 11, 2017 5:06 PM |
| **To:** | Wolfe, J (Intelligence) |
| **Subject:** | ping |

Hi!
When can we get coffee?

**Reporter #1**

PGP:

1

**Government Exhibit 6C**

| | |
|---|---|
| **From:** | **Reporter #1** |
| **Sent:** | Wednesday, June 21, 2017 10:02 AM |
| **To:** | Wolfe, J (Intelligence) |
| **Subject:** | Pwd |

Jim,

I can't seem to get into the wifi here.

Is the pwd: █████████ ?

And that 7th digit is a Lower case "I" as in igloo?

**Reporter #1**
Reporter, ███████████
███████

Sent from my iPhone

1

**Government Exhibit 6D**

| From: | Wolfe, J (Intelligence) |
|---|---|
| Sent: | Wednesday, June 21, 2017 10:14 AM |
| To: | **Reporter #1** |
| Subject: | Re: Pwd |

Did you try "███████████"

Sent from my iPhone

On Jun 21, 2017, at 10:01 AM, **Reporter #1**                    > wrote:

> Jim,
>
> I can't seem to get into the wifi here.
>
> Is the pwd: ████████?
>
> And that 7th digit is a Lower case ████████?
>
> **Reporter #1**
> Reporter, ████████
> ████████
>
> Sent from my iPhone

1

████████

**Government Exhibit 6D**

| From: | **Reporter #1** |
| Sent: | Wednesday, June 21, 2017 10:20 AM |
| To: | Wolfe, J (Intelligence) |
| Subject: | Re: Pwd |

Didn't work either. I will ask the senate press gallery director.

**Reporter #1**
Reporter, ███████████████

███████████ iPhone

On Jun 21, 2017, at 10:14 AM, Wolfe, J (Intelligence) <███████████████> wrote:

> Did you try "███████████"
>
> Sent from my iPhone
>
>> On Jun 21, 2017, at 10:01 AM, **Reporter #1** ███████████████ wrote:
>>
>> Jim,
>>
>> I can't seem to get into the wifi here.
>>
>> Is the pwd: ███████████?
>>
>> And that 7th digit is a Lower case ███████████?
>>
>> **Reporter #1**
>> Reporter, ███████████████
>> ███████████
>> Sent from my iPhone

1

███████████

**Government Exhibit 6D**





**Government Exhibit 7A**





**Government Exhibit 7B**







**Government Exhibit 7C**





**Government Exhibit 7D**

**Government Exhibit 8**

**Entire Exhibit Redacted**

---------------Text Message for date/time - 2017-10-18T20:25:01.000Z---------------
Message Subject:
Source Address: **Wolfe**
Destinations: **Reporter #4**
Message Contents
Are you on Signal?

---------------Text Message for date/time - 2017-10-18T20:25:28.000Z---------------
Message Subject:
Source Address: **Reporter #4**
Destinations: **Wolfe**
Message Contents
I am

**Government Exhibit 9A**

Government Exhibit 9B

| Address | Date | Date Converted | Body |
|---|---|---|---|
| | | 10/18/17 8:27 PM | Hey |
| | | 10/18/17 8:28 PM | Hey. James, right? |
| | | 10/18/17 8:29 PM | Yes, but you can call me Jim. |
| | | 10/18/17 8:29 PM | Will do. |
| | | 10/18/17 8:29 PM | Do you understand complete discretion? |
| | | 10/18/17 8:30 PM | I understand how to work with anonymous sources, if that's what you're asking. |
| | | 10/18/17 8:30 PM | Good. |
| | | 10/18/17 8:36 PM | What kind of help/info are you usually able to provide? |
| | | 10/18/17 8:43 PM | In other words, what's the best way to work with you? |
| | | 10/18/17 8:51 PM | By never using my name to any of your colleagues or other news related colleagues, got it? |
| | | 10/18/17 8:51 PM | Understood. |
| | | 10/18/17 8:52 PM | I know a lot of people in your firm and other organizations but I never want you to use my name with them. |
| | | 10/18/17 8:55 PM | Got it. |
| | | 10/19/17 11:07 PM | Not sure if this is something you can help with, so if not, you can tell me to bugger off. Has the committee interviewed ▮▮▮▮? ▮▮▮▮ told me he's "definitely a person of interest." |
| | | 10/19/17 11:08 PM | He's in the works. |
| | | 10/19/17 11:10 PM | Thanks. Now, is that something I can use from an anonymous source, or is it completely off the record? |
| | | 10/19/17 11:10 PM | OTR. |
| | | 10/19/17 11:10 PM | Ok |
| | | 10/19/17 11:16 PM | Any idea approx. when he might come in? |
| | | 10/19/17 11:16 PM | That detail has not been nailed down yet. |

| | |
|---|---|
| **From:** | REDACTED |
| **Sent:** | Thursday, October 26, 2017 11:08 AM |
| **To:** | **Male-1** |
| **Cc:** | Wolfe, J (Intelligence) |
| **Subject:** | RE: NBC News Q: Meeting with Senate Intel Staff? |

**Male-1** ,

## REDACTED

I've cc'ed our Security Director, Jim Wolfe, who can assist you in entering the building discreetly, if that is something that interests you.

# REDACTED

**From**: **Male-1**
**Sent:** Tuesday, October 24, 2017 9:23 PM
**To:**   REDACTED
**Cc:**   REDACTED
**Subject:** FW: NBC News Q: Meeting with Senate Intel Staff?

REDACTED

In response to your message of this morning, I am now considering my alternatives in light of this most recent media-circus request that I received approximately one hour later today. Please see below. I was disappointed to receive this latest communication from ████████, in violation of § 9.7 of the Rules of Procedure for the SSCI and the terms we had originally agreed based on your email of Friday, October 6, 2017: "What the Committee would like to prevent is the release of your interview date (which will create a media circus)…"

Although the associated document that I received on October 13 was marked "Committee Sensitive", it's unfortunate that the related Rules, Id., were once again broken today.

As was correctly alluded to on our call from last week, the term subpoena stems from the Latin: sub ("under") and poena ("penalty"). So yes, I plan to be there at ███████████. However, given the extraordinary damages already created by the continued illicit leaks stemming from information that has originated with your Committee, I am now considering my alternatives in order to limit the perpetuation of such future serious injury.

Best regards,
**Male-1**

On 10/24/17, 9:58 AM, **Reporter #3**                wrote:

1

**Government Exhibit 10**

Hello **Male-1** .

**Reporter #3**         here from ████████ . I hear that you will be paying a visit to Senate Intelligence staffers this week. Is that true? I'm reaching out to confirm if that is indeed the case.

Thanks for your attention to this.

Best,

**Report**
   **#3**

----------

**Government Exhibit 10**



SAMSUNG
✈ 100% 🔋 10:27 AM
Jim - Work

8:21 PM MMS

Your offer for getting together for a drink sounds good. You know, I've watched your career take off even before you ever had a career in journalism. I always loved meeting you over and our little restaurant in "Uniform Sierra" and was always delighted to see your eagerness in pursuing the ██ story and that ██ ████████ was

Enter message



SAMSUNG
✈ 100% 🔋 10:27 AM
Jim - Work

over and our little restaurant in "Uniform Sierra" and was always delighted to see your eagerness in pursuing the ██ story, and that ██████ was something else! I especially loved the way you would take the train to ██ from ████ most weekends and meeting up with me to just talk and find out what was going on in each others lives. I always tried to give you as much informa-tion that I could and to

Enter message



SAMSUNG
✈ 100% 🔋 10:28 AM
Jim - Work

the train to ██ from ████ most weekends and meeting up with me to just talk and find out what was going on in each others lives. I always tried to give you as much informa-tion that I could and to do the right thing with it so you could get that scoop before anyone else — I loved that about you! I always loved the way that you would pursue a story like nobody else was doing my hallway. I felt like I was always

Enter message



SAMSUNG
✈ 100% 🔋 10:28 AM
Jim - Work

else — I loved that about you! I always loved the way that you would pursue a story like nobody else was doing my hallway. I felt like I was always very supportive of your career and the tenacity that you exhibited to chase down a good story. One other important thing to me was that I always loved watching the video that you sent me when you were being inducted into the ████████ of

Enter message

**Government Exhibit 11**





**Government Exhibit 11**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**INVESTIGATIVE QUESTIONNAIRE**

1. Do you understand that you are being provided this questionnaire as part of a criminal investigation being conducted by the FBI, not an administrative inquiry by ___SSA___ (employer), the Department of Justice or other U.S. government agencies?

   Yes___✓___   No_____   Initial:_____

2. Do you understand and agree that responding to this questionnaire is voluntary, and is not the product of any actual or implied promise, threat, or coercion.

   Yes___✓___   No_____   Initial:_____

3. Do you understand making false statements, orally or in writing to the FBI in connection with a federal criminal investigation is a violation of law, including but not limited to, a violation of Title 18, United States Code, Section 1001?

   Yes___✓___   No_____   Initial:_____

4. The FBI is conducting an investigation of the unauthorized disclosure of classified national defense information contained in the following publications:

   [Provide copies of the materials described above for interviewee's review.   Article title is listed in the classified addendum.]

5. Were you ever briefed on or did you have knowledge of any information contained in the article referenced in the classified addendum prior to the publication?

   Yes_____   No___✓___   Initial:_____

6. Did you review the classified document in question? If yes, when and where did you review the classified document?

   Yes_____   No___✓___   Initial:_____

   _____

   _____

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**Government Exhibit 12**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

7. If yes to question six, which version of the classified document did you review (original, redacted, or both)?

N/A

8. Do you know of any other individuals who had access to the classified document? If so, who, where, and when?

No

*For purposes of this interview, the word "contact" includes: (i) any in-person conversations, communications, or interactions whatsoever, planned or unplanned, whether passively received or actively initiated; (ii) any telephonic conversations or communications whatsoever including but not limited to the use of text messages and/or pages; and, (iii) any written communications whatsoever, including but not limited to, email, correspondence, and notes of any kind?   The word "contact" includes communications, as defined in the preceding sentence, of any duration or type whatsoever, including negative responses to media inquiries, whether authorized by your employer or not, and whether considered personal or professional communications.*

9. Have you ever had any "contact" with the following reporters listed in the classified addendum from the aforementioned article?

|  | Yes | No |
|---|---|---|
| Reporter A |  | ✓ |
| Reporter B |  | ✓ |
| Reporter C |  | ✓ |

10. Besides Reporter A, Reporter B, and Reporter C, do you currently have or had any "contact" with any other reporters (professional, official, personal)?

Yes ✓     No _____     Initial: _____

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**Government Exhibit 12**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

If yes, who and describe the relationship (professional, official, personal).

Official — No
Professional — No
Personal — No

11. If yes to question ten, did you discuss or disclose any official U.S. government information or documents whether classified or unclassified which is the property of the U.S. government without express authorization from the owner of the information?

Yes_____ No ____✓____ N/A:_____
Initial: _____

If yes, please provide details.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**Government Exhibit 12**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

12.    If yes to question ten, are you required by _____ N/A _____ (employers) to report any contact with members of the media?

Yes_____    No_____    Initial:_____

If yes, did you and to who: _____

_____

_____

13.    Have you ever discussed with, disclosed too, or provided any information on any classified document whatsoever to, any unauthorized person or persons, including, but not limited to, reporters, journalists, co-workers, family members?

Yes_____    No____✓____    Initial:_____

If yes, please identify all such individuals: _____

_____

14.    Are you aware of any other U.S. government employee, or employees, who have discussed, disclosed, or provided any information classified information to any unauthorized person or persons, including, but not limited to, reporters, journalists, co-workers, family members?

Yes_____    No____✓____    Initial:_____

If yes, please identify all such individuals: _____

_____

15.    Do you have any other information that suggest _____ (employer) cannot properly maintain classified information or do you have any other information which may be of value to the investigation?

Yes_____    No____✓____    Initial:_____

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**Government Exhibit 12**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

Name (Print):            JAMES A. WOLFE

Title (print):            DIRECTOR OF SECURITY

Address (work):           HSOB, ███████ WASHINGTON, DC

Telephone number (work/home/cell phones): ████████████

Email (work/personal): ████████████████████████

All social media accounts:

Do you have any messaging systems to communicate with reporters? (i.e.: Wickr Me, Signal, Threema, ProtonMail, Snapchat, WhatsApp, Telegram, Xbox, and PS4):

Date of Birth: ████████

Social Security Number: ████████

**Signature:** ████████████

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, executed on date: __12/15/2017__ (Today's date).

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**Government Exhibit 12**