**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | **Criminal No.:** 18-cr-170 (KBJ) |
| v. ) | |
| ) | **Sentencing Date:** December 20, 2018 |
| **JAMES A. WOLFE** ) | |

## GOVERNMENT'S REPLY TO DEFENDANT'S SENTENCING MEMORANDUM

The United States of America, by and through its representative, the U.S. Attorney for the District of Columbia, files this Reply to the Defendant's Memorandum in support of its position on sentencing. Defendant Wolfe, in his sentencing memorandum, makes a number of representations about his conduct in this case that are flatly incorrect. As discussed herein, defendant Wolfe's conduct was not aberrant; rather, it reveals a pattern of behavior in which he used his position as Director of Security for the Senate Select Committee on Intelligence ("SSCI") in order to cultivate relationships with multiple young, female reporters, who were attempting to gain information about SSCI business. Wolfe hid his conduct in furtherance of this selfish aim, a behavior that ultimately culminated in his repeated lies to the FBI — intentional falsehoods that had an actual impact on the national security functions of the FBI and had the potential to disrupt important government functions.

Further, contrary to defendant Wolfe's assertions, his lies to the FBI were not cured immediately. He repeatedly lied in his December 2017 FBI interview about whether he provided information to reporters, and he lied again in his January 2018 interview. Wolfe's lies to the FBI about his unauthorized contacts with reporters were calculated. The lies disrupted an ongoing national security investigation – a harm he appreciated based on his position of trust. The

government asks the Court to consider the totality of the defendant's behavior underlying the charged offense. That conduct, and his lies about that conduct, undermined the public trust. Taking all aggravating circumstances and factors into account, a sentence of 24 months of incarceration is appropriate and justified in this case.

I. **DEFENDANT WOLFE INCORRECTLY ASSERTS THAT HIS LIES DID NOT CAUSE HARM DESERVING OF INCARCERATION.**

In March 2017, the Department of Justice provided to the SSCI classified materials that revealed the existence of and predication for the FISA surveillance of MALE-1. At that time, defendant Wolfe was the Director of Security for the SSCI, and he was charged with safeguarding information furnished to the SSCI to facilitate the SSCI's critical oversight function. In this role, Wolfe was involved in the logistical process by which the FISA application was provided to the SSCI. He was, in short, definitely aware of "the FISA," as he admitted to the FBI in October 30, 2018.

On December 15, 2017, and again on January 11, 2018, the FBI interviewed Wolfe in connection with its investigation into the leak of classified information about the FISA surveillance of MALE-1. During these interviews, Wolfe lied, and lied repeatedly, about his contacts with reporters. Wolfe asserts in his sentencing memorandum (p. 15), that these lies did not harm any victim, and that "to the extent one may consider either his wife (a former FBI agent) or the SSCI (including the current Ranking Member of the Judiciary Committee) as victims here, it is notable that they both urge the Court to impose a lenient, non-penal sentence." This assertion is misplaced.

When the FBI learned that Wolfe had been engaged in an lengthy, intimate relationship with REPORTER #2, a national security reporter who herself had published an article about MALE-1 in April 2017, the FBI expanded its investigation to determine whether Wolfe had

disseminated to unauthorized individuals classified information that had been entrusted to him over the past three decades in his role as SSCI Director of Security. As set forth in the attached Declaration of Special Agent Brian Dugan, Assistant Special Agent in Charge, FBI's Washington Field Office, the FBI took immediate additional steps to thoroughly investigate and closely monitor Wolfe's activities in order to determine whether the FBI needed to warn the broader USIC that their equities may have been compromised. Exhibit 13.

At the time Wolfe lied, the FBI was engaged in an investigation to identify the individual(s) who leaked classified information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security. Having served as SSCI Director of Security for nearly three decades, and having been responsible for safeguarding classified national security information provided to the SSCI from throughout the USIC, Wolfe fully appreciated the grave national security consequences of misleading federal agents in their efforts to investigate the compromise of classified information. Wolfe's lies disrupted an ongoing national security investigation; thus, they warrant upward departures pursuant to U.S.S.G. §§ 5K2.7 and 5K2.14, and a resulting incarcerative sentence.

## II. DEFENDANT WOLFE'S LIES WERE NOT MERELY "FOOLISH" ATTEMPTS TO CONCEAL AN AFFAIR WITH REPORTER #2.

Wolfe argues repeatedly and incorrectly in his sentencing memorandum that he was prosecuted for making a "foolish" decision to lie about his years-long relationship with REPORTER #2, and that he corrected this lie "almost immediately." (p. 2, 4, 14, 17 and 22). He further asserts, correctly, that the fact that he had engaged in a relationship with REPORTER #2 was known to the agents at the time of the December 15, 2017, interview. But Wolfe's lie about

his relationship with REPORTER #2 (and his disclosures of information to her) was not the only lie with which he was charged.

Wolfe was also charged with lying, and lying repeatedly, about his unauthorized contacts with multiple reporters during which he disclosed information that he learned as SSCI's Director of Security that was not otherwise publicly available. Those unauthorized contacts with reporters were not known to investigators until Wolfe admitted to some of them in his January 11, 2018 interview. Moreover, even during that interview, Wolfe explicitly lied when he denied disclosing non-public SSCI information to them. To this day, Wolfe has only admitted to disclosing such information to REPORTER #3, and he did not do so until the time of his plea on October 15, 2018.

Contrary to Wolfe's repeated assertions in his sentencing memorandum (p. 4, 14), the investigators did not know about his unauthorized contacts with other reporters at the time of the December 15, 2017 interview. Investigators did not learn of these contacts until the January 11, 2018 interview, when Wolfe generally admitted having contact with REPORTER #1. He also admitted having a "few reporter friends," and named REPORTERS #3, #4, #5, and #6.[1]

During that interview, Wolfe was asked to complete a second Investigative Questionnaire (Exhibit 14). That questionnaire asked:

> Did you provide [REPORTER #2] or any unauthorized person, in whole or in part, by way of summary, or verbal or non-verbal confirmation, the contents of any information controlled or possessed by the SSCI to include but not limited to: 1) Committee sensitive information as defined the Rule of Procedure of the SSCI, documents, materials, briefings, testimony, or other information received by, or in possession of the Committee, 2) any unclassified information, or 3) any classified information?

---

[1] REPORTERS #3 - #6 are all young, female national security reporters.  See Exhibit 15. Information about REPORTERS #5 and #6 and Wolfe's contacts with them were disclosed to the defense in discovery.

4

Wolfe responded, "No," orally and in writing.  In fact, the FBI discovered following the January 11, 2018 interview, that the defendant had used the encrypted Signal application to communicate with REPORTERS #3, #4, #5, and #6, and that the defendant provided non-public SSCI information about national security investigations to each of these reporters.  *See* Exhibits 7A-7D (REPORTER #3), Exhibit 9C (REPORTER #4), Exhibit 16 (REPORTER #5), Exhibit 17A (REPORTER #6).

Moreover, the FBI's later discovery of Wolfe's encrypted communications with one of the young reporters at issue is particularly telling, bespeaking quite a practiced and premeditated pattern of behavior.  When Wolfe volunteered to act as a confidential source for REPORTER #4, it was on the condition that she promise to never to use his name with any of the reporter's colleagues.  *See* Exhibit 9B. Wolfe engaged in similar communications with REPORTER #3 (Exhibit 7E) and REPORTER #5 (Exhibit 16).  And after providing REPORTER #6 with non-public information, he instructed her as follows:  "DO NOT TELL ANYONE." Exhibit 17B.

Finally, Wolfe's assertion that he immediately corrected his lies about the extent of his contact with REPORTER #2 is simply incorrect.  The defendant and REPORTER #2 had an extraordinary volume of contacts:  in the ten months between December 1, 2016, and October 10, 2017, alone, they exchanged more than 25,750 text messages and had 556 phone calls, an average of more than 83 contacts per day.  The FBI was unable to recover a significant portion of these text messages because they had been deleted by the defendant.  Moreover, there is reason to believe that Wolfe falsely denied to the FBI that he provided "scoops, leads, or information related to the SSCI" to Reporter #2 during their multiple-year relationship.  For instance, in May 2017, REPORTER #1 published an article reporting, for the first time, on certain communications at the

highest level of the government. That same day, defendant Wolfe texted REPORTER #2, "Didn't I tell you a while back" the information that was published in REPORTER #1's article. *See also* Exhibit 12 ("I always tried to give you as much information that I could . . . so that you could get that scoop before anyone else.").

**III.   DEFENDANT WOLFE'S IMPROPER CONDUCT WAS NOT ISOLATED OR LIMITED IN SCOPE.**

In this Circuit, the determination of whether conduct is considered to be "aberrant" is dependent on the degree to which it is a "spontaneous and seemingly thoughtless act rather than one which is the result of substantial planning." *United States v. Dyce*, 91 F.3d 1462, 1470 (D.C. Cir. 1996) (rejecting totality of the circumstances test). This analysis focuses on the defendant's conduct, and not the defendant's otherwise good standing and lack of criminal history.

Here, the defendant's conduct was not spontaneous or thoughtless; rather, it was sustained and calculated. The defendant's duplicitous conduct began when he entered into a relationship with REPORTER #2 in 2013, continued when he communicated non-public SSCI information to multiple reporters using the encrypted application Signal, and continued even after he was removed from his position as Director of Security following his December 15, 2017 interview, during which he lied to the FBI in January 2018.

When Wolfe violated his duty, first by engaging in furtive exchanges with multiple reporters, and second, by lying multiple times to the FBI, he foreseeably placed in some jeopardy the SSCI's ability to accomplish its important mission of overseeing the USIC. The SSCI must be able to obtain from the Executive Branch highly sensitive and classified intelligence secrets, and the USIC will only provide that information on the condition that those secrets remain safe and uncompromised.

Unlike other defendants who may only appreciate that lying to federal agents is wrong, Wolfe also possessed specialized knowledge that what he was doing could have an impact on SSCI business, and by extension, the national security.  Every day that the defendant reported to work at the SSCI SCIF from December 2013 to December 2017 – a period spanning over 1400 days – he knew he was violating the trust placed upon him by the SSCI and the USIC.  Wolfe's conduct was sustained over a four-year period, and it caused an undermining of public confidence in the trustworthiness of the official charged with safeguarding classified intelligence in furtherance of an important government function.  The government asserts that Wolfe's conduct in this regard justifies an upward departure pursuant to U.S.S.G. §§ 5K.2.7 and 5K2.14.[2]

## IV.     ALTERNATIVE TO INCARCERATION ARE INADEQUATE.

The government acknowledges the recent amendment to Guideline §5C1.1, effective November 1, 2018, but submits to the Court that the reasoning underlying this amendment actually undercuts its application in this case. As a preliminary matter, the amendment was adopted to recognize that that recidivist rates for individuals with no prior contact with the criminal justice system are very low.  This rationale does not apply here, where the government is seeking an above-guideline sentence for reasons that are wholly independent of specific deterrence of the defendant.

---

[2]     The government has reviewed the letters of support written for the defendant, including those written by the SSCI and former members of the USIC.  The letters share a certain common theme, which is perhaps best summarized as follows:  the defendant appeared steadfast and honest in my multiple dealings, and I believe he kept secrets to which I was privy.  What is missing from any of these letters, however, is a person who says they knew the double life that Wolfe was leading, and that they were aware he was sharing information from the SSCI with multiple national security reporters over multiple years.

Further, the amendment plainly does not address application to cases involving departures based on national security risks or interference with core governmental functions. Where, as here, the government seeks a departure which places the defendant in Zone D, the amendment is further inapplicable on its face. *Id.* at 73 (limiting amendment to cases where the "applicable guideline ranges are in Zones A or B of the Sentencing Table"). To the extent that the Court is considering alternative punishment, the government believes its requested sentence of 24 months incarceration cannot be accomplished through alternative community confinement methods. *See* U.S.S.G. §5F1.1, Application Note 2 ("Community confinement generally should not be imposed for a period in excess of six months"). The government does, however, seek special conditions of supervised release as part of any sentence fashioned by the Court, which should include the existing conditions of release that relate to his access to, and application for positions involving, national security information.

## CONCLUSION

For the reasons set forth above, the government respectfully submits that a custodial term of 24 months is an appropriate sentence given that Wolfe's conduct significantly disrupted a government function and significantly endangered national security.

Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar No. 472845

Dated: December 14, 2018          by:          /s/
                                          Jocelyn Ballantine
                                          Tejpal S. Chawla
                                          Assistant U.S. Attorneys

## Certificate of Service

I hereby certify that a copy of the foregoing Government's Reply to the Defendant's Sentencing Memorandum was served on the following counsel by electronic mail on December 14, 2018:

Preston Burton, Esq.
Benjamin Klubes, Esq.
Lauren R. Randell, Esq.
Buckley Sandler LLP
1250 24th Street, N.W., Suite 700
Washington, D.C. 20017

                                          /s/
                                          Jocelyn Ballantine
                                          Assistant U.S. Attorney

# REPLY ADDENDUM

# Government Exhibits 7E, 9C, and 13-17

# Redacted for the Public Record




**Government Exhibit 7E**



**Government Exhibit 9C**

**Declaration of Special Agent** ▮▮▮▮▮

I, Federal Bureau of Investigation (FBI) Special Agent ▮▮▮▮▮, do hereby state the following:

1. Among my duties as an Assistant Special Agent in Charge of the FBI's Washington Field Office is the supervision of investigations into unauthorized disclosures of classified national security information. One such investigation, opened in May 2017, was of the unauthorized disclosure to a member of the news media of a classified FBI application under the Foreign Intelligence Surveillance Act (FISA).

2. During the course of this investigation, the FBI learned that the defendant, James A. Wolfe, who may have had access to the classified FISA application in the course of his duties as Director of Security for the U.S. Senate Select Committee on Intelligence (SSCI), was engaged in conduct that appeared to compromise his ability to faithfully fulfill those duties. The FBI was aware that Executive Branch agencies within the Intelligence Community regularly provided classified national security information to the SSCI in furtherance of its oversight function.

3. Upon discovering Wolfe's conduct, the FBI devoted substantial investigative resources to determine whether Wolfe had made unauthorized disclosures of Executive Branch classified information to which he may have been granted access during his tenure as SSCI Director of Security – including the FISA application.

4. Typically, upon learning that a person holding a Top Secret clearance may have disclosed national security information to members of the news media, the FBI would fulfill its "duty-to-warn" obligation by notifying relevant Executive Branch equity holders in order that those agencies could take mitigation measures to protect their national security equities. In this case, because the known disclosure of classified information – the FISA application – involved an

**Government Exhibit 13**

FBI equity, the FBI devoted substantial agent and intelligence analyst resources, to promptly determine whether to make such notification to the broader Intelligence Community.

5. FBI leadership also took the step of personally notifying the SSCI Chair and Vice Chair of the investigation. In doing so, the FBI requested, in order to avoid the potential destruction of evidence, that the SSCI take no steps to reveal to Wolfe the existence of the investigation until the FBI could conduct additional investigative activity.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 14 day of December, 2018.

Special Agent

**Government Exhibit 13**

1. As defined in Rule of Procedure of the Senate Select Committee on Intelligence (SSCI) section 10.5, were you as SSCI Director of Security authorized by SSCI to communicate with any media (to include REPORTER #2) since 1 January 2013?

   Yes _____   No __X_____

2. Did you provide REPORTER #2 or any unauthorized person, in whole or in part, by way of summary, or verbal nor non-verbal confirmation, the contents of any information controlled or possessed by SSCI to include but not limited to: 1) "Committee sensitive" information as defined in the Rule of Procedure of the SSCI, documents, materials, briefings, testimony, or other information received by, or in the possession of the Committee, 2) any unclassified information, 3) any classified information?

   Yes _____   No __X_____

3. Did you assist REPORTER #2 with any information to allow her to develop, start, or initiate any of her news articles whether published or not since 1 January 2013?

   Yes _____   No __X_____

4. Did you ever provide REPORTER #2 in whole or in part, by way of summary, or verbal nor non-verbal confirmation, the contents of any unclassified or classified information provided to you in any form by any U.S. government Agency (i.e. Central Intelligence Agency, National Security Agency, Federal Bureau of Investigation)?

   Yes _____   No __X_____

**Signature:** _[signature]_

**Date:** 1/11/2018

**Government Exhibit 14**

**Government Exhibit 15**

**Redacted in its Entirety**






**Government Exhibit 16**

 

Government Exhibit 16





Government Exhibit 17A






Government Exhibit 17B