**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                          :
**UNITED STATES OF AMERICA**              :
                                                          :
                                                          :
        **v.**                                        :        **Criminal No. 18-170 (KBJ)**
                                                          :        **Sentencing Date: December 20, 2018**
                                                          :
**JAMES A. WOLFE**                              :
                                                          :
                                                          :
_____ :


**DEFENDANT'S REPLY TO GOVERNMENT SENTENCING MEMORANDUM**
**AND OPPOSITION TO MOTION FOR UPWARD DEPARTURE OR VARIANCE**

        James A. Wolfe, through counsel, respectfully submits this reply to the government's

sentencing memorandum and opposes its request for an upward departure and/or variance from

the sentencing range and Zone calculated correctly by the Probation Office.  The advisory

Guidelines and Section 3553 factors confirm that a non-incarcerative sentence is appropriate.

        The government's sentencing submission ("Gov. Mem.") reads like a Superseding

Indictment of someone else—someone charged with leaking Classified Information and causing

actual, provable harm to national security.  If that were the case here, perhaps the government's

shocking sentencing request of 24 months might at least pass muster, despite comparable situations

with individuals such as four-star General David Petraeus, who actually leaked highly sensitive

and classified military strategy documents to his mistress and lied about it to the FBI while he was

CIA Director, yet received just probation.  The same was true for Sandy Berger, the former

National Security Advisor who stole Classified Information from the National Archives and then

lied to government personnel about it.

But Mr. Wolfe's conduct is fundamentally different than that of General Petraeus or NSA Berger because this case involves no compromised Classified Information or actual endangerment of national security.  The government itself admitted no fewer than four times in its opening submission that it found no evidence that Mr. Wolfe disclosed Classified Information to anyone. *See infra* Part I.A.  Nonetheless, the government deploys the word "Classified" 58 times in a sentencing memorandum about a case in which there is no evidence of disclosure of Classified Information—let alone a charge.

Although the government also muses repeatedly about the "potential" harm to national security or hindrance of a national security investigation, it never provides any actual evidence— by affidavit or otherwise—of actual, palpable, articulable damage to national security to meet its evidentiary burden to support such departures.  This speculation stands in stark contrast to the reality presented by the officials uniquely situated to know best—the Senators leading the Senate Select Committee on Intelligence ("SSCI").  They did not assert any kind of national security impairment or governmental disruption justifying incarceration.  Instead, those Senators recommend at most a sentence of probation or community service.  Wolfe Memorandum ("Wolfe Mem.") Ex. 1.

Specifically, the government asks the Court to transform a Zone A Guidelines level 4 offense, with a reasonable sentencing range of 0-6 months for a first-time non-violent offender, into a Zone D level 15, with a range of 18-24 months (and then to sentence Mr. Wolfe at the top of that range).  The government has presented no evidence whatsoever that would be sufficient to inflate the reasonable Guidelines position by nearly 400%.  Instead, the government resorts to scaremongering and sleight of hand.  It argues that Mr. Wolfe's conduct qualifies for a five-level upward departure under U.S.S.G. § 5K2.7 for causing a "significant disruption of a governmental

function," yet then it retreats to asserting only a "**potential** to significantly disrupt the governmental function he performed" at SSCI in the face of the bipartisan letter from the SSCI leadership asserting no such disruption.  Gov. Mem. at 19 (emphasis added).  The government similarly requests a six-level upward departure under U.S.S.G. § 5K2.14 for "significantly endanger[ing]" "national security," yet it does not cite a single actual effect on national security resulting from Mr. Wolfe's offense conduct, much less his underlying contacts and relationship with the reporters.  Gov. Mem. at 21-22.  The mere fact that the FBI was conducting an investigation into a purported actual harm to national security—by someone else whom it apparently has failed to identify, not Mr. Wolfe—does not convert a lie to the FBI during that investigation into an independent *significant* danger to national security.

The government seeks a sentence that would incarcerate Mr. Wolfe for two years for lying about an affair and contacts with reporters that did not involve Classified Information, while it has routinely agreed to probation for substantially more serious conduct committed by the country's highest level military and civilian national security officials who actually disclosed or stole Classified Information and then lied about it.  In fact, the government fails to cite a single false statement case where the sentence was even within an order of magnitude of what it is asking for Mr. Wolfe.  Instead, the government gives the back of its hand, or ignores completely, the sentences given in recent false statement cases in this very Courthouse, including by this Court, and described in detail in Defendant's Sentencing Memorandum.  *Compare* Gov. Mem. at 33-34, *with* Wolfe Mem. at 19-21.

Mr. Wolfe should not bear the weight of the government's alternate reality and apparent frustration at its inability to prove any disclosure of Classified Information by the so-called "big leaker" it so publicly trumpeted when Mr. Wolfe was arrested.  We ask that the Court sentence

Mr. Wolfe to a just and fair sentence for the crime he actually committed—probation with community service.

**I.      Government Factual Inaccuracies.**

The government's narrative in support of its unjust sentencing position is misleading. Try as they might—and they try mightily—the government cannot convert this into a Classified Information case, and Mr. Wolfe should not be sentenced based on a fundamentally flawed premise. Nor should he be sentenced based on fear-mongering about encrypted messaging applications or the potential risk associated with media discussions by government employees who happen to have security clearances, regardless of the content of those messages or what they actually discussed. Mr. Wolfe should be sentenced for what he actually did.

*A.      Even the Government Admits Mr. Wolfe did not Disclose Classified Information.*

The government grudgingly admits that it lacks evidence that Mr. Wolfe disclosed Classified Information to anyone. *See, e.g.,* Gov. Mem. at 1 ("although the defendant is not alleged to have disclosed classified information"); *id.* at 6 ("notwithstanding the fact that the FBI did not uncover evidence that the defendant himself disclosed classified national security information"); *id.* at 22 ("[w]hile the investigation has not uncovered evidence that Wolfe disclosed classified information"); *id.* at 25 n.14 ("while Wolfe denied that he ever disclosed classified information to REPORTER #2, and the government has no evidence that he did").

The Court should see through the government's repetition of the word "Classified" in the hope that the Court will be confused about the nature of the actual evidence and charges in this case and sentence Mr. Wolfe as if he had compromised such information.[1]

---

[1] Similarly, the government devotes multiple pages of its memorandum describing the classified document that Mr. Wolfe is not accused of having disclosed. And although the government has walked back its initial assertion that Mr. Wolfe "received, maintained, and managed the Classified

The government also never actually accuses Mr. Wolfe of disclosing the substantive content of any testimony or matters before SSCI.  As much as the government would like the disclosures to have been worse in order to justify the disproportionate sentence it has apparently recently been ordered to pursue,[2] there is a vast and relevant difference between (a) disclosure of logistical information such as who would be appearing before SSCI and on what day, and (b) disclosing the substantive content of what those people actually said.  Mr. Wolfe must be judged based on what he actually disclosed, which never included the actual content of anyone's testimony, let alone any Classified Information.

The government also implies that Mr. Wolfe must have been disclosing Classified Information to someone because, like millions of people, he used certain messaging applications that are encrypted, and because he received an e-mail from a reporter that contained her PGP encryption key.  Gov. Mem. at 10 & n.8.  The government fails to acknowledge that the PGP key appears to be embedded in the reporter's standard e-mail signature that routinely would be included in each of her e-mails sent from her computer.  *See id.* Ex. 6C.  Other messages, which do not contain the PGP key, were sent instead from the reporter's cell phone; such cell phone e-

---

Document" (Indictment ¶ 18) to acknowledge that he was merely "involved in coordinating logistics for the FISA materials to be transported to the SSCI" (Gov. Mem. at 10), what the government still resists conceding is the fact that Mr. Wolfe had *no* access to read that document, let alone disclose any part of it.  Beyond providing an explanation of how the FBI's investigation arose, that document has absolutely no relevance to Mr. Wolfe's sentencing, but it and its subject, an individual under investigation for dealings with Russia potentially related to the Trump campaign, likely have everything to do with the vigor of the government's position.

[2] The government's departure arguments have been a moving target, for reasons only it can explain.  Just prior to the original deadline for sentencing memoranda, the government objected to the draft PSR on the ground that it would seek a departure under U.S.S.G. § 5K2.0.  After requesting from the Court "additional time to prepare its sentencing memorandum," Gov''ts Unopposed Mot. to Amend Briefing Schedule (Dkt. 41), the government shifted its objection to the PSR, announcing it would pursue two different departures, under U.S.S.G. §§ 5K2.7 and 5K2.14.

mails usually come with shorter signatures (in this case, just the reporter's name, phone number, and "Sent from my iPhone").  *Id.* Exs. 6B, 6D.  The fact that an e-mail signature contains a PGP key is not a basis for an extrapolation that it was ever used by a particular recipient of that e-mail, much less speculation about the content of any communications using such a key.  Beyond that, as the government was eventually forced to admit, the communications with Reporter # 1 about which it is so exercised involved such dangerous disclosures of information that threatened national security as requesting the Senate's publicly available media wifi password.  *Id.* at 15 & Ex. 6D.

> B.     *There is No Evidence that Mr. Wolfe Mishandled Classified Information.*

Bereft of any evidence of Mr. Wolfe's improper disclosure of Classified Information, the government then mischaracterizes its own investigative reports to contend that Mr. Wolfe tolerated and ignored *others* who purportedly shared Classified Information with Reporter # 2.  *Id.* at 25 & n.14.  In fact, Mr. Wolfe did **not** tell the FBI that he believed Reporter # 2 had been obtaining classified information from other SSCI sources, or that he had refused to initiate an investigation of those disclosures.  As the government's interview reports reveal, Mr. Wolfe discussed the fact that he knew multiple other SSCI staff and members were in contact with Reporter # 2.  FBI 302, Dec. 15, 2017, at 14, Bates No. G00026.  Mr. Wolfe mentioned the possibility that those other individuals were providing information to Reporter # 2, but he never suggested that information was classified.  *Id.*[3]

To the contrary, later in the same section of that 302, which the government omits, Mr. Wolfe is reported to have told the FBI that the one time he thought Reporter # 2 may have received

---

[3] Bates number references are to the documents as produced by the government in discovery under the Protective Order.  We will proffer relevant excerpts to the Court under seal if requested.

a classified document, he took steps to ascertain whether it was in fact classified—it was not—and he said that if he had identified a classified document in her possession, he would have initiated an investigation to determine its source. *Id.* Numerous letters in support of Mr. Wolfe from those who actually worked with him over his 30+ year SSCI career explicitly contradict the government's unfounded characterization that he is cavalier about protecting classified information. *See generally* Wolfe Mem. Ex. 4 (Clapper, Bookout, Davidson, Johnson, Litt, Smith, Snider letters); *id.* (Litt letter: Mr. Wolfe "clearly understood and enforced the importance of protecting the sensitive classified information that the committee dealt with . . . he would not bend or break the rules"). The government cannot abandon its own reports to put words into Mr. Wolfe's mouth in an effort to portray him as somehow indifferent to the possibility of improper disclosure of Classified Information

C.   *The FBI Knew About Contacts with Other Reporters Already.*

The government tries to weave a tale of the FBI investigation being impaired by Mr. Wolfe's denials of contacts with other reporters in December 2017 because the FBI was purportedly in the dark about those contacts until he admitted them in January 2018. *See, e.g.,* Gov. Mem. at 16 n.11, 4. That is fiction. The FBI was not "unaware of the additional reporters with whom Wolfe had been in contact." *Id.* at 16 n.11. The FBI appears to have known full well with either actual or certainly constructive knowledge by the time of that December 2017 interview that Mr. Wolfe had been in contact with other reporters beyond Reporter # 2. The FBI's October 30 search of Mr. Wolfe's phone retrieved text messages with, e.g., Reporters # 3 and # 4, including unencrypted messages that referenced switching in the future to communicating by Signal.[4] The

---

[4] *See, e.g.,* G00396 (SMS and MMS messages recovered from the October 30, 2017 search of Mr. Wolfe's phone, at Report p. 3830 (Reporter # 4); pp. 3661, 3992-97, 4169, 4197-201 (Reporter # 3)). The FBI also received most of the same information, including the content of messages, from

FBI used other text messages from Mr. Wolfe's phone (either from the cellular carrier's records or the phone itself) in the December 2017 interview of Mr. Wolfe.  FBI 302, Dec. 15, 2017, at 7-8, Bates No. G00019-20.

At best, the government's artful statement that the October search "did not yet reveal his encrypted communications with other reporters" (Gov. Mem. at 4) as of the December interview is merely misleading.  The non-encrypted messages had discussed creating encrypted messages—so the FBI knew he had Signal and discussed using it with reporters.  To be clear, whether or not the FBI already knew Mr. Wolfe had been in contact with other reporters, he should not have lied about that prior to his ultimate admission in his January 2018 interview.[5]  But it is a different matter for the government to claim some kind of harm to the investigation, let alone a substantial impairment of a government function (*see infra* Part II.A) or pose a significant national security risk, based on the incorrect claim that the FBI was totally in the dark about information it actually had in its possession.

## II.    There is No Basis for Any Upward Departure, and Certainly Not an 11-Point Upward Departure from a Base of 4.

The government seeks a total of 11 levels in upward departures under U.S.S.G. § 5K2.7 and U.S.S.G. § 5K2.14, neither of which apply to Mr. Wolfe's offense.  By any measure, the

---

Mr. Wolfe's cellular carrier.  *See, e.g.,* G00383 (including text message content received from a wireless carrier); G00379-382 (documenting that the materials in G00383 were received by the government in November 2017).  We can proffer relevant excerpts to the Court under seal pursuant to the Protective Order if requested.

[5] We also note that Mr. Wolfe was never charged with a false statement based on the second questionnaire that he signed at the beginning of his FBI interview in January 2018 (Gov. Mem. at 17), he did not plead guilty to such a false statement, did not admit to any such false statement as part of the agreed upon Statement of the Offense, and we do not concede that his statement was false.  And in any event, in that same interview, Mr. Wolfe did disclose that he had had contacts with other reporters, namely Reporters # 1, 3, and 4.  FBI 302, Jan. 11, 2018, at 9-10, Bates No. G00172-73.

requested increase of 11 levels from a base offense level of 4 is a significant departure from the Guidelines as calculated in the PSR and would yield an unreasonable sentence.

"'[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range,' which the court then treats as 'the starting point and the initial benchmark' for the sentence to be imposed." *United States v. Crummy*, 249 F. Supp. 3d 475, 480 (D.D.C. 2017) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)). Departures are limited to circumstances in which the sentencing court finds a particular case to be "outside the 'heartland'" to which the Commission intends individual Guidelines to apply. *See Rita v. United States*, 551 U.S. 338, 344 (2007). It is "uncontroversial that a major departure should be supported by a more significant justification than a minor one," *Gall*, 552 U.S. at 50, and at least by a preponderance of the evidence demonstrating that justification.[6]

The government does not explain how Mr. Wolfe's case falls outside the heartland of other false statement cases sufficient to warrant the dramatic departure it seeks. It provides no compelling facts in support of its position, which rests almost entirely on argument rooted in hypothetical situations that did not occur, and utterly fails to meet the evidentiary burden it bears to establish the factual basis for a departure.[7] It also fails to cite a single false statement case in

---

[6] Ordinarily, sentencing courts have applied the preponderance of the evidence standard in resolving factual disputes. *See* U.S.S.G. § 6A1.1 (comment.); *United States v. Long*, 328 F.3d 655, 670 (D.C. Cir. 2003). The *Long* panel acknowledged that an even higher standard might be required in "extraordinary circumstances." 328 F.3d at 671; *see also United States v. Pineda-Doval,* 614 F.3d 1019, 1041-42 (9th Cir. 2010) (clear and convincing evidence is required where a sentencing factor has an extremely disproportionate effect on the ultimate sentence). Given the disproportionate impact of the departures and variance sought in this case from the core Guidelines calculation, we believe a higher standard of proof is required. *See generally United States v. Henry*, 472 F.3d 910, 920-21 (D.C. Cir. 2007) (Kavanaugh, J., concurring). But regardless of the standard, the government has failed to meet its burden.

[7] We strenuously object to any attempt by the government to introduce any new facts or evidence related to the two departures or variance it seeks, whether at the sentencing hearing or in its reply

connection with either of its departure requests, which not only demonstrates the inappropriate nature of the departures, but also fails to provide any basis for the Court to conclude that 11 levels are the appropriate degree of departure. The Probation Office rightly rejected both of the government's proffered departures, stating "it is unclear, in the government's filing, how the defendant's criminal conduct, which is providing false statements to the FBI, would have created significant disruption to governmental function or significantly endangered national security, public health, or safety." Addendum, PSR p.26.

> A. *There was no substantial interference with a government function, and the government has not even attempted to present evidence of such interference.*

The government first argues for a five-level upward departure under U.S.S.G. § 5K2.7, which provides that the sentencing court may increase the sentence above the authorized guideline range if "the defendant's conduct resulted in a *significant* disruption of a governmental function." U.S.S.G. § 5K2.7 (emphasis added). There is no basis for this departure, let alone a five-level departure.

The government actually appears to concede that Mr. Wolfe's conduct only "**had the potential** to significantly disrupt the governmental function he performed," Gov. Mem. at 19 (emphasis added), and did not actually do so. The D.C. Circuit has also been clear that Section 5K2.7 only applies when the conduct actually, directly, tangibly, and significantly disrupts a government function. *See, e.g.*, *United States v. Root*, 12 F.3d 1116, 1122 (D.C. Cir. 1994) (upholding two-level departure from offense level of 18 where attorney forged numerous documents submitted in FCC applications, disrupting government function by causing the FCC to review numerous false applications); *United States v. Burns*, 893 F.2d 1343, 1344-45, 1347 (D.C.

---

memorandum, as a violation of fundamental due process rights and the Court's sentencing procedures. *See* Gov. Mem. at 7 (foreshadowing the introduction of such new evidence at the hearing). We move to strike any such evidence.

Cir. 1990), *reversed on other grounds*, 501 U.S. 129 (1991) (affirming five-level departure from offense level 19 for three different departure grounds including Section 5K2.7, where a U.S. AID employee engaged in elaborate agency-wide scheme, using agency personnel to divert AID funds for his own financial benefit and entangling two government agencies).[8]  The government offers no evidence sufficient to meet even the minimum preponderance of the evidence standard required to demonstrate that Mr. Wolfe's conduct significantly disrupted a government function.[9]

Even if the government had such evidence, the correct question is whether Mr. Wolfe's offense of conviction—a false statement—significantly disrupted a government function, not whether the underlying conduct he may have lied about did so.  In analogous false statement and perjury cases, courts have limited the Section 5K2.7 analysis to the actual conviction, not the other alleged misconduct that may have been the subject of the lie.[10]  And it is far from clear that a basic false statement case such as this permits an upward departure under Section 5K2.7, which excludes departures "when the offense of conviction is an offense such as bribery or obstruction of justice . . . unless the circumstances are unusual," because "in such cases interference with a governmental

---

[8] *See United States v. Burns*, Crim. No. 88-0302, 1988 WL 113811, at *2 (D.D.C. Oct. 14, 1988) (underlying sentencing).

[9] *See supra* note 6.

[10] *See, e.g., United States v. Ellis*, 419 F.3d 1189, 1190-91 (11th Cir. 2005) (reversing an upward departure under Section 5K2.7 where the defendant, a former district attorney, pleaded guilty to making a false statement where the underlying conduct involved sexually harassing a defendant in a pending criminal case and trying to dissuade her from talking to the FBI; "any disgrace [the defendant] brought to his office or the criminal justice system" was caused by his alleged sexual misconduct and witness tampering—not by his false statement); *see also United States v. Barone*, 913 F.2d 46, 51 (2d Cir. 1990) (reversing upward departure under Section 5K2.7: "As for other 'conduct' [the defendant] may have engaged in . . . **we limit the conduct considered by a district court in departing from the guidelines to acts related to the offenses charged**.") (emphasis added).

function is inherent in th[ose] offense[s]."[11]  Section 5K2.7.  Multiple courts have held that, for example, a Section 5K2.7 upward departure cannot apply in the context of a perjury conviction. *See United States v. Goodrich*, 919 F.2d 1365, 1369 (9th Cir. 1990) (reversing an upward departure under Section 5K2.7 where disruption of the governmental function did not go beyond the disruption inherent in the offense of perjury); *Barone*, 913 F.2d at 51 (same).

And lying to the FBI is not something that automatically significantly disrupts government function, otherwise every such false statement case would come equipped with a Section 5K2.7 departure—and, of course, the government does not even attempt to present any evidence showing such a disruption.  The FBI's job is to conduct investigations, however large.[12]  The Sentencing Commission surely cannot have intended to permit the government to convert every investigation into an upward departure incubator—and doing it here would offend the proportionality concept underlying 18 U.S.C. § 3553(a)(6).  At best, it appears that the FBI decided to make some unusual tactical decisions, notifying only the Chair and Vice-Chair of the SSCI instead of the entire Intelligence Community (Gov. Mem. at 3 n.2), but the government nowhere explains how that caused any substantial disruption to the government.

Even if the issue is Mr. Wolfe's underlying conduct, the government makes no effort to

---

[11] We note that the U.S. Attorney's Office for the District of Columbia appears to have never asked for this upward departure in a false statement case before, including in situations that caused far more disruption to government functions such as *United States v. Jeffrey Kahn*, No. 18-CR-00056 (D.D.C. Aug. 28, 2018).  The defendant in *Kahn*, an investigator contracted to conduct background investigations for the Office of Personnel Management, had falsely claimed that he had performed thorough background checks for the government, which caused the Office of Personnel Management to have to re-examine dozens of personnel files.  Yet the government did not seek, nor did this Court impose, any such upward departure for Mr. Kahn.  *See* Judgment as to Jeffrey Kahn at 2-3, ECF No. 39; Gov. Mem. in Aid of Sentencing at 3-4, ECF No. 28.

[12] Courts have also rejected the idea that false statements disrupt FBI investigation where "the agents knew that [the defendant] was lying when they questioned him."  *Ellis*, 419 F.3d at 1191.

provide any evidence that, for example, SSCI's operations were disrupted, and the government's own memorandum belies the argument. The government acknowledges that the FBI in fact asked SSCI to keep Mr. Wolfe in place in his position and avoid anything that could tip him off to the investigation (Gov. Mem. at 3 n.2), meaning that throughout the investigation the government determined that it would not ask the SSCI to change how it operated.[13] The Senators who lead SSCI, who are in the best position to know about any disruption of its oversight function— especially a "significant disruption"—and whom the government invokes in its memorandum, have instead written to the Court in support of Mr. Wolfe and mention no such thing. Wolfe Mem. Ex. 1.

The government's final argument is that Mr. Wolfe's conduct "undermined public confidence in the trustworthiness of the individual charged with safeguarding intelligence." Gov. Mem. at 20. Yet none of the three cases cited by the government involved false statements or perjury. In each, and very different from Mr. Wolfe's situation, the court granted an upward departure based on a loss of public confidence *directly* and *obviously* caused by *the actual offense charged*.[14] The Eleventh Circuit, for one, has directly rejected the application of the "undermining

---

[13] The lack of disruption to SSCI also takes this case out of the context discussed by the D.C. Circuit in *United States v. Saani*, 650 F.3d 761, 764-66 (D.C. Cir. 2011) (affirming a four-level Section 5K2.7 departure from a base offense level of 20) and cited by the government. In *Saani*, as a result of an Air Force government contract specialist pleading guilty to filing false tax returns that did not disclose $4 million in unexplained income, the government was required to review and triage millions of dollars in government contracts. *Id.* at 766. This required "the assistance of two senior officials at the Kuwaiti contracting office, who had to be diverted from their ordinary duties." *Id.* Nothing remotely analogous occurred as a result of Mr. Wolfe's actions.

[14] *See United States v. Paulus*, 419 F.3d 693, 695-96 (7th Cir. 2005) (six-level departure from an offense level of 18 imposed where a district attorney accepted bribes in return for favorable treatment of defendants); *United States v. Gunby*, 112 F.3d 1493, 1494, 1496-99 (11th Cir. 1997) (four-level departure from an offense level of 16 where a judge charged with fraud embezzled inflated filing fees paid by civil litigants over several years, directly impacting an entire county); *United States v. Shenberg*, 89 F.3d 1461, 1465-66, 1474 (11th Cir. 1996) (five-level departure

public confidence" concept in false statement cases as "def[ying] common sense." *See Ellis*, 419

F.3d at 1191 (reversing a trial court's upward departure under Section 5K2.7 where "the integrity

of the . . . district attorney's office and the public perception of the criminal justice system were

adversely affected," because "the disgrace [the defendant] brought to his office or the criminal

justice system" was caused by his alleged sexual misconduct and witness tampering—not by his

false statement).  Nor does it make sense that any time an employee of any public agency, at any

level, commits a crime, he or she should automatically be subject to a departure for some claimed

loss of public confidence in that agency.

Finally, highlighting the wildly disproportionate nature of the government's request, the

government apparently could not find a single case that would support a departure of over 100%

of the base offense level (five-level departure on a base offense level of four), further proving that

even if the upward departure applies, the government's request is extreme.  *See supra* Part II.

B.      *Wolfe's Conduct Did Not Significantly Endanger National Security.*

The government's second basis for an upward departure invokes U.S.S.G. § 5K2.14:  "If

national security, public health, or safety was *significantly* endangered, the court may depart

upward to reflect the nature and circumstances of the offense." (emphasis added).  Section 5K2.14,

usually referred to as the public endangerment departure, applies to "extreme cases where multiple

persons, the 'public,' are placed in extreme danger as a result of a defendant's conduct."  *United*

*States v. Singer*, 825 F.3d 1151, 1158 (10th Cir. 2016).  Unsurprising therefore, the majority of

Section 5K2.14 departure cases involve the threat of terrorism, mass violence, or other physical

---

from an offense level of 20 where the judge participated in a massive bribery scheme with other
judges and lawyers, among other misconduct).  Notably, the Section 5K2.7 departure was not even
specifically challenged or analyzed in *Paulus*.  419 F.3d at 698.  In *Shenberg*, it is further unclear
which Guideline the court applied, as the court cited U.S.S.G. § 5K2.0 generally but did not cite
Section 5K2.7.  *Shenberg*, 89 F.3d at 1474.

harm that significantly endanger public health or safety—not false statements to FBI agents.[15]

Yet, without any evidence of the public being placed in "extreme danger" by Mr. Wolfe's false

statements, the government seeks a six-level departure, from a base of offense level 4.

Left without any proof that Mr. Wolfe disclosed Classified Information, the government

would have to show, by at least a preponderance of the evidence, some kind of actual and

significant endangerment to national security as a result of Mr. Wolfe's contacts with reporters

regarding **non**-Classified Information at SSCI.  Here again, the government has submitted no such

evidence, and the Senators who lead SSCI asserted no danger to national security created by Mr.

Wolfe, emphasizing that the only punishment that would have befallen Mr. Wolfe for those

contacts "has already, effectively, been imposed"—that is, losing his job.  Wolfe Mem. Ex. 1.[16]

All the government can do, then, is conjure up numerous dire *potential* scenarios that may

have resulted from Mr. Wolfe's conduct, none of which actually occurred.  Courts are clear,

however, that a mere potential or hypothetical danger to national security is insufficient to support

an upward departure under Section 5K2.14.  *See, e.g., United States v. Elmardoudi*, 611 F. Supp.

---

[15] *See e.g., United States v. Leahy*, 169 F.3d 433, 444 (7th Cir. 1999) (upward departure for possession of ricin and a spray bottle containing a mixture of nicotine sulfate and dimethyl sulfoxide); *United States v. Bell*, 303 F.3d 1187, 1193 (9th Cir. 2002) (upward departure for possession of deadly chemicals and nerve agents);  *United States v. Carey*, No. 17-7070, 2018 WL 3814725, at *2 (10th Cir. Aug. 10, 2018) (upward departure for possession of explosives more dangerous than dynamite and improperly stored);  *United States v. Ada*, 700 Fed. App'x. 689, 691 (9th Cir. 2017) (upward departure for disruption of a governmental function and endangering public welfare where defendant caused government hospital to close for several months, forcing patients to undergo more serious treatment after clinic's closure).

[16] The government also tries to meet an incorrect, lower standard it has re-defined for the departure standard, repeatedly asserting that Mr. Wolfe's conduct "significantly impacted the national security."  Gov. Mem. at 21; *see also id.* at 22 ("the impact of the defendant's conduct on national security is concrete").  "Impacting" national security (which we dispute in any event) is a far cry from "significantly endangering" national security, which the government never even attempts to argue.

2d 879, 904 (N.D. Iowa 2008) (rejecting departure where government failed to prove any real danger to national security where defendant was selling government identification cards and social security numbers to foreign nationals living in the United States, because "apprehensions" about what could have happened "are very different from concrete evidence of possession of ricin or of a breach of military security") (citations omitted).

The government seems to be hanging its hat on the idea that Mr. Wolfe's affair exposed him to potential manipulation. But no actual significant endangerment to national security resulted from Mr. Wolfe's affair, however ill-advised it was, nor does the government assert, much less demonstrate with evidence, that anyone attempted to take advantage of Mr. Wolfe's indiscretion and thereby somehow endangered the public. Indeed, the government itself admits that the FBI asked SSCI to leave Mr. Wolfe in place, presumably for months, while the investigation proceeded. Gov. Mem. at 3 n.2. The FBI apparently did not see the significant endangerment to national security that the government now invokes.

*United States v. Roth*, on which the government pins its entire Section 5K2.14 argument, does not rescue the government's position. *See* Gov. Mem. at 22-23. *Roth* was a pre-*Booker* case from nearly 30 years ago, in which the defendant **actually endangered** national security by stealing $10 million in military equipment, including communication and aviation equipment, from his Air Force squadron. *See Roth*, 934 F.2d 248, 250 (10th Cir. 1991) (remanding for resentencing); *United States v. Roth*, No. 91-4195, 972 F.2d 357, 1992 WL 186283 at *2 (10th Cir. Aug. 4, 1992) (table) (after resentencing, noting the trial court's statement that "defendant's act of selling the equipment and removing it from the Air Force base was just as damaging to national security as sabotage of the stolen equipment would have been").[17]

---

[17] The government further mischaracterizes *Roth* as instead applying to the "potential

Finally, the government seems to suggest that simply lying to the FBI during a national security investigation transforms the lie into a national security breach itself.  Gov. Mem. at 22. The government cites no false statement cases (and indeed no cases at all) for that proposition, which would automatically convert every false statement to the FBI in a national security investigation into a departure case based on a theoretical impact on a national security investigation.

**III.    The § 3553(a) Factors Weigh <u>Against</u> the Government's Recommended Upward Variance, in Favor of a Probationary sentence with a community service requirement.**

As the final piece of its campaign to increase Mr. Wolfe's sentencing exposure, the Government seeks an upward variance from the applicable Guidelines range to request a 24 month period of incarceration.  The government, tellingly, did not even attempt to provide the Court with any examples of analogous sentences being imposed in false statement cases.

The extreme disproportionality between the Guidelines range and the requested sentence— representing an increase of approximately 300% from the top end of the range—would require the Court to find a significant and compelling justification to warrant the degree of the variance proposed.  *See United States v. Smith*, 440 F.3d 704, 707 (5th Cir. 2006) ("The farther a sentence varies from the applicable Guideline sentence, the more compelling the justification based on factors in section 3553(a) must be.") (internal quotation marks and citations omitted); *see also Gall*, 552 U.S. at 50.  But the government does not offer any significant or compelling justification for its unprecedented request, and just resorts to the same innuendos of potential national security

---

endangerment of national security" (Gov. Mem. at 22), despite neither *Roth* case ever even using the word "potential."  *Roth* also involved a 10-level upward departure from what appears to be an original offense level of 20, representing a 50% upward departure.  Here, the government asks the Court to add six levels to an offense level 4, an increase of 150%.  Even if *Roth* supported the government's request, using it for guidance on a proportional departure would, at most, yield two additional levels (50% of offense level 4).

breaches and repetition of the term "Classified Information" unmoored to any actual facts about Mr. Wolfe's conduct. The Section 3553(a) factors, in fact, weigh in favor of a probationary sentence with a community service requirement.

A.      *Guidelines Range and Policy Statement.*

The Court must consider the *correctly calculated* Guidelines range as the necessary starting point for its Section 3553(a) analysis. *See Gall*, 552 U.S. at 49. That correct range—stated in the Plea Agreement, agreed to by the government, and calculated by the Probation Office in the PSR—is an offense level of 4, resulting in a Guidelines range of 0 to 6 months (Zone A).

As a nonviolent first offender within Zone A, Mr. Wolfe falls within the ambit of the most recent Guidelines amendments and recent commentary from the Commission, which encourage sentencing courts to consider imposing sentences other than imprisonment for defendants such as Mr. Wolfe. *See* U.S.S.G. § 5C1.1 (comment n. 4) (effective Nov. 1, 2018); U.S. Sentencing Commission, Amendments to the Sentencing Guidelines, at 73 (Apr. 30, 2018). Thus, a probationary sentence with a community service requirement is within the applicable Guidelines range and complies with the recent commentary on the appropriate types of sentences for nonviolent first-time offenders.

Because neither of the upward departures sought by the government are appropriate, *see supra* Part II, there is no basis to begin the Court's Section 3553(a) analysis with a guidelines range of 18-24 months, in Zone D, as requested by the government.

B.      *Personal History and Characteristics.*

The government cannot refute that Mr. Wolfe's decades of military and government service demonstrate Mr. Wolfe's commitment to serving his country and community and that he carried out his life and work with integrity for a great number of years. The letters from Mr. Wolfe's family, friends, and colleagues vividly illustrate Mr. Wolfe's strong character—he is a decorated

military veteran, a loving and devoted father, and dedicated public servant.  To be sure, he made mistakes.  But the government tries to suggest that those 30 years of committed service vaporized and should not be taken into account by the Court in any way.  Gov. Mem. at 26.  Here again, the Senators he actually worked for strongly disagree, recognizing Mr. Wolfe's years of service and stating that there is "[no] public utility in depriving [Mr. Wolfe] of his freedom."  Wolfe Mem. Ex. 1.

Equally unavailing are the government's attempts to somehow hold Mr. Wolfe's years of service against him, arguing that because of his position in the government, he was uniquely capable of understanding the implications of his lie to FBI agents. Gov. Mem. at 26. The government is simply trying to get the benefit of the abuse of trust enhancement under U.S.S.G. § 3B1.3, despite conceding that it does not apply here. Gov. Mem. at 18 n.12, 28.  But even that enhancement would only have added 2 levels to Mr. Wolfe's offense level (which would still result in a Zone A sentence, 0-6 months).  The government effectively is asking the Court for a second bite at the apple, to grant a variance of up to four times the high end of the applicable guidelines range to make up for the inapplicability of that enhancement for this false statement scenario.  Mr. Wolfe understands that his actions were wrong and he has accepted responsibility for them, but the fact that he held a Senate staff position does not warrant an even greater enhancement than would be applicable under U.S.S.G. § 3B1.3.

Mr. Wolfe's years of service to his country weigh in favor of a more *lenient* sentence within the correct Guidelines range of 0-6 months, not a sentence at the top of an 18-24 month range.

*C.*    *Seriousness of the offense.*

The government again conflates the offense that Mr. Wolfe pleaded guilty to—a false statement to the FBI—with the crimes it has admitted he is *not* guilty of, disclosing Classified Information.  Its focus on the "grave risk of compromising the integrity of the SSCI's work and

his own duties," Gov. Mem. at 25, is misplaced because the "grave risk" never came to fruition. The Chairs of SSCI make no such claim. The government provides no evidence of such a compromise. And apparently the FBI at the time failed to see such a gravely serious offense, when it asked SSCI to keep Mr. Wolfe in his job, despite knowing at that point that he was having and hiding an affair with Reporter # 2. *See id.* at 3 n.2. Indeed, as the government admits regarding the seriousness of Mr. Wolfe's offense, Mr. Wolfe did not lie to the FBI "to further or conceal another crime," but to avoid revealing personal relationships with reporters. *Id.* at 25.

Mr. Wolfe in no way seeks to minimize the seriousness of what he did when he lied to the FBI. But he should be judged on those lies, not on allegations and insinuations without evidence seeking to justify the government's desire to end run the Statement of the Offense and its own agreement that there is no abuse of trust enhancement appropriate here.

D.     *Purposes of Sentencing.*

As noted in our sentencing memorandum, a sentence must be minimally sufficient—no more, no less—to achieve the objectives of sentencing. Wolfe Mem. at 1. A sentence of probation and community service serves the goals of sentencing by providing just punishment, adequate deterrence, and recognizing the unlikelihood that Mr. Wolfe will reoffend.[18]

Specific and general deterrence purposes will be served by the fact that Mr. Wolfe has already lost much due to the prosecution and associated publicity. A clear message has also been conveyed that will deter others from committing similar offenses. The government does not specify how a custodial sentence provides more general deterrence than has already been achieved, nor does the government explain why general deterrence justifies a variance to the extreme it seeks, which would substantially discount all the other Section 3553(a) factors that weigh so heavily in

---

[18] It does not appear that the government is contesting that there is no need for specific deterrence in this case.

favor of a probationary sentence. *See United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (Kavanaugh, J.) (government argument founded on deterrence alone is flawed because it elevates one Section 3553(a) factor—deterrence—above all others).

E.      *Avoiding Unwarranted Sentencing Disparities.*

Perhaps nothing illustrates better the excessiveness and disproportional result sought by the government than an examination of the sentences in comparable false statements cases. The facts in this case simply do not support Mr. Wolfe's sentence being such an outlier among false statements cases.

There are three recent false statements cases in this District that are relevant to Mr. Wolfe's case—*Kahn*, *van der Zwaan*, and *Papadopoulos*—all of which we addressed in our Sentencing Memorandum. Wolfe Mem. at 19-21. In none of those cases did the government seek an upward departure or variance from the original Guidelines range, and in none of them did the government request, let alone receive, a sentence anywhere near what it seeks here. Indeed, as we explained to the Court, there are distinguishing factors in each of those cases which weigh in favor of Mr. Wolfe being sentenced to a *lower* sentence than those individuals' minimal periods of incarceration.

The government addresses two of those cases, but conspicuously ignores *United States v. Kahn* in its opening filing. That is because *Kahn* exposes the fallacy of its key argument, that where a government employee at all involved in national security or with Classified Information[19] lies to the government, a lengthy jail sentence is required. Unlike van der Zwaan and Papadopoulos, Kahn **did** work for the government, and he most definitely had a connection to

---

[19] As repeatedly demonstrated here—a repetition necessary because of the government's consistent misdirection on this point—whether Mr. Wolfe had "access" to Classified Information should have no bearing on his sentence given the government's admission that it has no evidence, whatsoever, that he disclosed such information.

national security issues, conducting (or lying about conducting) background investigations that were used for security clearance decisions.  Yet this Court sentenced Kahn to one month in prison and five months of home confinement, not 24 months.  Judgment as to Jeffrey Kahn at 2-3, *United States v. Jeffrey Kahn*, No. 18-CR-00056 (D.D.C. Aug. 28, 2018), ECF No. 39; *see also* Gov't's Mem. in Aid of Sentencing at 3-4, July 23, 2018, ECF No. 28.

For the two cases the government actually addresses, *van der Zwaan* and *Papadopoulos*, the government concedes they are comparable, and admits that "[c]ases involving false statements to law enforcement on national security matters, without underlying criminal conduct involving a proven disclosure of classified material, are uncommon."  Gov. Mem. at 33.  Yet the government urges the Court to sentence Mr. Wolfe to prison for **24 times** longer than van der Zwaan, and **52 times** longer than Papadopoulos.  It is hard to find a more clear example of an unwarranted sentencing disparity.

Nor do cases involving high ranking government officials accused of **actually** disclosing Classified Information or endangering national security support the government's position.  As we explained in our opening memorandum, General Petraeus shared Classified Information about highly sensitive military strategies with his mistress, lied about it, and received probation (which was the sentence the government recommended).  Wolfe Mem. at 21 n.13.  Former National Security Advisor Sandy Berger stole Classified Information from the National Archives, destroyed that information, and then lied to the government about his conduct, and still received probation (again, the sentence the government recommended).  *See* Gov't's Sentencing Mem. at 9, *United States v. Berger*, No. 05-MJ-00175 (D.D.C. Sept 6. 2005), ECF No. 13; *see also* Factual Basis for Plea, ECF No. 6 (D.D.C. Apr. 1, 2005).  And as to General Michael Flynn, who admitted to numerous lies to FBI agents regarding his contacts with a Russian Ambassador while serving as a

surrogate of the presidential campaign and a member of the transition team—lies he told the FBI while serving as the National Security Advisor—the government is seeking a sentence at the low end of the guideline range, including no incarceration.  The government is not demanding *any* upward departures or variances on the basis of his high offices, or any other reason.  *See* Statement of the Offense at 2-5, *United States v. Flynn*, No. 17-CR-00232 (D.D.C. Dec. 1, 2017), ECF No. 4; Gov't's Sentencing Mem. at 1, 5, *United States v. Flynn*, Dec. 4, 2018, ECF No. 46.

Similarly, but well outside of the spotlight of the Special Counsel's investigation, a prosecutor handling this case recommended a probationary sentence for an FBI agent charged with improperly obtaining case information about an active criminal prosecution and then sharing that information with a close friend, who then shared it with counsel for the individual being prosecuted.  *See* Gov't's Mem. in Aid of Sentencing, *United States v. Rossini*, No. 1:08-MJ-00692-JMF (D.D.C. May 12, 2009), ECF No. 10.  When confronted with his conduct, the FBI agent-defendant lied to the investigators.  Certainly, no one would be better positioned to understand the implications of lying to a federal agent than an FBI agent himself, but the government made no argument for any departure or upward variance and even permitted the agent to plead guilty to a misdemeanor offense rather than charging him with a false statement.  *See id.*

High ranking defendants (far higher than Mr. Wolfe) who actually compromise Classified Information or secretly pander to our country's foremost foreign adversary and then lie about it to the government are permitted to resolve their cases with no incarceration (and, for General Petraeus and Berger, misdemeanor offenses).  Yet the government wants Mr. Wolfe to spend two years in prison.  We see no just principle in the government's position here, and no basis for the Court to conclude that such a sentence of Mr. Wolfe serves any notion of justice or fair and consistent sentencing.  The comparable cases involving false statements demonstrate that the

Government's request for an upward variance is unprecedented and unsupported in Mr. Wolfe's case, and instead weigh in favor of a probationary sentence with a community service requirement.

## CONCLUSION

For the foregoing reasons, we again respectfully ask the Court to impose a non-incarcerative sentence and, instead, impose a sentence of probation with a community service. The government's extreme sentencing position is unprincipled in fact and law. Its position is purely vindictive and furthers no legitimate reasonable sentencing objectives.

Respectfully submitted,


__/s/_____

Preston Burton (D.C. Bar No. 426378)
Benjamin B. Klubes (D.C. Bar No. 428852
Lauren R. Randell (D.C. Bar No. 503129)
Buckley Sandler LLP
1250 24th Street, N.W.
Washington, D.C. 20037
Telephone: (202) 349-8000
Email: pburton@buckleysandler.com

Counsel for James A. Wolfe

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of December 2018, I caused a true and correct copy of

the foregoing **Defendant's Reply to Government Sentencing Memorandum and Opposition**

**to Motion for Upward Departure or Variance**, to be filed with the Clerk of Court using the

CM/ECF filing system.


\_\_\_\_\_/s/_____

Lauren R. Randell, (D.C. Bar No. 503129)
Buckley Sandler LLP
1250 24th Street N.W., Suite 700
Washington, D.C. 20037
Telephone: (202) 349-8000
Email: lrandell@buckleysandler.com