```
 1                 BEFORE THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,        .
                                      .  Case Number 18-CR-170
 4            Plaintiff,              .
                                      .
 5        vs.                         .
                                      .  Washington, D.C.
 6   JAMES A. WOLFE,                  .  December 20, 2018
                                      .  2:36 p.m.
 7            Defendant.              .
     - - - - - - - - - - - - - - - -

 8

 9                     TRANSCRIPT OF SENTENCING
              BEFORE THE HONORABLE KETANJI B. JACKSON
10                   UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

     For the Government:         JOCELYN BALLANTINE, AUSA
13                               TEJPAL CHAWLA, AUSA
                                 United States Attorney's Office
14                               555 Fourth Street Northwest
                                 Washington, D.C. 20530
15
     For the Defendant:          PRESTON BURTON, ESQ.
16                               BENJAMIN KLUBES, ESQ.
                                 LAUREN RANDELL, ESQ.
17                               Buckley Sandler LLP
                                 1250 24th Street Northwest
18                               Suite 700
                                 Washington, D.C. 20037
19

20

21   Official Court Reporter:    SARA A. WICK, RPR, CRR
                                 U.S. Courthouse, Room 4704-B
22                               333 Constitution Avenue Northwest
                                 Washington, D.C. 20001
23                               202-354-3284

24

25   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.
```

```
 1                    P R O C E E D I N G S

 2           THE COURTROOM DEPUTY:  Your Honor, this is Criminal

 3    Case 18-170, United States of America versus James A. Wolfe.  We

 4    have probation officer Kelly Willett present.

 5        I'm going to ask counsel, please approach the podium, state

 6    your appearance for the record, and introduce any parties at

 7    your table.

 8           MS. BALLANTINE:  Good morning, your Honor.  Jocelyn

 9    Ballantine for the United States.  Together with me is AUSA

10    Tejpal Chawla.

11           THE COURT:  Good afternoon, Ms. Ballantine and

12    Mr. Chawla.

13           MR. BURTON:  Good afternoon, your Honor.  Preston

14    Burton on behalf of Mr. Wolfe.  I am accompanied by my

15    colleagues, Benjamin Klubes and Lauren Randell.

16           THE COURT:  Good afternoon to all of you, and to you,

17    Mr. Wolfe.  You may have a seat.

18        We are here for the sentencing of the defendant, Mr. James

19    Wolfe, who has pled guilty to one count of making a false

20    statement to a government agency, in violation of Section

21    1001(a)(2) of Title 18 of the United States Code.

22        The Court has received and reviewed the presentence report

23    and the sentencing recommendation from the probation department

24    and also the following documents that counsel have submitted in

25    advance of the hearing:  The sentencing memoranda and reply
```

1      memoranda from the government and from the defendant, including

2      exhibits.

3          The Court has also received a letter submission from an

4      individual who self-identifies as the person the parties refer

5      to in the statement of offense as male number 1.  I previously

6      shared this individual's filing, which purports to be an amicus

7      brief, with the parties.  I have construed it as a sentencing

8      submission rather than an amicus brief.  And I will be filing it

9      on the public docket after this hearing.

10         But I have also concluded that I will not be giving it any

11     weight with respect to my considerations regarding the

12     appropriate sentence to be imposed in this case.  This is

13     because the document does not speak to the guideline calculation

14     or shed any light on any of the 3553(a) factors that the Court

15     has to consider, nor has the government maintained that it

16     qualifies as any sort of victim statement, which the law would

17     otherwise have required me to take into account.

18         So just in the interest of transparency, I'm letting you

19     know that the Court has received this document.  It will be

20     filing this document.  But the document will have no bearing on

21     the Court's sentencing determination in this case.

22         Now, speaking of sentencing determinations, Mr. Wolfe, this

23     sentencing hearing -- you may be seated.  We're going to have a

24     conversation.  All right?

25             THE DEFENDANT:  Yes, ma'am.

1       THE COURT:  This sentencing hearing will essentially

2   proceed in four steps.  The first step of today's hearing is for

3   me to determine whether you have reviewed the presentence

4   report, whether there are any outstanding objections to the

5   statements in the PSR, and if so, I will resolve those

6   objections.

7       The second step is for the Court to determine what the

8   sentencing range is that applies in your case.  And I do this

9   based upon information about your criminal history and

10  considering any mitigating or aggravating factors that might

11  warrant a departure under the guidelines manual.

12      The third step is for me to hear from the government, from

13  your counsel, from you, and from any witnesses that you may have

14  if you wish to be heard at sentencing in this case.

15      And the last step requires the Court to fashion a just and

16  fair sentence in light of the factors set forward in the

17  statute, 18 U.S.C. 3553(a).  As a part of this last step, the

18  Court will actually impose the sentence, along with any other

19  required consequences of the offense.

20      Now, I often and always, really, speak directly to

21  defendants, because as I go through the sentencing process, I

22  realize that it is sometimes hard for nonlawyers to follow some

23  of the more mechanical procedures that we need to go through as

24  a part of this process.

25      But as you listen, it is important for you to keep in mind

1  why we're here at this moment and to focus on the gravity of

2  this situation.  You have committed and have pled guilty to

3  conduct that constitutes a federal crime.  So today's proceeding

4  is a serious matter, because it is fundamentally about the

5  consequences that you will have to face as a result of your

6  decision to engage in criminal behavior in violation of federal

7  law.

8           Understood?

9           THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  All right.  Starting with the discussion

11 of the final presentence report, the final presentence report

12 and sentencing recommendation in this matter was filed on

13 December 13th, 2018.

14     Let me start by asking whether the government has any

15 objection to any of the factual determinations in the

16 presentence report.

17          MS. BALLANTINE:  The government has no objection to

18 the factual statements in the report.

19          THE COURT:  Correct.  We will talk about the

20 calculation in a minute, but I am focusing on the factual

21 representations about the defendant's history and the

22 circumstances of the offense.

23          MS. BALLANTINE:  We have no objection to the factual

24 recitation.

25          THE COURT:  Let me talk to defense, but first, let me

1    just ask you, Mr. Wolfe, are you fully satisfied with your

2    attorneys in this case?

3              THE DEFENDANT:  Yes, your Honor, very.

4              THE COURT:  And do you feel that you have had enough

5    time to talk with them about the probation department's

6    presentence report and the papers filed by the government in

7    connection with the sentencing?

8              THE DEFENDANT:  I have, your Honor.

9              THE COURT:  All right.  Mr. Burton, have you and your

10   client read and discussed the presentence report?

11             MR. BURTON:  Yes, we have, your Honor.

12             THE COURT:  And are there any disputed issues of fact

13   related to that report?  We will talk about the calculation in a

14   moment, but the facts.

15             MR. BURTON:  I understand.  No, your Honor.

16             THE COURT:  All right.  Hearing no objection to the

17   presentence report's factual recitation, the Court will accept

18   those facts regarding the circumstances of the offense and the

19   history and characteristics of the offender, and therefore, the

20   facts stated in the presentence report will be the Court's

21   findings of fact for the purpose of this sentencing.

22        In addition to various facts, the presentence report also

23   lays out the probation office's calculation of the advisory

24   guideline range that applies to this case.  The calculation was

25   done using the 2018 guidelines manual, and is as follows:

1   Beginning with the guideline offense level, the applicable

2   guideline, according to the PSR, is 2B1.1, which has a base

3   offense level of 6 under these circumstances.  According to the

4   presentence report, no specific offense characteristics apply.

5       The government has also represented that Mr. Wolfe has

6   demonstrated acceptance of responsibility in a manner that

7   entitles him to a two-level reduction under 3E1.1A.

8       Therefore, prior to the consideration of any departures or

9   variances, Mr. Wolfe's total offense level is 4.

10      Is there any objection to the calculation of the guideline

11  offense level?

12          MS. BALLANTINE:  None from the government, your Honor.

13          MR. BURTON:  Not from the defense, your Honor.

14          THE COURT:  All right.  Turning to the applicable

15  criminal history category, the presentence investigation has

16  found that Mr. Wolfe has no prior convictions that receive any

17  criminal history points in the guidelines manual.  Therefore, he

18  has a criminal history point subtotal of 0.  This puts Mr. Wolfe

19  in criminal history category I.

20      Are there any objections to this criminal history

21  calculation?

22          MS. BALLANTINE:  None from the government.

23          MR. BURTON:  No, your Honor.

24          THE COURT:  Okay.  So given a criminal history

25  category of I and an adjusted offense level of 4, the applicable

1    sentencing range in this case under the guidelines is zero to

2    six months of imprisonment.

3        Are there any objections to this guideline range

4    calculation?

5            MS. BALLANTINE:  We do not object to the guideline

6    range calculation.

7            THE COURT:  I understand.  We're going to have

8    argument in a minute about adjustments.  But just as the

9    starting point here, we're at level 4, criminal history

10   category I, zero to six months; correct?

11           MS. BALLANTINE:  Yes, your Honor, we agree that's

12   correct.

13           THE COURT:  Mr. Burton?

14           MR. BURTON:  We agree that's correct.

15           THE COURT:  All right.  So having determined this

16   guideline range, the next step is for the Court to consider

17   departures.  The presentence report does not include any

18   departure grounds, but the Court notes that in its sentencing

19   memoranda, the government has asked for an upward departure,

20   meaning the imposition of a sentence of incarceration above the

21   guideline range for reasons set forward in the guidelines

22   manual, and the government points to two policy statements in

23   the guidelines manual.  These provisions are Section 5K2.7,

24   which authorizes an upward departure based on a significant

25   disruption of an important governmental function, and Section

5K2.14, which authorizes an upward departure based on

endangering the national security.

So Ms. Ballantine, you can approach if you would like to

make oral argument related to these.  And I actually do have a

procedural question.  So why don't you come forward.

MS. BALLANTINE:  Yes, your Honor.

THE COURT:  Did you intend to make oral argument

related to these, or are you wanting to rest on your briefs?

MS. BALLANTINE:  I would like to be heard briefly,

your Honor.

THE COURT:  All right.  First, let me ask you this

question, because I was a bit surprised by this upward departure

request, given the terms of your plea agreement.  So I want to

understand why the government believes, based on the plea

agreement, that it is entitled to ask for an upward departure at

this time.

MS. BALLANTINE:  Yes, your Honor.  The plea agreement

makes no concessions as to sentencing, and that was explicitly

made clear in my comments at the time of the plea on

October 15th.

THE COURT:  All right.  And tell me what you mean by

that.  Because what I do see in the plea agreement at page 4,

paragraph D, is a whole paragraph about allocution, which is

ordinarily what it is you're entitled to talk to the Court

about.  And the government and the defendant reserve rights

related to the allocution in various respects and in the last

sentence of this paragraph suggest that it is the Court who

would be raising issues of adjustments, departures, et cetera,

and that the parties just reserve the right to answer any

questions that I have about such departures, which suggested to

me that the parties had not contemplated that arguments would be

affirmatively made pertaining to departures.

MS. BALLANTINE:  Your Honor, we did contemplate that

we would make arguments pertaining to departures, and we were

very explicit in our negotiations with defense counsel that we

were making no concessions about sentencing.

We did so because the government feels strongly that 2B1.1

does not cover the offense conduct in this case and that the

offense conduct brings this case outside the heartland of

prosecutions considered under that guideline.

THE COURT:  All right.  So if you would like to segue

into your statement, and of course, I will let defense counsel

respond both on the procedural propriety of this and the

substance.

MS. BALLANTINE:  Yes.  2B1.1 is contained within

Part B of the sentencing guidelines, and it is titled "basic

economic offenses."  The entire guideline really deals with

larceny, embezzlement, and other forms of theft and provides for

increases in level based on economic valuations.

It is, in the government's view, impossible to monetize the

1    damage that Mr. Wolfe's conduct caused in this case.  Looking at

2    all of the relevant offense conduct, as the Court is required to

3    do under 1B1.3(a)(2), there is a course of conduct, course of

4    duplicitous conduct that Mr. Wolfe engaged in over a four-year

5    period that culminated in his lies in December of 2017 and again

6    in January of 2018 to try to hide that course of duplicitous

7    conduct.

8         I think the best example of why we feel strongly that this

9    case falls outside of the heartland of 2B1.1 is a case that the

10   Court recently handled, *United States versus Jeffrey Kahn*.

11   Mr. Kahn pled guilty to a 1001 violation based on a course of

12   conduct that occurred over four months and involved 19 falsified

13   reports concerning criminal background checks for federal

14   employees.

15        THE COURT:  But I didn't upwardly depart in Kahn's

16   case, did I?

17        MS. BALLANTINE:  You did not upwardly depart, your

18   Honor, but you didn't -- there were other -- that case fell

19   within the heartland of this case because the government was

20   able to demonstrate to the Court's satisfaction that there was

21   more than $40,000 worth of damage that was done in that

22   four-month period.  The Court, therefore, found that the base

23   offense level in that case was increased by six, looking at

24   2B1.1(b)(1)(D), and applied a base offense level of 12 in that

25   case.

1       THE COURT:  Right, because the government argued that

2  there was loss.  I don't understand how *Kahn* is similar to this

3  case at all.

4       MS. BALLANTINE:  It's precisely -- I think *Kahn*

5  demonstrates an example -- *Kahn* is an example of a case that

6  falls within the heartland of the types of prosecutions that are

7  contemplated in 2B1.1.  This is --

8       THE COURT:  So your beef is with the Sentencing

9  Commission in referencing fraud cases without loss to 2B1.1?

10      MS. BALLANTINE:  I have no beef with the Sentencing

11 Commission, your Honor.  I merely assert that it's the

12 government's position that Mr. Wolfe's conduct falls outside the

13 types of conduct that are -- that this guideline addresses.

14 This guideline makes no provision for harm to national security

15 that we believe Mr. Wolfe's conduct caused.

16      THE COURT:  All right.  So harm to national

17 security -- so your point is that this is outside the heartland

18 because of the harm to national security?

19      MS. BALLANTINE:  Yes.

20      THE COURT:  What about his falsehoods, which is really

21 the charge and the offense of conviction, caused a harm to

22 national security?

23      MS. BALLANTINE:  Your Honor, the FBI -- in the

24 government's view, it's more than the falsehood.  The Court has

25 to consider all of the relevant conduct here, not just the lie.

1    The relevant conduct here begins in 2013 when Mr. Wolfe enters

2    into a relationship with reporter number 2 and has unauthorized

3    conduct with that reporter.

4            THE COURT:  Are you using "relevant conduct" as the

5    term of art that it is under the guidelines such that I should

6    be flipping to the relevant conduct guideline to determine if

7    the kinds of things you're talking about count, or are you using

8    it in sort of a generic sense?

9            MS. BALLANTINE:  I believe it very much counts.  And

10   so turning to 1B1, your Honor, if the Court looks at 1B1.3 and

11   then moves down to (a)(2), (a)(2) says, "Solely with respect to

12   offenses of character for which 3D1.2(d) would require grouping

13   of multiple counts."  If you cross-reference 3D1.2(d), that

14   includes offenses under 2B1.1.  It directs that the Court shall

15   consider all acts and omissions described in subdivisions

16   (1)(A) -- 1(B) does not apply -- (1)(A) above.

17           THE COURT:  Right.

18           MS. BALLANTINE:  Turning to (1)(A), that says, "All

19   acts and omissions committed, aided, abetted, counseled,

20   commanded, induced, procured, or willfully caused by the

21   defendant."  And then turning back to sub (2) --

22           THE COURT:  No, no.  Wait.  Sorry.  "Willfully caused

23   by the defendant and," going down to the rest of (a)(1), "that

24   occurred during the commission of the offense of conviction, in

25   preparation for that offense, or in the course of attempting to

avoid detection or responsibility for that offense."

MS. BALLANTINE:  Your Honor, when I read that together with the rest of (2), I understand (2) to direct the Court to consider all of the acts that are a part of the same course of conduct or comment, scheme, or plan as the offense of conviction.

THE COURT:  But (2) -- to the extent that you -- you have to start with (a)(1), and then you go to (a)(2).  (a)(1) requires that within the ambit of relevant conduct, as the guidelines define it, we're talking about acts committed, aided, abetted, counseled, commanded, or willfully caused by the defendant, and it's limited, acts that occurred during.  This is very important because this is the limitation piece of relevant conduct.  It doesn't mean everything in the world.  It means it has to be -- the defendant has to do the acting.  That's the (1)(A) part.  And it has to occur during the commission of the offense, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for the offense.

So what about his relationships, et cetera, way back three years ago qualifies as relevant conduct with respect to the offense of conviction, which is the false statement?

MS. BALLANTINE:  Your Honor, Mr. Wolfe lied at his own admission to avoid detection for his improper contact with reporters and to avoid detection for disclosing SSCI-sensitive nonpublic government information to those reporters.  In the

1    government's view, it is a continuing course of conduct that

2    culminates in the lies.

3        And I would point out to the Court, this is -- in my view,

4    this is very similar to cases where a defendant lies to

5    investigators about -- for instance, to postal investigators or

6    to IRS investigators about frauds that the defendant has already

7    committed in order to cover up that fraud.

8            THE COURT:  Yes, but it depends on how it's charged as

9    to whether or not it counts as relevant conduct or how the

10   guideline is taken into account.  So to the extent that the

11   defendant has previously committed a crime and it's charged

12   separately, maybe you have a count about that and you have a

13   count about the lies, then you may not need relevant conduct.

14       It's unclear to me that Mr. Wolfe's -- and I'm just talking

15   about in a technical sense.  For the purpose of determining

16   whether the guideline calculation adequately accounts for this

17   conduct, it's unclear to me that the guideline calculation is

18   supposed to, given the limitations on relevant conduct, address

19   the kinds of things you're talking about.  Because the

20   relationship, the disclosure of nonpublic information did not

21   occur during the commission of his lie.  It didn't occur in

22   preparation for the lie or in the course of attempting to avoid

23   detection and responsibility for the lie.  Those are things that

24   happen after the offense.

25           MS. BALLANTINE:  Your Honor, you are the expert on the

guidelines, of course.  You have far more experience than I do.
But I do believe the underlying crime here is a violation of
18 U.S.C. 641, which criminalizes, among other things, these
disclosures of sensitive government information that Mr. Wolfe
made time and time again to these various young female reporters
that he was cultivating.

THE COURT:  Let's just be clear, because I don't want
the record to be confused.  He hasn't been charged with 641, has
he?

MS. BALLANTINE:  Your Honor, this is a case that has
been resolved by plea.  I don't believe -- there's no -- as I --
he's not charged in the indictment with 641 violations.

THE COURT:  So that cannot possibly be the offense of
conviction for the purpose of determining whether the guideline
relevant conduct applies or how it is applied.

MS. BALLANTINE:  Your Honor, there are numerous cases
where a defendant pleads guilty to a 1001 violation for lying to
investigators about fraud, and the amount of that loss is
included in calculating his base offense level.  I think that is
an identical -- I think that this is -- it's a very close
corollary.  It's identical to what we have here, which is a
defendant who has disclosed sensitive government information on
a multiple times -- on multiple occasions to reporters, who then
lies to cover up that conduct.

While absolutely it is not charged, it is, however,

1   relevant -- I don't think that it's required that it be charged

2   in order for the Court to consider it.

3           THE COURT:  No, it's not required, and the Court can

4   always consider sentencing facts under the ambit of 3553(a), to

5   the extent that that's your argument.

6       But what you're, I thought, arguing is that under the

7   guideline calculation, the Court has to take into account as

8   relevant conduct this prior conduct and the ways in which he

9   lied in order to cover up these other bad acts.

10      And the guideline does provide for a mechanism to take into

11  account, quote unquote, relevant conduct.  And I'm just trying

12  to understand whether the conduct at issue here fits into the

13  mechanism of the guidelines.

14          MS. BALLANTINE:  Your Honor, it's the government's

15  argument that it does.

16          THE COURT:  All right.  And so you say once that

17  relevant conduct is taken into account, the zero- to six-month

18  range that is produced by applying only 2B1.1 is insufficient?

19          MS. BALLANTINE:  Correct, your Honor, and that is

20  because of the two policy reasons that we've argued in our

21  papers.  And I will submit on what we have included in our

22  sentencing memorandum concerning the bases for upward departures

23  under 5K2.7 and 5K2.14.

24          THE COURT:  Before you do, let me just ask you,

25  because I'm trying to figure out these two policy provisions

1    that you have pointed to.  Are you familiar with the Eleventh

2    Circuit case in *Ellis* which the defendants raise in their

3    briefs?  Is that one you looked at?  Maybe not.

4              MS. BALLANTINE:  It is not one I looked at, your

5    Honor.

6              THE COURT:  In the *Ellis* case, it's pretty clear that

7    at least in the Eleventh Circuit, the disruption has to flow

8    from the lie.  So the *Ellis* case was a false statements case,

9    and in that case the Court, the district court, I believe -- and

10   I'm sure defense counsel will correct me if I'm wrong.  The

11   district court imposed the upward departure on the grounds that

12   whatever the misrepresentation was caused a -- you know,

13   jeopardized public trust, and this person was in a position of

14   authority.  And the Eleventh Circuit reversed and said no, what

15   you're looking at is something other than what disruption was

16   caused by the false statement.

17        So is the government making any representations about the

18   disruption that was caused by Mr. Wolfe's false statement?

19             MS. BALLANTINE:  Your Honor, as we submitted in our

20   initial sentencing memorandum, it's our position that

21   Mr. Wolfe's lies and his repeated lies, which again we think the

22   Court should consider as relevant conduct, undermine public

23   trust in the SSCI, which performs an incredibly important

24   oversight function, overseeing the United States intelligence

25   community, and that is -- that's our argument.

1          THE COURT:  When you say "repeated lies," are you

2    talking about his duplicitousness all along for the three years,

3    or are you talking about the times that he's talked to the FBI

4    and said over and over again, No, I don't have any contact with

5    reporters?

6          MS. BALLANTINE:  I refer to both, but I would

7    specifically point the Court to his repeated lies in the course

8    of his December 15th interview with the FBI and again in the

9    course of his January 11th interview with the FBI.

10         In the December 15th interview with the FBI, the FBI was

11   already certainly suspicious and well aware of his improper

12   contact with reporter number 2.  But they did not know or

13   appreciate the extent of his improper contact with other

14   reporters.

15         THE COURT:  But they were already investigating

16   contacts with reporters and doing a national security

17   investigation.  I understand they didn't know that piece of

18   information, but it's not as though they weren't investigating

19   at all and suddenly his lie made them turn on the switch to

20   investigate these issues.

21         MS. BALLANTINE:  They were already investigating, but

22   what the FBI was investigating was the disclosure of classified

23   FBI information that was published in a newspaper in

24   April of 2017.  That's the basis of this investigation.

25         THE COURT:  Which had nothing -- which was pre his

1    false statement; correct?

2            MS. BALLANTINE:  They're coterminous, your Honor.  He

3    made the false statement during the course of the investigation

4    into --

5            THE COURT:  No, they're not coterminous.  The FBI was

6    already investigating the classified information leak, and in

7    the context of that preexisting investigation, they came and

8    spoke to him, at which point he made a false statement, if not

9    more than one.

10           MS. BALLANTINE:  Made multiple false statements --

11           THE COURT:  Okay.

12           MS. BALLANTINE:  -- appreciating the gravity of lying

13   to the FBI as it is conducting a national security investigation

14   into the very information that Wolfe himself was obligated to

15   protect.

16           THE COURT:  All right.  Thank you.

17       Mr. Burton?  I guess I assumed it was you.  I don't know.

18   You might have different duties among your lawyer group there.

19           MR. BURTON:  Sadly, it's all me today.

20           THE COURT:  Okay.

21           MR. BURTON:  Your Honor, just to address the

22   procedural point, it is -- the plea agreement left the parties

23   in a position to allocute.  During negotiations, we specifically

24   sought to limit the departure issue.  So I am not going to

25   dispute that they have the ability --

1          THE COURT:  To raise it?

2          MR. BURTON:  -- to raise it.  It's not specifically

3    reflected in the plea agreement.  In fact, the only upward

4    departure mentioned is if Mr. Wolfe, in the paragraph just prior

5    to the provision you read, committed another offense, it

6    contemplates seeking an upward departure.

7          THE COURT:  All right.

8          MR. BURTON:  But we are not challenging their ability.

9    We were shocked by their position, but we're not challenging

10   their ability to raise it.

11         THE COURT:  Okay.

12         MR. BURTON:  With respect to the issues that the Court

13   identified, I was going to address *Ellis* in response to this

14   issue.  Our position is, first of all, for a false statement to

15   be criminal, the false statement must be material.  And that

16   requirement of materiality effectively addresses interference

17   with a government function as a part of the offense.

18         Here, a lot of the cases that the government just mentioned

19   or scenarios -- Mr. Wolfe was indicted; he was indicted solely

20   for three false statement counts.  He was not indicted for 641,

21   which by the way in this instance would be a misdemeanor if he

22   had been charged with that, which he was not.  He was -- the

23   offense of conviction, and the only offenses he was charged

24   with, were false statements.

25         The government launched its investigation based on an

1    April 11th, 2017, article which revealed classified information

2    identifying -- addressing male number 1 and a FISA warrant.  The

3    FBI started its investigation.  They don't interrogate Mr. Wolfe

4    until -- they interrogate him first in October, on October 30th.

5    He's not charged with lying in that meeting.  He's indicted --

6    all three counts deal with the December 15th, 2017, meeting.

7        By the terms of their own affidavit, the FBI had already

8    notified the senators that Mr. Wolfe was under investigation.

9    So it did not -- the lies did not and could not impair the

10   function, as they are arguing.

11       THE COURT:  What is your -- first, it sounds as though

12   the government is beginning somewhat differently than I think

13   they did in their brief --

14       MR. BURTON:  Yes.

15       THE COURT:  -- by suggesting that 2B1.1 itself is

16   really not adequate, not -- this is not the kind of thing that

17   should be referenced to that guideline, that guideline is really

18   about loss and theft and economic offenses based on its title.

19       What is your thought on that?

20       MR. BURTON:  False statements, that charge is an

21   expansive charge.  I'm not going to presume what the sentencing

22   commission -- you would know far better than I -- contemplated

23   historically in dealing with this particular charge.  But false

24   statements arise in a variety of contexts.  One of them we cite

25   to the Court in the *Ellis* case which you mentioned, which -- and

our position is, it is not outside the heartland, because the

concept of a false statement is a lie to a government function,

a government official.  It has to be, and it has to be material.

So therefore, any interference is encompassed in the concept of

materiality.  It's in the very elements of the offense.

And for a departure, there would have to be -- that

interference would have to be substantial or significant,

pervasive or systematic.  They make no assertion, they cite no

false statement cases.  We cite -- the only one we could find

was the *Ellis* case.  And interesting, in that case, your Honor,

Mr. Ellis was indicted for criminal civil rights violations.  He

was indicted for witness tampering.  They superseded and they

added a false statement count, and that's what he pleaded guilty

to.  And the district court in sentencing him imposed this

departure that they seek in this case, and the Eleventh Circuit

said no, even though he was actually charged, which is a far cry

from what Mr. Wolfe is charged with here.

And additionally, we don't believe it applies here legally.

But also --

THE COURT:  Either?  What about national security?

MR. BURTON:  May I just address --

THE COURT:  Disruption?

MR. BURTON:  Yes.  I can deal with that.  There is --

those cases deal with public endangerment, not with a

theoretical harm that's presented.  Not every person who has a

security clearance and at some point in their life had access to

classified information gets tagged with this enhancement.

There's no evidence of his having ever -- and I will remind your

Honor, we specifically stated when we entered his guilty plea,

there is no evidence in this case that Mr. Wolfe compromised any

classified information.

We cite the case from Iowa, your Honor, where the district

judge rejected this enhancement, the public endangerment

enhancement, because of a theoretical danger that a defendant

could present.

The cases where this has been applied are people with

ricin, or the principal case that they cite for this is an Army

or an Air Force officer who was selling F-16 -- 15 -- I think

millions of dollars' worth of F-16 parts to people.  That's a

tangible, tangible danger to national security.

Here, it's a theoretical.  Just because he at some point

had access to classified information, in the absence of some

proof that he shared classified information, it doesn't warrant

that enhancement.

Additionally --

THE COURT:  And you would say that even if he was only

charged with a false statement case?

In other words, I'm just trying to understand the

relationship between the charge, the sentencing guideline, and

the upward departure.  *Ellis*, I thought, was not concerned with

1    the reason why the false statement was made, the harm that

2    flowed from the prior conduct that was being covered up by the

3    false statement.  *Ellis*, I thought -- and I was looking for it

4    here in all my papers -- pretty clearly said it's error unless

5    the disruption -- now, I know *Ellis* was not a public interest

6    case.  It was a -- I mean, it wasn't a 5K2.14 case, it was a

7    5K2.7 case.

8         MR. BURTON:  Yes.

9         THE COURT:  But still, its reasoning indicates that it

10   is the conduct underlying the offense of conviction, meaning

11   what the defendant did that raised the charge in the case,

12   making a false statement, that's important, and the consequences

13   of the false statement that matters when you're looking at an

14   upward departure in this way.

15       Am I wrong about that?  Because you suggested with the

16   national security situation, that if we were in exactly the same

17   circumstance but hypothetically, if Mr. Wolfe had, as a

18   precursor to this, been providing classified information,

19   then -- and somehow the government didn't charge him for that,

20   then there might be an upward departure situation.

21        MR. BURTON:  So let me clarify, because I think I

22   either misspoke or --

23        THE COURT:  Or I misheard you.  That's possible.

24        MR. BURTON:  No, I doubt that.  It does have to be

25   related to the offense conduct.  There is no offense conduct

1     from his lie that damaged any national security.

2         Now, I do think in the *Root* case, again, that's an example

3     of tying the conduct that he was convicted of to the national

4     security.  That's the principal case they rely on.  That's the

5     Air Force gentleman who is -- he was prosecuted for stealing

6     government property.  He was selling it.  And there, it is

7     related.

8         There is no relation to national security from his lies to

9     these agents.  But even taking a step deeper, even if you

10    considered that -- that was the argument I was trying to make --

11    there's no there there in this case.  There is no proof by a

12    preponderance of the evidence to support either of these

13    departures.  The affidavit that they submitted does not prove

14    that they do not meet their burden to show.  That's what I was

15    trying to argue, apparently poorly.

16        THE COURT:  No, no.  Understood.

17        MR. BURTON:  But the other point I think the Court

18    should be mindful of is, we have a letter from the Senate,

19    which, you know, that's the government component with a fairly

20    good purview as to what Mr. Wolfe did, what he knew, what his

21    responsibilities were, and that's not just simply a character

22    letter.  I think that's a pretty powerful letter expressing

23    views from -- it's a bipartisan letter.  I think it confounds

24    their argument.  There is no impairment.  There is no discussion

25    of any national security impairment presented by Mr. Wolfe.

1          And there are unusual features to this case, but they deal

2     with Mr. Wolfe's sensational affair, but there is no evidence

3     tying his conduct to the release of any classified information

4     or demonstrating that he harmed national security.

5          They now bring up this 641 charge, which was nowhere argued

6     in their papers.  And I would advise the Court that, in addition

7     to being a new argument, is -- that's a misdemeanor anyway,

8     which does not implicate either of these issues.

9          If the Court -- and I would be prepared to address also the

10    disproportionality just as a final point.

11          THE COURT:  All right.  Yes, please.  So we've been

12    discussing the applicability of these upward departure

13    provisions.  And the government is seeking, from what I could

14    tell -- at one point in their brief, they say 11-level increase

15    under the departure provisions.

16          MR. BURTON:  Not only in our review of the cases is an

17    upward departure for a false statement unprecedented, but this

18    level is completely disproportionate.  If you look at the

19    starting levels in any of the cases that they cite, you have,

20    you know, a 1/8 addition.  You're talking about cases where

21    people are starting at, say, a level 28 and getting four more

22    levels.  From a percentage standpoint, this is way

23    disproportionate.  They're seeking a 400 percent increase based

24    on these departures they seek.

25          To the extent that the guidelines -- one of the

1    undergirding principles was proportionate sentencing.  What the

2    government seeks here, which again we do not believe is

3    justified under the law or the facts or the proof that they've

4    presented in this case, but it is completely disproportionate.

5    The marginal increases -- I think the largest one we saw was a

6    50 percent increase in the guidelines.  They're seeking a

7    400 percent increase.  It's utterly disproportionate.

8         And the other cases I would note for the Court, similar to

9    *Ellis*, though a slightly different context, the perjury cases,

10   *Barone* and the others that were cited in our brief --

11             THE COURT:  There were perjury charges in those cases?

12             MR. BURTON:  Yes, there was a perjury charge, and this

13   first enhancement for the impairment of the government function

14   for impairing the grand jury's function was sought, and the

15   Court of Appeals rejected the Second Circuit, and I believe the

16   Third Circuit in *Goodrich* rejected those bases for a departure.

17             THE COURT:  All right.  Thank you.

18        I don't know if you want to say anything maybe about the

19   extent of the departure that you're requesting.

20             MS. BALLANTINE:  Yes, your Honor, just briefly.  I

21   have to say, we were -- this was a very difficult case to write

22   a sentencing memorandum for, because it's a little bit of a

23   unicorn.  We could not find any other truly comparable cases,

24   and nor, I think, was defense able to.

25        But in terms of --

```
1          THE COURT:  Can I just press down on that a little
2    bit?
3          MS. BALLANTINE:  Yes.
4          THE COURT:  What do you mean?  There are cases in
5    which people lied to the FBI, aren't there?
6          MS. BALLANTINE:  There are absolutely cases in which
7    people lied to the FBI, your Honor, but it's rare to find those
8    cases that really are just lies to the FBI about a continued
9    pattern of lying.  A typical false statements case would be lies
10   to the FBI about fraud, as amply covered in 2B1.1, lies that
11   have as a substantial component of the lie an obstruction of
12   justice component, so for instance, lies that fall into the
13   perjury line of reasoning.
14        This is a series of lies to the FBI about a pattern of
15   duplicitous conduct that, again, as we've said, we believe
16   caused great harm to the national security.  But it's not -- we
17   were unable to find another case that had these same facts.
18        So the Court has asked for my response on the degree of
19   enhancement that we are seeking.  We're asking the Court to
20   impose an 11-level enhancement to reach a base offense level of
21   15.  And I would just point to two analogies within the
22   guidelines themselves.
23        The first is looking at 2B1.1(b)(1)(G).  A loss valued at
24   more than $250,000 would permit an increase of 12 levels, so
25   more than we are seeking here.  We're unable to quantify the
```

loss here, which the government doesn't believe it's capable --
that it's possible to do.  We certainly think that the conduct
here is more than $250,000 worth of loss, $250,000 being -- not
even able to buy a modest home in this area.

And the other guideline we would point to in just the
discussion about the appropriateness of the level is 2C1.1.
This is inapplicable conduct.  That's offenses involving public
officials and violations of federal election campaign laws.  But
I think it is relevant and noteworthy for the fact that it
assigns a base offense level of 14 where the defendant is a
public official.  And I think looking further into that,
Mr. Wolfe would certainly qualify as a public official.

So we simply note that crimes involving public officials
seem to be treated more seriously by the guidelines, so there is
no applicable guideline to this conduct.

THE COURT:  All right.  Let me tell you why this is
hard for me.  It's hard for me, in part, because some of the
things that the parties have said here today are not things that
are in their briefs.  So primarily the government, in terms of
its quantifying the harm in the way that it has, analogizing it
to other guidelines, you know, this notion of relevant conduct
being the actual relevant conduct, I didn't really get a sense
that that's what you were saying from your briefs.  So I'm not
necessarily prepared to really engage in the guideline analysis,
given that that was not raised squarely in the written

1    submissions prior to this point.

2         But I do note that the upward departure provisions are

3    departure provisions in the discretion of the Court.  The

4    guidelines themselves are advisory in general.  And let me tell

5    you why I am concerned about the position that the government is

6    taking in this case.

7         It appears to the Court that the government's suggestion

8    that an upward departure is warranted derives primarily from its

9    concerns about the noncriminal prior conduct of this defendant.

10   That is his providing sensitive, albeit not classified,

11   information to reporters in contravention of the Senate's rules

12   and the standards of his position.

13        And as I tried to ferret out in the comments and the

14   questions that I was asking, the request for an upward

15   departure, in the Court's view, is not clearly tied to the

16   conduct underlying the offense of conviction, which is the

17   conduct that occurred after the series of unauthorized contacts

18   with reporters when the FBI agents were questioning Mr. Wolfe

19   about it.

20        Mr. Wolfe's reporter contacts, the previous activities,

21   were certainly potentially harmful and entirely inappropriate,

22   but those acts themselves were not criminal.  And in this

23   Court's view, the risks associated with that conduct should not

24   drive the sentence that is supposed to be imposed in this case,

25   and especially not to the degree that the government suggests.

1     The government here today and somewhat in its brief

2     indicates that it's making sort of a heartland argument, that

3     what is happening in the heartland of 2B1.1 is not really what's

4     happening here.  But the heartland, I say, is not just theft

5     cases in 2B1.1.  The heartland includes other false statement

6     cases of a similar nature where individuals are confronted by

7     government agents and make false statements.

8         And to that extent, in this Court's view, the government

9     hasn't demonstrated that this false statement is inherently

10    different from any of the other cases in which people lie to the

11    government in order to cover up something, whether it be prior

12    fraud, whether it be other circumstances, obstruction of

13    justice, or whatever it may be.

14        According to the statement of offense, Mr. Wolfe did engage

15    in a variety of inappropriate acts.  But again, we have to

16    isolate what is criminal from what is not, because as the

17    Eleventh Circuit's *Ellis* case teaches, it's important to examine

18    the impact of the criminal act, Mr. Wolfe's conduct in making

19    false statements to the FBI, when the Court considers whether to

20    depart upward from the guideline range that is otherwise imposed

21    for that offense.

22        Having an affair is not a crime.  Maintaining relationships

23    with reporters is not a crime.  Even giving a reporter

24    nonclassified but sensitive nonpublic information is not a

25    crime.  The only criminal act that has occurred as charged in

1    this case -- I know the government here referenced some other

2    criminal statute, but that's not the charge, nor has it ever

3    been the charge in this case.  The only charge we're talking

4    about is lying to the FBI.

5        And while the government talks a lot about the significance

6    of Mr. Wolfe's sensitive position, the importance of the Senate

7    Select Committee on Intelligence, and the national security

8    risks that can arise from a breach of confidentiality, all of

9    which is true, it has not shown that the lies themselves had the

10   repercussions that the upward departure provisions require.

11       Let me just say, in particular, that the memo or -- nor the

12   government's statements here today show that the false

13   statements disrupted a government function or created a national

14   security risk.  The government does not contend that something

15   about the lie changed the course of the government's

16   investigation in a material way.  And the FBI's continuation of

17   its ongoing work related to investigating these matters is not a

18   disruption of its activities.  This is what the FBI does.  Nor

19   do the false statements made to the Bureau appear to pose any

20   national security risk.

21       Yes, Mr. Wolfe's employment contract and the SSCI rules

22   unambiguously prohibited him from communicating with the media,

23   but his conduct in making these false statements is what brings

24   us here today.

25       So with that in mind, the Court rejects the government's

1    request for an upward departure.  I don't think either of the

2    provisions that the government points to apply in terms of an

3    upward departure, and I don't think this case is necessarily,

4    based on the facts presented, outside the heartland of false

5    statement cases for the purpose of an upward departure.

6        As a result, the Court will conclude that the previously

7    calculated range of zero to six months of imprisonment is the

8    appropriate range of punishment under the guidelines.

9        All right.

10           MS. BALLANTINE:  Your Honor, if I may, I believe we

11   were procedurally required to proceed with this as a motion for

12   upward departure, motion for departure.  So I believe the Court

13   also needs to state that it is denying the government's motion.

14           THE COURT:  I see.  Excuse me.  Thank you.

15       In addition to rejecting the request, I deny the

16   government's motion for an upward departure of 11 levels, and I

17   will conclude that no such departure will be provided, such that

18   the calculated range of zero to six months is the applicable

19   guideline range in this case.

20       All right.  So having calculated the guidelines, the Court

21   now turns to Section 3553, which requires the Court to consider

22   a variety of factors, including the guideline range, which I

23   have just calculated.  And consistent with my normal practice at

24   sentencing, I will take a moment to describe generally the

25   applicable statutory and guideline penalties for this offense.

The charge of making a false statement to the government in violation of Section 1001(a)(2) of Title 18 of the United States Code carries a statutory maximum penalty of five years of imprisonment.  This Court may choose to impose a sentence of probation of not less than one or more than five years.

If a term of imprisonment is imposed, the statute provides that Mr. Wolfe may face a supervised release range following imprisonment of up to three years, while under the guidelines that recommended range is one to three years.

The statute of conviction sets a maximum fine of up to $250,000, while the guideline fine range is between $500 and $9,500.  And the statutory and guideline restitution provisions are inapplicable, because there is no identified victim.

Let me ask counsel whether I have stated accurately the statutory and guideline framework under which we are operating in regard to this case.

MS. BALLANTINE:  Yes, your Honor.

MR. BURTON:  Yes, your Honor.

THE COURT:  All right.  Before the Court discusses its considerations of the various sentencing factors, I would like to give the parties the opportunity to address the sentencing guideline calculation and the Court's consideration of 3553(a) factors.

Let me start with Ms. Ballantine.  Does the government wish to speak about the application of the factors in 3553(a) or the

1    sentence that it believes should be imposed in light of the

2    Court's previous ruling?

3           MS. BALLANTINE:  Yes, your Honor.  3553(a)(1) requires

4    the Court, of course, to consider the nature and circumstances

5    of Mr. Wolfe's offense and of Mr. Wolfe's -- and 3553(a)(2)

6    requires the Court to consider the history and characteristics

7    of the defendant.

8           In both of those considerations, it's the government's view

9    that Mr. Wolfe engaged in a duplicitous course of conduct that

10   involves the provision of sensitive nonpublic information to

11   young female reporters over a four-year period and that that

12   culminated in his lies.

13          Mr. Wolfe was not permitted by the terms of his employment

14   to have contact with those reporters, and he was not permitted

15   to disclose to them the information that he did disclose.

16          In considering those natures and characteristics, when

17   Mr. Wolfe was ultimately interviewed by the FBI in

18   December of 2017, he lied about those conducts -- those

19   contacts, and he lied repeatedly.  He did so, he stated, because

20   he believed correctly that he would lose his job.  And yet, when

21   the FBI went back in January of 2018 to conduct a second

22   interview, not interrogation, interview of Mr. Wolfe, he lied

23   again very specifically about whether he had provided that

24   sensitive information to those reporters.

25          So the assertion that this is just a single lie to cover up

an affair that the defense makes, your Honor, we believe is

incorrect.  To date, he's only accepted responsibility for

disclosing sensitive information to reporter number 3, despite

clear evidence to the contrary as developed in this case and

submitted to the Court in the exhibits attached to our

sentencing memorandum.

Mr. Wolfe asserts incorrectly that the SSCI is the victim

of his duplicitous conduct and that he only disclosed to those

reporters logistical information, who was going to testify and

when and where they were going to testify.

This really minimizes, in the government's view, the harm

that those disclosures caused.  Witnesses whose identities are

made public in the course of investigations may refuse to

cooperate fully.  They may themselves become subject to

unnecessary scrutiny or threats.  It's for that reason that in

an ordinary criminal case, the government, the court reporter,

and the grand jury are prohibited under Rule 6(c) from making

public that witness information, because it can have such a

disastrous effect on investigations.  So the government takes

issue with defense's statement that these are merely logistical

information.  That information itself is highly sensitive.

Your Honor, in conclusion, the impact that this case had on

the FBI, who is the true victim in this case, was significant.

The FBI discovered Wolfe's conduct during an investigation into

an extremely serious matter.  And when it learned of Mr. Wolfe's

conduct over the course of those four years, the FBI turned and

opened -- it turned the course of the investigation away from

who disclosed the classified information that was originally the

subject of that investigation, and they necessarily and

correctly undertook a full investigation to determine whether

Mr. Wolfe's conduct over the course of a 28-, 30-year career

with the SSCI, in which he was entrusted with safeguarding the

nation's most classified and sensitive information so that SSCI

could conduct its oversight role.  That's a significant turn.

And your Honor, because of his conduct over the course of

those four years and because he lied to the FBI when he alone

should have appreciated the gravity of lying to the FBI in a

national security investigation, we do ask the Court to vary

from the sentencing guideline range that the Court has

calculated and to sentence Mr. Wolfe to a two-year period of

incarceration.

THE COURT:  All right.  Thank you.

Mr. Burton?

MR. BURTON:  Yes, your Honor.  Jim Wolfe lied.  He

admitted it.  And he lied for reasons that people can

understand.  But those are no justification for his having lied

to the FBI.  He's not standing here with a pardon waiting in the

wings.  He didn't receive a good luck tweet this morning from

the president.  He is here, and he will address the Court in his

own words about his lies, his conduct, and the situation he

1    found himself in.

2        We have submitted, I think, extensive briefing in this case

3    on the 3553 factors.  I'm not going to repeat those.  If the

4    Court has particular questions, I will answer them.  But we

5    submit this case does not warrant a variance for the very same

6    reasons we just addressed.

7        The government -- this is a false statement case, and the

8    underlying conduct has fueled a lot of interest, but ultimately,

9    as the Court just stated moments ago, that conduct is not

10   criminal.  I think the government still conflates a harm from

11   the leak of classified information, which there is no evidence

12   that Jim Wolfe leaked it, to imputing that leak to him.

13       Two months ago, Mr. Wolfe stood here and admitted his guilt

14   and in open court admitted his infidelity.

15       As the Court knows from the presentence report and our

16   submission, Mr. Wolfe came up from modest beginnings, joined the

17   Army right out of high school, worked his way through college

18   while he was working for the Senate.  He served his country for

19   over three decades, both in the Army and proudly for the Senate.

20   He helped his community.  He raised two fine sons, one of whom

21   is here today, flew in from his own military service, and he is

22   here from Korea.  He's seated in the front row.  Mr. Wolfe's

23   wife is here, and as painful as this whole episode has been, she

24   supports him.  She's also seated with Mr. Wolfe's son.  Other

25   friends and supporters are here.

A 3553 factor the Court also must consider in addition to the one that the government emphasizes are his character and background.  And the letters in this case, I would submit to the Court, are extraordinary.  They don't even acknowledge the letter that the Senate sent on behalf of Mr. Wolfe.  It's a remarkable letter from people who are probably in the best place to assess Mr. Wolfe's conduct, both its impact and Mr. Wolfe's character over the years that he's worked.  It's a bipartisan letter, and at no small price to the senators, because they've all gotten some political blowback from having written it.

But the other letters that have been submitted to the Court from former Director of National Intelligence Clapper, former DNI General Counsel Robert Litt, former White House Chief of Staff Denis McDonough, these are all people attesting to Mr. Wolfe's character.

And the footnote the government has in its reply tries to equate these character letters with character witnesses appearing at a trial.  But there's a fundamental difference. These people all know he's pleaded guilty.  They know the essence of the allegations.  They've been in the paper.  There have been a blistering set of articles.  And knowing all that, they chose to write to the Court.  They know he's guilty, but they still support him and share their view of his character in support of a lenient sentence in this case.

The Senate, in particular, both the chair and vice chair,

1   who were briefed by the FBI in the course of the investigation

2   of this case, they signed that letter requesting leniency on

3   behalf of Mr. Wolfe.  It's a remarkable letter.

4        And we also have letters from ordinary people who Mr. Wolfe

5   has helped along the way and have never forgotten.  He did the

6   little things that meant a lot to people, not just writing

7   checks.

8        The letter from the head of Our Daily Bread who shared with

9   the Court, Ms. Weglein, when her father suddenly died, Mr. Wolfe

10  stepped in to help deliver food to the homeless.  He's been

11  supporting that charity with his volunteer acts for a decade.

12       He helped Dana Byrnes, who is also here today, with his

13  family when Mr. Byrnes was deployed overseas.  Those are little

14  things that I think give the Court a glimpse of the kind of man

15  Mr. Wolfe is, independent of his conduct.

16       He's also attempted to repay the contributors to his

17  defense fund, to people who at least identified themselves when

18  they -- and a lot of them aren't accepting the checks, but he's

19  written checks to those people.

20       The government, of course, emphasizes Mr. Wolfe's

21  underlying conduct and as usual in its submissions emphasizes

22  general deterrence.  But these are fundamentally at odds with

23  positions they've taken for far more serious conduct by other

24  government officials.  We cite in our brief General David

25  Petraeus or General Flynn or National Security Advisor Berger or

1    even FBI Special Agent Rossini.  These people were all

2    fundamentally treated differently for very similar conduct.

3        The director of security for the Senate Select Committee on

4    Intelligence is not a seat on the National Security Council.

5    The logistical aspects and facilities management described in

6    the government's sentencing memorandum are a lot closer to what

7    occurred in a typical day at work for Mr. Wolfe than sitting

8    around and learning classified information.

9        But contrast that with General Petraeus who, as the sitting

10   CIA director, lied to the FBI about having provided classified

11   war plans to his mistress; to General Flynn, who we all know has

12   not been sentenced but received a supporting sentencing

13   memorandum from the Special Counsel, despite lying to the FBI

14   while he was the sitting national security advisor about his

15   having run a shadow foreign policy that was contrary to the

16   then-President Obama's policy.

17            THE COURT:  Wasn't that letter predicated on his

18   supposed cooperation?

19            MR. BURTON:  Yes.

20            THE COURT:  Do we have cooperation in this case?

21            MR. BURTON:  We do not.  It wasn't a part of this

22   case, that's correct.

23            THE COURT:  All right.

24            MR. BURTON:  We submit that Mr. Wolfe's actions, when

25   compared to those actions, and also we cited some others, as

wrong as they were, and they were wrong, they pale by

comparison.

We also cited three recent false statement cases that have

been sentenced in this district, including one by your Honor.  I

would submit, in all those cases, they share one common quality.

They're fairly low-level actors, but their lies were primarily

about underlying conduct.  I think that applies to

Mr. van der Zwaan.  I think that applies to Mr. Papadopoulos.

Mr. Papadopoulos, in particular, his lies impeded the Special

Counsel's ability to interview a witness who was transiting

through the United States.

Mr. Wolfe's lies, and there were definitely more than one,

were essentially false denials about actions that could

jeopardize his marriage or his job, but they weren't about

illegal conduct.

And I don't think the government, in its sentencing

submissions, addresses the one that your Honor sentenced,

Mr. Kahn's case.  In Mr. Kahn's case, there is a national

security component there that really touched on national

security.

THE COURT:  Was Mr. Kahn questioned by the FBI?

MR. BURTON:  I don't --

THE COURT:  Wasn't his false statement in the context

of his representation --

MR. BURTON:  In the forms?

1          THE COURT:  Yeah.  I don't know.  I haven't gone back

2    and looked at it, even though it was my case.  But I think I

3    vaguely recall that Mr. Kahn was a person who does background

4    investigations.  That was his job.  And he actually didn't call

5    all of the references or whatever you do in a background

6    investigation but represented in a form that he had completed

7    his work.

8          MR. BURTON:  I thought he actually made an affirmative

9    false statement, but I will defer to the Court's recollection on

10   that.

11         THE COURT:  All right.

12         MR. BURTON:  For all these reasons, your Honor, we

13   respectfully request, consistent with the guidelines and the

14   recent commentary regarding first-time zone A offenders and the

15   3553 factors, that Mr. Wolfe be sentenced to probation with a

16   term of community service, as set forth in our sentencing

17   memoranda.

18         THE COURT:  All right.  Thank you, Mr. Burton.

19      Mr. Wolfe?

20         THE DEFENDANT:  Your Honor, it saddens me to stand

21   here before you today under the title of the United States

22   Government against James Wolfe.  I'm not sure it's possible to

23   feel any lower than I do right at this moment.

24      A little over a year ago, I was interviewed by the FBI, and

25   I was asked a series of questions about a personal relationship

that I had outside my marriage and about other reporters that I had contact with.  I lied.  I lied about those.  I lied about those to protect my wife, my sons, and selfishly, I lied about those to protect myself and my job.

Although I admitted the affair after being confronted with incontrovertible evidence by the FBI, I continued to falsely deny aspects of my contacts with other reporters during that interview, and I was not completely forthcoming in the follow-on interview by the FBI in my home in January.

I've worked hard all my life to serve my country.  And your Honor, I know you've had a chance to read the information.  I joined the Army shortly after I got out of high school.  I then went on to work at the U.S. Senate.  I put myself through college, nights and on weekends.  I've worked very hard.  I love helping the committee staff and the senators who I worked for, and I took that job very seriously.  I'm a good father to two really good sons.  I'm incredibly gratified one of my sons is here today.  I have been married to my wife, Jane, for 10 years.

By my selfish actions and my actions alone, I've humiliated my wife and my sons and my family pursuing a relationship outside my marriage.  It was a significant lapse in judgment and a personal failure on my part, for which I am solely and completely responsible.  I compounded the lack of judgment of sharing information with other reporters after that relationship ended, though I did not engage in any inappropriate

relationships after that ended.  And then I lied about it to the agents.

As I said before, I not only failed my wife and acted dishonorably when I lied to the agents, I failed at something that I stressed over the years to the committee staff who I worked with for over 30 years, 31 to be exact, about the relationships with media.  I'll spend the rest of my life paying the price for my actions.

Despite all the bad times over the past several months, I have received tremendous support from my family, true friends, and even total strangers, which I am extremely grateful.  I want to publicly apologize to my wife and sons, to law enforcement, to the Court, my colleagues and friends, the Senate Intelligence Committee for my conduct and lies.

I'm extremely grateful for the support letter that my office provided when they wrote the letter to you, your Honor, on my behalf.  I am so very sorry.  I let them down and my colleagues and friends as well.

Your Honor, I am so sorry.  I am beyond embarrassed.  I am beyond humiliated.  I am beyond mortified.  The gravity of my actions hit home when I was arrested in my house this past June. I created a career that spanned over half my life, and I destroyed it with this action.  Those actions and my false denials were critical lapses in judgment and a personal failure on my part.  It is because what I have done, no one else, that I

am before this court today.  I have acknowledged what I have
done, broken the rules of the committee, and then lied about it.

But I want to make it perfectly clear, I never compromised
classified information.  I never jeopardized national security.
In fact, I defended it with my life, both in uniform and as a
civilian working for the Senate.

I know I must be punished, like many who have stood before
you today.  I certainly hope not to be sentenced to jail, but I
do hope that you will require me to give something back to the
community in the way of community service.  I'm good at that.
Service to the country and the committee were my life's
profession, something that I will never be able to return to and
that I deeply care about.

Thank you, your Honor.

THE COURT:  Thank you, Mr. Wolfe.

The Court will take a 10-minute recess, and I will come
back and pronounce sentencing.

(Recess taken from 3:56 p.m. to 4:13 p.m.)

THE COURT:  After calculating the sentencing
guidelines and considering departures and hearing the statements
of counsel and Mr. Wolfe, I must now consider the relevant
factors set forth by Congress in statute 18 U.S.C. 3553(a) in
order to ensure that the Court imposes a sentence that is
sufficient but not greater than necessary to comply with the
purposes of sentencing.  These purposes include the need for the

1    sentence imposed to reflect the seriousness of the offense, to

2    promote respect for the law, and to provide just punishment for

3    the offense.  The sentence should also deter criminal conduct,

4    protect the public from future crimes by a defendant, and

5    promote rehabilitation.

6        In addition to the guidelines and policy statements, the

7    Court must consider the nature and circumstances of the offense,

8    the history and characteristics of the defendant, the types of

9    sentences available, the need to avoid unwarranted sentencing

10   disparities among defendants with similar records who have been

11   found guilty of similar conduct, and the need to provide

12   restitution to any victims of an offense.

13       This Court has considered all of these factors when

14   deciding the appropriate sentence in this case, and in

15   accordance with my ordinary practice, I won't detail my

16   considerations with respect to each factor orally here today.

17       However, I do think that it is important to say something

18   for the record and for you, Mr. Wolfe, about the nature and

19   circumstances of the offense, your history and characteristics

20   as an offender and otherwise, and the need to avoid unwarranted

21   sentencing disparities.  Again, the Court has taken into account

22   all of the 3553(a) factors, but these three warrant particular

23   mention at this time.

24       Starting with the nature of the offense, you have admitted

25   to making false statements to FBI agents who questioned you

about your contacts with reporters.  The record clearly

demonstrates that you knew it was important to tell the truth

when talking to the FBI and that you also knew that the

government was investigating reporters' access to sensitive

information that was under your purview and that was supposed to

have been withheld from the public.

I can certainly imagine how scary it must have been, from

your perspective, when the FBI came around asking you about

contact with the reporters, given what we now know about your

history of conduct.  In that moment, you had been caught.  The

jig was up.

But what I'm wondering is whether in that moment it

occurred to you that after years of hiding your affair and

covering your tracks pertaining to your contact with reporters,

what you really needed to do was just come clean and tell the

truth about what you had been up to.

The defense memoranda suggests that your response to the

agents' questions was human nature.  You had done bad things.

You violated the no contact rule and engaged in an illicit

romantic affair.  And it might be true that many of us would

have responded in a similar way.  Maybe in that moment, you

calculated that the conduct that you sought to shield was worse

than any lie that you could tell to cover it up.  You say here

that this was a significant lapse in judgment, and perhaps that

is so.

But under federal law, the lies themselves are also significant.  They were criminal acts, and this Court is required to treat them as such.

And I want to be clear.  Notwithstanding the fact that you were having an affair and that you were violating the Senate's rules, what is critical here from the standpoint of the seriousness of your offense is the choice that you made to lie about that behavior when the FBI asked you whether or not you had had any contact with reporters.  You did have the option to tell the truth.  And if you had done so, you would not be sitting here today facing criminal charges and potential prison time.

For the purpose of today's hearing, I think it's important for us all to understand why lying to law enforcement agents who are conducting an investigation is a serious crime, especially under the circumstances presented here.

The prosecution has focused like a laser on the potential implications of the particular reporter contacts that you had, the fact that you had been talking to reporters about matters that the SSCI was handling in some circumstances, and that you had given, at least on one occasion, sensitive nonpublic information.  The government requests an upward variance under 3553(a) primarily on that basis.

But again, to the Court, that underlying conduct, albeit very troubling, is not solely what makes this false statement

offense a serious crime.  The seriousness of your criminal

behavior derives from the fact that the proper functioning of

our entire system of government, our democracy and all of the

institutions that relate to it, requires truth.  And for our

justice system, in particular, to work as intended, people who

are being legitimately questioned by government investigators

have to tell the truth.  If you don't, if they don't, then

there's a risk that whatever the government is investigating,

whether it's your own bad choices or someone else's, doesn't get

discovered, which means that the truth will not be known and

justice will not be done.

Now, in this case it just so happens that what the

government was investigating was related to certain improper

things that had been done and that the government suspected you

had done, and the FBI agents already had done the work to figure

out the answers to the questions they were asking you even

before they approached you.

But one could easily imagine a circumstance in which

government agents asked significant questions of important

witnesses at the beginning of an investigation, and if people

lie, then the investigation itself can be thrown off course.

Making false statements to a government agent is a federal crime

precisely because of the risk that such lies will thwart

legitimate law enforcement inquiries, making it impossible for

the truth to be known and for justice to be served.

1   So in terms of the nature and seriousness of this offense,

2   even though the guideline range is relatively low under the

3   circumstances presented here, there is no question that you have

4   committed a serious crime.

5   Turning to your characteristics as an offender, which as I

6   mentioned is another factor that the statutes require the Court

7   to consider, I will say that defense counsel has done an

8   admirable job of highlighting your exemplary past.  You have no

9   criminal history.  You served honorably in the Armed Forces.

10  You held an important government position, the director of

11  security for the U.S. Senate Select Committee on Intelligence,

12  for approximately 30 years.  The Court has reviewed the many

13  letters that have been submitted by your family members, your

14  friends, and the extraordinary correspondence from various

15  distinguished current and former government officials, all of

16  whom attest to your working class roots, your hard-working

17  nature, your dedication to your job and your sons and your

18  family and the Senate, your interest in giving back to wounded

19  warriors and homeless people in your community, and your overall

20  selflessness as a person and public servant.

21  I am appreciative of receiving letters like this and also

22  of the many people here today who support you.  I want to

23  acknowledge, in particular, as defense counsel did, your son,

24  who is here in person in uniform.  I want to thank him for his

25  service and for being here today.  His presence and the presence

of other supporters and the written letters that the Court has received are all testimonials that provide the Court with important insight into who you are as a person.  And I have taken them into account.

I was particularly interested in and grateful for the letter from your wife, to whom you have now publicly apologized. She discussed plainly how painful this has all been, but she continues to support you, and I have no reason to doubt the sincerity of those who hold you in such high esteem, even now.

In this regard, Mr. Wolfe, you are a lucky man.  I sentence lots of people, and not many of them have the kind of support that I have seen, both from the letters that have been presented and from the presence of the people here today.  I believe them when they tell me about your character, and I have taken their statements to heart.

There is one aspect of your life service that is actually difficult to evaluate as I try to assess offender characteristics, as the law requires, and that is, your previously well-regarded role as the director of security for the SSCI.  Let me explain the difficulty.  It arises because, as the parties have framed it, your distinguished service in this role actually cuts both ways.  Your supporters, including Senators Burr, Warren, and Feinstein, who either now or previously were leaders in that committee, maintain that you were a trusted friend and effective director of security who

served your country well and who should not be incarcerated for

your criminal behavior, largely because you were a valued

security director who was faithful and operated with

distinction.

     But the prosecutors contend that it is precisely this role,

the fact that you were someone who had access to sensitive

nonpublic information and who was acutely aware of the no

contact rules because you were tasked to enforce them, that it

is precisely because of that that your lies are essentially more

culpable than the ordinary case and that this case, this

circumstance warrants a lengthy period of incarceration as a

variance from the guidelines.

     This is an admittedly difficult balance to strike, because

I can see both sides of this argument, and both are credible.

     Here's where I ultimately come down on this, Mr. Wolfe.  I

am not inclined to vary upward from the guidelines, as the

government requests, but I am persuaded that your role as

director of security for the Senate Select Committee on

Intelligence is an aggravating factor with respect to this

particular crime and not a mitigating one.

     Again, I don't doubt the representations that you did a

good job, perhaps even the best job in this role, as a general

matter.  Apparently, you did have access to all kinds of

information, including classified information, and you

safeguarded it, which is an important public service.

1          But in your service as security director, you also had a

2   special obligation to follow the rules that you were tasked with

3   enforcing and to secure even the seemingly insignificant

4   nonclassified, nonpublic logistical information in your

5   possession.  The fact of your role and the duties of your

6   position makes it all the more unfathomable that you were

7   carrying on in this fashion, having regular contact with various

8   reporters in violation of the Senate's rules, over a number of

9   years.

10         And even more important for present purposes, as a

11  government official who worked specifically in the area of

12  information security, you understood the importance of the FBI's

13  investigation into security breaches concerning information that

14  was being transmitted between the Executive Branch and Congress,

15  and you had a solemn obligation to tell the truth when agents

16  questioned you about all this in the context of that

17  investigation.

18         In their main sentencing brief, the prosecutors put it this

19  way:  You were in persistent flagrant violation of the very

20  rules you were charged with helping to enforce, and your long

21  tenure as director of security and your special responsibilities

22  to enforce the media contact rules are offender characteristics

23  highly relevant to an assessment of the gravity of your failure

24  to be candid with the FBI.

25         The Court agrees with this assessment of the significance

of your position when evaluating your culpability in lying to the FBI.  And despite all of the wonderful qualities that I know that you have, based on what your friends and family members and former colleagues say, it is this duplicitousness in carrying on as director of security while simultaneously and clandestinely engaging in security breaches which culminated in the lies to the FBI that bring you here today that, in this Court's view, tips the balance.

Although it wasn't discussed much here today, I also want to explain briefly why this Court is generally unmoved by the kinds of "fall from grace, public shaming is sufficient" types of sentiments that have been expressed in writing to support a nonincarcerative sentence in this case and others like it.  I do accept that, as a factual matter, you have lost a job that you love.  You have faced highly negative media intention.  Your reputation is shattered.  You and your family have been humiliated.  And it will be difficult to return to the status that you once enjoyed.  Your wife's letter lays this all out clearly.  And I understand, these are real circumstances that are unquestionably painful.

But the question for the Court is whether facing such consequences is all that justice requires for the crime that you have committed under the circumstances presented here.  I think not, Mr. Wolfe, and I often explain to defendants who have committed similar crimes my view that those who have a lot to

lose by engaging in criminal behavior and do so anyway have accepted the risk that they will lose everything if they break the law.  Not being able to continue to work in the job that you love, being embarrassed, not having the same standing in the community is not a punishment.  That's the baseline.  It is the natural consequence of having chosen to break the law.  The shame, the stigma, the changed personal and professional circumstances are all truly unfortunate, but they go with the territory.

To put this another way, the more one has to lose, the more reckless it is to engage in behavior that violates the law.  And surely, such defendants can't expect the Court to set aside the legal consequences of their criminal behavior just because they knowingly gambled away the advantages that they had in life.

I also think it's important to recognize in this same vein the inequity that is inherent in the suggestion that a defendant who walks with senators and who has every opportunity to do the right thing, every incentive to conform his behavior to the law should be treated better at sentencing because he has already suffered so much by virtue of having lost the advantages to which he has become accustomed.

This Court routinely sentences people who come from nothing, who have nothing, and whose life circumstances are such that they really don't have a realistic shot of doing anything other than committing crimes.  The unfortunate life

circumstances of those defendants don't result in a lower

penalty.  So why should someone who had every chance of doing

the right thing, a person who society rightly expects to live up

to high moral and ethical standards and who has no excuse for

breaking the law, be treated any better in this regard.

So to the extent that the fall from grace and stigma-type

arguments suggest as much, this Court finds them unpersuasive.

I have taken into account the fact that Mr. Wolfe has suffered

such collateral consequences, but I put no real stock in that.

The third and final factor that I want to discuss orally

this afternoon is Section 3553(a)'s requirement that the Court

consider the need to avoid unwarranted disparities, which is a

factor that is often important in my consideration of how to

sentence a defendant.  Both parties have provided touchtones in

this regard in their sentencing memoranda, and I have looked at

the allegedly comparable cases.

While it is true that certain defendants who have actually

removed classified materials from a secure facility or shared

classified information improperly, such as General Petraeus and

former National Security Advisor Sandy Berger, received

probationary terms, they were not charged with lying to federal

investigators, and their crime of conviction involving the

mishandling of classified information is classified as a

misdemeanor.

In the case of Jeffrey Kahn, which has been mentioned here

1    I believe by both parties, whom I sentenced to one month of

2    imprisonment, the guideline range was driven in part by a loss

3    calculation that was derived from the government's having to

4    redo his work as a background investigator.  And in my view, the

5    nature of his false statements in regard to not having completed

6    his work in actuality when he said he did is markedly different

7    from the nature of the false statement at issue here.

8         The most recent, most analogous cases are those that

9    involve defendants who have faced the same charges and who have

10   the same guideline range and who made false statements under

11   substantially the same circumstances, specifically the Alexander

12   van der Zwaan and George Papadopoulos cases.  Both of these

13   defendants received prison time, Mr. Wolfe, and it is not

14   apparent to the Court that their circumstances, the fact that

15   they had counsel or that their lies consisted of recounting

16   whole narratives and were not immediately abandoned, those

17   circumstances which are highlighted by your counsel in the memo

18   don't really, in my view, appear to make these cases materially

19   different from the circumstances presented here.

20        You made blatant false statements directly to FBI agents

21   who questioned you about matters of significance in the context

22   of an ongoing investigation.  And if anything, the fact that you

23   were a government official tasked with responsibility of

24   protecting government secrets yourself seems to make you more

25   culpable than van der Zwaan or Papadopoulos, who held no such

1    positions.

2         In the final analysis, the Court is compelled to consider

3    what sentence would be sufficient but not greater than necessary

4    to comply with the purposes of punishment that are laid out in

5    the statute at 18 U.S.C. 3553(a).  Senators Burr, Warner, and

6    Feinstein have respectfully posited in their letter that there

7    would be no public utility in depriving you of your freedom by

8    imposing a term of incarceration in this case, and your counsel

9    echoes this sentiment.  The main defense brief argues that,

10   quote, a prison sentence in this context would achieve only

11   purely punitive goals, end quote.

12        These arguments and the applicable statutes raise a

13   significant question.  Would one or more of the listed purposes

14   of punishment be achieved by imposing a term of incarceration in

15   this case?  And for the reasons already discussed, this Court is

16   compelled to answer yes.  Both just punishment and deterrence

17   warrant a term of incarceration in this case.  Lying to the FBI

18   is a serious crime, especially when it is committed by a

19   government official who understands the importance of

20   truthfulness in the context of a national security

21   investigation.

22        Therefore, just punishment requires a serious response to

23   this offense.  Other similar and arguably even less culpable

24   individuals have received prison terms for lying to the FBI.

25   Therefore, a nonincarcerative sentence here would create

unwarranted sentencing disparities in a manner that undermines any notions of seriousness and just punishment.

And perhaps most importantly, there is an acute need for specific and general deterrence, specific because it apparently took you more than one try to finally tell the truth and admit the extent of your contacts with reporters, in violation of the Senate's rules and your own ethical obligations, and general because the public needs to know and understand that when you come into contact with FBI agents who are conducting an investigation, federal law requires you to tell the truth in response to their questions.

We may well be living in an era of alternative facts, but if you propagate falsehoods in response to government investigators, even about things that are not themselves criminal acts, you will be taken seriously and treated seriously because you are committing a serious federal crime.

That is what happened in this case, Mr. Wolfe.  To be clear, you are not accused of having leaked classified information or having provided to reporter contacts any substantive information that was materially detrimental to the interests of the United States.  So in that sense, this case is really not about leaking.  It is about lying.

The guideline range for lying to the FBI under the circumstances presented here is zero to six months, and in this Court's view, lies told by a person in your position under the

circumstances presented here do not warrant zero months of imprisonment, especially given the sentences imposed on similar defendants who did not hold positions of public trust.

Having taken all of the 3553(a) factors into account and especially those I have highlighted here today, this Court believes that a penalty of two months of imprisonment is sufficient but not greater than necessary to reflect the seriousness of the instant false statements offense, to promote deterrence, and to avoid unwarranted sentencing disparities.

And because it is undisputed that you pose a low risk of recidivism, the Court will impose a shorter term of supervised release than the minimum recommended in the sentencing guidelines.  I will impose four months rather than 12 months of supervised release.

Therefore, based on my consideration of all of the 3553(a) factors, I will now state the sentence to be imposed.

Mr. Wolfe, please stand.  It is the judgment of the Court that you, Mr. James Wolfe, are hereby committed to the custody of the Bureau of Prisons for a term of two months of imprisonment on Count 3 of the indictment.  You are further sentenced to serve four months of supervised release on Count 3 and to pay a $100 special assessment.

Because the Court finds that you do have the ability to pay a fine and because 18 U.S.C. 3572(a)(6) requires the Court to consider the expected cost to the government of any imprisonment

1    or supervised release as addressed in paragraph 133 of the

2    presentence report, you are further ordered to pay a fine in the

3    amount of $7,500.  The special assessment and fine are

4    immediately payable to the Clerk of the Court for the U.S.

5    District Court for the District of Columbia.  Within 30 days of

6    any change of address, you shall notify the Clerk of the Court

7    of the change until such time that financial obligation is paid

8    in full.  The Court waives any interest or penalties that may

9    accrue on unpaid balances.

10       Within 72 hours of release from custody, you shall report

11   in person to the probation office in the district to which you

12   are released.  While on supervision, you shall submit to the

13   collection of DNA.  You shall not possess a firearm or other

14   dangerous weapon.  You shall not use or possess an illegal

15   controlled substance.  And you shall not commit another federal,

16   state, or local crime.

17       You shall also abide by the general conditions of

18   supervision adopted by the U.S. Probation Office, as well as the

19   following special condition, which I will state and then

20   describe the reasons for as the D.C. Circuit requires:

21   Community service.  During the period of supervised release, you

22   shall also contribute hours of community service at a rate of no

23   less than 20 hours per month, unless excused from the minimum

24   monthly requirement by the probation office.  The probation

25   office will supervise your participation and approve the

program.  You must provide written verification of completed community service hours to the probation office.

Mr. Wolfe is a good candidate for community service, given his history of volunteering with charities and his skills and experience in doing so, and this condition is reasonably necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

The Court finds that the provision in the standard supervision order for the submission of periodic drug tests is suspended, as Mr. Wolfe is believed to pose a low risk of future substance abuse.

The probation office shall release the presentence investigation report to all appropriate agencies in order to execute the sentence of the Court.  Treatment agencies shall return the presentence report to the probation office upon the defendant's completion or termination from treatment.

Mr. Wolfe, pursuant to 18 U.S.C. 3742, you have the right to appeal the sentence imposed by the Court under the terms, the limited terms of your plea agreement.  If you choose to appeal, you must file an appeal within 14 days after the Court enters judgment.  If you are unable to afford the cost of an appeal, you may request permission from the Court to file an appeal without cost to you.

Let me ask counsel whether there are any objections to the

1    sentence imposed that are not already noted on the record?

2             MS. BALLANTINE:  No objections from the government,

3    your Honor.  Thank you.

4             MR. BURTON:  No, your Honor.  I do have a couple of

5    requests.

6             THE COURT:  All right.  Why don't you make them now.

7             MR. BURTON:  I would ask if the Court would permit

8    self-surrender and also recommend to the Bureau of Prisons that

9    Mr. Wolfe serve his sentence at the minimum security satellite

10   camp at Cumberland, Maryland.

11            THE COURT:  Let me ask the government if they object

12   to either request by the defense.

13            MS. BALLANTINE:  No, your Honor.

14            THE COURT:  All right.  Your request is granted.  The

15   Court will allow Mr. Wolfe to self-surrender.  I find that you

16   meet the relevant statutory factors, given your history of

17   compliance in terms of coming to court, that you won't flee, and

18   that you don't pose a danger to the community.

19        I will also make the requested recommendation regarding

20   placement in terms of the Bureau of Prisons.

21        That concludes the Court's judgment.

22        Mr. Wolfe, I must caution you about your conduct while you

23   are out on supervision prior to voluntary surrender.  You are

24   required to continue to follow the conditions of release that

25   have applied to your case up to this point, as the pretrial

1    services office has directed and will continue to direct.  If

2    you violate any of the conditions of supervision, an arrest

3    warrant may issue, and you may be detained for failing to comply

4    with the conditions of release prior to your voluntary surrender

5    date.

6         Even more importantly, the penalties for failure to

7    surrender for such service are serious.  Such a violation is a

8    separate offense for which you could be sentenced to a fine or

9    imprisonment for up to 10 years or both.

10        Do you understand?

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  All right.  Is there anything else that we

13   need to address today?

14             MR. BURTON:  One other thing.  The government needs to

15   move to dismiss Counts 1 and 2 of the indictment.

16             THE COURT:  Good point.

17             MS. BALLANTINE:  The government hereby moves to

18   dismiss Counts 1 and 2 on the indictment.

19             THE COURT:  Any objection?

20             MR. BURTON:  None.

21             THE COURT:  All right.  The government's motion is

22   granted.  Counts 1 and 2 of the indictment are hereby dismissed.

23        Anything else, Counsel?

24             MR. BURTON:  Not from the defense, your Honor.

25             MS. BALLANTINE:  Not from the government, your Honor.

1          THE COURT:  All right.  Mr. Wolfe, good luck.

2      (Proceedings adjourned at 4:48 p.m.)

3

4  - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

5

6          CERTIFICATE OF OFFICIAL COURT REPORTER

7

8          I, Sara A. Wick, certify that the foregoing is a

9  correct transcript from the record of proceedings in the

10  above-entitled matter.

11

12

13

14  /s/ Sara A. Wick_____          December 29, 2018_____

15  SIGNATURE OF COURT REPORTER          DATE

16

17

18

19

20

21

22

23

24

25